# THE UNITED STATES OF AMERICA

## I-797A | NOTICE OF ACTION | DEPARTMENT OF HOMELAND SECURITY
U.S. CITIZENSHIP AND IMMIGRATION SERVICES

| Receipt Number | | Case Type | |
|---|---|---|---|
| EAC1713950923 | | I129 - PETITION FOR A NONIMMIGRANT WORKER | |
| Received Date | Priority Date | Petitioner | |
| 04/11/2017 | | AXTRIA INC, | |
| Notice Date | Page | Beneficiary | |
| 05/15/2017 | 1 of 2 | KANWAR, SHIKHA | |

AXTRIA INC
c/o MICHAEL EDWARD PISTON
TRANSNATIONAL LEGAL SERVICE PC
1955 W HAMLIN RD STE 100
ROCHESTER MI 48309

**Notice Type:** Approval Notice
Class: H1B
Valid from 10/01/2017 to 09/09/2020

The above petition and change of status have been approved. The status of the named foreign worker(s) in this classification is valid as indicated above. The foreign worker(s) can work for the petitioner, but only as detailed in the petition and for the period authorized. Changes in employment or training may require you to file a new Form I-129 petition. Since this employment or training authorization stems from the filing of this petition, separate employment or training authorization documentation is not required. The I-94 attached below may contain a grace period of up to 10 days before, and up to 10 days after the petition validity period for the following classifications: CW-1, E-1, E-2, E-3, H-1B, H-2B, H-3, L-1A, L-1B, O-1, O-2, P-1, P-2, P-3, TN-1, and TN-2. H-2A nonimmigrants may contain a grace period of up to one week before and 30 days after the petition validity period. The grace period is a period of authorized stay but does not provide the beneficiary authorization to work beyond the petition validity period. The decision to grant a grace period and the length of the granted grace period is discretionary, final and cannot be contested on motion or appeal. Please contact the IRS with any questions about tax withholding.

The petitioner should keep the upper portion of this notice. The lower portion should be given to the worker. He or she should keep the right part with his or her Form I-94, *Arrival-Departure Record*. The I-94 portion should be given to the U.S. Customs and Border Protection when he or she leaves the United States. The left part is for his or her records. A person granted a change of status who leaves the U.S. must normally obtain a visa in the new classification before returning. The left part can be used in applying for the new visa. If a visa is not required, he or she should present it, along with any other required documentation, when applying for reentry in this new classification at a port of entry or pre-flight inspection station. The petitioner may also file Form I-824, *Application for Action on an Approved Application or Petition*, to request that we notify a consulate, port of entry, or pre-flight inspection office of this approval.

The approval of this visa petition does not in itself grant any immigration status and does not guarantee that the alien beneficiary will subsequently be found to be eligible for a visa, for admission to the United States, or for an extension, change, or adjustment of status.

**THIS FORM IS NOT A VISA AND MAY NOT BE USED IN PLACE OF A VISA.**

Please see the additional information on the back. You will be notified separately about any other cases you filed.

Vermont Service Center
U. S. CITIZENSHIP & IMMIGRATION SVC
75 Lower Welden Street
Saint Albans VT 05479-0001
Customer Service Telephone: 800-375-5283



PLEASE TEAR OFF FORM I-94 PRINTED BELOW AND STAPLE TO ORIGINAL I-94 IF AVAILABLE

Detach This Half for Personal Records
**Receipt#** EAC1713950923
**I-94#** 243235915 85
**NAME** KANWAR, SHIKHA
**CLASS** H1B
**VALID FROM** 10/01/2017 **UNTIL** 09/09/2020

**PETITIONER**
AXTRIA INC,
400 CONNELL DRIVE STE 1300
BERKELEY HEIGHTS NJ 07922

243235915 85
**Receipt Number** EAC1713950923
**US Citizenship and Immigration Services**

**I94 Departure Record**
**Petitioner:** AXTRIA INC

| 14. Family Name | |
|---|---|
| KANWAR | |
| 15. First (Given) Name | 16. Date of Birth |
| SHIKHA | 10/09/1989 |
| 17. Country of Citizenship | |
| INDIA | |

# I-797A | NOTICE OF ACTION | DEPARTMENT OF HOMELAND SECURITY
U.S. CITIZENSHIP AND IMMIGRATION SERVICES

| Receipt Number EAC1713950923 | | Case Type I129 - PETITION FOR A NONIMMIGRANT WORKER |
|---|---|---|
| Received Date 04/11/2017 | Priority Date | Petitioner AXTRIA INC, |
| Notice Date 05/15/2017 | Page 2 of 2 | Beneficiary KANWAR, SHIKHA |

The Small Business Regulatory Enforcement and Fairness Act established the Office of the National Ombudsman (ONO) at the Small Business Administration. The ONO assists small businesses with issues related to federal regulations. If you are a small business with a comment or complaint about regulatory enforcement, you may contact the ONO at www.sba.gov/ombudsman or phone 202-205-2417 or fax 202-481-5719.

NOTICE: Although this application or petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify this information before and/or after making a decision on your case so we can ensure that you have complied with applicable laws, rules, regulations, and other legal authorities. We may review public information and records, contact others by mail, the internet or phone, conduct site inspections of businesses and residences, or use other methods of verification. We will use the information obtained to determine whether you are eligible for the benefit you seek. If we find any derogatory information, we will follow the law in determining whether to provide you (and the legal representative listed on your Form G-28, if you submitted one) an opportunity to address that information before we make a formal decision on your case or start proceedings.

Please see the additional information on the back. You will be notified separately about any other cases you filed.

Vermont Service Center
U. S. CITIZENSHIP & IMMIGRATION SVC
75 Lower Welden Street
Saint Albans VT 05479-0001

**Customer Service Telephone: 800-375-5283**



PLEASE TEAR OFF FORM I-94 PRINTED BELOW AND STAPLE TO ORIGINAL I-94 IF AVAILABLE

Detach This Half for Personal Records

Receipt# VOID VOID VOID
I-94#
NAME VOID VOID VOID
CLASS
VALID FROM UNTIL VOID VOID

PETITIONER VOID VOID VOID

VOID VOID VOID

VOID VOID VOID

Receipt Number VOID VOID
US Citizenship and Immigration Services
VOID VOID VOID
I94 Departure Record
Petitioner VOID VOID

14. Family Name
VOID VOID VOID
15. First (Given) Name | 16. Date of Birth
VOID VOID VOID
17. Country of Citizenship VOID VOID

VOID VOID VOID

FORM I-797A [REV. 08/01/16]

## THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.

| Receipt Number | | Case Type | |
|---|---|---|---|
| EAC1713950923 | | I129 - PETITION FOR A NONIMMIGRANT WORKER | |
| **Received Date** | **Priority Date** | **Petitioner** | |
| 04/11/2017 | | AXTRIA INC, | |
| **Notice Date** | **Page** | **Beneficiary** | |
| 04/17/2017 | 1 of 1 | KANWAR, SHIKHA | |

| AXTRIA INC<br>c/o MICHAEL EDWARD PISTON<br>TRANSNATIONAL LEGAL SERVICE PC<br>1955 W HAMLIN RD STE 100<br>ROCHESTER MI 48309 | **Notice Type:** Receipt Notice<br>Amount received: $2460.00 U.S.<br>Class requested: H1B |
|---|---|

We have received the application or petition ("your case") listed above. This notice only shows that your case was filed on the "Received Date" listed above. It does NOT grant you any immigration status or immigration benefit, and it is not evidence that your case is still pending. We will notify you in writing when we make a decision on your case or if we need additional information.

Please save this and any other notices about your case for your records. You should also keep copies of anything you send us, as well as proof of delivery. Have these records available when you contact us about your case.

**If any of the above information is incorrect or you have any questions about the status of your case, please call the USCIS National Customer Service Center (NCSC) at 1-800-375-5283 or visit the USCIS website at www.uscis.gov** (if you are hearing impaired, the NCSC TDD number is 1-800-767-1833). If you call us, please have your Alien Registration Number (A-Number) and/or the receipt number shown above. The receipt number is a tracking number for your case and will help with inquiries.

**Processing time** - Processing times vary by case type. Go to www.uscis.gov to see the current processing times listed by case type and office.

- View your case status on our website's Case Status Online page.
- You can also sign up to receive free email updates as we process your case.
- Most of the time your case is pending, the process status will not change. This is because we are working on cases that were filed before your case.
- When we make a decision on your case or if we need something from you, we will notify you by mail and update our systems.
- If you do not receive an initial decision or update from us within our current processing time, contact the NCSC at 1-800-375-5283 or visit our website at www.uscis.gov.

**If your address changes** - If your mailing address changes while your case is pending, please update your address with us using the Online Change of Address option at www.uscis.gov or by calling the NCSC at 1-800-375-5283. Otherwise, you might not receive notices about this case.

Number of workers: 1

| Name | DOB | COB | Class | Consulate/POE | OCC |
|---|---|---|---|---|---|
| KANWAR, SHIKHA | 10/09/1989 | INDIA | F1 | | 020 |

**Return of Original Documents** - Use Form G-884 to request the return of original documents submitted to establish eligibility for an immigration or citizenship benefit. You only need to submit one Form G-884 if you are requesting multiple documents contained in a single USCIS file. However, if the requested documentation is in more than one USCIS file, you must submit a separate request for each file. (For example: If you wish to obtain your mother's birth certificate and your parents' marriage certificate, both of which are in the USCIS file that pertains to her, submit one Form G-884 with your mother's information.)

**NOTICE:** Under the Immigration and Nationality Act (INA), the information you provide on and in support of applications and petitions is submitted under the penalty of perjury. USCIS and the U.S. Department of Homeland Security reserve the right to verify this information before and/or after making a decision on your case so we can ensure that you have complied with applicable laws, rules, regulations, and other legal authorities. We may review public information and records, contact others by mail, the internet or phone, conduct site inspections of businesses and residences, or use other methods of verification. We will use the information obtained to determine whether you are eligible for the benefit you seek. If we find any derogatory information, we will follow the law in determining whether to provide you (and the legal representative listed on your Form G-28, if you submitted one) an opportunity to address that information before we make a formal decision on your case or start proceedings.

Please see the additional information on the back. You will be notified separately about any other cases you filed.

USCIS/Vermont Service Center
U. S. CITIZENSHIP & IMMIGRATION SVC
75 Lower Welden Street
Saint Albans VT 05479-0001

**Customer Service Telephone: 800-375-5283**





# Petitioner: Axtria, Inc.

Check# _ _006733_ _ for amount of **$2460**

Enclosed covering the below listed fees, for the I-129 petition
for H1 classification of,

Beneficiary Name _ _SHIKHA KANWAR_ _ :


✓ $460      (Filing Fee)
✓ $1500     (Training Fee)
✓ $500      (Fraud Prevention Fee)



# Notice of Entry of Appearance as Attorney or Accredited Representative

**Department of Homeland Security**

**DHS**
**Form G-28**
OMB No. 1615-0105
Expires 03/31/2018

---

## Part 1. Information About Attorney or Accredited Representative

1. USCIS ELIS Account Number (*if any*)
▶ [ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ]

### Name and Address of Attorney or Accredited Representative

2.a. Family Name (*Last Name*) | Piston
2.b. Given Name (*First Name*) | Michael
2.c. Middle Name | Edward
3.a. Street Number and Name | 1955 W. Hamlin Rd
3.b. Apt. [ ] Ste. [X] Flr. [ ] | 100
3.c. City or Town | Rochester Hills
3.d. State | MI   3.e. ZIP Code | 48309
3.f. Province | n/a
3.g. Postal Code | n/a
3.h. Country | USA
4. Daytime Telephone Number | 2488440700
5. Fax Number | 2488440345
6. E-Mail Address (*if any*) | preeti@tnls.com
7. Mobile Telephone Number (*if any*) | 

## Part 2. Notice of Appearance as Attorney or Accredited Representative

This appearance relates to immigration matters before (*Select only one box*):

1.a. [X] USCIS
1.b. List the form numbers | I-129
2.a. [ ] ICE
2.b. List the specific matter in which appearance is entered | 
3.a. [ ] CBP
3.b. List the specific matter in which appearance is entered | 

I enter my appearance as attorney or accredited representative at the request of:

4. Select only one box:
   [ ] Applicant   [X] Petitioner   [ ] Requestor
   [ ] Respondent (ICE, CBP)

### Information About Applicant, Petitioner, Requestor, or Respondent

5.a. Family Name (*Last Name*) | Singh
5.b. Given Name (*First Name*) | Romi
5.c. Middle Name | R
6. Name of Company or Organization (*if applicable*) | Axtria INC

---



Form G-28   05/05/16   Y

## Part 2.  Notice of Appearance as Attorney or Accredited Representative *(continued)*

### *Information About Applicant, Petitioner, Requestor, or Respondent (continued)*

7.  USCIS ELIS Account Number *(if any)*
    ▶ [                    ]

8.  Alien Registration Number (A-Number) or Receipt Number
    [                    ]

9.  Daytime Telephone Number
    [ 9089884690 ]

10. Mobile Telephone Number *(if any)*
    [                    ]

11. E-Mail Address *(if any)*
    [ romi.singh@axtria.com ]

### *Mailing Address of Applicant, Petitioner, Requestor, or Respondent*

**NOTE:** Provide the mailing address of the applicant, petitioner, requestor, or respondent. **Do not** provide the business mailing address of the attorney or accredited representative **unless** it serves as the safe mailing address on the application, petition, or request being filed with this Form G-28.

12.a. Street Number and Name   [ 400 Connell Drive ]

12.b. Apt. [ ]  Ste. [X]  Flr. [ ]  [ 1300 ]

12.c. City or Town   [ Berkeley Heights ]

12.d. State [ NJ ]   12.e. ZIP Code [ 07922 ]

12.f. Province   [ n/a ]

12.g. Postal Code   [ n/a ]

12.h. Country
    [ USA ]

## Part 3.  Eligibility Information for Attorney or Accredited Representative

Select **all applicable** items.

1.a. [X]  I am an attorney eligible to practice law in, and a member in good standing of, the bar of the highest courts of the following states, possessions, territories, commonwealths, or the District of Columbia.  *(If you need additional space, use Part 6.)*

Licensing Authority
[ Michigan Supreme Court ]

1.b. Bar Number *(if applicable)*
[ P34568 ]

1.c. Name of Law Firm
[ TransNational Legal Service PC ]

1.d. **I** *(choose one)* [X] **am not** [ ] **am** subject to any order of any court or administrative agency disbarring, suspending, enjoining, restraining, or otherwise restricting me in the practice of law.  If you are subject to any orders, explain in the space below.  *(If you need additional space, use Part 6.)*
[                    ]

2.a. [ ]  I am an accredited representative of the following qualified nonprofit religious, charitable, social service, or similar organization established in the United States, so recognized by the Department of Justice, Board of Immigration Appeals, in accordance with 8 CFR 292.2.  Provide the name of the organization and the expiration date of accreditation.

2.b. Name of Recognized Organization
[                    ]

2.c. Date accreditation expires
    *(mm/dd/yyyy)* ▶ [                    ]



## Part 3.  Eligibility Information for Attorney or Accredited Representative *(continued)*

**3.** ☐  I am associated with

[                                                    ],

the attorney or accredited representative of record who previously filed Form G-28 in this case, and my appearance as an attorney or accredited representative is at his or her request.

**NOTE:** If you select this item, also complete **Item Numbers 1.a. - 1.b. or Item Numbers 2.a. - 2.c.** in **Part 3.** *(whichever is appropriate).*

**4.a.** ☐  I am a law student or law graduate working under the direct supervision of the attorney or accredited representative of record on this form in accordance with the requirements in 8 CFR 292.1(a)(2)(iv).

**4.b.**  Name of Law Student or Law Graduate

[                                                    ]

## Part 4.  Applicant, Petitioner, Requestor, or Respondent Consent to Representation, Contact Information, and Signature

### Consent to Representation and Release of Information

**1.**  I have requested the representation of and consented to being represented by the attorney or accredited representative named in **Part 1.** of this form.  According to the Privacy Act of 1974 and DHS policy, I also consent to the disclosure to the named attorney or accredited representative of any record pertaining to me that appears in any system of records of USCIS, ICE or CBP.

When you (the applicant, petitioner, requestor, or respondent) are represented, DHS will send notices to both you and your attorney or accredited representative either through mail or electronic delivery.

DHS will also send the Form I-94, Arrival Departure Record, to you **unless** you select **Item Number 2.a.** in **Part 4.**  All secure identity documents and Travel Documents will be sent to you (the applicant, petitioner, requestor, or respondent) at your U.S. mailing address **unless** you ask us to send your secure identity documents to your attorney of record or accredited representative.

If you do not want to receive original notices or secure identity documents directly, but would rather have such notices and documents sent to your attorney of record or accredited representative, please select **all applicable** boxes below:

**2.a.** ☒  I request DHS send any notice (including Form I-94) on an application, petition, or request to the U.S. business address of my attorney of record or accredited representative as listed in this form.  I understand that I may change this election at any future date through written notice to DHS.

**2.b.** ☐  I request that DHS send any secure identity document, such as a Permanent Resident Card, Employment Authorization Document, or Travel Document, that I am approved to receive and authorized to possess, to the U.S. business address of my attorney of record or accredited representative as listed in this form or to a designated military or diplomatic address for pickup in a foreign country (if permitted).  I consent to having my secure identity document sent to my attorney of record or accredited representative's U.S. business address and understand that I may request, at any future date and through written notice to DHS, that DHS send any secure identity document to me directly.

**3.a.**  Signature of Applicant, Petitioner, Requestor, or Respondent

➡ [                                                    ]

**3.b.**  Date of Signature  *(mm/dd/yyyy)* ▶ [03/22/2013]

## Part 5.  Signature of Attorney or Accredited Representative

I have read and understand the regulations and conditions contained in 8 CFR 103.2 and 292 governing appearances and representation before the Department of Homeland Security. I declare under penalty of perjury under the laws of the United States that the information I have provided on this form is true and correct.

**1.**  Signature of Attorney or Accredited Representative

[                                                    ]

**2.**  Signature of Law Student or Law Graduate

[                                                    ]

**3.**  Date of Signature  *(mm/dd/yyyy)* ▶ [03/30/2013]



## Part 6. Additional Information

Use the space provided below to provide additional information pertaining to **Part 3., Item Numbers 1.a. - 1.d.** or to provide your U.S. business address for purposes of receiving secure identity documents for your client (if your client has consented to your receipt of such documents under **Part 4.**)

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____





## Petition for a Nonimmigrant Worker

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-129**
OMB No. 1615-0009
Expires 12/31/2018

| For USCIS Use Only | Receipt | Partial Approval (explain) | Action Block |
|---|---|---|---|
| | | | |

Class: _____
No. of Workers: _____
Job Code: _____
Validity Dates:
From: _____
To: _____

☐ Classification Approved
☐ Consulate/POE/PFI Notified
   At: _____
☐ Extension Granted
☐ COS/Extension Granted

▶ **START HERE - Type or print in black ink.**

### Part 1.  Petitioner Information

If you are an individual filing this petition, complete **Item Number 1.  If you are a company or an organization filing this petition,** complete **Item Number 2.**

**1.  Legal Name of Individual Petitioner**

| Family Name (Last Name) | Given Name (First Name) | Middle Name |
|---|---|---|
| n/a | n/a | n/a |

**2.  Company or Organization Name**

| Axtria INC |
|---|

**3.  Mailing Address of Individual, Company or Organization**

In Care Of Name

| Romi R Singh, Director-Staffing Solutions |
|---|

Street Number and Name | Apt. Ste. Flr. | Number
400 Connell Drive | ☐ ☒ ☐ | 1300

City or Town | State | ZIP Code
Berkeley Heights | NJ | 07922

Province | Postal Code | Country
n/a | n/a | United States

**4.  Contact Information**

Daytime Telephone Number | Mobile Telephone Number | Email Address (if any)
9089884690 | | romi.singh@axtria.com

**5.  Other Information**

Federal Employer Identification Number (FEIN) | Individual IRS Tax Number | U.S. Social Security Number (if any)
▶ 271142668 | ▶ n / a | ▶ n / a

**Part 2.   Information About This Petition** (See instructions for fee information)

1.  **Requested Nonimmigrant Classification** (Write classification symbol):   `H1B`

2.  **Basis for Classification** (select **only one** box):
    - [x] **a.**   New employment.
    - [ ] **b.**   Continuation of previously approved employment without change with the same employer.
    - [ ] **c.**   Change in previously approved employment.
    - [ ] **d.**   New concurrent employment.
    - [ ] **e.**   Change of employer.
    - [ ] **f.**   Amended petition.

3.  **Provide the most recent petition/application receipt number for the beneficiary.  If none exists, indicate "None."**    ► `N` `o` `n` `e`

4.  **Requested Action** (select **only one** box):
    - [ ] **a.**   Notify the office in **Part 4.** so each beneficiary can obtain a visa or be admitted.  (**NOTE:** A petition is not required for E-1, E-2, E-3, H-1B1 Chile/Singapore, or TN visa beneficiaries.)
    - [x] **b.**   Change the status and extend the stay of each beneficiary because the beneficiary(ies) is/are now in the United States in another status (see instructions for limitations).  This is available only when you check "New Employment" in **Item Number 2.**, above.
    - [ ] **c.**   Extend the stay of each beneficiary because the beneficiary(ies) now hold(s) this status.
    - [ ] **d.**   Amend the stay of each beneficiary because the beneficiary(ies) now hold(s) this status.
    - [ ] **e.**   Extend the status of a nonimmigrant classification based on a free trade agreement.  (See Trade Agreement Supplement to Form I-129 for TN and H-1B1.)
    - [ ] **f.**   Change status to a nonimmigrant classification based on a free trade agreement.  (See Trade Agreement Supplement to Form I-129 for TN and H-1B1.)

5.  **Total number of workers included in this petition.**  (See instructions relating to when more than one worker can be included.)    ►

**Part 3.   Beneficiary Information** (Information about the beneficiary/beneficiaries you are filing for.  Complete the blocks below.  Use the Attachment-1 sheet to name each beneficiary included in this petition.)

1.  **If an Entertainment Group, Provide the Group Name**
    `n/a`

2.  **Provide Name of Beneficiary**

    | Family Name (Last Name) | Given Name (First Name) | Middle Name |
    |---|---|---|
    | KANWAR | Shikha | |

3.  **Provide all other names the beneficiary has used.**  Include nicknames, aliases, maiden name, and names from all previous marriages.

    | Family Name (Last Name) | Given Name (First Name) | Middle Name |
    |---|---|---|
    | | | |
    | | | |
    | | | |

4.  **Other Information**

    Date of birth (mm/dd/yyyy)  `10/09/1989`      Gender   [ ] Male   [x] Female      U.S. Social Security Number (if any)  ► `1` `7` `8` `2` `9` `9` `6` `3` `9`

**Part 3.  Beneficiary Information** (Information about the beneficiary/beneficiaries you are filing for.  Complete the blocks below.  Use the Attachment-1 sheet to name each beneficiary included in this petition.) (continued)

Alien Registration Number (A-Number)

▶ A-

Country of Birth

India

Province of Birth

Himachal Pradesh

Country of Citizenship or Nationality

India

**5.  If the beneficiary is in the United States, complete the following:**

Date of Last Arrival (mm/dd/yyyy)

02/07/2017

I-94 Arrival-Departure Record Number

▶ 2 4 3 2 3 5 9 1 5 8 5

Passport or Travel Document Number

J7236128

Date Passport or Travel Document Issued (mm/dd/yyyy)

08/01/2012

Date Passport or Travel Document Expires (mm/dd/yyyy)

07/31/2022

Passport or Travel Document Country of Issuance

India

Current Nonimmigrant Status

F1

Date Status Expires or D/S

(mm/dd/yyyy) D/S

Student and Exchange Visitor Information System (SEVIS) Number (if any)

N0013616518

Employment Authorization Document (EAD) Number (if any)

YSC1790015735

**6.  Current Residential U.S. Address** (if applicable) (do not list a P.O. Box)

Street Number and Name

800 Forest Ave

Apt. Ste. Flr.   Number

[x]  [ ]  [ ]   2C

City or Town

Westfield

State

NJ

ZIP Code

07090

**Part 4.  Processing Information**

1.  If a beneficiary or beneficiaries named in **Part 3.** is/are outside the United States, or a requested extension of stay or change of status cannot be granted, state the U.S. Consulate or inspection facility you want notified if this petition is approved.

**a. Type of Office** (select only one box):   [ ] Consulate   [ ] Pre-flight inspection   [ ] Port of Entry

**b. Office Address** (City)

**c. U.S. State or Foreign Country**

**d. Beneficiary's Foreign Address**

Street Number and Name

2, Main Block, North View, P and T colony, The Mall

Apt.Ste. Flr.   Number

[ ]  [ ]  [ ]

City or Town

Shimla

State

Himachal Pradesh

Province

n/a

Postal Code

171001

Country

India

2.  Does each person in this petition have a valid passport?   [x] Yes   [ ] No.  If no, go to **Part 9.** and type or print your explanation.

## Part 4.  Processing Information (continued)

**3.**   Are you filing any other petitions with this one?

☐ Yes.  If yes, how many? ▶ [        ]          ☒ No

**4.**   Are you filing any applications for replacement/initial I-94, Arrival-Departure Records with this petition?  Note that if the beneficiary was issued an electronic Form I-94 by CBP when he/she was admitted to the United States at an air or sea port, he/she may be able to obtain the Form I-94 from the CBP Website at **www.cbp.gov/i94** instead of filing an application for a replacement/initial I-94.

☐ Yes.  If yes, how many? ▶ [        ]          ☒ No

**5.**   Are you filing any applications for dependents with this petition?

☐ Yes.  If yes, how many? ▶ [        ]          ☒ No

**6.**   Is any beneficiary in this petition in removal proceedings?

☐ Yes.  If yes, proceed to **Part 9.** and list the beneficiary's(ies) name(s).     ☒ No

**7.**   Have you ever filed an immigrant petition for any beneficiary in this petition?

☐ Yes.  If yes, how many? ▶ [        ]          ☒ No

**8.**   Did you indicate you were filing a new petition in **Part 2.**?

☒ Yes.  If yes, answer the questions below.          ☐ No.  If no, proceed to **Item Number 9.**

   **a.**   Has any beneficiary in this petition ever been given the classification you are now requesting within the last seven years?

      ☐ Yes.  If yes, proceed to **Part 9.** and type or print your explanation.     ☒ No

   **b.**   Has any beneficiary in this petition ever been denied the classification you are now requesting within the last seven years?

      ☐ Yes.  If yes, proceed to **Part 9.** and type or print your explanation.     ☒ No

**9.**   Have you ever previously filed a nonimmigrant petition for this beneficiary?

☐ Yes.  If yes, proceed to **Part 9.** and type or print your explanation.     ☒ No

**10.**   If you are filing for an entertainment group, has any beneficiary in this petition not been with the group for at least one year?

☐ Yes.  If yes, proceed to **Part 9.** and type or print your explanation.     ☐ No

**11.a.**   Has any beneficiary in this petition ever been a J-1 exchange visitor or J-2 dependent of a J-1 exchange visitor?

☐ Yes.  If yes, proceed to **Item Number 11.b.**     ☒ No

**11.b.**   If you checked yes in **Item Number 11.a.**, provide the dates the beneficiary maintained status as a J-1 exchange visitor or J-2 dependent.  Also, provide evidence of this status by attaching a copy of either a DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status, a Form IAP-66, or a copy of the passport that includes the J visa stamp.

[                                                                                  ]

## Part 5.  Basic Information About the Proposed Employment and Employer

Attach the Form I-129 supplement relevant to the classification of the worker(s) you are requesting.

**1.**   Job Title                                           **2.**   LCA or ETA Case Number

[ Sr. Associate - Business Operations Analytics ]          [ I-200-17069-878066 ]

## Part 5.  Basic Information About the Proposed Employment and Employer (continued)

3.  Address where the beneficiary(ies) will work if different from address in **Part 1.**

Street Number and Name

| At Axtria's Office at 300 Connell Dr. | Apt. Ste. Flr. ☐ ☒ ☐ | Number | 5000 |

City or Town

| Berkeley Heights | State | NJ | ZIP Code | 07922 |

4.  Did you include an itinerary with the petition?  ☐ Yes  ☒ No

5.  Will the beneficiary(ies) work for you off-site at another company or organization's location?  ☐ Yes  ☒ No

6.  Will the beneficiary(ies) work exclusively in the Commonwealth of the Northern Mariana Islands (CNMI)?  ☐ Yes  ☒ No

7.  Is this a full-time position?  ☒ Yes  ☐ No

8.  If the answer to **Item Number 7.** is no, how many hours per week for the position?  ▶

9.  Wages:  $ 82,500.00  per (Specify hour, week, month, or year)  ▶ year

10.  Other Compensation (Explain)

Standard Benefits

11.  Dates of intended employment  From: (mm/dd/yyyy) 10/01/2017   To: (mm/dd/yyyy) 09/09/2020

12.  Type of Business

Software Development and Business Analytics

13.  Year Established  2009

14.  Current Number of Employees in the United States  179

15.  Gross Annual Income  As of Jan 2017 $38.5M

16.  Net Annual Income

## Part 6.  Certification Regarding the Release of Controlled Technology or Technical Data to Foreign Persons in the United States

(This section of the form is required only for H-1B, H-1B1 Chile/Singapore, L-1, and O-1A petitions.  It is not required for any other classifications.  Please review the Form I-129 General Filing Instructions before completing this section.)

**Select Item Number 1. or Item Number 2. as appropriate.  DO NOT select both boxes.**

With respect to the technology or technical data the petitioner will release or otherwise provide access to the beneficiary, the petitioner certifies that it has reviewed the Export Administration Regulations (EAR) and the International Traffic in Arms Regulations (ITAR) and has determined that:

1.  ☒  A license is not required from either the U.S. Department of Commerce or the U.S. Department of State to release such technology or technical data to the foreign person; or

2.  ☐  A license is required from the U.S. Department of Commerce and/or the U.S. Department of State to release such technology or technical data to the beneficiary and the petitioner will prevent access to the controlled technology or technical data by the beneficiary until and unless the petitioner has received the required license or other authorization to release it to the beneficiary.

## Part 7.  Declaration, Signature, and Contact Information of Petitioner or Authorized Signatory (Read the information on penalties in the instructions before completing this section.)

Copies of any documents submitted are exact photocopies of unaltered, original documents, and I understand that, as the petitioner, I may be required to submit original documents to U.S. Citizenship and Immigration Services (USCIS) at a later date.

I authorize the release of any information from my records, or from the petitioning organization's records that USCIS needs to determine eligibility for the immigration benefit sought.  I recognize the authority of USCIS to conduct audits of this petition using publicly available open source information.  I also recognize that any supporting evidence submitted in support of this petition may be verified by USCIS through any means determined appropriate by USCIS, including but not limited to, on-site compliance reviews.

If filing this petition on behalf of an organization, I certify that I am authorized to do so by the organization.

I certify, under penalty of perjury, that I have reviewed this petition and that all of the information contained in the petition, including all responses to specific questions, and in the supporting documents, is complete, true, and correct.

**1.**    **Name and Title of Authorized Signatory**

Family Name (**Last Name**)

Singh

Given Name (**First Name**)

Romi

Title

Director-Staffing Solutions

**2.**    **Signature and Date**

Signature of Authorized Signatory

Date of Signature
(mm/dd/yyyy)  03/22/2017

**3.**    **Signatory's Contact Information**

Daytime Telephone Number

9089884690

Email Address (if any)

romi.singh@axtria.com

**NOTE:**  If you do not fully complete this form or fail to submit the required documents listed in the instructions, a final decision on your petition may be delayed or the petition may be denied.

## Part 8.   Declaration, Signature, and Contact Information of Person Preparing Form, If Other Than Petitioner

Provide the following information concerning the preparer:

**1.**    **Name of Preparer**

Family Name (**Last Name**)

Pradhan

Given Name (**First Name**)

Preeti

**2.**    **Preparer's Business or Organization Name** (if any)

(If applicable, provide the name of your accredited organization recognized by the Board of Immigration Appeals (BIA).)

TransNational Legal Service PC

**Part 8.  Declaration, Signature, and Contact Information of Person Preparing Form, If Other Than Petitioner** (continued)

3.  **Preparer's Mailing Address**

Street Number and Name

| | Apt. | Ste. | Flr. | Number |
|---|---|---|---|---|

1955 W. Hamlin Rd            ☐   ☒   ☐   100

City or Town: Rochester Hills     State: MI     ZIP Code: 48309

Province: n/a     Postal Code: n/a     Country: United States

4.  **Preparer's Contact Information**

Daytime Telephone Number: 248-844-0700     Fax Number: 248-844-0345     Email Address (if any): preeti@tnls.com

*Preparer's Declaration*

By my signature, I certify, swear, or affirm, under penalty of perjury, that I prepared this petition on behalf of, at the request of, and with the express consent of the petitioner or authorized signatory.  The petitioner has reviewed this completed petition as prepared by me and informed me that all of the information in the form and in the supporting documents, is complete, true, and correct.

5.  **Signature and Date**

Signature of Preparer: *Preeti*     Date of Signature (mm/dd/yyyy): 03/20/2017



# H Classification Supplement to Form I-129

### Department of Homeland Security
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-129**
OMB No. 1615-0009
Expires 12/31/2018

---

**1.** Name of the Petitioner

Axtria INC

**Name of the beneficiary or if this petition includes multiple beneficiaries, the total number of beneficiaries**

**2.a.** Name of the Beneficiary

Shikha KANWAR

**OR**

**2.b.** Provide the total number of beneficiaries

**3.** List each beneficiary's prior periods of stay in H or L classification in the United States for the last six years (beneficiaries requesting H-2A or H-2B classification need only list the last three years). Be sure to only list those periods in which each beneficiary was actually in the United States in an H or L classification. Do not include periods in which the beneficiary was in a dependent status, for example, H-4 or L-2 status.

**NOTE:** Submit photocopies of Forms I-94, I-797, and/or other USCIS issued documents noting these periods of stay in the H or L classification. (If more space is needed, attach an additional sheet.)

| Subject's Name | Period of Stay (mm/dd/yyyy) | |
| --- | --- | --- |
| | From | To |
| None | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**4.** Classification sought (select **only one** box):

- ☒ **a.** H-1B Specialty Occupation
- ☐ **b.** H-1B1 Chile and Singapore
- ☐ **c.** H-1B2 Exceptional services relating to a cooperative research and development project administered by the U.S. Department of Defense (DOD)
- ☐ **d.** H-1B3 Fashion model of distinguished merit and ability
- ☐ **e.** H-2A Agricultural worker
- ☐ **f.** H-2B Non-agricultural worker
- ☐ **g.** H-3 Trainee
- ☐ **h.** H-3 Special education exchange visitor program

**5.** Are you filing this petition on behalf of a beneficiary subject to the Guam-CNMI cap exemption under Public Law 110-229?
☐ Yes  ☒ No

**6.** Are you requesting a change of employer and was the beneficiary previously subject to the Guam-CNMI cap exemption under Public Law 110-229?
☐ Yes  ☒ No

**7.a.** Does any beneficiary in this petition have ownership interest in the petitioning organization?
☐ Yes. If yes, please explain in **Item Number 7.b.**  ☒ No

---

**7.b.**   Explanation

---

## Section 1.   Complete This Section If Filing for H-1B Classification

1.   Describe the proposed duties.

Please see attached petition letter

2.   Describe the beneficiary's present occupation and summary of prior work experience.

Please see attached petition letter

### Statement for H-1B Specialty Occupations and H-1B1 Chile and Singapore

By filing this petition, I agree to, and will abide by, the terms of the labor condition application (LCA) for the duration of the beneficiary's authorized period of stay for H-1B employment.  I certify that I will maintain a valid employer-employee relationship with the beneficiary at all times.  If the beneficiary is assigned to a position in a new location, I will obtain and post an LCA for that site prior to reassignment.

I further understand that I cannot charge the beneficiary the ACWIA fee, and that any other required reimbursement will be considered an offset against wages and benefits paid relative to the LCA.

| Signature of Petitioner | Name of Petitioner | Date (mm/dd/yyyy) |
|---|---|---|
|  | Romi R Singh, Director-Staffing Solutions | 03/22/2017 |

### Statement for H-1B Specialty Occupations and U.S. Department of Defense (DOD) Projects

As an authorized official of the employer, I certify that the employer will be liable for the reasonable costs of return transportation of the alien abroad if the beneficiary is dismissed from employment by the employer before the end of the period of authorized stay.

| Signature of Authorized Official of Employer | Name of Authorized Official of Employer | Date (mm/dd/yyyy) |
|---|---|---|
|  | Romi R Singh, Director-Staffing Solutions | 03/22/2017 |

### Statement for H-1B U.S. Department of Defense Projects Only

I certify that the beneficiary will be working on a cooperative research and development project or a co-production project under a reciprocal government-to-government agreement administered by the U.S. Department of Defense.

| Signature of DOD Project Manager | Name of DOD Project Manager | Date (mm/dd/yyyy) |
|---|---|---|
|  |  |  |

---

## Section 2.   Complete This Section If Filing for H-2A or H-2B Classification

1.   Employment is:  (select **only one** box)

☐ **a.** Seasonal        ☐ **b.** Peak load        ☐ **c.** Intermittent        ☐ **d.** One-time occurrence

2.   Temporary need is:  (select **only one** box)

☐ **a.** Unpredictable        ☐ **b.** Periodic        ☐ **c.** Recurrent annually

---



# H-1B and H-1B1 Data Collection and
# Filing Fee Exemption Supplement

### Department of Homeland Security
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-129**
OMB No. 1615-0009
Expires 12/31/2018

**1.** Name of the Petitioner

Axtria INC

**2.** Name of the Beneficiary

Shikha KANWAR

## Section 1.   General Information

**1.** **Employer Information -** (select all items that apply)

**a.** Is the petitioner an H-1B dependent employer? ☒ Yes ☐ No

**b.** Has the petitioner ever been found to be a willful violator? ☐ Yes ☒ No

**c.** Is the beneficiary an H-1B nonimmigrant exempt from the Department of Labor attestation requirements? ☒ Yes ☐ No

    **c.1.** If yes, is it because the beneficiary's annual rate of pay is equal to at least $60,000? ☒ Yes ☐ No

    **c.2.** Or is it because the beneficiary has a master's degree or higher degree in a specialty related to the employment? ☒ Yes ☐ No

**d.** Does the petitioner employ 50 or more individuals in the United States? ☒ Yes ☐ No

    **d.1.** If yes, are more than 50 percent of those employees in H-1B, L-1A, or L-1B nonimmigrant status? ☐ Yes ☒ No

**2.** **Beneficiary's Highest Level of Education** (select **only one** box)

☐ **a.** NO DIPLOMA

☐ **b.** HIGH SCHOOL GRADUATE DIPLOMA or the equivalent (for example: GED)

☐ **c.** Some college credit, but less than 1 year

☐ **d.** One or more years of college, no degree

☐ **e.** Associate's degree (for example: AA, AS)

☐ **f.** Bachelor's degree (for example: BA, AB, BS)

☒ **g.** Master's degree (for example: MA, MS, MEng, MEd, MSW, MBA)

☐ **h.** Professional degree (for example: MD, DDS, DVM, LLB, JD)

☐ **i.** Doctorate degree (for example: PhD, EdD)

**3.** Major/Primary Field of Study

Master of Science in Business Analytics and Project Management

**4.** Rate of Pay Per Year

$82,500.00/year

**5.** DOT Code

0 2 0

**6.** NAICS Code

5 4 1 5 1 1

## Section 2.   Fee Exemption and/or Determination

In order for USCIS to determine if you must pay the additional **$1,500** or **$750** American Competitiveness and Workforce Improvement Act (ACWIA) fee, answer all of the following questions:

**1.** Are you an institution of higher education as defined in section 101(a) of the Higher Education Act of 1965, 20 U.S.C. 1001(a)? ☐ Yes ☒ No

**2.** Are you a nonprofit organization or entity related to or affiliated with an institution of higher education, as defined in 8 CFR 214.2(h)(19)(iii)(B)? ☐ Yes ☒ No

## Section 2.   Fee Exemption and/or Determination (continued)

3. Are you a nonprofit research organization or a governmental research organization, as defined in 8 CFR 214.2(h)(19)(iii)(C)?  ☐ Yes  ☒ No

4. Is this the second or subsequent request for an extension of stay that this petitioner has filed for this alien?  ☐ Yes  ☒ No

5. Is this an amended petition that does not contain any request for extensions of stay?  ☐ Yes  ☒ No

6. Are you filing this petition to correct a USCIS error?  ☐ Yes  ☒ No

7. Is the petitioner a primary or secondary education institution?  ☐ Yes  ☒ No

8. Is the petitioner a nonprofit entity that engages in an established curriculum-related clinical training of students registered at such an institution?  ☐ Yes  ☒ No

If you answered yes to any of the questions above, you are not required to submit the ACWIA fee for your H-1B Form I-129 petition. If you answered no to all questions, answer **Item Number 9.** below.

9. Do you currently employ a total of 25 or fewer full-time equivalent employees in the United States, including all affiliates or subsidiaries of this company/organization?  ☐ Yes  ☒ No

If you answered yes, to **Item Number 9.** above, you are required to pay an additional ACWIA fee of **$750**. If you answered no, then you are required to pay an additional ACWIA fee of **$1,500**.

**NOTE:** A petitioner seeking initial approval of H-1B nonimmigrant status for a beneficiary, or seeking approval to employ an H-1B nonimmigrant currently working for another employer, must submit an additional **$500** Fraud Prevention and Detection fee. For petitions filed on or after December 18, 2015, an additional fee of **$4,000** must be submitted if you responded yes to **Item Numbers 1.d. and 1.d.1. of Section 1.** of this supplement. This **$4,000** fee was mandated by the provisions of Public Law 114-113.

The Fraud Prevention and Detection Fee and Public Law 114-113 fee do not apply to H-1B1 petitions. **These fees, when applicable, may not be waived.** You must include payment of the fees when you submit this form. Failure to submit the fees when required will result in rejection or denial of your submission. Each of these fees should be paid by separate checks or money orders.

## Section 3.   Numerical Limitation Information

1. Specify the type of H-1B petition you are filing. (select **only one** box):

   ☐ **a.** CAP H-1B Bachelor's Degree   ☐ **c.** CAP H-1B1 Chile/Singapore

   ☒ **b.** CAP H-1B U.S. Master's Degree or Higher   ☐ **d.** CAP Exempt

2. If you answered **Item Number 1.b. "CAP H-1B U.S. Master's Degree or Higher**," provide the following information regarding the master's or higher degree the beneficiary has earned from a U.S. institution as defined in 20 U.S.C. 1001(a):

   **a.** Name of the United States Institution of Higher Education

   | University of Connecticut |

   **b.** Date Degree Awarded   **c.** Type of United States Degree

   | 12/18/2016 |   | Master of Science in Business Analytics and Project Management |

   **d.** Address of the United States institution of higher education

   | Street Number and Name | Apt. | Ste. | Flr. | Number |
   |---|---|---|---|---|
   | 2100 Hillside Rd | ☐ | ☐ | ☐ | |

   | City or Town | State | ZIP Code |
   |---|---|---|
   | Storrs | CT | 06268 |

## Section 3.   Numerical Limitation Information (continued)

3. If you answered **Item Number 1.d. "CAP Exempt,"** you must specify the reason(s) this petition is exempt from the numerical limitation for H-1B classification:

☐ **a.** The petitioner is an institution of higher education as defined in section 101(a) of the Higher Education Act, of 1965, 20 U.S.C. 1001(a).

☐ **b.** The petitioner is a nonprofit entity related to or affiliated with an institution of higher education as defined in 8 CFR 214.2(h)(8)(ii)(F)(2).

☐ **c.** The petitioner is a nonprofit research organization or a governmental research organization as defined in 8 CFR 214.2(h)(8)(ii)(F)(3).

☐ **d.** The beneficiary will be employed at a qualifying cap exempt institution, organization or entity pursuant to 8 CFR 214.2(h)(8)(ii)(F)(4).

☐ **e.** The petitioner is requesting an amendment to or extension of stay for the beneficiary's current H-1B classification.

☐ **f.** The beneficiary of this petition is a J-1 nonimmigrant physician who has received a waiver based on section 214(l) of the Act.

☐ **g.** The beneficiary of this petition has been counted against the cap and **(1)** is applying for the remaining portion of the 6 year period of admission, or **(2)** is seeking an extension beyond the 6-year limitation based upon sections 104(c) or 106(a) of the American Competitiveness in the Twenty-First Century Act (AC21).

☐ **h.** The petitioner is an employer subject to the Guam-CNMI cap exemption pursuant to Public Law 110-229.

## Section 4.   Off-Site Assignment of H-1B Beneficiaries

1. The beneficiary of this petition will be assigned to work at an off-site location for all or part of the period for which H-1B classification sought.   ☐ Yes   ☒ No

   If no, do not complete **Item Numbers 2.** and **3**.

2. Placement of the beneficiary off-site during the period of employment will comply with the statutory and regulatory requirements of the H-1B nonimmigrant classification.   ☐ Yes   ☐ No

3. The beneficiary will be paid the higher of the prevailing or actual wage at any and all off-site locations.   ☐ Yes   ☐ No



Suite 1300
Berkeley Heights, NJ 07922
(908) 988-4690
www.axtria.com

March 27, 2017

Director
United States Department of Homeland Security
Citizenship & Immigration Service
Vermont Service Center

**RE: SHIKHA KANWAR – PETITION FOR CHANGE OF STATUS TO H-1B.**

**POSITION OFFERED: SR. ASSOCIATE-BUSINESS OPERATIONS ANALYTICS**

Dear Director:

## INTRODUCTION:

Axtria is a **Big Data and Analytics company** which combines industry knowledge, analytics and technology to deliver solutions that help our clients make **better data driven decisions**. Axtria partners deeply with clients to accelerate profitable growth by building capabilities and a culture of data-driven decision making. Axtria serves clients with a strong onshore presence, and has built a global delivery model that is committed to delivering high quality, high-impact solutions for our clients and to building a world-class firm with enduring value with efficient execution, innovation and virtualization. We engage with innovative solution design, and our 'everything-as-a-service' approach adapts to our clients' changing business needs – turning services on/off, scaling resources to support product launches, etc.

Our unique team combines real-world business knowledge, a depth of analytical skill, and experience with the latest technologies. Those who excel at Axtria share a number of common qualities- they are smart and have the analytical toolkit to put their intelligence to work. They are passionate about data and analytics, and they are constantly learning – recognizing this drives career development, client value and firm growth. They are entrepreneurial, and are energized by the idea of creating something new. We offer attractive performance-based compensation packages including salary, bonus, profit sharing and stock options. Our staffing model offers a variety of flexible working arrangements. Comprehensive benefits are available including health insurance, life insurance, flex spend, and 401k with company match. Established in 2009, Axtria currently employs almost 180 employees and has annual revenue of about $ 38.5 Million.

We require the services of Shikha Kanwar as a Sr. Associate-Business Operations Analytics.

## JOB DUTIES OF SHIKHA KANWAR AS A SR. ASSOCIATE-BUSINESS OPERATIONS ANALYTICS

1. **Understand the client's business requirement - 10%**
   - Understand the client's requirement and assist in presenting a solution.
   - Evaluate results of experimentally designed tests, and communicate test learning to clients
   - Responsible for Knowledge transfer and arriving at SLAs for steady state
   - Manage communication and client expectations through for each initiative/project;

2. **Analytics Solution Delivery - 75%**
   - Manage concurrent projects ensuring exceptional client satisfaction and on-time delivery
   - Work on projects with peers and senior colleagues to deliver existing analytics solutions for clients.
   - Application of advanced statistical, econometric and optimization models and algorithms to real-world business problems
   - Apply sound data management practices to ensure data consistency, quality and ease of access
   - Develop new statistical models as well as provide analysis using existing models

- Responsible for delivery of assigned module/ components /phases of a project.
- Responsible for Status reporting

3. **Axtria's Capabilities Development. - 15%**
    - Develop and maintain skills to the highest standards to identify best practices and emerging trends in analytics, both within and outside the domain.

## SHIKHA KANWAR'S QUALIFICATIONS:

In light of the above job duties, this position requires a minimum of a bachelor's degree in a field directly related to the specialty or its equivalent in education or work experience. Shikha Kanwar satisfies the requirement for the H-1B specialty occupation as she has Master of Business Analytics and Project Management from University of Connecticut School of Business, USA and a Bachelor of Technology in Electronics and Communication Engineering from India.

An individual without college specialization in one of these areas would be unable to perform the duties expected of him/her and maintain the viability of the company. Consequently, the nature of these duties marks the position as a specialty occupation within the meaning of the definition of the Occupational Outlook Handbook.

## LOCATION OF WORK:

The Establishment, venue and location of the service that will be performed is at **Axtria's Office at 300 Connell Dr., Ste. 5000, Berkeley Heights, NJ 07922**. Upon H1B approval by USCIS, Shikha Kanwar will be part of Axtria's team tasked with the development, implementation, and enhancement of analytics solutions under various Master Services Agreements (MSAs) between Axtria and its clients. There are several active projects at any given time under various MSAs and/or other instruments. Shikha Kanwar's employment with Axtria is not limited to the expiration of any one particular Axtria MSA. Axtria has hundreds of active projects across clients and enclosed are Axtria's agreements with some of these clients which are amended periodically.

## RIGHT TO CONTROL

Shikha Kanwar will be employed by Axtria in valid H-1B status in the U.S. where she will perform professional specialty occupation services in the capacity of **Sr. Associate - Business Operations Analytics**. Axtria will remain Shikha Kanwar's actual employer throughout the term of this service agreement.

Axtria will have a traditional employer-employee relationship with Shikha Kanwar. She will work at our office at **300 Connell Dr., Ste. 5000, Berkeley Heights, NJ 07922** which is leased by Axtria; Shikha Kanwar will work in our offices and report on a regular basis to the President & CEO of Axtria, Inc., through Head of Consulting; her work schedule will be set and performance will be monitored in accordance with the standard company procedures. She will use our tools/instrumentalities, to perform the duties of her employment, and her supervisor will directly review her work-product. Axtria, will claim Shikha Kanwar for tax purposes and provide standard benefits to her, just as it is currently doing for most of our current in house workers. Axtria has agreed to employ Shikha Kanwar, contingent upon approval of this H-1B petition.

## THE FOLLOWING IS AXTRIA INC.'S AGREEMENT WITH SHIKHA KANWAR:

1. Shikha Kanwar will work on a temporary basis, pursuant to the conditions of the H-1B petition.
2. Her job title will be **Sr. Associate-Business Operations Analytics**.
3. Axtria Inc. will be her actual employer and will pay her.
4. Her annual salary paid by Axtria Inc. will be **$82,500.00**
5. Axtria Inc. will be responsible for paying, hiring, firing, supervising and controlling Shikha Kanwar from the corporate office located at **400 Connell Dr., Ste. 1300, Berkeley Heights, NJ 07922**.
6. Axtria reserves the right to assign additional work to Shikha Kanwar as necessary.

Regardless of the terms mentioned above, Axtria reserves the right to terminate the employment with or without cause or advance notice.

We would be grateful if this H-1B petition is approved.

Sincerely,

Romi Singh
Director – Staffing Solutions

OMB Approval: 1205-0310
Expiration Date: 05/31/2018

Labor Condition Application for Nonimmigrant Workers
ETA Form 9035 & 9035E
**U.S. Department of Labor**



### Electronic Filing of Labor Condition Applications
### For The H-1B Nonimmigrant Visa Program

This Department of Labor, Employment and Training Administration (ETA), electronic filing system enables an employer to file a Labor Condition Application (LCA) and obtain certification of the LCA. This Form must be submitted by the employer or by someone authorized to act on behalf of the employer.

A) I understand and agree that, upon my receipt of ETA's certification of the LCA by electronic response to my submission, I must take the following actions at the specified times and circumstances:
- print and sign a hardcopy of the electronically filed and certified LCA;
- maintain a signed hardcopy of this LCA in my public access files;
- submit a signed hardcopy of the LCA to the United States Citizenship and Immigration Services (USCIS) in support of the I-129, on the date of submission of the I-129;
- provide a signed hardcopy of this LCA to each H-1B nonimmigrant who is employed pursuant to the LCA.

☑ Yes ☐ No

B) I understand and agree that, by filing the LCA electronically, I attest that all of the statements in the LCA are true and accurate and that I am undertaking all the obligations that are set out in the LCA (Form ETA 9035E) and the accompanying instructions (Form ETA 9035CP).

☑ Yes ☐ No

C) I hereby choose one of the following options, with regard to the accompanying instructions:

☐ I choose to have the Form ETA 9035CP electronically attached to the certified LCA, and to be bound by the LCA obligations as explained in this form

☑ I choose not to have the Form ETA 9035CP electronically attached to the certified LCA, but I have read the instructions and I understand that I am bound by the LCA obligations as explained in this form

---

ETA Form 9035/9035E Attestation   **FOR DEPARTMENT OF LABOR USE ONLY**   Page 1 of 1

Case Number: ___I-200-17069-878066___   Case Status: ___CERTIFIED___   Period of Employment: ___09/09/2017___ to ___09/09/2020___

OMB Approval: 1205-0310
Expiration Date: 05/31/2018

### Labor Condition Application for Nonimmigrant Workers
### ETA Form 9035 & 9035E
### U.S. Department of Labor



*Please read and review the filing instructions carefully before completing the ETA Form 9035 or 9035E. A copy of the instructions can be found at http://www.foreignlaborcert.doleta.gov/. In accordance with Federal Regulations at 20 CFR 655.730(b), incomplete or obviously inaccurate Labor Condition Applications (LCAs) will not be certified by the Department of Labor. If the employer has received permission from the Administrator of the Office of Foreign Labor Certification to submit this form non-electronically, ALL required fields/items containing an asterisk ( * ) must be completed as well as any fields/items where a response is conditional as indicated by the section ( § ) symbol.*

## A. Employment-Based Nonimmigrant Visa Information

| 1. Indicate the type of visa classification supported by this application *(Write classification symbol):* * | H-1B |
|---|---|

## B. Temporary Need Information

1. Job Title * SR.ASSOCIATE - BUSINESS OPERATIONS ANALYSTICS

| 2. SOC (ONET/OES) code * | 3. SOC (ONET/OES) occupation title * |
|---|---|
| 15-2031 | OPERATIONS RESEARCH ANALYSTS |

| 4. Is this a full-time position? * | Period of Intended Employment | |
|---|---|---|
| ☑ Yes  ☐ No | 5. Begin Date * *(mm/dd/yyyy)* 09/09/2017 | 6. End Date * *(mm/dd/yyyy)* 09/09/2020 |

7. Worker positions needed/basis for the visa classification supported by this application

| 2 | **Total Worker Positions Being Requested for Certification** * |
|---|---|

Basis for the visa classification supported by this application
*(indicate the total workers in each applicable category based on the total workers identified above)*

| 2 | a. New employment * | 0 | d. New concurrent employment * |
|---|---|---|---|
| 0 | b. Continuation of previously approved employment * without change with the same employer | 0 | e. Change in employer * |
| 0 | c. Change in previously approved employment * | 0 | f. Amended petition * |

## C. Employer Information

1. Legal business name * AXTRIA, INC.

2. Trade name/Doing Business As (DBA), if applicable   N/A

3. Address 1 *   400 CONNELL DR, STE 1300

4. Address 2   N/A

| 5. City * BERKELEY HEIGHTS | 6. State * NJ | 7. Postal code * 07922 |
|---|---|---|
| 8. Country * UNITED STATES OF AMERICA | 9. Province N/A | |
| 10. Telephone number * 8779298742 | 11. Extension N/A | |
| 12. Federal Employer Identification Number (FEIN from IRS) * 271142668 | 13. NAICS code (must be at least 4-digits) * 541511 | |

---

ETA Form 9035/9035E       **FOR DEPARTMENT OF LABOR USE ONLY**                    Page 1 of 5

Case Number: ___I-200-17069-878066___   Case Status: ___CERTIFIED___   Period of Employment: ___09/09/2017___ to ___09/09/2020___

OMB Approval: 1205-0310
Expiration Date: 05/31/2018

Labor Condition Application for Nonimmigrant Workers
ETA Form 9035 & 9035E
**U.S. Department of Labor**



---

**D. Employer Point of Contact Information**

__Important Note__: The information contained in this Section must be that of an employee of the employer who is authorized to act on behalf of the employer in labor certification matters. The information in this Section <u>must</u> <u>be</u> different from the agent or attorney information listed in Section E, unless the attorney is an employee of the employer.

| 1. Contact's last (family) name *  SINGH | 2. First (given) name *  ROMI | 3. Middle name(s) *  R |
|---|---|---|
| 4. Contact's job title *  DIRECTOR - STAFFING SOLUTIONS | | |
| 5. Address 1 *  400 CONNELL DR, STE 1300 | | |
| 6. Address 2  N/A | | |
| 7. City *  BERKELEY HEIGHTS | 8. State *  NJ | 9. Postal code *  07922 |
| 10. Country *  UNITED STATES OF AMERICA | 11. Province  N/A | |
| 12. Telephone number *  8779298742 | 13. Extension  N/A | 14. E-Mail address  IMMIGRATION@AXTRIA.COM |

---

**E. Attorney or Agent Information (If applicable)**

| 1. Is the employer represented by an attorney or agent in the filing of this application? *  If "Yes", complete the remainder of Section E below. | ☑ Yes    ☐ No | |
|---|---|---|
| 2. Attorney or Agent's last (family) name §  PISTON | 3. First (given) name §  MICHAEL | 4. Middle name(s) §  EDWARD |
| 5. Address 1 §  1955 WEST HAMLIN ROAD | | |
| 6. Address 2  STE. 100 | | |
| 7. City §  ROCHESTER HILLS | 8. State §  MI | 9. Postal code §  48309 |
| 10. Country §  UNITED STATES OF AMERICA | 11. Province  N/A | |
| 12. Telephone number §  2488440700 | 13. Extension  3 | 14. E-Mail address  PREETI@TNLS.COM |
| 15. Law firm/Business name §  TRANSNATIONAL LEGAL SERVICES, P.C. | 16. Law firm/Business FEIN §  383305483 | |
| 17. State Bar number (only if attorney) §  P34568 | 18. State of highest court where attorney is in good standing (only if attorney) §  MI | |
| 19. Name of the highest court where attorney is in good standing (only if attorney) §  SUPREME COURT | | |

---

ETA Form 9035/9035E          **FOR DEPARTMENT OF LABOR USE ONLY**          Page 2 of 5

Case Number: ___I-200-17069-878066___  Case Status: ___CERTIFIED___  Period of Employment: ___09/09/2017___ to ___09/09/2020___

OMB Approval: 1205-0310
Expiration Date: 05/31/2018

Labor Condition Application for Nonimmigrant Workers
ETA Form 9035 & 9035E
**U.S. Department of Labor**



---

## F. Rate of Pay

| 1. Wage Rate (Required) | 2. Per: (Choose only one) * |
|---|---|
| From: $ _____ 70000.00 _____ * | ☐ Hour ☐ Week ☐ Bi-Weekly ☐ Month ☑ Year |
| To: $ _____ 85000.00 | |

## G. Employment and Prevailing Wage Information

**Important Note**: It is important for the employer to define the place of intended employment with as much geographic specificity as possible. The place of employment address listed below <u>must be a physical location and cannot be a P.O. Box</u>. The employer may use this section to identify up to three (3) physical locations and corresponding prevailing wages covering each location where work will be performed and the electronic system will accept up to 3 physical locations and prevailing wage information. If the employer has received approval from the Department of Labor to submit this form non-electronically and the work is expected to be performed in more than one location, an attachment must be submitted in order to complete this section.

### a. Place of Employment 1

| 1. Address 1 *  300 CONNELL DRIVE, STE 5000 |
|---|

| 2. Address 2 |
|---|

| 3. City *  BERKELEY HEIGHTS | 4. County *  UNION |
|---|---|
| 5. State/District/Territory *  NJ | 6. Postal code *  07922 |

| *Prevailing Wage Information* (corresponding to the place of employment location listed above) | |
|---|---|
| 7. Agency which issued prevailing wage §  N/A | 7a. Prevailing wage tracking number (if applicable) §  N/A |

| 8. Wage level *   ☑ I   ☐ II   ☐ III   ☐ IV   ☐ N/A |
|---|

| 9. Prevailing wage *  $  67829.00 | 10. Per: (Choose only one) *  ☐ Hour ☐ Week ☐ Bi-Weekly ☐ Month ☑ Year |
|---|---|

| 11. Prevailing wage source (Choose only one) *   ☑ OES   ☐ CBA   ☐ DBA   ☐ SCA   ☐ Other |
|---|

| 11a. Year source published *  2016 | 11b. If "OES", and SWA/NPC did not issue prevailing wage OR "Other" in question 11, specify source §  OFLC ONLINE DATA CENTER |
|---|---|

## H. Employer Labor Condition Statements

❗ **Important Note:** In order for your application to be processed, you <u>MUST</u> read Section H of the Labor Condition Application – General Instructions Form ETA 9035CP under the heading "Employer Labor Condition Statements" and agree to all four (4) labor condition statements summarized below:
  (1) **Wages:** Pay nonimmigrants at least the local prevailing wage or the employer's actual wage, whichever is higher, and pay for non-productive time. Offer nonimmigrants benefits on the same basis as offered to U.S. workers.
  (2) **Working Conditions:** Provide working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed.
  (3) **Strike, Lockout, or Work Stoppage:** There is no strike, lockout, or work stoppage in the named occupation at the place of employment.
  (4) **Notice:** Notice to union or to workers has been or will be provided in the named occupation at the place of employment. A copy of this form will be provided to each nonimmigrant worker employed pursuant to the application.

| 1. <u>I have read and agree to</u> Labor Condition Statements 1, 2, 3, and 4 above and as fully explained in Section H of the Labor Condition Application – General Instructions – Form ETA 9035CP. * | ☑ Yes   ☐ No |
|---|---|

---

**FOR DEPARTMENT OF LABOR USE ONLY**

Case Number: _I-200-17069-878066_   Case Status: _CERTIFIED_   Period of Employment: _09/09/2017_ to _09/09/2020_

OMB Approval: 1205-0310
Expiration Date 05/31/2018

Labor Condition Application for Nonimmigrant Workers
ETA Form 9035 & 9035E
**U.S. Department of Labor**



---

## I. Additional Employer Labor Condition Statements – H-1B Employers ONLY

*!* **Important Note:** In order for your H-1B application to be processed, you **MUST** read Section I – Subsection 1 of the Labor Condition Application – General Instructions Form ETA 9035CP under the heading "Additional Employer Labor Condition Statements" and answer the questions below.

### a. Subsection 1

| | |
|---|---|
| 1. Is the employer H-1B dependent? § | ☑ Yes   ☐ No |
| 2. Is the employer a willful violator? § | ☐ Yes   ☑ No |
| 3. If "Yes" is marked in questions I.1 and/or I.2, you must answer "Yes" or "No" regarding whether the employer will use this application <u>ONLY</u> to support H-1B petitions or extensions of status for exempt H-1B nonimmigrants? § | ☑ Yes   ☐ No   ☐ N/A |

If you marked "Yes" to questions I.1 and/or I.2 and "No" to question I.3, you **MUST** read Section I – Subsection 2 of the Labor Condition Application – General Instructions Form ETA 9035CP under the heading "Additional Employer Labor Condition Statements" and indicate your agreement to all three (3) additional statements summarized below.

### b. Subsection 2

   A.  **Displacement:** Non-displacement of the U.S. workers in the employer's workforce
   B.  **Secondary Displacement:** Non-displacement of U.S. workers in another employer's workforce; and
   C.  **Recruitment and Hiring:** Recruitment of U.S. workers and hiring of U.S. workers applicant(s) who are equally or better qualified than the H-1B nonimmigrant(s).

| | |
|---|---|
| 4. <u>I have read and agree</u> to Additional Employer Labor Condition Statements A, B, and C above and as fully explained in Section I – Subsections 1 and 2 of the Labor Condition Application – General Instructions Form ETA 9035CP. § | ☐ Yes   ☐ No |

---

## J. Public Disclosure Information

*!* **Important Note:** You <u>must</u> select from the options listed in this Section.

| | |
|---|---|
| 1.  Public disclosure information will be kept at: * | ☑ Employer's principal place of business<br>☐ Place of employment |

---

## K. Declaration of Employer

*By signing this form, I, on behalf of the employer, attest that the information and labor condition statements provided are true and accurate; that I have read  sections H and I of the Labor Condition Application – General Instructions Form ETA 9035CP, and that I agree to comply with the Labor Condition Statements as set forth in the Labor Condition Application – General Instructions Form ETA 9035CP and with the Department of Labor regulations (20 CFR part 655, Subparts H and I).  I agree to make this application, supporting documentation, and other records available to officials of the Department of Labor upon request during any investigation under the Immigration and Nationality Act. Making fraudulent representations on this Form can lead to civil or criminal action under 18 U.S.C. 1001, 18 U.S.C. 1546, or other provisions of law.*

| 1.  Last (family) name of hiring or designated official * | 2.  First (given) name of hiring or designated official * | 3.  Middle initial * |
|---|---|---|
| SINGH | ROMI | R |

| 4.  Hiring or designated official title * |
|---|
| DIRECTOR-STAFFING SOLUTIONS |

| 5.  Signature * | 6.  Date signed * |
|---|---|
| *[signature]* | 07/22/2017 |

---

OMB Approval: 1205-0310
Expiration Date: 05/31/2018

Labor Condition Application for Nonimmigrant Workers
ETA Form 9035 & 9035E
**U.S. Department of Labor**



---

### L. LCA Preparer

**Important Note.** Complete this section if the preparer of this LCA is a person other than the one identified in either Section D (employer point of contact) or E (attorney or agent) of this application.

| 1. Last (family) name § | 2. First (given) name § | 3. Middle initial § |
|---|---|---|
| RENGARAJ | REVATHY | N/A |

| 4. Firm/Business name § |
|---|
| TRANSNATIONAL LEGAL SERVICES, PC |

| 5. E-Mail address §   REVATHI@TNLS.COM |
|---|

### M.  U.S. Government Agency Use (ONLY)

By virtue of the signature below, the Department of Labor hereby acknowledges the following:

This certification is valid from _____09/09/2017_____ to _____09/09/2020_____.

_Certifying Officer_

| Department of Labor, Office of Foreign Labor Certification | 03/16/2017 |
|---|---|
| | Determination Date (date signed) |

| I-200-17069-878066 | CERTIFIED |
|---|---|
| Case number | Case Status |

*The Department of Labor is not the guarantor of the accuracy, truthfulness, or adequacy of a certified LCA.*

### N. Signature Notification and Complaints

The signatures and dates signed on this form will not be filled out when electronically submitting to the Department of Labor for processing, but **MUST** be complete when submitting non-electronically. If the application is submitted electronically, any resulting certification **MUST** be signed *immediately upon receipt* from the Department of Labor before it can be submitted to USCIS for further processing.

Complaints alleging misrepresentation of material facts in the LCA and/or failure to comply with the terms of the LCA may be filed using the WH-4 Form with any office of the Wage and Hour Division, Employment Standards Administration, U.S. Department of Labor. A listing of the Wage and Hour Division offices can be obtained at http://www.dol.gov/esa.  Complaints alleging failure to offer employment to an equally or better qualified U.S. worker, or an employer's misrepresentation regarding such offer(s) of employment, may be filed with the U.S. Department of Justice, Office of the Special Counsel for Immigration-Related Unfair Employment Practices, 950 Pennsylvania Avenue, NW, Washington, DC, 20530.  Please note that complaints should be filed with the Office of Special Counsel at the Department of Justice only if the violation is by an employer who is H-1B dependent or a willful violator as defined in 20 CFR 655.710(b) and 655.734(a)(1)(ii).

### O.  OMB Paperwork Reduction Act *(1205-0310)*

These reporting instructions have been approved under the Paperwork Reduction Act of 1995.  Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number.  Obligations to reply are mandatory (Immigration and Nationality Act, Section 212(n) and (t) and 214(c).  Public reporting burden for this collection of information, which is to assist with program management and to meet Congressional and statutory requirements is estimated to average 1 hour per response, including the time to review instructions, search existing data sources, gather and maintain the data needed, and complete and review the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the U.S. Department of Labor, Room C-4312, 200 Constitution Ave. NW, Washington, DC 20210.  (Paperwork Reduction Project OMB 1205-0310.)  **Do NOT send the completed application to this address.**

---

ETA Form 9035/9035E       **FOR DEPARTMENT OF LABOR USE ONLY**                       Page 5 of  5

Case Number:____I-200-17069-878066____  Case Status:____CERTIFIED____  Period of Employment:____09/09/2017____ to ____09/09/2020____

# LCA LOG
## 2 Positions

### ETA Case# I-200-17069-878066

List of beneficiaries for whom H1-B petition has been applied for, on the Labor Condition Application **ETA No. I-200-17069-878066** approved for **Axtria Inc.**

**Job Title:**              Sr. Associate – Business Operations Analytics
**Salary Range:**           $70,000 - $85,000 /year
**Place of Employment:**    300 Connell Dr., Ste 5000, Berkeley Heights, NJ 07922

| NAME | TITLE | H1 receipt # |
|---|---|---|
| 1.  Shikha Kanwar | Sr. Associate – Business Operations Analytics | not received yet |
| 2.  Cheng Wang | Sr. Associate – Business Operations Analytics | not received yet |

# University of Connecticut

Be it known that

## Shikha Kanwar

having satisfied the requirements for the Degree of

## Master of Science

in

## Business Analytics and Project Management

has been admitted to that degree with all the related honors, privileges, and obligations. In recognition we present the seal of the University and the signatures as authorized by the Board of Trustees.

_President of the University_

_President of the Board of Trustees_

_Dean, Graduate School_

Given at Storrs, in the State of Connecticut, on the Eighteenth day of December, Two Thousand and Sixteen.



STATE OF CONNECTICUT
Board of Governors for Higher Education

# UNIVERSITY OF CONNECTICUT
STORRS, CONNECTICUT, 06269-4077

2/13/2017
Page 1 of 1

**ISSUED TO STUDENT
IN SEALED ENVELOPE**

Lauren DiGrazia
University Registrar

AN OFFICIAL SIGNATURE IS WHITE WITH
A BLUE BACKGROUND.

Name       : Shikha Kanwar
Student ID : 2330050

---

Send To:  Shikha Kanwar
          9 Owen Street
          Apt.303
          Hartford, CT 06105


- - - - Degrees Awarded - - - - -

Degree     : Master of Science
Confer Date : 2016-12-18
Plan       : Business Analytics and Project Management

- - - - - Beginning of Graduate Record - - - - -

### Fall 2015  (2015-08-31 to 2015-12-20)

| Course | Description | Units | Grade |
|--------|-------------|-------|-------|
| Program : Graduate School | | | |
| Plan | Busn Analytics and Proj Man MS Field of Study | | |
| OPIM 5270 | Intro to Project Mgmt | 3.0 | A- |
| OPIM 5272 | Process Modeling and Data Mgmt | 3.0 | A- |
| OPIM 5505 | Analytical Consulting for Fina | 3.0 | A+ |
| OPIM 5603 | Predictive Modeling | 3.0 | A+ |
| OPIM 5641 | Business Decision Modeling | 3.0 | A |
| TERM GPA : | 4.000    TERM TOTALS : | 15.0 | |
| CUM  GPA : | 4.000    CUM  TOTALS : | 15.0 | |

### Spring 2016  (2016-01-19 to 2016-05-07)

| Course | Description | Units | Grade |
|--------|-------------|-------|-------|
| Program : Graduate School | | | |
| Plan | Busn Analytics and Proj Man MS Field of Study | | |
| MGMT 5670 | Project Leadership and Communi | 3.0 | A- |
| OPIM 5603 | Data Analytics using R | 3.0 | A |
| OPIM 5671 | Data Mining and Business Intel | 3.0 | A+ |
| TERM GPA : | 4.000    TERM TOTALS : | 9.0 | |
| CUM  GPA : | 4.000    CUM  TOTALS : | 24.0 | |

### Summer 2016  (2016-05-09 to 2016-08-26)

| Course | Description | Units | Grade |
|--------|-------------|-------|-------|
| Program : Graduate School | | | |

---

| Plan | : Busn Analytics and Proj Man MS Field of Study | | |
|------|--------|------|------|
| OPIM 5800 | Field Study Internship | 3.0 | S |
| TERM GPA : | 0.000    TERM TOTALS : | 3.0 | |
| CUM  GPA : | 4.000    CUM  TOTALS : | 27.0 | |

### Fall 2016  (2016-08-29 to 2016-12-18)

| Course | Description | Units | Grade |
|--------|-------------|-------|-------|
| OPIM 5500 | Field Study Internship | 0.0 | S |
| Notice | Standard Repeat | | |
| OPIM 5669 | Project Risk and Cost Mgmt | 3.0 | A |
| OPIM 5770 | Adv Busn Analytics and Pro Mana | 3.0 | A+ |
| TERM GPA : | 4.150    TERM TOTALS : | 6.0 | |
| CUM  GPA : | 4.030    CUM  TOTALS : | 33.0 | |

Graduate Career Totals

| CUM GPA : | 4.030    CUM  TOTALS : | 33.0 |
|-----------|------------------------|------|

- - - - - End of Transcript - - - - -



# UCONN
UNIVERSITY OF CONNECTICUT

January 12, 2017

Shikha Kanwar
9 Owen Street
Apt. 303
Hartford, CT 06105

Dear Ms. Kanwar:

I am pleased to certify that you have completed all requirements for the Master of
Science degree in Business Analytics and Project Management, effective
December 18, 2016. Your conferral date for the degree is December 18, 2016.

For your information the graduate commencement ceremony is held once each year in
early May. Information concerning the ceremony is not mailed but is posted to the
Graduate School web site (at http://www.grad.uconn.edu/) by the middle of the preceding
February. This posting contains all of the information and due dates you will need if you
wish to participate in a commencement ceremony. Students completing degrees during
the twelve months preceding the ceremony are eligible to participate.

You have my congratulations and best wishes for the future.

Sincerely,

Kent Holsinger, Ph.D.
Dean


cc:  Jose M. Cruz


The Graduate School
438 WHITNEY ROAD EXTENSION, UNIT 1152
WHETTEN GRADUATE CENTER, 2ND FLOOR
STORRS, CT 06269-1152
PHONE 860.486.3617
FAX 860.486.6739
gradschool@uconn.edu
grad.uconn.edu

An Equal Opportunity Employer

Serial No.: 120252
क्रम संख्या :

Roll No.: 68449
अनुक्रमांक :
Registration No.: 2K8-E&CE-105
पंजीकरण संख्या :

# National Institute of Technology, Hamirpur (Himachal Pradesh)
## Bachelor of Technology

Certified that................**Shikha Kanwar**................has obtained the degree in Bachelor of Technology in ................**Electronics & Communication Engineering**................of the National Institute of Technology, Hamirpur, Himachal Pradesh, after having

passed the Examination for the said degree held in **May, 2012** with a Cummulative Grade Point Average of **7.95** on a 10 point scale.

Given this day, the **13th June 2013**, under the seal of the Institute at Hamirpur (H.P.) in the Republic of India.

## राष्ट्रीय प्रौद्योगिकी संस्थान, हमीरपुर (हिमाचल प्रदेश)
## प्रौद्योगिकी स्नातक

प्रमाणित किया जाता है कि ................**शिखा कंवर**................ ने राष्ट्रीय प्रौद्योगिकी संस्थान, हमीरपुर, हिमाचल प्रदेश, द्वारा ली गई

परीक्षा के आधार पर **मई, 2012** में ................**इलेक्ट्रॉनिक्स एवं संचार अभियांत्रिकी**................ शाखा में प्रौद्योगिकी स्नातक की उपाधि 10 अंकीय मापकम में संचित

कोटि अंक भाध्यम **7.95** से प्राप्त की है।

भारतीय गणतन्त्र के अन्तर्गत हमीरपुर, (हि.प्र.) में आज दिनांक **13 जून 2013** को संस्थान की मुद्रा अंकित यह उपाधि दी गई।

Chairman, Board of Governors
अध्यक्ष, अधिशासक परिषद्

Director & Chairman, Senate
निदेशक एवं अध्यक्ष, अधिषद्

Registrar
कुलसचिव



**OFFICE OF THE DEAN (ACADEMICS)**
**NATIONAL INSTITUTE OF TECHNOLOGY, HAMIRPUR-177 005**
**HIMACHAL PRADESH (INDIA).**
Dean(Academics): +91 1972    254006/25462
Website:http:/www.nith.ac.in/    Fax:+91 1972 223834
AR(Academics)   : +91 1972 254072

## TRANSCRIPT FOR THE ACADEMIC SESSION 2008-2012

## DETAILS OF THE STUDENT

| | |
|---|---|
| **NAME OF THE APPLICANT** | Ms. Shikha Kanwar |
| **FATHER'S NAME** | Sh. V.K. Kanwar |
| **UNIVERSITY CONFERRING DEGREE** | National Institute of Technology, Hamirpur (HP) – 177.005. |
| **INSTITUTION ATTENDED** | National Institute of Technology, Hamirpur (HP) – 177 005. |
| **ENGINEERING MAJOR** | Electronic & Communication Engineering |
| **COURSE PURSUED BY APPLICANT** | Bachelor of Technology |
| **DATE OF COMMENCEMENT OF COURSE** | August – 2008 |
| **DATE OF COMPLETION OF COURSE** | May-2012 |
| **MEDIUM OF INSTRUCTION & EXAM** | English |

**(Prof. Vinod Kapoor),**
**Dean (Academics),**
**NIT, Hamirpur (HP).**        Page 1 of 6



# NATIONAL INSTITUTE OF TECHNOLOGY, HAMIRPUR, HIMACHAL PRADESH (INDIA).

## NORMS OF THE INSTITUTE

To become eligible for the award of degree of "**BACHELOR OF TECHNOLOGY**" a candidate is required to pass all the examinations of each of the eight semesters mentioned below.

## DURATION OF COURSE

The four years course is divided into eight semesters.

| B. Tech. 1st Year | Semester 1 & Semester 2 |
| B. Tech. 2nd Year | Semester 3 & Semester 4 |
| B. Tech. 3rd Year | Semester 5 & Semester 6 |
| B. Tech. 4th Year | Semester 7 & Semester 8 |

## THE GRADING SYSTEM

| LETTER GRADE | GRADE POINTS (NUMERICAL VALUE) | DESCRIPTION OF PERFORMANCE |
|---|---|---|
| A | 10 | Outstanding |
| AB | 09 | Excellent |
| B | 08 | Very Good |
| BC | 07 | Good |
| C | 06 | Average |
| CD | 05 | Below Average |
| D | 04 | Marginal |
| F | 02 | Poor |
| Z | 00 | |

**Pass Grade: SGPI = 4.5, CGPI = 5.0**

SGPI = Semester Grade Point Index.
CGPI = Cumulative Grade Point Index.

## CERTIFICATE

1. The Institute follows absolute grading system, however for the conversion, equivalent percentage marks of CGPI may be considered.
2. She remained Bonafide student of this Institute during her period of studies/stay.
3. Medium of instruction in this institution is English.
4. All transcripts are being issued under the signatures and seal of Dean (Academics), National Institute of Technology, Hamirpur (HP).

(Prof. Vinod Kapoor),
Dean (Academics),
NIT, Hamirpur (HP).          Page 2 of 6



# NATIONAL INSTITUTE OF TECHNOLOGY, HAMIRPUR, HIMACHAL PRADESH (INDIA)-177 005

**DETAILS OF THE SUBJECTS TAUGHT, EXAMINATION SCHEME AND THE GRADES OBTAINED FOR ALL THE COMPLETED SEMESTERS OF THIS DEGREE COURSE:**

**PROGRAMME: Bachelor of Technology**
**DEPARTMENT: Electronic & Communication Engineering**
**December-2008**
**B. Tech. 1st Year (1st Semester) – ROLL NO: 08449**

| Course No. | Course Name | Credits | Grade |
|---|---|---|---|
| BS-104 | Engineering Physics | 04 | BC |
| BS-104 (P) | Engg. Physics Lab. | 01 | B |
| BS-111 | Engg. Mathematics-I | 04 | B |
| ES-101 | Engg. Mechanics & Strength of Materials | 05 | C |
| ES-102 | Basic Electrical Engg. | 04 | BC |
| ES-102 (P) | Basic Electrical Engg. Lab. | 01 | BC |
| HU-101 | Communication Skills | 03 | B |
| HU-101 (P) | Communication Skills Lab. | 01 | BC |
| TA-102 | Computer Fundamentals & Prog. | 04 | C |
| TA-102 (P) | Computer Fundamentals & Prog. Lab. | 01 | BC |
| WP-111 | Workshop-I | 03 | AB |

| CURRENT SEMESTER PERFORMANCE | | | CUMULATIVE PERFORMANCE | | |
|---|---|---|---|---|---|
| CREDITS | EARNED GRADE POINTS | SGPI | EARNED CREDITS | EARNED GRADE POINTS | CGPI |
| 31 | 222 | 7.16 | 31 | 222 | 7.16 |

**PROGRAMME: Bachelor of Technology**
**Department : Electronic & Communication Engineering**
**May-2009**
**B. Tech. 1st Year (2nd. Semester) – ROLL NO: 08449**

| Course No. | Course Name | Credits | Grade |
|---|---|---|---|
| BS-103 | Engg. Chemistry | 04 | B |
| BS-103 (P) | Engg. Chemistry Lab. | 02 | AB |
| BS-105 | Material Science | 04 | AB |
| BS-105 (P) | Material Science Lab. | 01 | BC |
| BS-122 | Engg. Mathematics-II | 04 | B |
| ES-103 | Basic Electronics Engg. | 04 | BC |
| ES-103 (P) | Basic Electronics Lab. | 01 | BC |
| ES-104 | Basic Thermodynamics | 04 | BC |
| TA-101 | Engg. Graphics | 03 | C |
| WP-122 | Workshop-II | 03 | AB |

| CURRENT SEMESTER PERFORMANCE | | | CUMULATIVE PERFORMANCE | | |
|---|---|---|---|---|---|
| CREDITS | EARNED GRADE POINTS | SGPI | EARNED CREDITS | EARNED GRADE POINTS | CGPI |
| 30 | 233 | 7.77 | 61 | 455 | 7.46 |



**(Prof. Vinod Kapoor),**
**Dean (Academics),**
**NIT, Hamirpur (HP).**

Page 3 of 6



# NATIONAL INSTITUTE OF TECHNOLOGY, HAMIRPUR, HIMACHAL PRADESH (INDIA)-177 005.

**DETAILS OF THE SUBJECTS TAUGHT, EXAMINATION SCHEME AND THE GRADES OBTAINED FOR ALL THE COMPLETED SEMESTERS OF THIS DEGREE COURSE:**

**PROGRAMME: Bachelor of Technology**
**DEPARTMENT: Electronic & Communication Engineering**
**December – 2009**
**Tech. 2nd Year (3rd Semester) – ROLL NO: 08449**

| Course No. | Course Name | Credits | Grade |
|---|---|---|---|
| BS-237 | Differetial Equotations, Probability & Queuing | 04 | B |
| ECA-231 | Extra Curricular Activity-I | 01 | BC |
| ECE-231 | Digital Electronics & Logic Design | 04 | C |
| ECE-231 (P) | Digital Electronics & Logic Design  (P) | 01 | BC |
| ECE-232 | Analog Electronic Circuits | 04 | BC |
| ECE-232 (P) | Analog Electronic Circuits Lab | 01 | B |
| ECE-233 | Electromagnatic Field Theory | 03 | AB |
| EE-231 | Electric Circuit  Theory | 04 | C |
| EE-231(P) | Electric Circuit Theory (P) | 01 | B |

| CURRENT SEMESTER PERFORMANCE | | | CUMULATIVE PERFORMANCE | | |
|---|---|---|---|---|---|
| CREDITS | EARNED GRADE POINTS | SGPI | EARNED CREDITS | EARNED GRADE POINTS | CGPI |
| 23 | 165 | 7.17 | 84 | 620 | 7.38 |

**PROGRAMME: Bachelor of Technology**
**DEPARTMENT: Electronic & Comm. Engg.**
**May – 2010**
**B. Tech. 2nd Year (4th Semester) – ROLL NO: 08449**

| Course No. | Course Name | Credits | Grade |
|---|---|---|---|
| CSE-243 | Data Structures | 04 | BC |
| CSE-243(P) | Data Structures Lab | 01 | BC |
| ECA-242 | Extra Curricular Activity-II | 01 | B |
| ECE-241 | Electronic Measurement & Instrumentation | 04 | B |
| ECE-241(P) | Electronic Measurement & Instrumentation Lab. | 01 | B |
| ECE-242 | Communication Theory | 04 | BC |
| ECE-243 | Micro Electronics Technology | 04 | AB |
| HU-202 | Engineering Economics | 04 | B |

| CURRENT SEMESTER PERFORMANCE | | | CUMULATIVE   PERFORMANCE | | |
|---|---|---|---|---|---|
| CREDITS | EARNED GRADE POINTS | SGPI | EARNED CREDITS | EARNED GRADE POINTS | CGPI |
| 23 | 179 | 7.78 | 107 | 799 | 7.47 |



**(Prof. Vinod Kapoor),**
**Dean (Academics),**
**NIT, Hamirpur (HP).**

Page 4 of 6



# NATIONAL INSTITUTE OF TECHNOLOGY, HAMIRPUR, HIMACHAL PRADESH (INDIA)-177 005.

**DETAILS OF THE SUBJECTS TAUGHT, EXAMINATION SCHEME AND THE GRADES OBTAINED FOR ALL THE COMPLETED SEMESTERS OF THIS DEGREE COURSE:**

**PROGRAMME: Bachelor of Technology**
**DEPARTMENT: Electronic & Comm. Engg.**
**December – 2010**
**B. Tech. 3rd Year (5th Semester) – ROLL NO: 08449**

| Course No. | Course Name | Credits | Grade |
|---|---|---|---|
| EC-351 | Microprocessor & Its Applications | 04 | AB |
| EC-351 (P) | Microprocessor Lab. | 01 | AB |
| EC-352 | Communication Systems | 04 | A |
| EC-352(P) | Communication Systems Lab | 01 | A |
| EC-353 | Design of Linear Integrated Circuits | 04 | BC |
| EC-353 (P) | Linear Integrated Circuits Lab. | 01 | AB |
| EC-354 | Power Electronics | 03 | BC |
| EC-354(P) | Power Electronics Lab | 01 | AB |
| EC-355 | VLSI Technology | 03 | B |
| ENE-300 (b) | Energy & Environment | 03 | AB |

**CURRENT SEMESTER PERFORMANCE**  **CUMULATIVE PERFORMANCE**

| CREDITS | EARNED GRADE POINTS | SGPI | EARNED CREDITS | EARNED GRADE POINTS | CGPI |
|---|---|---|---|---|---|
| 25 | 213 | 8.52 | 132 | 1012 | 7.67 |

**PROGRAMME: Bachelor of Technology**
**DEPARTMENT: Electronic & Comm. Engg.**
**May – 2011**
**B. Tech. 3rd Year (6th Semester) – ROLL NO: 08449**

| Course No. | Course Name | Credits | Grade |
|---|---|---|---|
| EC-361 | Design of Digital Communication Systems | 04 | A |
| EC-361(P) | Digital Communication Lab | 01 | AB |
| EC-362 | Wave Propagation & Antenna Design | 04 | AB |
| EC-363 | MEMS & Sensor Design | 04 | B |
| EC-363(P) | MEMS & Sensor Design Lab | 01 | AB |
| EC-364 | Microcontroller & Embedded System Design | 03 | B |
| EC-364 (P) | Embedded System Lab | 01 | AB |
| EC-366 | Minor Project | 02 | AB |
| ENE-300 (c ) | Environmental Science & Engineering | 03 | B |
| MSS-301 | Principles of Management | 03 | BC |

**CURRENT SEMESTER PERFORMANCE**  **CUMULATIVE PERFORMANCE**

| CREDITS | EARNED GRADE POINTS | SGPI | TOTAL CREDITS | EARNED GRADE POINTS | CGPI |
|---|---|---|---|---|---|
| 26 | 222 | 8.54 | 158 | 1234 | 7.81 |

**(Prof. Vinod Kapoor),**
**Dean (Academics),**
**NIT, Hamirpur (HP).**



## NATIONAL INSTITUTE OF TECHNOLOGY, HAMIRPUR, HIMACHAL PRADESH (INDIA).

**DETAILS OF THE SUBJECTS TAUGHT, EXAMINATION SCHEME AND THE GRADES OBTAINED FOR ALL THE COMPLETED SEMESTERS OF THIS DEGREE COURSE:**

### PROGRAMME: Bachelor of Technology
### DEPARTMENT: Electronic & Comm. Engg.

#### December – 2011
#### B. Tech. 4th Year (7th Semester) – ROLL NO: 08449

| Course No. | Course Name | Credits | Grade |
|---|---|---|---|
| EC-471 (a) | Satellite Communication | 03 | BC |
| EC-471 (P) | LAB-1 | 01 | B |
| EC-472 (b) | Mobile Communication | 03 | A |
| EC-473 (b) | Device Modelling for Circuit Simulation | 03 | B |
| EC-474 (a) | Digital Signal Processing | 03 | BC |
| EC-475 (a) | Analysis & Design of Biomedical Electronics | 03 | AB |
| EC-479 (P) | Lab-2 (VHDL) | 01 | B |
| EC-496 (P) | Industrial Training Viva | 02 | A |
| EC-497 (P) | Seminar | 02 | B |
| EC-498 (P) | Major Project-I | 03 | B |

| CURRENT SEMESTER PERFORMANCE | | | CUMULATIVE PERFORMANCE | | |
|---|---|---|---|---|---|
| CREDITS | EARNED GRADE POINTS | SGPI | TOTAL CREDITS | EARNED GRADE POINTS | CGPI |
| 24 | 199 | 8.29 | 182 | 1433 | 7.87 |

**PROGRAMME: Bachelor of Technology   DEPARTMENT: Electronic & Comm. Engg.**

#### May – 2012
#### B. Tech. 4th Year (8th Semester) – ROLL NO: 08449

| Course No. | Course Name | Credits | Grade |
|---|---|---|---|
| EC-481 | Microwave Devices & Design of Microwave Systems | 03 | AB |
| EC-481 (P) | Microwave Lab | 01 | AB |
| EC-482 | Optical Fiber Communication Systems & its Design | 04 | B |
| EC-482 (P) | Optical Fiber Communication Lab | 01 | B |
| EC-483 | VLSI Design Techniques | 03 | AB |
| EC-483 (P) | VLSI Design Lab | 01 | B |
| EC-484 | Spread Spectrum & CDMA | 03 | B |
| EC-485 | Wireless Communication | 03 | AB |
| EC-499 | Major Project-II | 03 | AB |

| CURRENT SEMESTER PERFORMANCE | | | CUMULATIVE PERFORMANCE | | |
|---|---|---|---|---|---|
| CREDITS | EARNED GRADE POINTS | SGPI | EARNED CREDITS | EARNED GRADE POINTS | CGPI |
| 22 | 189 | 8.59 | 204 | 1622 | 7.95 |

Sket.

**(Prof. Vinod Kapoor),
Dean (Academics),
NIT, Hamirpur (HP).**

Page 6 of 6



SALES - MARKETING

August 24, 2015

### EXPERIENCE CERTIFICATE

This is to certify that Ms. Shikha Kanwar (6864) has served in our organization from January 07, 2013 to July 31, 2015. At the time of leaving she was working in the capacity of Business Associate Consultant and based at New Delhi office.

We wish you all success in future endeavors.

For ZS Associates India Pvt Ltd

Abhijit Nimgaonkar
Office Managing Principal

**ZS Associates India Private Limited**
A Subsidiary of ZS Associates International, Inc. CIN - U72200PN2004FTC020841

Registered Office:
Magarpatta Cybercity, Tower 12, Level 6
Hadapsar, Pune - 411013, Maharashtra, India
T | +91 20 6606 5000   F | +91 20 6606 5001
www.zsassociates.com

Branch Office:
3rd to 8th floors, Block-A4, IT/ITEs SEZ of DLF Limited
Village - Silokhera, Sec-30, Gurgaon (Haryana) 122002 India
T | +91 124 679 7000   F | +91 124 679 7001

 **ZS**

August 24, 2015

Shikha Kanwar
Emp No: 6864
ZS Associates India Pvt Ltd

Ms. Shikha Kanwar,

This refers to your letter of resignation. Your resignation has been accepted and you are released from the services of ZS Associates India with effect from **July 31, 2015** which was your last working day with us.

On behalf of ZS Associates India Pvt Ltd, and your colleagues, we would like to thank you for your contribution to the company and we also wish you all the best for the future.

For ZS Associates India Pvt Ltd

Abhijit Nimgaonkar
Office Managing Principal

**ZS Associates India Private Limited**
A Subsidiary of ZS Associates International, Inc. CIN - U72200PN2004FTC020841

Registered Office:
Magarpatta Cybercity, Tower 12, Level 6
Hadapsar, Pune - 411013, Maharashtra, India
T | +91 20 6606 5000   F | +91 20 6606 5001
www.zsassociates.com

Branch Office:
3rd to 8th floors, Block-A4, IT/ITEs SEZ of DLF Limited
Village - Silokhera, Sec-30, Gurgaon (Haryana) 122002 India
T | +91 124 679 7000   F | +91 124 679 7001



Open Information

| Date | Reference |
|---|---|
| 01/30/2013 | EGI/H-13:0176 Uen |
| Your Date | Your Reference |

Attending to this matter
GR/EIL/HRS Ashish Saxena/VJ

**TO WHOM SO EVER IT MAY CONCERN**

This is to certify that Shikha Kanwar (EGIL19394) was employed with Ericsson India Global Services Pvt Ltd since 10/04/2012 till 01/04/2013. She was working as Graduate Engineer Trainee at the time of leaving the Company.

She resigned from the services of the Company and left on her own accord. She was relieved from the Company on 01/04/2013.

We wish her all the best in her future endeavors.

For ERICSSON INDIA GLOBAL SERVICES PVT. LTD.

Ashish Saxena
Head HR SSC
HR & O

**Ericsson India Global Services Private Limited**

Knowledge Boulevard,

A-8A, Sector 62A. NOIDA

INDIA - 201 309

**www.ericsson.co.in / www.ericsson.com**

Tel: + 91 120 3029200

Tel: + 91 120 4256000

Fax: + 91 120 3029135

Registered Office

4th Floor, Dakha House

18/17, W.E.A., Pusa Lane,

Karol Bagh,

New Delhi 110 005 INDIA

Department of Homeland Security
U.S. Immigration and Customs Enforcement

I-20, Certificate of Eligibility for Nonimmigrant Student Status
OMB NO. 1653-0038

## SEVIS ID: N0013616518

| | | Class of Admission |
|---|---|---|
| **SURNAME/PRIMARY NAME** Kanwar | **GIVEN NAME** Shikha | **F-1** |
| **PREFERRED NAME** Shikha Kanwar | **PASSPORT NAME** | |
| **COUNTRY OF BIRTH** INDIA | **COUNTRY OF CITIZENSHIP** INDIA | |
| **DATE OF BIRTH** 09 OCTOBER 1989 | **ADMISSION NUMBER** 97959018830 | **ACADEMIC AND LANGUAGE** |
| **FORM ISSUE REASON** CONTINUED ATTENDANCE - Updated Form I-20 or Name Conversion | **LEGACY NAME** Shikha Kanwar | |

## SCHOOL INFORMATION

| | |
|---|---|
| **SCHOOL NAME** University of Connecticut Graduate Business Learning Center | **SCHOOL ADDRESS** 100 Constitution Plaza, Hartford, CT 06103 |
| **SCHOOL OFFICIAL TO CONTACT UPON ARRIVAL** Neena Kapoor International Adviser | **SCHOOL CODE AND APPROVAL DATE** BOS214F10146008 29 JANUARY 2003 |

## PROGRAM OF STUDY

| | | |
|---|---|---|
| **EDUCATION LEVEL** MASTER'S | **MAJOR 1** Management Science 52.1301 | **MAJOR 2** None 00.0000 |
| **PROGRAM ENGLISH PROFICIENCY** Required | **ENGLISH PROFICIENCY NOTES** Student is proficient | **EARLIEST ADMISSION DATE** 01 AUGUST 2015 |
| **START OF CLASSES** 31 AUGUST 2015 | **PROGRAM START/END DATE** 31 AUGUST 2015 - 06 MAY 2017 | |

## FINANCIALS

| ESTIMATED AVERAGE COSTS FOR: 9 MONTHS | | STUDENT'S FUNDING FOR: 9 MONTHS | |
|---|---|---|---|
| Tuition and Fees | $ 14,850 | Personal Funds | $ 36,097 |
| Living Expenses | $ 21,247 | Funds From This School | $ |
| Expenses of Dependents (0) | $ 0 | Funds From Another Source | $ |
| Other | $ | On-Campus Employment | $ |
| TOTAL | $ 36,097 | TOTAL | $ 36,097 |

## REMARKS

CPT authorized from 8/29/16-12/02/16

## SCHOOL ATTESTATION

I certify under penalty of perjury that all information provided above was entered before I signed this form and is true and correct. I executed this form in the United States after review and evaluation in the United States by me or other officials of the school of the student's application, transcripts, or other records of courses taken and proof of financial responsibility, which were received at the school prior to the execution of this form. The school has determined that the above named student's qualifications meet all standards for admission to the school and the student will be required to pursue a full program of study as defined by 8 CFR 214.2(f)(6). I am a designated school official of the above named school and am authorized to issue this form.

| X | DATE ISSUED | PLACE ISSUED |
|---|---|---|
| SIGNATURE OF: Neena Kapoor, International Adviser | 18 August 2016 | Hartford, CT |

## STUDENT ATTESTATION

I have read and agreed to comply with the terms and conditions of my admission and those of any extension of stay. I certify that all information provided on this form refers specifically to me and is true and correct to the best of my knowledge. I certify that I seek to enter or remain in the United States temporarily, and solely for the purpose of pursuing a full program of study at the school named above. I also authorize the named school to release any information from my records needed by DHS pursuant to 8 CFR 214.3(g) to determine my nonimmigrant status. **Parent or guardian, and student, must sign if student is under 18.**

| X | 09/12/2016 |
|---|---|
| SIGNATURE OF: Shikha Kanwar | DATE |

| X | | | |
|---|---|---|---|
| NAME OF PARENT OR GUARDIAN | SIGNATURE | ADDRESS (city/state or province/country) | DATE |

ICE Form I-20 (3/31/2018)

Page 1 of 3

**Department of Homeland Security**
U.S. Immigration and Customs Enforcement

I-20, Certificate of Eligibility for Nonimmigrant Student Status
OMB NO. 1653-0038

---

## SEVIS ID: N0013616518 (F-1)          NAME: Shikha Kanwar

### EMPLOYMENT AUTHORIZATIONS

| TYPE | FULL/PART-TIME | STATUS | START DATE | END DATE |
|------|----------------|--------|------------|----------|
| CPT | FULL TIME | APPROVED | 06 JUNE 2016 | 19 AUGUST 2016 |
| CPT | PART TIME | APPROVED | 29 AUGUST 2016 | 02 DECEMBER 2016 |

### EMPLOYER INFORMATION

| TYPE | | AUTHORIZATION DATES | |
|------|--|---------------------|--|
| CPT | | 06 JUNE 2016 – 19 AUGUST 2016 | |
| **EMPLOYER NAME** | **START DATE** | **END DATE** | **CITY & STATE** |
| Symphony Health Solutions | 06 JUNE 2016 | 19 AUGUST 2016 | CONSHOHOCKEN, PA |

| TYPE | | AUTHORIZATION DATES | |
|------|--|---------------------|--|
| CPT | | 29 AUGUST 2016 – 02 DECEMBER 2016 | |
| **EMPLOYER NAME** | **START DATE** | **END DATE** | **CITY & STATE** |
| Symphony Health Solutions | 29 AUGUST 2016 | 02 DECEMBER 2016 | Conshohocken, PA |

### CHANGE OF STATUS/CAP-GAP EXTENSION

### AUTHORIZED REDUCED COURSE LOAD

### CURRENT SESSION DATES

| CURRENT SESSION START DATE | CURRENT SESSION END DATE |
|----------------------------|--------------------------|
| 29 AUGUST 2016 | 07 MAY 2016 |

### TRAVEL ENDORSEMENT

This page, when properly endorsed, may be used for re-entry of the student to attend the same school after a temporary absence from the United States. Each endorsement is valid for one year.

| Designated School Official | TITLE | SIGNATURE | DATE ISSUED | PLACE ISSUED |
|----------------------------|-------|-----------|-------------|--------------|
| Meena Kapoor | Int'l Advisor | X _(signature)_ | 8/18/16 | Storrs CT |
| | | X | | |
| | | X | | |
| | | X | | |

---

ICE Form I-20 (3/31/2018)

Department of Homeland Security
U.S. Immigration and Customs Enforcement

I-20, Certificate of Eligibility for Nonimmigrant Student Status
OMB NO. 1653-0038

## SEVIS ID: N0013616518

| | | |
|---|---|---|
| **SURNAME/PRIMARY NAME**<br>Kanwar | **GIVEN NAME**<br>Shikha | **Class of Admission** |
| **PREFERRED NAME**<br>Shikha Kanwar | **PASSPORT NAME** | **F-1** |
| **COUNTRY OF BIRTH**<br>INDIA | **COUNTRY OF CITIZENSHIP**<br>INDIA | |
| **DATE OF BIRTH**<br>09 OCTOBER 1989 | **ADMISSION NUMBER** | **ACADEMIC AND LANGUAGE** |
| **FORM ISSUE REASON**<br>CONTINUED ATTENDANCE | **LEGACY NAME**<br>Shikha Kanwar | |

### SCHOOL INFORMATION

**SCHOOL NAME**
University of Connecticut
Graduate Business Learning Center

**SCHOOL ADDRESS**
100 Constitution Plaza, Hartford, CT 06103

**SCHOOL OFFICIAL TO CONTACT UPON ARRIVAL**
Neena Kapoor
International Adviser

**SCHOOL CODE AND APPROVAL DATE**
BOS214F10014008
28 JANUARY 2003

### PROGRAM OF STUDY

**EDUCATION LEVEL**
MASTER'S

**MAJOR 1**
Management Science 52.1301

**MAJOR 2**
None 30.0000

**PROGRAM ENGLISH PROFICIENCY**
Required

**ENGLISH PROFICIENCY NOTES**
Student is proficient

**EARLIEST ADMISSION DATE**
01 AUGUST 2015

**START OF CLASSES**
31 AUGUST 2015

**PROGRAM START/END DATE**
31 AUGUST 2015 - 18 DECEMBER 2016

### FINANCIALS

| ESTIMATED AVERAGE COSTS FOR: 9 MONTHS | | STUDENT'S FUNDING FOR: 9 MONTHS | |
|---|---|---|---|
| Tuition and Fees | $ 14,850 | Personal Funds | $ 36,097 |
| Living Expenses | $ 21,247 | Funds From This School | $ |
| Expenses of Dependents (0) | $ 0 | Funds From Another Source | $ |
| Other | $ | On-Campus Employment | $ |
| TOTAL | $ 36,097 | TOTAL | $ 36,097 |

### REMARKS

Program shortened to actual completion date. Post-completion OPT recommended from 1/16/17 to 1/15/18 to seek employment in Business Analytics & Project Management and apply principles gained in program.

### SCHOOL ATTESTATION

I certify under penalty of perjury that all information provided above was entered before I signed this form and is true and correct. I executed this form in the United States after review and evaluation in the United States by me or other officials of the school of the student's application, transcripts, or other records of courses taken and proof of financial responsibility, which were received at the school prior to the execution of this form. The school has determined that the above named student's qualifications meet all standards for admission to the school and the student will be required to pursue a full program of study as defined by 8 CFR 214.2(f)(6). I am a designated school official of the above named school and am authorized to issue this form

X
**SIGNATURE OF:** Neena Kapoor, International Adviser

**DATE ISSUED**
11 October 2016

**PLACE ISSUED**
Hartford, CT

### STUDENT ATTESTATION

I have read and agreed to comply with the terms and conditions of my admission and those of any extension of stay. I certify that all information provided on this form refers specifically to me and is true and correct to the best of my knowledge. I certify that I seek to enter or remain in the United States temporarily, and solely for the purpose of pursuing a full program of study at the school named above. I also authorize the named school to release any information from my records needed by DHS pursuant to 8 CFR 214.3(g) to determine my nonimmigrant status. **Parent or guardian, and student, must sign if student is under 18.**

X
**SIGNATURE OF:** Shikha Kanwar

**DATE** 10/12/2016

**NAME OF PARENT OR GUARDIAN**    X    **SIGNATURE**    **ADDRESS (city/state or province/country)**    DATE

ICE Form I-20 (3/31/2018)

Page 1 of 3

**Department of Homeland Security**
U.S. Immigration and Customs Enforcement

I-20, Certificate of Eligibility for Nonimmigrant Student Status
OMB NO. 1653-0038

## SEVIS ID: N0013616518 (F-1)    NAME: Shikha Kanwar

### EMPLOYMENT AUTHORIZATIONS

| TYPE | FULL/PART-TIME | STATUS | START DATE | END DATE |
|---|---|---|---|---|
| OPT | PART TIME | APPROVED | 29 AUGUST 2016 | 02 DECEMBER 2016 |
| POST-COMPLETION OPT | FULL TIME | REQUESTED | 16 JANUARY 2017 | 15 JANUARY 2018 |

### EMPLOYER INFORMATION

| TYPE | | AUTHORIZATION DATES | | |
|---|---|---|---|---|
| OPT | | 29 AUGUST 2016 – 01 DECEMBER 2016 | | |

| EMPLOYER NAME | START DATE | END DATE | CITY & STATE |
|---|---|---|---|
| Symphony Health Solutions | 29 AUGUST 2016 | 22 DECEMBER 2016 | Conshohocken, PA |

### CHANGE OF STATUS/CAP-GAP EXTENSION

### AUTHORIZED REDUCED COURSE LOAD

### CURRENT SESSION DATES

| CURRENT SESSION START DATE | CURRENT SESSION END DATE |
|---|---|
| 29 AUGUST 2016 | 14 DECEMBER 2016 |

### TRAVEL ENDORSEMENT

This page, when properly endorsed, may be used for re-entry of the student to attend the same school after a temporary absence from the United States. Each endorsement is valid for one year.

| Designated School Official | TITLE | SIGNATURE | DATE ISSUED | PLACE ISSUED |
|---|---|---|---|---|
| Neena Kapoor | Int'l Advisor | X | 10/11/16 | Storrs CT |
| | | X | | |
| | | X | | |
| | | X | | |

ICE Form I-20 (3/31/2018)

Page 2 of 3

**Department of Homeland Security**
U.S. Immigration and Customs Enforcement

I-20, Certificate of Eligibility for Nonimmigrant Student Status
OMB NO. 1653-0038

## SEVIS ID: N0013616518

| SURNAME/PRIMARY NAME | GIVEN NAME | CLASS |
|---|---|---|
| Kanwar | Shikha | |
| **PREFERRED NAME** | **PASSPORT NAME** | **F-1** |
| Shikha Kanwar | | |
| **COUNTRY OF BIRTH** | **COUNTRY OF CITIZENSHIP** | |
| INDIA | INDIA | |
| **DATE OF BIRTH** | **ADMISSION NUMBER** | |
| 09 OCTOBER 1989 | | |
| **FORM ISSUE REASON** | **LEGACY NAME** | **ACADEMIC AND LANGUAGE** |
| CONTINUED ATTENDANCE - Updated Form I-20 or Name Conversion | Shikha Kanwar | |

## SCHOOL INFORMATION

| SCHOOL NAME | SCHOOL ADDRESS |
|---|---|
| University of Connecticut Graduate Business Learning Center | 100 Constitution Plaza, Hartford, CT 06103 |
| **SCHOOL OFFICIAL TO CONTACT UPON ARRIVAL** | **SCHOOL CODE AND APPROVAL DATE** |
| Nadine Boudissa International Adviser | BOS214F10146008 29 JANUARY 2003 |

## PROGRAM OF STUDY

| EDUCATION LEVEL | MAJOR 1 | MAJOR 2 |
|---|---|---|
| MASTER'S | Management Science 52.1301 | None 00.0000 |
| **NORMAL PROGRAM LENGTH** | **PROGRAM ENGLISH PROFICIENCY** | **ENGLISH PROFICIENCY NOTES** |
| 24 Months | Required | Student is proficient |
| **PROGRAM START DATE** | **PROGRAM END DATE** | |
| 31 AUGUST 2015 | 06 MAY 2017 | |

## FINANCIALS

| ESTIMATED AVERAGE COSTS FOR: 9 MONTHS | | STUDENT'S FUNDING FOR: 9 MONTHS | |
|---|---|---|---|
| Tuition and Fees | $ 14,850 | Personal Funds | $ 36,097 |
| Living Expenses | $ 21,247 | Funds From This School | $ |
| Expenses of Dependents (0) | $ 0 | Funds From Another Source | $ |
| Other | $ | On-Campus Employment | $ |
| TOTAL | $ 36,097 | TOTAL | $ 36,097 |

## REMARKS

## SCHOOL ATTESTATION

I certify under penalty of perjury that all information provided above was entered before I signed this form and is true and correct. I executed this form in the United States after review and evaluation in the United States by me or other officials of the school of the student's application, transcripts, or other records of courses taken and proof of financial responsibility, which were received at the school prior to the execution of this form. The school has determined that the above named student's qualifications meet all standards for admission to the school and the student will be required to pursue a full program of study as defined by 8 CFR 214.2(f)(6). I am a designated school official of the above named school and am authorized to issue this form.

X _Nadine Boudissa_

| SIGNATURE OF: Nadine Boudissa, International Adviser | DATE ISSUED | PLACE ISSUED |
|---|---|---|
| | 12 May 2016 | Hartford, CT |

## STUDENT ATTESTATION

I have read and agreed to comply with the terms and conditions of my admission and those of any extension of stay. I certify that all information provided on this form refers specifically to me and is true and correct to the best of my knowledge. I certify that I seek to enter or remain in the United States temporarily, and solely for the purpose of pursuing a full program of study at the school named above. I also authorize the named school to release any information from my records needed by DHS pursuant to 8 CFR 214.3(g) to determine my nonimmigrant status. **Parent or guardian, and student, must sign if student is under 18.**

X _Shikha_

| SIGNATURE OF: Shikha Kanwar | DATE |
|---|---|
| | 06/03/2016 |

| | X | | |
|---|---|---|---|
| NAME OF PARENT OR GUARDIAN | SIGNATURE | ADDRESS (city/state or province/country) | DATE |

**Department of Homeland Security**
U.S. Immigration and Customs Enforcement

I-20, Certificate of Eligibility for Nonimmigrant Student Status
OMB NO. 1653-0038

## SEVIS ID: N0013616518 (F-1)       NAME: Shikha Kanwar

### EMPLOYMENT AUTHORIZATIONS

| AUTHORIZATION TYPE | FULL/PART-TIME | STATUS | START DATE | END DATE |
|---|---|---|---|---|
| CPT | FULL TIME | APPROVED | 06 JUNE 2016 | 19 AUGUST 2016 |

### EMPLOYER INFORMATION

| TYPE | | AUTHORIZATION DATES | | |
|---|---|---|---|---|
| CPT | | 06 JUNE 2016 - 14 AUGUST 2016 | | |
| EMPLOYER NAME | START DATE | END DATE | CITY & STATE | |
| Symphony Health Solutions | 06 JUNE 2016 | 19 AUGUST 2016 | CONSHOHOCKEN, PA | |

### CHANGE OF STATUS/CAP-GAP EXTENSION

### AUTHORIZED DROP BELOW FULL COURSE OF STUDY

### TRAVEL ENDORSEMENT

This page when properly endorsed, may be used for reentry of the student to attend the same school after a temporary absence from the United States. Each certification signature is valid for one year.

| Designated School Official | TITLE | SIGNATURE | DATE ISSUED | PLACE ISSUED |
|---|---|---|---|---|
| Nadine Barclay | Int'l Advisor | Nadine Barclay | 5/12/16 | Storrs, CT |
| | | X | | |
| | | X | | |
| | | X | | |

**Department of Homeland Security**
U.S. Immigration and Customs Enforcement

I-20, Certificate of Eligibility for Nonimmigrant Student Status
OMB NO. 1653-0038

## SEVIS ID: N0013616518

| SURNAME/PRIMARY NAME<br>Kanwar | GIVEN NAME<br>Shikha | CLASS |
|---|---|---|
| PREFERRED NAME<br>Shikha Kanwar | PASSPORT NAME | **F-1** |
| COUNTRY OF BIRTH<br>INDIA | COUNTRY OF CITIZENSHIP<br>INDIA | |
| DATE OF BIRTH<br>09 OCTOBER 1989 | ADMISSION NUMBER | |
| FORM ISSUE REASON<br>CONTINUED ATTENDANCE - Updated Form I-20 or Name<br>Conversion | LEGACY NAME<br>Shikha Kanwar | ACADEMIC AND<br>LANGUAGE |

### SCHOOL INFORMATION

| SCHOOL NAME<br>University of Connecticut<br>Graduate Business Learning Center | SCHOOL ADDRESS<br>100 Constitution Plaza, Hartford, CT 06103 |
|---|---|
| SCHOOL OFFICIAL TO CONTACT UPON ARRIVAL<br>Nadine Boudissa<br>International Adviser | SCHOOL CODE AND APPROVAL DATE<br>BOS214F10146008<br>29 JANUARY 2003 |

### PROGRAM OF STUDY

| EDUCATION LEVEL<br>MASTER'S | MAJOR 1<br>Management Science 52.1301 | MAJOR 2<br>None 00.0000 |
|---|---|---|
| NORMAL PROGRAM LENGTH<br>24 Months | PROGRAM ENGLISH PROFICIENCY<br>Required | ENGLISH PROFICIENCY NOTES<br>Student is proficient |
| PROGRAM START DATE<br>31 AUGUST 2015 | PROGRAM END DATE<br>06 MAY 2017 | |

### FINANCIALS

| ESTIMATED AVERAGE COSTS FOR: 9 MONTHS | | STUDENT'S FUNDING FOR: 9 MONTHS | |
|---|---|---|---|
| Tuition and Fees | $ 14,850 | Personal Funds | $ 36,097 |
| Living Expenses | $ 21,247 | Funds From This School | $ |
| Expenses of Dependents (0) | $ 0 | Funds From Another Source | $ |
| Other | $ | On-Campus Employment | $ |
| TOTAL | $ 36,097 | TOTAL | $ 36,097 |

### REMARKS

### SCHOOL ATTESTATION

I certify under penalty of perjury that all information provided above was entered before I signed this form and is true and correct. I executed this form in the United States after review and evaluation in the United States by me or other officials of the school of the student's application, transcripts, or other records of courses taken and proof of financial responsibility, which were received at the school prior to the execution of this form. The school has determined that the above named student's qualifications meet all standards for admission to the school and the student will be required to pursue a full program of study as defined by 8 CFR 214.2(f)(6). I am a designated school official of the above named school and am authorized to issue this form.

X *Nadine Boudissa*

| SIGNATURE OF: Nadine Boudissa, International Adviser | DATE ISSUED<br>05 November 2015 | PLACE ISSUED<br>Hartford, CT |
|---|---|---|

### STUDENT ATTESTATION

I have read and agreed to comply with the terms and conditions of my admission and those of any extension of stay. I certify that all information provided on this form refers specifically to me and is true and correct to the best of my knowledge. I certify that I seek to enter or remain in the United States temporarily, and solely for the purpose of pursuing a full program of study at the school named above. I also authorize the named school to release any information from my records needed by DHS pursuant to 8 CFR 214.3(g) to determine my nonimmigrant status. **Parent or guardian, and student, must sign if student is under 18.**

X *Shikha*

| SIGNATURE OF: Shikha Kanwar | DATE<br>01/11/2016 |
|---|---|

| X | | | |
|---|---|---|---|
| NAME OF PARENT OR GUARDIAN | SIGNATURE | ADDRESS (city/state or province/country) | DATE |

ICE Form I-20 (3/31/2018)

**Department of Homeland Security**
U.S. Immigration and Customs Enforcement

I-20, Certificate of Eligibility for Nonimmigrant Student Status
OMB NO. 1653-0038

## SEVIS ID: N0013616518 (F-1)   NAME: Shikha Kanwar

### EMPLOYMENT AUTHORIZATION

| EMPLOYMENT STATUS | TYPE |
| --- | --- |
| EMPLOYMENT START DATE | EMPLOYMENT END DATE |
| EMPLOYER NAME | EMPLOYER LOCATION |
| COMMENTS | |

### CHANGE OF STATUS/CAP-GAP EXTENSION

| REQUESTED VISA TYPE | REQUEST/PETITION STATUS | RECEIPT NUMBER | BENEFIT START DATE/REQUEST DATE |
| --- | --- | --- | --- |

### EVENT HISTORY

| EVENT NAME | EVENT DATE |
| --- | --- |
| Registration | 24 SEPTEMBER 2015 |

### OTHER AUTHORIZATIONS

| AUTHORIZATION | START DATE | END DATE |
| --- | --- | --- |

### TRAVEL ENDORSEMENT

This page when properly endorsed, may be used for reentry of the student to attend the same school after a temporary absence from the United States. Each certification signature is valid for one year.

| SCHOOL OFFICIAL | TITLE | SIGNATURE | DATE ISSUED | PLACE ISSUED |
| --- | --- | --- | --- | --- |
| Arthur Galinat | Asst Director | x _(signature)_ | 5/14/2016 | Storrs, CT |
| | | x | | |
| | | x | | |
| | | x | | |



UNITED STATES OF AMERICA      EMPLOYMENT AUTHORIZATION CARD

Surname
KANWAR

Given Name
SHIKHA

USCIS#                Category  Card#
105-411-213    C03B   YSC1790015737

Country of Birth
India

Terms and Conditions
Student: Post-Completion Opt

Date of Birth                          Sex
09 OCT 1989      F

Valid From:        02/16/17
Card Expires:      02/15/18

NOT VALID FOR REENTRY TO U.S.

Fingerprint not available



29105174

## U.S. Citizenship and Immigration Services

This card is not evidence of U.S. citizenship or permanent residence.
This document is void if altered, and may be revoked by the U.S. Government.
The person identified is authorized to work in the U.S. for the validity of this card.

FORM I-766 Rev. (10-2014)

If found, drop in any US mailbox. USPS: Mail to USCIS, 777 NW Slate Pkwy, Suite 200, Lees Summit, MO 64086-5699

123

IAUSA10541121341YSC179001S735<<
8910093F1802153IND<<<<<<<<<<<0<
KANWAR<<SHIKHA<<<<<<<<<<<<<<<<<<

| CO. | File | Dept | CLOCK | Voucher No. |
|-----|------|------|-------|-------------|
| 7GY | 000346 | 100100 | XN50X | 30045643 |



# Earnings Statement

Axtria Inc

Period Ending:    03/15/2017
Pay Date:          03/15/2017

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 02
State: 00

Kanwar,Shikha
300 Connell Drive
Suite 5000
Berkeley Heights, NJ 07922

| Earnings | rate | hours | this period | Other Benefits | |
|----------|------|-------|-------------|----------------|--|
| Regular | $3,437.50 | 0.0 | $3,437.50 | **and Information** | **this Period** |
| | Gross Pay | | $3,437.50 | | |

| Deductions | Statutory | |
|------------|-----------|--|
| | Federal income tax | $657.86 |
| | Social Security tax | $0.00 |
| | Medicare tax | $0.00 |
| | State tax | $143.97 |
| | State tax 2 | $0.00 |
| | Local tax | $0.00 |
| | Local tax 2 | $0.00 |
| | Tax SUI | $26.30 |
| | Net Pay | $2,609.37 |

\* Excluded from federal taxable wages



## U.S. Customs and Border Protection
### Securing America's Borders

## Most Recent I-94

**Admission (I-94) Record Number : 24323591585**

**Most Recent Date of Entry: 2017 February 07**

**Class of Admission : F1**

**Admit Until Date : D/S**

**Details provided on the I-94 Information form:**

| | |
|---|---|
| Last/Surname : | **KANWAR** |
| First (Given) Name : | **SHIKHA** |
| Birth Date : | **1989October09** |
| Passport Number : | **J7236128** |
| Country of Issuance : | **India** |

Get Travel History

▶ Effective April 26, 2013, DHS began automating the admission process. An alien lawfully admitted or paroled into the U.S. is no longer required to be in possession of a preprinted Form I-94. A record of admission printed from the CBP website constitutes a lawful record of admission. See 8 CFR § 1.4(d).

▶ If an employer, local, state or federal agency requests admission information, present your admission (I-94) number along with any additional required documents requested by that employer or agency.

▶ Note: For security reasons, we recommend that you close your browser after you have finished retrieving your I-94 number.

OMB No. 1651-0111
Expiration Date:02/28/2017

For inquiries or questions regarding your I-94, please click here

Accessibility | Privacy Policy

भारत गणराज्य REPUBLIC OF INDIA



THESS ARE TO REQUEST AND REQUIRE IN THE NAME OF THE PRESIDENT OF THE REPUBLIC OF INDIA ALL THOSE WHOM IT MAY CONCERN TO ALLOW THE BEARER TO PASS FREELY WITHOUT LET OR HINDRANCE AND TO AFFORD HIM OR HER EVERY ASSISTANCE AND PROTECTION OF WHICH HE OR SHE MAY STAND IN NEED

BY ORDER OF THE PRESIDENT OF THE REPUBLIC OF INDIA



आर.एस. वर्मा/R.S. Verma
Passport Granting Officer
पासपोर्ट प्रदाता अधिकारी
पासपोर्ट कार्यालय शिमला
Passport Office Shimla

---

भारत गणराज्य REPUBLIC OF INDIA

| | | |
|---|---|---|
| प्रकार / Type | देश कोड / Country Code | पासपोर्ट नं / Passport No |
| P | IND | J7236128 |

उपनाम / Surname
**KANWAR**

दिया गया नाम / Given Name(s)
**SHIKHA**

| राष्ट्रीयता / Nationality | लिंग / Sex | जन्म तिथि / Date of Birth |
|---|---|---|
| INDIAN | F | 09/10/1989 |

जन्म स्थान / Place of Birth
**SHIMLA HP**

जारी करने का स्थान / Place of Issue
**SHIMLA**

| जारी करने की तिथि / Date of Issue | समाप्ति की तिथि / Date of Expiry |
|---|---|
| 01/08/2012 | 31/07/2022 |

*Shikha*

P<IND<KANWAR<<SHIKHA<<<<<<<<<<<<<<<<<<<<<<<<<
J7236128<4IND8910093F2207319<<<<<<<<<<<<<<<<0

IMMIGRATION INDIA

A1-384

2 8 DEC 2016

ARRIVED
NEW DELHI

DEPARTED
0 7 FEB 2017
IMMIGRATION IND.
D1-360
NEW DELHI

516



# VISA — UNITED STATES OF AMERICA

| Field | Value |
|---|---|
| Issuing Post Name | NEW DELHI |
| Surname | KANWAR |
| Given Name | SHIKHA |
| Passport Number | J7236128 |
| Sex | F |
| Entries | M |
| Issue Date | 16JUL2015 |
| Annotation | N0013616518 |
| Control Number | 20151950460025 |
| Visa Type /Class | R   F1 |
| Birth Date | 09OCT1989 |
| Nationality | IND |
| Expiration Date | 13JUL2020   0110 |

K4288723

UNIVERSITY OF CONNECTICUT

```
VNUSAKANWAR<<SHIKHA<<<<<<<<<<<<<<<<<<<<<<<<<<
J7236128<4IND8910093F2007139F1NWD0VPHM253269
```

36

पंजीकरण

विदेशों में रहने वाले भारतीय नागरिकों को सलाह दी जाती है कि वे निकटतम भारतीय मिशन/केन्द्र में अपना पंजीकरण करवाएं।

चेतावनी

यह पासपोर्ट भारत सरकार की सम्पत्ति है। इस पासपोर्ट के बारे में किसी पासपोर्ट अधिकारी से इसके धारक को यदि कोई सूचना मिलती है जिसमें पासपोर्ट लौटाने की मांग भी शामिल है तो उसका तुरंत अनुपालन किया जाए।

यह पासपोर्ट डाक द्वारा किसी भी देश से बाहर न भेजा जाए। यह पासपोर्ट धारक या उसके द्वारा प्राधिकृत व्यक्ति के कब्जे में ही होना चाहिए। इसमें किसी भी प्रकार का फेरबदल या बिगाड़ी नहीं की जानी चाहिए।

पासपोर्ट गुम हो जाने, चोरी हो जाने अथवा नष्ट हो जाने पर इसकी सूचना भारत में सबसे निकटतम पासपोर्ट अधिकारी को अथवा यदि पासपोर्ट धारक विदेश में है तो निकटतम भारतीय मिशन/केन्द्र और स्थानीय पुलिस को तत्काल दी जानी चाहिए। विस्तृत पूछताछ के बाद ही डुप्लीकेट पासपोर्ट जारी किया जाएगा।

---

INDIAN CITIZENS RESIDENT ABROAD ARE ADVISED TO REGISTER THEMSELVES AT THE NEAREST INDIAN MISSION/POST.

REGISTRATION

CAUTION

THIS PASSPORT IS THE PROPERTY OF THE GOVERNMENT OF INDIA. ANY COMMUNICATION RECEIVED BY THE HOLDER FROM A PASSPORT AUTHORITY REGARDING THIS PASSPORT, INCLUDING DEMAND FOR ITS SURRENDER, SHOULD BE COMPLIED WITH IMMEDIATELY.

THIS PASSPORT SHOULD NOT BE SENT OUT OF ANY COUNTRY BY POST. THIS SHOULD BE IN THE CUSTODY EITHER OF THE HOLDER OR OF A PERSON AUTHORISED BY THE HOLDER. IT MUST NOT BE ALTERED OR MUTILATED IN ANY WAY.

LOSS, THEFT OR DESTRUCTION OF THIS PASSPORT SHOULD BE IMMEDIATELY REPORTED TO THE NEAREST PASSPORT AUTHORITY IN INDIA OR IF THE HOLDER IS ABROAD, TO THE NEAREST INDIAN MISSION/POST AND TO THE LOCAL POLICE. ONLY AFTER EXHAUSTIVE ENQUIRIES SHALL A DUPLICATE PASSPORT BE ISSUED.

---

पिता / कानूनी अभिभावक का नाम / Name of Father / Legal Guardian
**VIJAY KUMAR KANWAR**

माता का नाम / Name of Mother
**PROMILA KANWAR**

पति या पत्नी का नाम / Name of Spouse

पता / Address
**2 MAIN BLOCK NORTH VIEW P**

**AND T COLONY THE MALL**

**SHIMLA HP 171001**

पुराने पासपोर्ट का न. और इसके जारी होने की तिथि एवं स्थान / Old Passport No. with Date and Place of Issue

फाइल नं. / File No.
**SMLB00455812          0**



400 Connell Dr.
Suite 1300
Berkeley Heights, NJ 07922
(877) 929-8742
www.axtria.com

9/16/2016

shikha.kanwar@uconn.edu

Shikha Kanwar
9 Owen Street, 303
Hartford, CT 06105

Dear Shikha:

It is my pleasure to present you with an offer to join our team as a **Sr. Associate**. The following terms outline the structure of the relationship between you and Axtria, Inc. (the "Company "). By accepting this offer, you will agree with a full time employment start date of **2/1/2017** ("Start Date").

You will initially report to **Shashank Varma**. As part of an entrepreneurial company, you'll wear many hats. Your general responsibilities will include:

- Application of advanced statistical, econometric and optimization models and algorithms to real-world business problems
- Develop new statistical models as well as provide analysis using existing models
- Provide ad-hoc analysis of marketing programs, including test analysis and recommendations for future programs
- Evaluate results of experimentally designed tests, and communicate test learning to clients
- Assist in the development of marketing and analytic data marts
- Apply sound data management practices to ensure data consistency, quality and ease of access
- Work on projects with peers and senior colleagues to deliver existing analytics solutions for clients.
- Collaborate with Product Management and Technology teams on enhancements of solutions and development of new solutions.
- Develop and maintain skills to the highest standards to identify best practices and emerging trends in analytics, both within and outside the domain.
- Manage concurrent projects ensuring exceptional client satisfaction and on-time delivery
- Contribute to Axtria's development of new solutions and analytical models

**Compensation:** Your compensation will be **$82,500** at an annualized rate, less payroll deductions and all required withholdings (your "Base Salary"). You will be paid semi-monthly on the 15th and the last working day of each month or at such intervals as may be offered by the Company to employees from time to time. You will also be eligible for the benefits offered generally to employees from time to time.

**Relocation Assistance:** The Company will provide reimbursement of up to **$2,000** to cover transportation and transportation of household goods. You'll need to file an expense report with receipts after you begin employment. Under most instances, qualified relocation expense reimbursements are non-taxable fringe benefits. You'll be responsible for paying any required taxes on relocation assistance. You are responsible for reimbursing the company all amounts paid in relocation if you do not work for at least two full years from the date of joining at the new location.

You initially will be entitled to take 15 days of paid time off (for California based employees, the entitlement will be 12 vacation and 3 sick days) during each year during your employment to be taken at such time or times as shall be mutually convenient and consistent with his duties and obligations to the Company. Such vacation shall be governed by the Company's vacation or time off policies, as may be amended from time to time.

In addition to the above compensation, you may have the opportunity to take advantage of various Company benefit plans and other incentives. Information regarding the Company's benefit structure will be provided to you if and when such benefits are offered by the Company, subject to the terms and conditions of official plan documents. Any such benefits, of course, may be modified or changed from time to time at the sole discretion of the Company, and the future provision of such benefits to you in no way changes or impacts your status as an at-will employee.

As an employee or the Company, you will be expected to abide by its rules and regulations which will be provided for you by our Human Resources representative, and sign and comply with a Proprietary Information and Inventions Agreement which prohibits unauthorized use or disclosure of the Company's proprietary information and includes covenants regarding your activities during and after your employment with the Company.

Unless otherwise approved in writing by the Company, you will work at the Company's principal place of business at 400 Connell Dr. #1300, Berkeley Heights NJ 07922. Normal working hours are 8:00 a.m. to 5:00 p.m., Monday through Friday. As an exempt salaried employee, you will be expected to work additional hours as required by the nature of your work assignments.

Our offer to hire you is contingent upon your submission of satisfactory proof of your identity and your legal authorization to work in the United States. If you fail to submit this proof, federal law prohibits us from hiring you. The employment terms in this letter supersede any other agreements or promises made to you by anyone, whether oral or written. As required by law, this offer is subject to satisfactory proof of your right to work in the United States.

Shikha Kanwar
*9/16/2016*
*Page 3*

This offer expires 3 days from the date above ("Expiration Time). Please sign and date this letter, and return it by or before the Expiration Time.

Shikha, we are all very impressed with your background. On behalf of the entire team, I would like to express that we are very excited about the prospect of your more active participation with our dynamic team and helping develop the Company as the *worldwide leader in Business Analytics Solutions*.

Sincerely,

Jaswinder S. Chadha
President & CEO

Accepted by:

Print Name: Shikha Kanwar

Date: 09/21/2016

## PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT

As an employee of **AXTRIA, INC.** (the "Company"), its subsidiary or its affiliate (together, the "Company"), and as a condition of my employment by the Company and in consideration of the compensation now and hereafter paid to me, I agree to the following:

1.  **Maintaining Confidential Information.**
    (a) **Company Information.**  I agree at all times during the term of my employment and thereafter to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation, without the written authorization of the Board of Directors of the Company, any trade secrets, confidential knowledge, data or other proprietary information of the Company.  By way of illustration and not limitation, such shall include information relating to products, processes, know-how, designs, formulas, methods, samples, prototypes, developmental or experimental work, improvements, discoveries, plans for research, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, suppliers and customers, and information regarding the skills and compensation of other employees of the Company.

    (b) **Former Employer Information.**  I agree that I will not, during my employment with the Company, improperly use or disclose any proprietary information or trade secrets of my former or concurrent employers or companies, if any, and that I will not bring onto the premises of the Company any unpublished documents or any property belonging to my former or concurrent employers or companies unless previously and specifically consented to in writing by said employers or companies.

    (c) **Third Party Information.**  I recognize that the Company has received and in the future will receive confidential or proprietary information from third parties subject to a duty on the Company's part to maintain the confidentiality of such information and, in some cases, to use it only for certain limited purposes.  I agree that I owe the Company and such third parties, both during the term of my employment and thereafter, a duty to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation (except in a manner that is consistent with the Company's agreement with the third party) or use it for the benefit of anyone other than the Company or such third party (consistent with the Company's agreement with the third party), unless expressly authorized to act otherwise by an officer of the Company.

2.  **Assignment of Inventions and Original Works.**
    (a) **Inventions and Original Works Retained by Me.**  I have attached hereto as Exhibit A, a complete disclosure of all inventions, original works of authorship, developments, improvements, and trade secrets that I have, alone or jointly with others, conceived, developed or reduced to practice or caused to be conceived, developed or reduced to practice prior to the commencement of my employment with

the Company, that I consider to be my property or the property of third parties and that I wish to have excluded from the scope of this Agreement. If disclosure of an item on Exhibit A would cause me to violate any prior confidentiality agreement, I understand that I am not to disclose such on Exhibit A but in the applicable space on Exhibit A I am only to disclose a cursory name for each such invention, a listing of the party(ies) to whom it belongs and the fact that full disclosure as to such inventions has not been made for that reason. A space is provided on Exhibit A for such purpose. If no disclosure is attached, I represent that there are no such inventions.

**(b) Inventions and Original Works Assigned to the Company.** I agree that I will make prompt written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign, without further compensation, to the Company all my right, title and interest in and to any ideas, inventions, original works of authorship, developments, improvements or trade secrets which I may solely or jointly conceive or reduce to practice, or cause to be conceived or reduced to practice, during the period of my employment with the Company

I acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of my employment and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act (17 U.S.C., Section 101).

**(c) Inventions and Original Works Assigned to the United States.** I hereby assign to the United States government all my right, title and interest in and to any and all inventions, original works of authorship, developments, improvements or trade secrets whenever full title to same is required to be in the United States by a contract between the Company and the United States or any of its agencies.

**(d) Obtaining Letters Patent, Copyright Registrations and Other Protections.** I will assist the Company in every proper way to obtain and enforce United States and foreign proprietary rights relating to any and all inventions, original works of authorship, developments, improvements or trade secrets of the Company in any and all countries. To that end I will execute, verify and deliver such documents and perform such other acts (including appearing as a witness) the Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such proprietary rights and the assignment thereof. In addition, I will execute, verify and deliver assignments of such proprietary rights to the Company or its designee. My obligation to assist the Company with respect to proprietary rights in any and all countries shall continue beyond the termination of my employment, but the Company shall compensate me at a reasonable rate after my termination for the time actually spent by me at the Company's request on such assistance.

In the event the Company is unable for any reason, after reasonable effort, to secure my signature on any document needed in connection with the actions specified in the

preceding paragraph, I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and in my behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of the preceding paragraph with the same legal force and effect as if executed by me. I hereby waive and quit claim to the Company any and all claims of any nature whatsoever which I now or may hereafter have for infringement of any proprietary rights assigned to the Company.

(e) **Obligation to Keep the Company Informed.** In addition to my obligations under paragraph 2(b) above, during the period of my employment and for one (1) year after termination of my employment for any reason, I will promptly disclose to the Company fully and in writing all patent applications filed by me or on my behalf. At the time of each such disclosure, I will advise the Company in writing of any inventions that I believe are not required to be assigned to the company under Section (2b); and I will at that time provide to the Company in writing all evidence necessary to substantiate that belief. I understand that the Company will keep in confidence and will not disclose to third parties without my consent any proprietary information disclosed in writing to the Company pursuant to this Agreement relating to inventions that are not required to be assigned to the company under the provisions of Section 2(b). I will preserve the confidentiality of any such invention that is required to be assigned to the Company under Section 2(b). I agree to keep and maintain adequate and current records (in the form of notes, sketches, drawings and in any other form that may be required by the Company) of all proprietary information developed by me and all inventions made by me during the period of my employment at the Company, which records shall be available to and remain the sole property of the Company at all times.

3. **No Conflicting Employment; No Inducement of Other Employees or Solicitation of Customers.**
I agree that during the period of my employment by the Company I will not, without the Company's express written consent, engage in any other employment or business activity directly related to the business in which the Company is now involved or becomes involved, nor will I engage in any other activities which conflict with my obligations to the Company. For a period of one (1) year after the termination or cessation of my employment with the Company for any reason, I agree that I will not, directly or indirectly, alone or as a partner, officer, director, employee, consultant, agent, independent contractor, or stockholder of any company or business organization, engage in any business activity which is directly or indirectly in competition with the products or services being developed, marketed, sold or otherwise provided by the Company, or which is directly or indirectly detrimental to the Company's business ("Competitive Activity"). I further agree that, for a period of one (1) year after the termination or cessation of my employment with the Company, I will not in any capacity, either separately, jointly or in association with others, directly or indirectly, solicit or contact in connection with, or in furtherance of, a Competitive Activity any of the Company's employees, consultants, agents, suppliers, customers or prospects that were such

with respect to the Company at any time during the one year immediately preceding the date of my termination of employment or that become such with respect to the Company at any time during the one year immediately following the date of my termination. My obligations under this Section 3 shall survive the termination or cessation of my employment.

If any restriction set forth in this Section is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend only over the maximum period of time, range of activities or geographic area as to which it may be enforceable.

**4.   No Conflicting Obligations.**
I represent that my performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any agreement or obligation of mine relating to any time prior to my employment by the Company. I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict herewith.

**5.   Return Of Company Documents.**
When I leave the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, together with all copies thereof (in whatever medium recorded) belonging to the Company, its successors or assigns whether kept at the Company, home or elsewhere. I further agree that any property situated on the Company's premises and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice. Prior to leaving, I will cooperate with the Company in completing and signing the Company's termination statement for technical and management personnel confirming the above and my obligations under this Agreement.

**6.   Termination.**
You may terminate your employment with the Company at any time and for any reason whatsoever simply by notifying the Company in writing. Likewise, the Company may terminate your employment at any time and for any reason whatsoever, with or without cause or advance notice. This at-will employment relationship cannot be changed except in writing signed by an officer of the Company.

This Agreement is subject to termination for convenience by Company or Employee upon two (2) weeks prior written notice from one party to the other. Company has the option of paying Employee two (2) weeks compensation at Employee's regular salary in lieu of providing Employee the written notice provided for above. In the event Company's client provides less than (2) weeks' notice of termination, then Employee will be entitled to the same notice as Company.

**7.    Notification of New Employer.**
In the event that I leave the employ of the Company, I hereby consent to the notification of my new employer of my rights and obligations under this Agreement.

**8.    Legal and Equitable Remedies.**
Because my services are personal and unique and because I may have access to and become acquainted with the proprietary information of the Company, the Company shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that the Company may have for a breach of this Agreement.

**9.    General Provisions.**

(a) **Not an Employment Contract.**  I agree and understand that nothing in this Agreement shall confer any right with respect to continuation of my employment by the Company, nor shall it interfere in any way with my right or the Company's right to terminate my employment at any time, with or without cause.

(b) **Governing Law; Consent to Personal Jurisdiction.**  This Agreement will be governed by and construed according to the laws of the State of New Jersey, excluding conflicts of laws principles.  I hereby expressly consent to the personal jurisdiction of the state and federal courts located in New Jersey for any lawsuit filed there against me by the Company arising from or relating to this Agreement.

(c) **Entire Agreement.**  This Agreement, hereby incorporated herein, sets forth the final, complete and exclusive agreement and understanding between the Company and me relating to the subject matter hereof and supersedes all prior and contemporaneous understandings and agreements relating to its subject matter.  No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing and signed by both the Company and me.  Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

(d) **Severability.**  If one or more of the provisions in this Agreement are deemed unenforceable by law, then the remaining provisions will continue in full force and effect.

(e) **Successors and Assigns.**  This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors and its assigns.

(f) **Survival.**  The provisions of this Agreement shall survive the termination of my employment and the assignment of this Agreement by the Company to any successor in interest or other assignee.

(g) **Waiver.** No waiver by the Company of any breach of this Agreement shall be a waiver of any preceding or succeeding breach. No waiver by the Company of any right under this Agreement shall be construed as a waiver of any other right. The Company shall not be required to give notice to enforce strict adherence to all terms of this Agreement.

(h) **Notice.** Any notices required or permitted hereunder shall be given to the appropriate party at the address specified below or at such other address as the party shall specify in writing. Such notice shall be deemed given upon personal delivery, or sent by certified or registered mail, postage prepaid, three (3) days after the date of mailing.

This Agreement shall be effective as of the first day of my employment with the Company, namely: 2/1/2017.

I UNDERSTAND THAT THIS AGREEMENT AFFECTS MY RIGHTS TO INVENTIONS I MAKE DURING MY EMPLOYMENT, AND RESTRICTS MY RIGHT TO DISCLOSE OR USE THE COMPANY'S PROPRIETARY INFORMATION DURING OR SUBSEQUENT TO MY EMPLOYMENT.

I HAVE READ THIS AGREEMENT CAREFULLY AND UNDERSTAND ITS TERMS. I HAVE COMPLETELY FILLED OUT EXHIBIT A TO THIS AGREEMENT.

Dated: 09 / 21 , 2016.

Signature

Shikha Kanwar
Name
9 Owen Street, 303
Hartford, CT 06105

ACCEPTED AND AGREED

AXTRIA, INC.
400 CONNELL DR, SUITE 1300
BERKELEY HEIGHTS, NJ 07922

By:

Jaswinder S. Chadha
President & CEO

# Axtria, Inc.

## Client Portfolio

Master Services Agreements between Axtria and few of its clients, for some active ongoing projects, which are amended periodically.

FINAL

**MARKETING SOURCING**

**MASTER SERVICES AGREEMENT**

**BETWEEN**

**BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.**

**AND**

**AXTRIA INC.**

**EFFECTIVE DATE: MAY 30, 2016**

FINAL

## TABLE OF CONTENTS

1. Services; Statement of Work; Purchase Order ................................................................. 3
2. Vendor Personnel .............................................................................................................. 4
3. Invoices .............................................................................................................................. 5
4. Payment ............................................................................................................................. 6
5. MLR Review, Trademarks, Domain Names and Promotional Materials ........................... 7
6. Independent Contractor .................................................................................................... 7
7. Indemnification .................................................................................................................. 8
8. Insurance ........................................................................................................................... 9
9. Personal Information ....................................................................................................... 10
10. Confidential Information and Use of BI's Name ............................................................ 11
11. Ownership of Deliverables ............................................................................................ 13
12. Conflicts of Interest ....................................................................................................... 15
13. Reporting ....................................................................................................................... 15
14. Audit ............................................................................................................................... 17
15. Term and Termination ................................................................................................... 18
16. Representations and Warranties ................................................................................... 19
17. On-Site BI Facility Access ............................................................................................ 22
18. Miscellaneous ................................................................................................................ 22
EXHIBIT A  SAMPLE STATEMENT OF WORK ................................................................. 26
   EXHIBIT A  Appendix I Tracking Report (Excel Spreadsheet) ....................................... 28
EXHIBIT B  SUBMISSION REQUIREMENTS .................................................................... 29
   EXHIBIT B1  BI Policy #29:  Promotional Materials and Promotional Programs Approval ... 35
      EXHIBIT B1  Appendix I General Guidelines for Product Promotional Materials .......... 37
      EXHIBIT B1  Appendix II General Guidelines for Promotional Programs .................... 38
EXHIBIT C  PURCHASE ORDERS, CONTACT INFORMATION & INVOICE INSTRUCTIONS ... 39
   EXHIBIT C1  SAMPLE EXPENSE REPORT ................................................................. 41
   EXHIBIT C2  PRODUCTION SERVICES ...................................................................... 42
EXHIBIT D  STATEMENT OF RATES ................................................................................ 43
EXHIBIT E  BI TRAVEL AND EXPENSE REIMBURSEMENT GUIDELINE FOR VENDORS ... 44
EXHIBIT F  REBATE SCHEDULE ...................................................................................... 45
EXHIBIT G  ATTESTATION TO BI REGARDING REPORTING REQUIREMENTS AND TRAINING ... 46
EXHIBIT H  ADVERSE EVENT, TECHNICAL PRODUCT COMPLAINT, MEDICAL INFORMATION REQUEST AND EXTRANEOUS COMMENT NOTIFICATION ................................................................. 47
EXHIBIT I  ON-SITE POLICIES .......................................................................................... 53

Marketing Sourcing Master Services Agreement
Boehringer Ingelheim Pharmaceuticals, Inc./ Axtria Inc.
Effective Date:  May 30, 2016

FINAL

**BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.**
**MARKETING SOURCING**
**MASTER SERVICES AGREEMENT**

THIS MASTER SERVICES AGREEMENT ("Agreement") is effective as of this 30th day of May, 2016 ("Effective Date") by and between Boehringer Ingelheim Pharmaceuticals, Inc. ("BI"), a Delaware corporation with its principal place of business at 900 Ridgebury Rd., Ridgefield, CT 06877, and Axtria Inc., with its principal place of business at 400 Connell Drive, Suite 1300, Berkeley Heights, NJ 07922 ("Vendor") (referred to herein individually as "Party" or collectively as "Parties").

1. <u>Services; Statement of Work; Purchase Order</u>

1.1 Vendor agrees to perform services as requested by BI from time to time (the "Services"). Vendor will, as requested from time to time, provide Services for BI and/or any Affiliate of BI (as defined below) created under the laws of and having its principal place of business in a state located in the United States of America ("US Affiliate"). In case of a Statement of Work (as defined below) between a US Affiliate of BI and Vendor, any rights and obligations of BI and Vendor resulting from this Agreement shall exist accordingly only between the respective US Affiliate of BI and Vendor. Therefore, in case of a Statement of Work of a US Affiliate of BI, "BI" shall mean the US Affiliate of BI. For purposes of clarity, Services may be provided hereunder for BI and/or any US Affiliate of BI. For all other purposes, "Affiliate" shall mean any company (i) 50% or more of whose outstanding securities or assets are owned or controlled, directly or indirectly, by BI, (ii) which owns or controls, directly or indirectly, 50% or more of the outstanding securities or assets of BI, or (iii) any company owned or controlled, directly or indirectly, to the extent of 50% or more of the outstanding securities or assets, by any of the companies described in (i) or (ii) above or any company that is under the common control of any of said companies according to (i), (ii) or (iii).

1.2 The Services and schedule of Deliverables (as defined below in <u>Article 11</u>) shall be set forth in detail in a written Statement of Work ("SOW"), substantially in the form attached hereto as <u>Exhibit A</u>. The SOW shall be effective upon Vendor acceptance of a Purchase Order referring to and incorporating the SOW in its entirety or by reference (the "PO").

1.3 BI shall issue each approved PO electronically to Vendor. If acceptable, Vendor shall accept each PO by signing it and sending it, without modification or revision, electronically to <u>purchasing.rdg@boehringer-ingelheim.com</u>. Vendor shall not perform Services or incur costs or liabilities of any kind without having accepted a BI-approved PO incorporating the provisions of the agreed upon SOW. In no event will BI be liable for any Services performed or costs or liabilities incurred by Vendor without a prior agreed upon SOW and PO. If Vendor fails to sign and return the PO, the applicable PO will nonetheless be deemed accepted by Vendor upon Vendor's commencement of the Services specified in the PO. Any acceptance of the applicable PO is limited to acceptance of the express terms contained therein. Additional or different terms or any attempt by Vendor to vary in any degree any of the terms of the PO shall be deemed material and are hereby objected to and rejected but shall not operate as a rejection of the balance of the PO. Any PO that is not signed and returned by Vendor or deemed accepted by Vendor by commencement of Services within thirty (30) days of receiving such PO will expire automatically upon expiration of such thirty (30) day time period.

1.4 Each SOW and corresponding PO shall be deemed incorporated by reference as though fully set forth herein and shall remain separate, several, and independent from every other SOW and corresponding PO. An SOW may be revised from time to time during the term of this Agreement by mutual written agreement and by written Amendment signed by both Parties. A PO may be revised from time to time by

FINAL

securing an approved revised PO or Change Order from BI, which is accepted by Vendor in the same manner as set forth in <u>Section 1.3</u> above. "Change Order" means an amendment to an SOW, which describes any change in the details of an SOW, including, without limitation, changes to the budget, timelines or scope of Services. In the event of a conflict between the terms of this Agreement, a PO, and an SOW, the terms of these documents will take precedence according to the following order: (1) this Agreement; (2) the applicable PO; and (3) the applicable SOW.

1.5    BI's designated representative for the specification, direction and approval of the Services (or such other representative or representatives as BI may subsequently designate in writing) shall be stipulated in the SOW or PO.

## 2.   Vendor Personnel

2.1    Vendor shall appoint a "Project Manager" to be responsible for its performance of an SOW. The Project Manager shall be identified in the applicable SOW. The Project Manager shall coordinate performance of such SOW with a representative designated by BI, which BI representative shall have responsibility over all matters and for all communications related to such SOW on behalf of BI. Vendor shall engage the Project Manager, and such employees, agents, consultants, subcontractors, or other third parties ("Vendor Personnel") reasonably necessary to assist Vendor in providing the Services at Vendor's own cost, unless otherwise pre-approved by BI in writing. The agents, consultants and subcontractors specifically identified in each PO are hereby approved by BI. Any additional agents, consultants and/or subcontractors that have access to BI Confidential Information must be pre-approved by BI in writing which, for purposes of this <u>Section 2.1</u> only, may include an e-mail transmission by BI. Each agent, consultant and subcontractor shall agree to be bound by the terms and conditions of this Agreement. Notwithstanding the foregoing, Vendor shall remain liable and responsible for the acts and omissions of all Vendor Personnel, including but not limited to those relating to confidentiality and reporting obligations hereunder.

2.2    Vendor and Vendor Personnel shall be fully trained, competent and skilled in and for the performance of the Services. Vendor and Vendor Personnel will comply with all applicable federal, state or local laws or rules in connection with the performance of the Services and shall hold all required licenses and/or certifications.   In the event Vendor discovers that any such license and/or certification has been suspended or terminated, Vendor shall notify BI immediately in writing. Vendor also, as applicable, shall provide and maintain facilities sufficient in quality and quantity to perform the Services.

2.3    Vendor shall use commercially reasonable efforts to ensure that Vendor Personnel assigned to perform the Services remain assigned until the Services they are being tasked to provide are complete. Vendor agrees to provide to BI, as soon as possible, notice of termination of employment of any Vendor Personnel assigned to perform the Services due to the death, illness, maternity leave, voluntary termination, resignation, disability or other causes beyond Vendor's reasonable control. In such event, Vendor shall identify a suitable replacement within five (5) business days following such notice to BI, subject to BI's prior written approval. Except to the extent prohibited by law, BI reserves the right to request the replacement of any Vendor Personnel assigned to perform the Services who, in BI's sole judgment, is not performing satisfactorily or who is otherwise unsuitable. In the event of such a request, Vendor shall use commercially reasonable efforts to provide suitable replacements within two (2) business days of the request at no additional expense.

2.4    Vendor shall comply with all applicable laws, ordinances, rules, regulations and lawful orders of any public authority bearing on the safety of persons or property or their protection from damage, injury or loss. Vendor and others working on behalf of Vendor shall further comply with provisions of the Occupational

FINAL

Safety and Health Act (OSHA) of 1970 and subsequent revisions following the Effective Date. Additionally, Services shall be performed in accordance with applicable OSHA standards.

2.5   BI is an equal opportunity employer and federal contractor or subcontractor. Consequently, the Parties agree that, as applicable, they will abide by the requirements of 41 CFR 60-1.4(a), 41 CFR 60-300.5(a) and 41 CFR 60-741.5(a) and that these laws are incorporated herein by reference. These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, or national origin. These regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, national origin, protected veteran status or disability. The Parties also agree that, as applicable, they will abide by the requirements of Executive Order 13496 (29 CFR Part 471, Appendix A to Subpart A), relating to the notice of employee rights under federal labor laws. Regardless of the applicability of the foregoing requirements, Vendor shall not discriminate on the basis of race, color, religious creed, sex, marital status, sexual orientation, gender identity, gender expression, ancestry, national origin, age, mental, physical or intellectual disability, veteran status, pregnancy, childbirth or related medical condition, genetic information or any other class or characteristic protected by federal, state or local law, with respect to Vendor Personnel in connection with fulfilling the obligations set forth in this Agreement.

2.6   INTENTIONALLY OMITTED.

2.7   During the term of this Agreement and for a period of one (1) year thereafter, neither party shall, directly or indirectly, on behalf of itself or any other person, solicit for employment or engagement any person who is then, or who was at any time during the term, employed or engaged as an employee, contractor, sales representative or otherwise engaged in any professional, managerial or other position with the other party; provided, however, that the foregoing provisions shall not apply with respect to any person who seeks employment or engagement from the other party of such person's own initiative, such as, but not limited to, in response to the other party's general announcement or advertisement.

3.  **Invoices**

3.1   Vendor shall invoice BI for Services and Deliverables as set forth in the applicable SOW or PO. Each invoice shall substantially comply with the requirements as set forth in Exhibit C.

3.2   For Services subject to State of Connecticut state sales tax, Vendor shall separately state the taxable amount of such Services on the invoice.

3.3   Except as otherwise provided in this Agreement and/or applicable PO, the failure of Vendor to make demand for payment within twelve (12) months of completing the Services under an applicable PO shall be considered a waiver by the Vendor of its rights to receive payment.

3.4   Vendor agrees that BI may, without the need for further consent from Vendor, disclose information relating to Vendor and this Agreement to an agent of BI solely for the purpose of allowing agent to process POs, invoices and accounts payable.

3.5   INTENTIONALLY OMITTED.

FINAL

## 4.   Payment

4.1   In exchange for providing the Services, BI shall pay Vendor the fees and project expenses set forth in the applicable SOW and/or PO, subject to those set forth in the Statement of Rates attached as <u>Exhibit D</u>. BI will reimburse Vendor for reasonable, documented transportation, lodging or meal expenses that have been incurred in conformance with the BI Travel and Expense Reimbursement Guideline for Vendors referenced in <u>Exhibit E</u>, and explicitly set forth in the applicable PO. Deviations from the BI Travel and Expense Reimbursement Guideline will require prior review and written approval by BI. Vendor agrees that all project expenses and travel or other expenses incurred by Vendor or any Vendor Personnel and reimbursable by BI will be reimbursed at actual cost without any profit, overhead, or general administration charges or other markup, except as specifically set forth herein or in the applicable SOW or exhibits attached hereto. Discounts received by Vendor which are based on the pass-through costs incurred by Vendor in connection with the performance of obligations under this Agreement shall be passed on to BI and Vendor shall credit BI its pro rata portion of any rebate or other concession provided by any third party supplier. Vendor will not be reimbursed for travel to and from BI's place of business, unless specifically set forth in an applicable PO. Further, Vendor will not be reimbursed for any payment to a consultant or subcontractor that is not specified in the applicable PO, project budget approved by BI or otherwise pre-approved by BI in writing. All third party expenses in the creation or production of programs must be included in the project proposals. Third party expenses in excess of $10,000 must be supported by at least three (3) bids unless otherwise agreed to by BI in writing.

4.2   BI will remit payment for Services performed and Deliverables in accordance with this Agreement and the applicable SOW and accepted by BI and expenses approved by BI. Payment will be made by BI within forty-five (45) days after receipt of Vendor's undisputed invoice with supporting documentation. In the event of a dispute, Vendor will submit a revised invoice for the undisputed amount for which BI will remit payment pursuant to the terms of this Section 4.2. To dispute an invoice, BI must provide notice of the dispute no later than forty-five (45) days after receipt. Vendor assumes all responsibility and liability for the payment of any federal, state or local income taxes due on payments received from BI, and shall be responsible for all employment taxes and withholding with respect to Vendor Personnel. Vendor agrees to defend, indemnify and hold BI and its Affiliates harmless from and against any and all such liabilities or claims including, but not limited to, interest assessed or penalty and reasonable attorneys' fees incurred, arising from Vendor's failure to pay such tax. Payment hereunder shall represent full and complete compensation for all obligations assumed by Vendor and for all intellectual property rights, including inventions, improvements, copyrights or patent rights assigned or created as works made for hire as more fully set forth in <u>Article 11</u>

4.3   Vendor agrees to provide a valid United States federal tax identification number to BI. In the event that Vendor does not provide a valid tax identification number, Vendor acknowledges and agrees that BI may be required by law to withhold said withholding taxes from gross payments due to Vendor.

4.4   Within sixty (60) days following completion of the Services and Deliverables and payment by BI of all amounts invoiced under each PO, the amounts payable to Vendor in accordance with the terms of the PO and the amounts actually paid to Vendor shall be reconciled. If BI has made prior payments to Vendor that exceed the amount owing to Vendor, Vendor will return the difference to BI within forty-five (45) days following the earlier of (i) request by BI or (ii) discovery by Vendor of such overpayment. If BI has made prior payments to Vendor that are less than the amount owing to Vendor, BI will pay the difference to Vendor after the reconciliation and within forty-five (45) days after receipt of the final invoice.

4.5   BI will not be liable for (i) payment of any fees in excess of the amount set forth in the applicable PO or (ii) reimbursement to Vendor for any expenses not specifically included in the applicable SOW, except

Page 6 of 56

Marketing Sourcing Master Services Agreement
Boehringer Ingelheim Pharmaceuticals, Inc./ Axtria Inc.
Effective Date: May 30, 2016

FINAL

pursuant to a written amendment to the applicable SOW executed by BI and Vendor and a revised PO issued by BI and accepted by Vendor.

## 5. MLR Review, Trademarks, Domain Names and Promotional Materials

5.1 Print and other production will be handled by BI. Contact Sourcingmkliterature.rdg@boehringer-ingelheim.com regarding the development of specifications, unless otherwise directed in writing by BI.

5.2 Marketing, sales and medical meetings shall be planned, budgeted and managed by Global Congress and Meeting Services (GCMS). All expenses related to the logistics of a meeting or congress (e.g., hotel contracting, room registration, meeting space, travel, ground, meals, AV etc.) are arranged and paid through GCMS. All meeting requests are submitted on a BI "Meeting Request Form". It is the Vendor's responsibility to stay current with the GCMS SOP guidelines. To request the current SOP or ask any questions, Vendor must send inquiries to meetings.rdg@boehringer-ingelheim.com.

5.3 Vendor acknowledges that BI has a medical, legal and regulatory review process ("MLR Review") to allow BI to ensure that all BI promotional materials and programs and third party communications comply with applicable laws and regulations including, but not limited to, those relating to the United States Food and Drug Administration ("FDA"). Vendor agrees to strictly adhere to BI's "Submission Requirements" as set forth in Exhibit B. Vendor acknowledges and agrees that all content, scripts, materials and programs developed or prepared by Vendor hereunder will be submitted to BI for MLR Review in accordance with the Submission Requirements for BI's prior written approval ("BI MLR Approval"). No promotional materials or other third party communications will be piloted, launched, or otherwise used in a promotional context or sent or communicated to any healthcare professional or other individual without prior written BI MLR Approval. In the event any provision contained in Exhibit B conflicts with any part of this Agreement, the provisions set forth in this Agreement shall take precedence. Vendor agrees not to alter BI approved content, scripts, materials and/or programs in any way without BI's prior express written consent.

5.4 When developing materials that utilize BI's trademarks, trade names or logos, Vendor shall comply with BI's Corporate Logo Guidelines and any other design guidelines provided to Vendor in writing or via the internet at http://cd.boehringer-ingelheim.com. Vendor is invited to register at the Corporate Design website and subscribe to the "News" section in order to be notified and informed of any changes to the guidelines.

5.5 If, as a result of FDA notification a corrective advertisement is requested for a BI product program related to the Services provided by Vendor hereunder, Vendor will distribute that message to its applicable network as specified by BI. BI will pay normal and reasonable distribution costs to communicate this message.

5.6 Domain names and SSL-certificates relating to BI, its business or its products shall be registered and/or applied for by BI only, not by Vendor. Any requests for or other communications regarding domain names/SSL-certificates (registrations, applications or transfers) shall be addressed to Domain.names@boehringer-ingelheim.com exclusively.

## 6. Independent Contractor

For the purposes of this Agreement, Vendor and BI are independent contractors and are not agents, joint venturers, or business partners of the other. Neither Party is granted any right or authority to assume or create any obligation or responsibility, express or implied, on behalf of, or in the name of the other Party, or to bind the other Party in any manner whatsoever. Each Party is solely responsible to select, engage and discharge its

employees and other personnel, to determine and pay their compensation, taxes and benefits, and to otherwise direct and control their services and determine all matters. Except as specifically set forth in this Agreement, nothing contained in this Agreement shall impose an obligation of exclusivity on one Party by the other. Vendor Personnel performing Services under this Agreement shall at all times be under Vendor's exclusive direction and control and shall be employees, agents or sub-contractors of Vendor. The Parties hereby acknowledge and agree that BI shall have no right to control the manner, means, or method by which Vendor performs the Services called for by this Agreement. Rather, BI shall be entitled only to direct Vendor with respect to the elements of Services to be performed by Vendor and the results to be derived by BI, to inform Vendor as to where and when such Services shall be performed, and to review and assess the performance of such Services by Vendor for the limited purposes of assuring that such Services have been performed and confirming that such results were satisfactory.

## 7.  Indemnification

7.1   Vendor, at its own expense, shall defend, indemnify and hold harmless BI, its Affiliates, officers, directors, employees, agents, successors and assigns ("BI Indemnitees") from and against all loss, liability, costs, charges, claims or damages which includes all costs and expenses of any investigation and defense of such claims, including the reasonable fees and expenses of attorneys and experts, etc. ("Losses") that result from or arise out of the violation of any third party's trade secrets, trademarks, copyright, patent rights or other intellectual property rights in connection with the performance of Services provided under this Agreement. Notwithstanding the foregoing, this indemnity obligation shall not apply to the extent that any infringement or claim thereof is based upon: (i) the combination, operation or use of the Services, Deliverables in combination with equipment or software not supplied by Vendor hereunder where the Services and/or Deliverables would not themselves be infringing, (ii) compliance with designs, specifications or instructions provided by BI Indemnitees or any third parties working at the direction of BI Indemnitees, (iii) use of the Services and/or Deliverables in an application or environment for which it was not designed or not contemplated under this Agreement, or (iv) modifications of the Services and/or Deliverables by anyone other than Vendor where the unmodified version of the Services and/or Deliverables would not be infringing. In addition, in the event that any part of the Services or Deliverables (as defined below) does or is likely to become the subject of a suit, action or claim of infringement and its use is or may be enjoined, Vendor shall, at BI's option and subject to BI's written approval, (i) modify the Services or Deliverables, at Vendor's own expense, so that it is non-infringing and functionally equivalent; or (ii) obtain for BI, at no additional cost to BI, sufficient rights to allow BI to use the infringing Services, and/or Deliverables as contemplated hereunder; or (iii) substitute non-infringing services or deliverables acceptable to BI that are substantially similar to the Services, and/or Deliverables described in a PO. Any such replacement services, and/or deliverables shall be subject to all of the terms and conditions of this Agreement, including without limitation, the foregoing indemnification provisions. Further, the options and remedies set forth above will not limit any other rights or remedies available to BI under this Agreement or at law or in equity.

7.2   BI, at its own expense, shall defend, indemnify and hold harmless Vendor, its officers, directors, employees, agents, successors and assigns ("Vendor Indemnitees") from and against all Losses that result from or arise out of the violation of any third party's trade secrets trademarks, copyright, patent rights or other intellectual property rights as a direct result of BI's own written direction provided to Vendor in the course of Vendor's performance under this Agreement.

7.3   Vendor shall defend and indemnify the BI Indemnitees against all Losses which may arise out of the acts and omissions of any Vendor Indemnitee or any Vendor Personnel in the performance of the Services under this Agreement that result in a breach of this Agreement, provided that Vendor shall not be liable for

FINAL

nor be required to defend nor indemnify BI if the Losses result solely from the negligence or willful misconduct of any BI Indemnitee.

7.4 Vendor shall defend and indemnify the BI Indemnitees against all Losses resulting from (i) any acts of bribery, corruption, fraud, embezzlement or dishonesty committed by Vendor or any Vendor Personnel, acting alone or in collusion with another party, in the performance of the Services hereunder, and (ii) claims made by Vendor employees against BI including, wage and hour related (overtime, misclassification), discrimination, retaliation, leave laws and other state and federal employment claims.

7.5 The absence of insurance shall not diminish Vendor's responsibility to defend or indemnify BI Indemnitees.

7.6 A Party seeking indemnification (an "Indemnitee") shall (i) provide the indemnifying Party ("Indemnitor") with written notice, within a reasonable time after notice of any applicable claim is received by Indemnitee; and (ii) allow Indemnitor to have sole control of the defense or settlement of the claim; provided, however, Indemnitor shall not settle any claim which may have a material adverse impact on Indemnitee without the prior written consent of Indemnitee; and (iii) provide Indemnitor with reasonable assistance, information and authority necessary to perform Indemnitor's obligations.

8. **Insurance**

8.1 Without limiting its responsibilities under <u>Article 7</u>, Vendor shall maintain in force at all times during the term of this Agreement the following insurance including any special terms indicated and shall, upon written request of BI, provide to BI Global Sourcing certificates of insurance for each type of insurance specified below. The insurance shall be with an insurance company that is duly licensed and having a minimum A.M. Best rating of A-VIII.

8.1.1 Commercial General Liability Insurance in respect of Vendor's liability for loss of or damage to property, including property of BI, and against liability in respect of injury, including death, resulting therefrom, for the sum of not less than $1,000,000 for any one occurrence or the aggregate of $2,000,000 for any series of occurrences within any twelve (12) month period. The policy shall carry an endorsement indicating that all certificate holders shall be given a minimum of thirty (30) days' prior written notice of cancellation, non-renewal or termination and BI shall be named as additional insured under such policy of insurance.

8.1.2 If applicable, Commercial Automobile Liability Insurance, including all owned, non-owned and hired automobiles used in the performance of Services under this Agreement with a combined Single Limit for bodily injury and property damage for the sum of not less than $1,000,000 each accident.

8.1.3 Statutory Worker's Compensation and Employer's Liability Insurance with a limit of not less than $1,000,000 each accident or disease. If Vendor is not required by law to carry such coverage, BI shall not be responsible for any injury or disease sustained by Vendor or its employees, agents or representatives while in the performance of this Agreement, and Vendor agrees to indemnify BI for any claim made against BI.

8.1.4 If applicable, Professional Liability or Errors and Omissions Insurance covering any error or omission in the performance of Services hereunder for the sum of not less than $5,000,000 for any one occurrence and the aggregate of $5,000,000 for any series of occurrences within any twelve (12) month period.

Page 9 of 56

Marketing Sourcing Master Services Agreement
Boehringer Ingelheim Pharmaceuticals, Inc./ Axtria Inc.
Effective Date:  May 30, 2016

FINAL

     8.1.5   It is expressly understood and agreed that BI does not in any way represent that the above specified limits of liability or policy forms are sufficient or adequate to protect the Vendor's interests or liabilities.

## 9. Personal Information

    9.1   In performance under this Agreement, Vendor may gain access to certain information that can be used by itself or in combination with other available information to identify a specific individual, or that is otherwise defined as personal information by applicable law in the state and/or country of performance of Services and/or origin of the information ("Personal Information"). Personal Information includes, without limitation, information related to BI or BI's customers, consumers, patients, employees, personnel, physicians, suppliers, consultants and competitors, whether verbal or recorded in any form or medium, disclosed to Vendor by BI or collected by Vendor on BI's behalf including, but not limited to, (a) individually identifiable health information, (b) employment information, (c) insurance information, (d) family information, (e) an individual's name, address, phone number, e-mail address, social security number, or credit card information, and/or (f) all information, data and materials, including without limitation, demographic, medical and financial information, that relate to (i) the past, present, or future physical or mental health or condition of an individual; (ii) the provision of health care to an individual; or (iii) the past, present, or future payment for the provision of health care to an individual. Vendor agrees that Personal Information shall be transmitted, handled, stored, maintained, used, and eliminated in a manner that will preserve the confidentiality of the Personal Information and in strict compliance with HIPAA and HITECH (as defined below) and with all other applicable privacy and data security laws, rules and regulations in those respective states, countries, and other jurisdictions where Vendor provides Services and/or collects, uses, discloses or otherwise processes Personal Information. If Vendor performs any activity using Personal Information that constitutes or may be deemed to constitute "marketing" or the "sale of protected health information," as defined by HIPAA, Vendor shall obtain all appropriate individual authorizations prior to any use or disclosure associated with such Personal Information as may be required by HIPAA or applicable privacy and data security laws. Unless otherwise mutually agreed in writing, Vendor further agrees not to use or disclose Personal Information received pursuant to this Agreement for any purpose other than the performance of this Agreement. Furthermore, if Vendor becomes a Business Associate, as defined by HIPAA, Vendor is solely responsible for implementing and adhering to a Business Associate Agreement in compliance with HIPAA. Except as reasonably required in the performance of this Agreement, Vendor shall at no time release Personal Information subject to HIPAA, HITECH or other state or federal laws to BI.

    9.2   When collecting, using, disclosing, retaining or otherwise processing Personal Information on behalf of BI, Vendor will comply with BI privacy policies and any other applicable policies, including, without limitation, ones related to confidentiality and data security. Any and all consents collected by Vendor from individuals on behalf of BI relating to collection, use, disclosure, retention and other processing of the individual's Personal Information, must be retained by the Vendor for at least five (5) years after termination or expiration of this Agreement. Vendor agrees to establish commercially reasonable controls to prevent unauthorized access, use or disclosure of Personal Information. Vendor will implement all safeguards that reasonably and appropriately protect the confidentiality, integrity, and security of Personal Information. Such safeguards shall include the encryption of sensitive Personal Information that includes United States Social Security Numbers (or the comparable identifiers in other countries), driver's license numbers, medical information, bank account numbers and/or credit card information, when such data is transmitted or at rest including, but not limited to, data located on laptops, back-up tapes, USB flash drives and other portable devices.

9.3 Upon expiration or termination of this Agreement, or at any time upon request of BI, Vendor shall return to BI and/or destroy all Personal Information held in any form or medium whatsoever collected or received from or on behalf of BI. Vendor shall promptly send BI a written certification signed by an authorized representative of Vendor acknowledging that all Personal Information has been returned and/or destroyed. Any collection, use, disclosure, retention and other processing of the Personal Information other than as contemplated by or in violation of this Agreement is a material breach of this Agreement.

## 10. Confidential Information and Use of BI's Name

10.1 For purposes of this Agreement, the term "Confidential Information" includes, (a) as it relates to BI, BI's or its Affiliate's products, proprietary technologies, pharmaceutical and chemical compounds and any other products developed, manufactured, distributed, or otherwise exploited by BI or any BI Affiliate, together with the software and all other equipment, components, devices, data, specifications, designs, test results, formulas, algorithms, ideas, concepts, know-how, methods, techniques, documentation, and other information and materials of any sort related thereto, along with the Deliverables (not including any Underlying Vendor Intellectual Property contained therein) and (b) as it relates to both Parties, (i) any and all source code, object code, concepts, techniques, information, and materials of any sort relating to software or firmware products used, developed, or otherwise disclosed or exploited by the disclosing party (the "Discloser"); (ii) any and all ideas, concepts, know-how, methods, techniques, structures, information, including without limitation all specifications and test data, and materials relating to the research, design, development, engineering, invention, patent, patent application, manufacture, or improvement of any and all chemical compounds, pharmaceuticals, medical devices, products or information, computer, electronic, or other equipment, components, circuitry, or devices of any sort, which is or are constructed, designed, improved, altered, or used by the Discloser or its Affiliate; (iii) any and all internal business procedures and business plans, client and marketing information and materials, customers, prospective customers, licensing techniques, vendor information, purchasing information, financial information (price lists, fees, sales data and rates for services and other billing or collection related information), service and operational manuals, ideas for new products and services, strategic data, forecasts, and any other information which relates to the way the Discloser or its Affiliate conducts its business; (iv) any and all information and materials in Discloser's possession or under its control from any other person or entity which Discloser is obligated to treat as confidential or proprietary; (v) any information of the Discloser, including a formula, pattern, compilation, program, device, method, technique, or process that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use and (vi) Personal Information. For purposes of clarity, BI shall be deemed the only "Discloser" in relation to clause (a) in this Section 10.1.

10.2 The party receiving the Confidential Information (the "Recipient") shall keep in strictest confidence, both during the term of this Agreement and subsequent to termination of this Agreement, and shall not for any reason, except as directed by Discloser in writing, disclose, communicate or divulge to any person, firm or corporation, or use, directly or indirectly, for their own benefit or the benefit of others, any Confidential Information of Discloser which the Recipient may acquire or develop in connection with or as a result of the performance of the Services hereunder. Upon termination of this Agreement, for any reason whatsoever, the Recipient shall deliver to Discloser or destroy, as directed by Discloser, at Recipient's own expense all materials containing Confidential Information as well as any other matter in their possession or control relating to any of the Services performed hereunder and shall keep no copies, summaries or analyses of any kind, regardless of the format in which such information exists or is stored, except for a single copy for archival purposes, to comply with the audit requirements hereunder. Recipient shall promptly send Discloser a written certification signed by an authorized representative of Recipient acknowledging that all Confidential Information has been returned to Discloser or destroyed as directed by Discloser.

FINAL

10.3   Each Party agrees to treat any Confidential Information of the other Party in the same confidential manner and subject to the same use and disclosure limitations to which such Party applies to its own Confidential Information during the term of this Agreement and for ten (10) years following termination or expiration thereof.

10.4   Each Party acknowledges that disclosure of any Confidential Information by it or its respective personnel could give rise to irreparable injury to the other Party and that such injury may be inadequately compensable in damages.  Accordingly, each Party is entitled, in addition to the rights and remedies it may have under and pursuant to this Agreement or under applicable law, and without posting bond, to have an injunction issued by any competent court enjoining and restraining the other Party and/or its personnel from continuing any breach or threatened breach of the foregoing undertakings.  The existence of any claim or cause of action that either Party may have against the other Party shall not constitute a defense or bar to the enforcement of this provision.

10.5   The obligations of confidentiality and non-disclosure set forth in this Article 10 shall not apply to:

   10.5.1   Information which at the time of disclosure or discovery is in the public domain;

   10.5.2   Information which, after disclosure, becomes part of the public domain by publication or otherwise, except by breach of this Agreement;

   10.5.3   Information which either Party can establish by reasonable proof was in its possession at the time of disclosure by the other Party and was not acquired, directly or indirectly, from the other Party or subject to restriction; or

   10.5.4   Information which either Party receives from a third party provided, however, that such information was not obtained by said third party, directly or indirectly, from the other Party and that said party has a right to disclose such information.

10.6   If a Recipient is requested or required to disclose Confidential Information pursuant to any law, judicial or administrative process, or subpoena, Recipient will make known to the appropriate government or court officials the proprietary nature of any information requested and shall make any claim of confidentiality with respect thereto.  Further, Recipient will promptly notify Discloser in writing of such request or requirement and will provide the opportunity for Discloser to review any such subpoena to confirm its validity and will either (i) promptly seek protective relief from such disclosure obligation, or (ii) direct Recipient to comply with such request or requirement.  Recipient shall cooperate with efforts of Discloser to maintain the confidentiality of such information or to resist compulsory disclosure thereof.  If, after a reasonable opportunity to seek protective relief, such relief is not obtained by Discloser, or if Discloser fails to obtain such relief, Recipient may disclose only such portion of such Confidential Information that Recipient reasonably believes, on the basis of advice of Recipient's counsel, Recipient is legally obligated to disclose.

10.7   Vendor agrees and understands that any information or materials provided by BI or generated by Vendor pursuant to this Agreement are subject to United States laws and regulations, which may restrict exports, re-exports or other transfers to other countries and parties.  Vendor agrees that no material or information will be exported, re-exported, transferred or disclosed contrary to the applicable laws and regulations of the United States, or to any country, entity or other party which is ineligible to receive such items under U.S. law and regulations including the regulations of the U.S. Department of Commerce and the U.S. Department of Treasury.  Vendor agrees and understands it shall be solely responsible for (i) complying

Page 12 of 56

Marketing Sourcing Master Services Agreement
Boehringer Ingelheim Pharmaceuticals, Inc./ Axtria Inc.
Effective Date:  May 30, 2016

FINAL

with applicable laws and regulations related to performance of Services hereunder and (ii) monitoring any modifications to them.

10.8 Vendor and Vendor Personnel, in good faith, undertake to protect Confidential Information (including but not limited to patent-relevant, scientific or technical information) against unauthorized access by third parties. If Confidential Information is communicated via internet mail, use of internet mail encryption technology is compulsory. For another option for electronic communication between the Parties, Vendor shall provide a "Secure File Transfer Protocol" site or BI shall provide a suitable technology at http://guides.boehringer-ingelheim.com free of charge. For files over 2MB, files must be uploaded to the BI TEMPO FTP site. Without limiting the foregoing, any failure by BI to use such internet mail encryption technology in its communication of any BI Confidential Information shall not affect the confidential and proprietary nature of such information. Rather, such information shall continue to be BI Confidential Information and subject to the restrictions of this entire Article.

10.9 For purposes of clarification, and not in limitation of the duty of confidentiality set forth above, Vendor acknowledges and agrees that it shall not use BI's name or BI case studies, named or blinded, or BI Confidential Information. This prohibition shall apply, without limitation, to use in any marketing or advertising materials, sales literature, list of Vendor clients, in presentations to other prospective Vendor clients including, without limitation, general Vendor capability presentations, in presentations at conferences, seminars or other educational or informational venues, and/or in internal presentations to BI, its Affiliates and the employees thereof except as required for performance of Services under the applicable SOW. Vendor shall require each Vendor Personnel to comply with this Section 10.9 and shall be responsible for any breach of this Section 10.9 by any Vendor Personnel.

## 11. Ownership of Deliverables

11.1 Except as provided in Section 11.5 below, all rights, title and interest in and to all materials, documents, presentations, reports, information, data, results, analysis, summaries, and suggestions of every kind and description supplied to Vendor by BI or generated or developed by Vendor under this Agreement or an SOW as work product ("Deliverables") shall be the sole and exclusive property of BI, and BI shall have the right to make whatever use it deems desirable of the Deliverables. In the event of new vendor selection, Vendor shall transfer all materials and data to new vendor at no cost to BI. All Deliverables will be transferred to BI or new vendor, in the case of new vendor selection, in an electronic format that is reasonably acceptable to BI. At all times, BI shall be the exclusive owner of all proprietary rights of any kind or nature existing under the laws of any jurisdiction in the Deliverables, regardless of the state of completion or actual delivery of such Deliverables. The parties agree that all Deliverables created pursuant to this Agreement shall be "work made for hire" as that term is defined in the copyright laws of the United States, excluding any Underlying Vendor Intellectual Property (as defined in Section 11.7) contained or embodied therein. BI and its Affiliates shall have all rights, title and interest in and to the Deliverables, including the sole and exclusive right to secure and own copyrights and renewals throughout the World, and, accordingly Vendor's execution of this Agreement will constitute an assignment of its copyrights in all said work and its agreement to cooperate with BI by executing any documents or otherwise, by assisting BI in asserting or establishing its proprietary rights and copyrights in the Deliverables. BI and its Affiliates shall have exclusive, worldwide, unlimited rights to all Deliverables created pursuant to this Agreement except as otherwise specifically provided in this Agreement. Vendor agrees that BI or its Affiliate shall have the exclusive rights to publish or otherwise disseminate the results of the Services, including, without limitation, any work product produced by Vendor and Vendor shall have no publication rights with respect to such results.

FINAL

11.2 It is understood and agreed that all copyrights, trademarks, service marks, trade names, brand names, trade symbols, slogans, advertising plans, ideas, and other proprietary rights developed or furnished by Vendor as Deliverables in connection with its Services under this Agreement shall be the exclusive property of BI except as specifically provided in this Article 11. On all Deliverables prepared for BI by the Vendor, the Vendor shall place the appropriate trademark registration notice or notice of trademark claim, if any (e.g., ® or ™), indicating BI trademark rights, in accordance with the BI Brand Guideline. Similarly, the Vendor shall put a valid copyright notice in BI's name on all Deliverables created by the Vendor for BI.

11.3 Without limiting the foregoing, BI shall own all worldwide right, title and interest in and to the following: all original artwork, electronic files, video, photography, copy, layouts, films, concepts, ideas, names, logos, trademarks, brand names, symbols, slogans messages, themes and any other materials related to the preparation of and/or production of all Services contracted for whether produced by the Vendor or by any Vendor Personnel retained on behalf of BI, and whether or not the material was published, displayed, distributed, broadcast, or otherwise presented. From time to time, instances may arise in which third parties own proprietary rights in materials proposed to BI by Vendor as part of the Deliverables pursuant to this Agreement (except to the extent otherwise set forth in the applicable SOW). In all such instances, Vendor shall immediately, fully and clearly, inform BI of such third party's rights in writing. Vendor will proceed only with BI's written authorization upon being provided by Vendor with documentation evidencing permission for Vendor and BI to use such third parties rights in the Deliverables per the terms of the applicable SOW.

11.4 Limitations of rights for use of any third party's intellectual property shall be clearly defined and communicated to BI in writing for its consent in accordance with this Article 11. The third party permission obtained by Vendor shall include, without limitation, all necessary releases, licenses, permits and other authorizations to use the name, likeness, photographs, copyrighted material, quotes, data adaptations, artwork, or any other property or right belonging to any third party for use in marketing communications, education and public relations for BI for the appropriate time frame/duration of the campaign, geographic scope, and/or the use intended (e.g., use of photograph on the web versus use in a print ad). BI agrees to abide by the terms of such releases, licenses, permits, and other authorizations, provided it has approved use of such materials in accordance with this Article 11. Limitations of rights for use of any third party's intellectual property shall be clearly defined and communicated to BI in writing for its consent in accordance with this Article 11.

11.5 BI acknowledges that Vendor will own all rights, title and interest to all materials, tools, templates, methodologies, processes, know-how and proprietary information and technology developed by Vendor and used by Vendor to deliver the Services pursuant to this Agreement, and any and all improvements, updates, modifications and derivative works related thereto (collectively, the "Underlying Vendor Intellectual Property"). Vendor acknowledges that it shall not acquire any right, title or interest in or to any of BI's Confidential Information, even if incorporated into any such Underlying Vendor Intellectual Property. To the extent any Underlying Vendor Intellectual Property would or could limit BI's use of such Deliverables, Vendor hereby grants to BI an irrevocable, perpetual, non-exclusive, worldwide, royalty-free, license to BI and its Affiliates to use, execute, reproduce display, perform, modify, and distribute copies of Underlying Vendor Intellectual Property solely as part of any Deliverables provided to BI, as reasonably required solely in conjunction with BI's or its Affiliates' own business operations. In the event BI Confidential Information or intellectual property is included within Underlying Vendor Intellectual Property for purposes of performing the Services hereunder, such BI Confidential Information and intellectual property shall be removed by Vendor from its Underlying Vendor Intellectual Property upon completion of the Services and shall not be retained or used by Vendor for any other purpose.

*Marketing Sourcing Master Services Agreement*
*Boehringer Ingelheim Pharmaceuticals, Inc./ Axtria Inc.*
*Effective Date: May 30, 2016*

FINAL

## 12. Conflicts of Interest

12.1   Vendor warrants and represents that no amount has been or will be paid to or shared with, directly or indirectly, any BI employee, officer, board member or representative as wages, compensation, gifts, or otherwise.

12.2   Vendor also agrees to disclose via email to BI Global Sourcing the name(s) of any BI employee, consultant, independent contractor, officer, board member, or representative who is an immediate family member (spouse, child, grandchild, sibling, parent, or grandparent) of anyone who owns, directly or indirectly, any interest in Vendor. Should this situation change during the time of this Agreement, Vendor will advise BI Global Sourcing via email of such change immediately.

## 13. Reporting

13.1   Pursuant to applicable laws, drug and device manufacturers are required to report data on any and all items of value including, but not limited to, fees, meals, educational items, gifts, expense reimbursements and other payments or items of value ("Payments") provided to health care professionals ("HCPs") and/or health care organizations ("HCOs"). These reports may be made public by BI in order to comply with applicable state and federal laws, to comply with BI policies and procedures governing Payments to HCPs and/or HCOs, or as otherwise legally required to be disclosed by BI. Vendor will report to BI any and all Payments made by Vendor or any Vendor Personnel under this Agreement to HCPs and/or HCOs, as defined by BI. Vendor must report all Payments made to all HCPs and/or HCOs incurred during each calendar month in accordance with the BI Transparency and Disclosure Policy provided by BI. Reports must be submitted quarterly by the 15th day of the month following the close of each calendar quarter and Vendor must ensure that all Payments made during each calendar year are reported to BI on or before January 31 of the following calendar year. Vendor understands that to comply with its reporting and disclosure obligations, BI may be required to report direct or indirect payments or other transfers of value made by Vendor to HCPs and/or HCOs hereunder. Vendor shall provide, to each HCP and/or HCO to which Vendor makes any Payment, written notification that such payment and corresponding information (including, without limitation, such personally identifiable information as HCP and/or HCO name, address, state(s) where HCP is licensed to practice, form of payment, amount of payment, and other information required by BI) will be reported to BI and will be reported or disclosed by BI as legally required. Vendor represents and warrants that it will only provide to HCPs and/or HCOs Payments as permitted under applicable law and BI's policies and procedures. Vendor and Vendor Personnel providing Services for BI under this Agreement are required to complete a web-based training module on BI reporting procedures. Training must be completed by each Vendor Personnel within thirty (30) days of such individual commencing Services under this Agreement. Vendor will execute and deliver to BI the Attestation to BI Regarding Reporting Requirements and Training in the form attached hereto as Exhibit G (the "Attestation") within forty–five (45) days following the date of execution of this Agreement.

13.2   If Vendor or any Vendor Personnel becomes aware of any adverse event, product complaint, or extraneous comment (as each such term is defined in Exhibit H) related to the use of any pharmaceutical product owned or promoted by BI, or on behalf of BI, Vendor will be responsible for reporting each such event, complaint or comment to BI in accordance with the process attached hereto as Exhibit H, as amended by BI from time to time and provided or made available to Vendor. Any Vendor Personnel who may receive any such adverse event, product complaint, or extraneous comment in connection with the Services is required to complete the adverse event training specified in Exhibit H before performing any Services hereunder, but in no event later than forty-five (45) days following the execution of this Agreement. Vendor will keep (i) a copy of the completed and signed Training Record certificate for each Vendor Personnel who has completed the adverse event training, and (ii) an up-to-date list containing the

FINAL

names of all Vendor Personnel who have completed the training and the dates of completion. Vendor will execute and deliver to BI the Attestation regarding this reporting requirement within forty-five (45) days following the date of execution of this Agreement.

13.3 Vendor agrees to submit to BI reports, in form, timeframe, and substance to be agreed between BI and Vendor, providing reasonably detailed information (while respecting applicable patient privacy laws) regarding patient and consumer usage of the Deliverables and materials generated as part of the Services provided by Vendor pursuant to this Agreement. Reports and final executive summaries must be received on a mutually agreed to schedule. Vendor acknowledges and agrees that BI shall be the sole and exclusive owner of all data generated directly or indirectly in connection with this reporting.

13.4 Vendor represents and warrants that it will, and it will cause all Vendor Personnel to promptly report to BI any breach of data security, loss, compromise, or unauthorized use, unauthorized access, attempted unauthorized access, or disclosure of any part or all of BI's Confidential Information including, but not limited to, any Personal Information. Such notice shall be given as soon as possible and, in any event, within twenty-four (24) hours of the first day that Vendor or such Vendor Personnel knows of the loss, compromise, or unauthorized use or disclosure. Notice shall be given in writing, to the Chief Privacy Officer. For purposes of this Agreement, (i) unauthorized use means the sharing, employment, application, utilization, examination or analysis of any Confidential Information or Personal Information not authorized under this Agreement, and (ii) unauthorized disclosure means the release, transfer, provision of, access to or divulging in any other manner, any Confidential Information or Personal Information, except as expressly permitted hereunder or under applicable law in the state or country of performance of Services or origin of such Confidential Information or Personal Information. Use or disclosure of Confidential Information or Personal Information is unauthorized if it (i) violates the provisions of this Agreement, (ii) constitutes a breach of any applicable U.S. federal or state statute, regulation or guidance, or breach notification laws, or (iii) constitutes a violation of any BI policy related to the protection and confidentiality of such Confidential Information or Personal Information of which Vendor has been advised in writing. Vendor agrees to use its best efforts to mitigate the effects of any breach, to promptly propose correction action to BI and to promptly undertake all corrective action as approved or requested by BI.

13.5 BI requires Vendor to fully comply with all applicable disclosure obligations regarding Vendor's relationship with BI that may be externally imposed on Vendor based on Vendor's and/or Vendor Personnel's affiliation with any formulary or pharmacy and therapeutics committees or committees associated with the development of clinical guidelines, treatment protocols or standards, as well as any disclosure obligations which are required by any health care institution, medical committee, or other medical or scientific organization ("Committee"). Vendor shall also disclose to such Committee the nature of Vendor's relationship with BI. This disclosure requirement set forth above extends two (2) years beyond the term of this Agreement. If participation on the Committee by Vendor or Vendor Personnel creates the appearance of impropriety on behalf of BI, BI reserves the right to terminate this Agreement upon written notice pursuant to Article 15 of this Agreement.

13.6 Vendor shall notify BI, within twenty-four (24) hours, promptly by telephone and by email if any governmental or regulatory authority requests an inspection or makes written or oral inquiries of Vendor regarding any aspect of BI's activities pursuant to this Agreement. Vendor agrees to provide BI with a copy of any inspection report related to the Services pursuant to this Agreement. Unless otherwise required by applicable law or regulation, Vendor shall not allow access to any governmental or regulatory authority relating to such BI activities without giving BI the right to have a representative present. Vendor and BI shall cooperate in resolving any concerns of any governmental or regulatory authority. Vendor shall promptly notify BI by telephone or by email if Vendor believes that the actions or inactions of any

FINAL

governmental or regulatory authority, including the issuance or failure to issue any report, permit, or license, may cause a negative impact on Vendor's ability to perform the Services.

## 14. Audit

14.1 Vendor shall maintain appropriate documentation necessary to demonstrate Vendor's compliance with applicable law, regulation, BI policy, and as otherwise necessary to comply with the terms of this Agreement. This includes, but is not limited to, books, accounts, and records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of funds relating to this Agreement. All documentation related to the Services ("Documentation") shall be promptly and fully disclosed to BI by Vendor upon prior written request. Upon prior written request and at reasonable times, Vendor shall make available for inspection, copying, review and audit by representatives of BI, the FDA or any other regulatory agencies, including foreign regulatory agencies, all Documentation at Vendor location. Vendor agrees to exercise best efforts to take all reasonable steps that are requested by BI as a result of an audit to cure deficiencies in all Documentation. Vendor shall retain all Documentation and ensure conformance with applicable national and local regulations and as specified by BI. Vendor shall not destroy any Documentation without obtaining the prior written consent of BI.

14.2 During the term of this Agreement (including any renewal terms) and for a period of five (5) years following expiration or termination of this Agreement, BI reserves its right to confirm and validate Vendor's and Vendor Personnel's compliance with the terms of this Agreement and/or applicable laws and regulations through periodic audits of Vendor's documents and systems. BI's representatives, designees, auditors and regulators, as BI may from time to time designate ("BI's Auditors"), shall, upon reasonable notice, have the right to audit Vendor's documents, systems and operations, and conduct interviews with Vendor Personnel. Vendor shall provide access at all reasonable times and after reasonable notice to BI's Auditors to any facility or part of a facility at which Vendor is providing the Services and to any and all data and records relating to the Services provided to BI. The foregoing audit rights shall include when applicable, audits (i) of practices and procedures, (ii) of systems, (iii) of security practices and procedures, (iv) of disaster recovery and backup procedures, and (v) necessary to enable BI to meet applicable law and/or regulations.

14.3 During the term of this Agreement (including any renewal terms) and for a period of five (5) years following the termination or expiration of this Agreement, BI reserves its right to examine Vendor's financial and time records including, but not limited to, records of any expenditures relating to Vendor Personnel time (if applicable to an SOW) and out of pocket expenses incurred and charged to BI and to request copies of same. BI will notify Vendor sufficiently in advance to assure that such records are made available to BI's authorized representative at Vendor's business offices, and Vendor shall cooperate with such requests.

14.4 Any BI expenses incurred for an audit or examination shall be borne by BI unless an audit reveals that there has been an overcharge. If, as a result of an audit, it is determined that Vendor or any Vendor Personnel has overcharged BI or has charged BI with regard to administrative tasks performed for the benefit of Vendor and not directed to the management or conduct of a BI project, BI shall notify Vendor of the amount of such overcharge and Vendor shall promptly pay to BI the amount of the overcharge. If such overcharge is in excess of five percent (5%) of the charges subject to the audit, Vendor shall reimburse BI for all BI costs associated with the audit. The expenses associated with correcting deficiencies (including payment of any government-levied penalties) that may be identified as a result of the audit or government inspection and/or enforcement action shall be the responsibility of Vendor unless otherwise agreed upon, in writing, by both Parties.

FINAL

14.5 Notwithstanding anything to the contrary specified in this Agreement, Vendor shall retain all records, documents and other information required to meet BI's audit requirements under this Agreement for the longer of (i) five (5) years from the termination or expiration of this Agreement, (ii) until final resolution of any dispute concerning this Agreement, or (iii) as long as required by law, regulation or BI policy.

14.6 Vendor shall conduct internal audits consistent with industry guidelines and, if requested by BI in writing, provide BI with an audit certificate evidencing the scope and date of performance of each such audit. Vendor shall promptly make available the results of a review or audit conducted by Vendor, its Affiliates, or any Vendor Personnel (including internal and external auditors), relating to Vendor's operating practices and procedures to the extent relevant to the Services or BI (including, e.g., any SAS-70 reports) to the BI Senior Director, Corporate Compliance Audit or other individual identified by BI. Vendor shall, and shall cause Vendor Personnel to provide all audit-related materials to BI at Vendor's expense.

14.7 Without limiting the generality of this Article 14, upon ten (10) days' prior notice from BI to Vendor that BI wishes an information security audit to be performed, Vendor shall conduct or allow BI to conduct, as specified in BI's notice, such information security audit to test the compliance with generally accepted industry standards or such other security standards and procedures as determined by BI and as established by BI policy. To the extent that Vendor is conducting an information security audit, this information security audit shall be conducted either by Vendor or a third party designated by Vendor which is acceptable to BI, in accordance with standards acceptable to BI, and at no expense to BI. To the extent that BI elects to conduct an information security audit pursuant to this Article 14, Vendor acknowledges and agrees that BI Auditors may conduct an information security audit of the environment used to provide the Services, including security, policies, and operational matters. Regardless as to who is conducting the audit, Vendor shall, at no expense to BI: (i) provide any BI or Vendor designated auditor with all assistance and resources reasonably required to conduct any information security audit authorized pursuant to this Article 14, and (ii) remedy any deficiencies identified during any such information security audit as directed by BI.

## 15. Term and Termination

15.1 The term of this Agreement shall be for a period of three (3) year(s), commencing upon the Effective Date hereof, and upon written mutual consent, may be renewed for one (1) additional one (1) year period for a maximum term of four (4) years. Any consent by BI to a renewal of this Agreement will be at BI's sole discretion.

15.2 BI may terminate this Agreement or any given SOW or PO at any time without cause upon thirty (30) days' prior written notice.

15.3 Either Party may terminate this Agreement or any SOW or PO effective upon written notice to the other Party if such Party breaches any of the terms or conditions of this Agreement or the applicable SOW or PO and fails to cure each breach within thirty (30) days after receiving written notice thereof from the non-breaching Party specifying the breach alleged by such Party. Notwithstanding the foregoing, BI reserves the right to immediately terminate this Agreement, or any PO issued hereunder, upon written notice to Vendor if Vendor breaches any of the representations and warranties set forth in Article 16.

15.4 Upon termination of this Agreement or any SOW or PO, except as set forth in this Agreement, Vendor shall immediately cease all Services under the applicable SOW(s) or PO(s), cease to represent itself as providing Services to BI under the applicable SOW(s) or PO(s) and deliver at no additional expense to BI, or new vendor in the case of new vendor selection, (i) a report describing the current state of the Services, Licensed Property, and Deliverables to be provided by Vendor under this Agreement and any

FINAL

SOW(s) and PO(s) outstanding as of the date of termination; (ii) all BI Confidential Information in its possession; and (iii) all Deliverables, in whatever state of development they may exist on the date of termination. Upon delivery and receipt of the above, BI shall make payment to Vendor, as expeditiously as is practicable following receipt of an invoice from Vendor, for the Services, Deliverables, and Licensed Property performed to the reasonable satisfaction of and accepted by BI, as of the date of termination, at the agreed upon rates for authorized Services and project expenses that cannot be canceled or recovered in whole or in part, and for authorized expenses incurred, pursuant to the BI Travel and Expense Reimbursement Guideline for Vendors in Exhibit E, in connection therewith which are reimbursable under the terms of this Agreement and cannot be canceled or recovered in whole or in part. Notwithstanding the foregoing, BI shall not reimburse Vendor for any advance or upfront payment made by Vendor that cannot be canceled or recovered unless such reimbursement was pre-approved in writing by BI. If BI has made prior payments to Vendor that exceed the amount owing to Vendor upon termination of this Agreement, Vendor will return the difference to BI within thirty (30) days after the date of termination.

15.5 Notwithstanding the foregoing, the Parties hereby acknowledge and agree that, upon expiration or termination of this Agreement, unless otherwise directed by BI in writing or resulting from a termination by Vendor, Vendor will continue performance under each outstanding SOW or PO even if performance extends beyond the expiration or termination date subject to the continued and timely payments of amounts due for such performance (at the then current rates). In such event, each uncompleted SOW or PO shall continue in full force and effect and the terms and conditions of this Agreement will continue to apply to each such SOW or PO until completed or until such SOW or PO is specifically terminated in accordance with this Agreement or the terms of such SOW or PO. The Parties further acknowledge and agree that termination of a specific SOW or PO will not affect the validity of any remaining SOW(s) or PO(s). Upon termination of this Agreement pursuant to the provisions of Section 15.3, without limiting its rights or available remedies under law, BI shall be entitled to a pro rata refund of any portion of amounts paid to Vendor by BI for Services and/or Deliverables which have not, as of the effective date of such termination, been provided by Vendor substantially in conformance with terms of the applicable SOW(s), and the terms hereof.

15.6 The obligations set forth in Article 7 (Indemnification), Article 9 (Personal Information), Article 10 (Confidential Information and Use of BI's Name), Article 11 (Ownership of Deliverables), Article 13 (Reporting), Article 14 (Audit), Article 16 (Representations and Warranties) and Article 18 (Miscellaneous) shall survive the expiration or termination of this Agreement.

## 16. Representations and Warranties

16.1 Vendor represents and warrants that (i) it has all requisite power and authority to enter into and perform its obligations under this Agreement, and (ii) that this Agreement constitutes the binding obligation of Vendor, enforceable against Vendor in accordance with its terms.

16.2 Vendor represents and warrants that it has no outstanding agreement or obligation which is in conflict with any of the provisions of this Agreement, or that would preclude Vendor and Vendor Personnel from complying with the provisions hereof and further certifies that it will not enter into any such conflicting agreement during the term of this Agreement.

16.3 Vendor represents and warrants that Vendor and Vendor Personnel are not persons or organizations excluded from participation in Medicare, Medicaid or other federal healthcare programs by the Department of Health and Human Service's Office of Inspector General and are not using in any capacity persons or organizations that are, debarred, suspended, or otherwise excluded by any federal government agency including, but not limited to the FDA, or barred from federal contracting by the

Page 19 of 56

*Marketing Sourcing Master Services Agreement*
*Boehringer Ingelheim Pharmaceuticals, Inc./ Axtria Inc.*
*Effective Date: May 30, 2016*

FINAL

General Services Administration. It further warrants and represents that Vendor Personnel are appropriately licensed and in good standing. Vendor further represents and warrants that Vendor and Vendor Personnel have not been convicted of, have not plead guilty to, and have not been found by a court or government agency to have violated, an offense involving bribery, fraud, kickbacks, moral turpitude or other applicable anti-corruption law or regulation. Further, Vendor represents, warrants and covenants that neither Vendor nor any Vendor Personnel is the subject of a Notice of Initiation of Disqualification Proceedings and Opportunities to Explain ("NIDPOE") letter or Notice of Opportunity for Hearing ("NOH") from the FDA. Vendor agrees to immediately disclose in writing to BI if Vendor or any Vendor Personnel becomes the subject of a NIDPOE or NOH, is debarred or if any action, suit, claim, investigation, or legal or administrative proceeding is pending or, to the best of Vendor's knowledge, threatened, relating to the debarment of Vendor or any Vendor Personnel performing Services hereunder. Vendor will immediately inform BI in writing of any debarment, exclusion, suspension or proposed debarment, exclusion or suspension by any federal government agency of Vendor or Vendor Personnel. Debarment, exclusion, suspension or proposed debarment, exclusion or suspension by any government agency or violation, intention to violate or potential violation of any law or regulation involving bribery, fraud, kickbacks, moral turpitude or corruption will constitute grounds for automatic termination of this Agreement by BI in BI's sole discretion.

16.4    Vendor represents and warrants that to the best of its knowledge:

   16.4.1    it is and will be the sole author of all works developed and/or used by Vendor, other than that software, if any, provided by BI, in preparing the Deliverables;

   16.4.2    it has and will have full and sufficient rights to all intellectual property needed to perform the Services and provide the Deliverables and to assign or grant the rights granted pursuant to this Agreement free and clear of any liens, claims or encumbrances; and

   16.4.3    none of the Deliverables infringe any patents, copyrights, trademarks or similar rights of any third-party, nor has any claim of such infringement been threatened or asserted.

16.5    Vendor represents and warrants that all Services and Deliverables shall be performed or provided in a workmanlike manner and with professional diligence and skill and shall be in conformity with the SOW and other performance requirements set forth herein or in a PO issued pursuant hereto.

16.6    Vendor represents and warrants that to the best of its knowledge (i) there are no BI employees with significant fiduciary interest in it or its affiliates; (ii) no BI employees serve as officers, shareholders, directors, or employees of Vendor and/or its affiliates; and (iii) no BI employees are compensated by or act on Vendor's or its affiliates' behalf, nor are related by blood or marriage to any of Vendor and/or its affiliates' employees that have contractual influence or authority over Vendor and/or its affiliates. In the event that such conflict exists or arises, Vendor agrees to make full and effective disclosure to BI.

16.7    Vendor represents and warrants that (i) it is in compliance with and will adhere to the BI Supplier Code of Conduct (located at https://www.bi-supplierxchange.com) or a Code of Conduct adopted by Vendor that is consistent with the BI Supplier Code of Conduct, and furthermore, it has effective compliance programs, policies and procedures to address relevant risk areas associated with the pharmaceutical industry, and (ii) it shall comply with all local, state and federal laws, industry guidelines, rules and regulations relevant to the provision of Services set forth in this Agreement in each country and state in which Services are performed. Without limiting the foregoing, Vendor represents and warrants that Services performed by Vendor on behalf of BI shall be in compliance with the applicable protocol, if any, and all applicable local, state and federal legislation, regulation, rules and guidelines, sound scientific procedures, any foreign

FINAL

corrupt practices act, any anti-bribery anti-corruption act, any conditions imposed by the FDA, those relating to the Federal Trade Commission, the federal False Claims Act, the PhRMA Code on Interactions with Healthcare Professionals, the Department of Health and Human Services Health Information Technology for Economic and Clinical Health Act of 2009, as amended ("HITECH"), Health Insurance Portability and Accountability Act of 1996 as amended ("HIPAA"), and all state consumer privacy laws, the anti-fraud and abuse statute, 42 U.S.C. § 1320a-7b(b) (known as the "Anti-Kickback Statute") and any applicable state anti-kickback laws.

16.8    Vendor represents and warrants that it has disclosed all third parties that have any role in providing the Services or Deliverables as required by Section 2.1.

16.9    Vendor represents and warrants that it will fully and completely cooperate with BI in any investigation relating to Vendor's activities under this Agreement, including investigations related to bribery, fraud, kickbacks, corruption or other similar issues.

16.10   Vendor represents and warrants that it and Vendor Personnel have complied and at all times will comply with the requirements of the United States Foreign Corrupt Practices Act as amended ("FCPA"), the United Kingdom Bribery Act of 2010 as amended (the "UKBA"), and all other applicable anti-bribery and anti-corruption laws and regulations.  Without limiting the generality of the foregoing, Vendor represents and warrants that it and Vendor Personnel have not and will not make, pay, offer to pay, promise or authorize directly or indirectly the payment of money or anything of value, to anyone, including but not limited to Government Officials in order to influence or obtain or retain approvals, licenses, secure improper advantages or business in connection with the Services or Deliverables provided under this Agreement.  Vendor will immediately notify BI if it learns that any such payment, offer, promise, or authorization has been made, directly or indirectly.  Upon BI's request from time to time, Vendor agrees to certify compliance with the foregoing in a form suitable to BI.  "Government Official" means any officer or employee of a government or any department, agency, or instrumentality thereof (including officers and employees of government-owned entities or public international organizations), any person acting in an official capacity for or on behalf of any government entity or official, or any political party, party official, and/or candidate for public office.  Without limiting the foregoing, "Government Official" includes all employees of government-owned or government-controlled (in whole or in part) hospitals, companies, or healthcare facilities, including doctors, nurses, contracting officers, procurement personnel and other persons employed by such entities.  In addition, "Government Official" includes any immediate family member or anyone acting on behalf of any person described above.

16.11   Vendor represents and warrants that if it learns any information giving it a good faith reasonable belief that Vendor or Vendor Personnel has or may have violated, intends to violate, or has caused a violation or potential violation of the FCPA, UKBA and/or any other applicable anti-bribery and anti-corruption law or regulation (even if Vendor believes that it may not be subject to such laws or regulations), Vendor will promptly notify BI in writing.

16.12   Vendor represents and warrants that none of its Vendor Personnel or other persons who have any role in providing Services under this Agreement are Government Officials or related to a Government Official covered by FCPA, UKBA and/or other applicable anti-bribery and anti-corruption laws and regulations.

16.13   Vendor represents and warrants that no beneficial owner of 15% or more of Vendor's shares and no directors, and officers are Government Officials.

16.14   Vendor agrees that if any such person or Vendor Personnel becomes a Government Official, Vendor shall promptly notify BI in writing.

FINAL

16.15 For purposes of this Section, BI refers only to Boehringer Ingelheim Pharmaceuticals, Inc. ("BIPI") and does not include any Affiliate. Vendor acknowledges that BI has entered a Corporate Integrity Agreement ("CIA") with the Office of Inspector General of the U.S. Department of Health and Human Services ("OIG"). A copy of the BI CIA is located on the OIG website at http://oig.hhs.gov/compliance/corporate-integrity-agreements/cia-documents.asp. Pursuant to the CIA, in the event Vendor provides Covered Functions under this Agreement and becomes a Relevant Covered Person as defined in Section II.C.2. of the CIA, then Vendor agrees to comply with (i) BI Code of Conduct; (ii) BI's Compliance Program and applicable policies and procedures; (iii) all applicable federal health care program requirements; (iv) FDA requirements; and (v) all certification, training, and screening requirements of Sections III.B, C and F of the CIA after becoming a Relevant Covered Person. A copy of BI's Code of Conduct and Corporate Compliance Program is available at http://us.boehringer-ingelheim.com/our_responsibility/responsible_business_practices.html. For clarification, a "Relevant Covered Person" does not include part-time or per diem contractors, subcontractors, agents or other person who are not reasonably expected to work more than 160 hours per year for BI.

## 17. On-Site BI Facility Access

If any Vendor Personnel are permitted to use BI's facilities, and, if appropriate, BI's equipment, to provide the Services, use of and access to BI's facilities shall be limited to those facilities and those hours required to render Services set forth in the applicable SOW. Each Vendor Personnel shall be subject to and comply with the On-Site Policies attached hereto as Exhibit I.

## 18. Miscellaneous

18.1 Assignment. This Agreement may not be assigned or transferred by Vendor without the prior written consent of BI.

18.2 Notices. All notices required or permitted to be given by one Party to the other under this Agreement shall be sufficient, if delivered personally, or if sent by certified mail, return receipt requested, or via nationally recognized overnight carrier with all freight charges prepaid and addressed as follows (or as subsequently noticed in writing to the other Party):

If to BI:            Boehringer Ingelheim Pharmaceuticals, Inc.
                     900 Ridgebury Rd.
                     Ridgefield, CT 06877-0368
                     Attn: Vice President, Global Sourcing, Marketing Services
                     With a copy to: General Counsel

If to Vendor:        Axtria Inc.
                     Suite 1300
                     400 Connell Drive
                     Berkeley Heights, NJ 07922
                     With a copy to: President

Any such notice shall be deemed to have been given when delivered if personally delivered, on the business day after dispatch if sent by overnight carrier, or on the date of receipt if sent by certified mail, return receipt requested.

FINAL

18.3 Severability. If any provision of this Agreement is found to be invalid, illegal or unenforceable by a court of competent jurisdiction, the validity, legality and enforceability of the remaining provisions shall in no way be affected or impaired thereby.

18.4 Waivers. Waivers, to be binding, must be made in writing, refer to this Agreement and signed by both parties. No waiver of the terms of this Agreement or failure by either Party to exercise any option, right or privilege on any occasion or through the course of dealing shall be construed to be a waiver of the same on any other occasion.

18.5 Disputes. Any dispute, controversy or claim arising out of or relating to this Agreement, or the breach hereof, shall be referred to upper management of the Parties for good faith discussion and resolution. The Parties agree that, pending resolution of a dispute, Vendor shall continue to perform its obligations under this Agreement and the applicable SOW and PO, and BI shall continue to make payment to Vendor for any undisputed items. Where a controversy or claim relates to a matter upon which BI's decision is declared by this Agreement to be final, binding and conclusive, or the decision is to be made solely by BI, or in BI's sole judgment or considered judgment or the like, the issue for resolution shall be limited to whether BI's decision was made in good faith. If any dispute, controversy, or claim cannot be resolved by such good faith discussion between the Parties, then each shall have all remedies available to them at law and in equity.

18.6 Governing Law. This Agreement and all SOWs and POs issued hereunder shall be construed, interpreted and enforced under the laws of the State of Connecticut. Each of the Parties irrevocably and unconditionally: (i) agrees that any suit, action or legal proceeding arising out of or relating to this Agreement shall be instituted in the United States District Court for the District of Connecticut in which BI is located, or if such court does not possess subject matter jurisdiction of any type or will not accept jurisdiction, in any court of general jurisdiction in Fairfield County, Connecticut; (ii) consents and submits to the exclusive jurisdiction of such foregoing courts in any such suit, action or proceeding; consents to personal jurisdiction in such courts; (iii) waives any objection which it may have to laying of venue of any such suit, action or proceeding in said courts; (iv) waives any constitutional, statutory or common law right of trial by jury; and (v) waives any claim or defense of inconvenient forum.

18.7 Government Disclosure. Vendor agrees that BI in its sole discretion may disclose the terms of this Agreement to the U.S. government or any agency thereof, or to any other government or government agency.

18.8 Entire Agreement. This Agreement, the SOWs and POs issued from time to time hereunder and the Exhibits attached hereto, or thereto, constitute the entire agreement of the Parties as to the subject matter covered herein and supersedes all prior oral or written agreements, proposals, understandings, representations, conditions and promises relating thereto. The provisions of this Agreement may not be modified or amended except by a written instrument referring to this Agreement and signed on behalf of both Parties.

18.9 Counterparts. The Parties may execute this Agreement or any SOW in two or more counterparts which shall, in the aggregate, be signed by all the Parties; each counterpart shall be deemed an original instrument as against any Party who has signed such counterpart. Additionally, the Parties may execute this Agreement by exchange of signatures sent by facsimile transmission or electronic transmission, including electronically scanned (i.e., PDF). Once signed by all Parties, this Agreement shall become effective and binding, and such complete facsimile or electronic copy shall be treated the same as an original for all purposes under this Agreement.

Page 23 of 56

*Marketing Sourcing Master Services Agreement*
*Boehringer Ingelheim Pharmaceuticals, Inc./ Axtria Inc.*
*Effective Date: May 30, 2016*

FINAL

18.10 No Further Obligations.   Nothing contained in this Agreement shall be construed, by implication or otherwise, as an obligation for either Party to enter into any SOW or PO with the other.   Vendor acknowledges and agrees that the terms and conditions of this Agreement do not constitute a promise or guarantee of future work.

**SIGNATURES ON FOLLOWING PAGE**

Page 24 of 56

*Marketing Sourcing Master Services Agreement*
*Boehringer Ingelheim Pharmaceuticals, Inc./ Axtria Inc.*
*Effective Date:  May 30, 2016*

FINAL

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the day and year first set forth above

Axtria Inc.

By: _____

Printed Name: ASHEESH SHARMA

Title: SENIOR PRINCIPAL

Date: 6/13/2016

Boehringer Ingelheim Pharmaceuticals, Inc.

By: _____

Printed Name: Christopher Strohm

Title: VP Commercial Operations

Date: 6/13/2016

Boehringer Ingelheim Pharmaceuticals, Inc.

By: _____

Printed Name: Michael Craigen

Title: Director, Global Sourcing

Date: 6/14/16

ATTACHMENTS:

Exhibit A:  Sample Statement of Work
    Exhibit A - Appendix I:  Tracking Report (Excel Spreadsheet)
Exhibit B:  Submission Requirements
    Exhibit B1:  BI Policy #29:  Promotional Materials and Promotional Programs Approval
        Exhibit B1 - Appendix I:  General Guidelines for Product Promotional Materials
        Exhibit B1 - Appendix II:  General Guidelines for Promotional Programs
Exhibit C:  Purchase Orders, Contact Information & Invoice Instructions
    Exhibit C1:  Sample Expense Report
    Exhibit C2:  Production Services
Exhibit D:  Statement of Rates
Exhibit E:  BI Travel and Expense Reimbursement Guideline for Vendors
Exhibit F:  Rebate Schedule
Exhibit G:  Attestation to BI Regarding Reporting Requirements and Training
Exhibit H:  Adverse Event, Technical Product Complaint, Medical Information Request and Extraneous Comment
    Notification
Exhibit I:  On-Site Policies

*Page 25 of 56*

*Marketing Sourcing Master Services Agreement*
*Boehringer Ingelheim Pharmaceuticals, Inc. / Axtria Inc*
*Effective Date: May 30, 2016*

FINAL

## EXHIBIT A

## SAMPLE STATEMENT OF WORK

This Statement of Work ("SOW") dated and entered into on this XX day of XXX, 20XX (the "Effective Date"), is made by and between Boehringer Ingelheim Pharmaceuticals, Inc., a Delaware Corporation with its principal place of business at 900 Ridgebury Rd., Ridgefield, CT 06877 ("BI") and XXX with offices located at XXX ("Vendor") pursuant to and subject to the terms and conditions of the Marketing Sourcing Master Services Agreement, dated XXX (the "Agreement") between the parties, the terms and conditions of which are incorporated by reference. Any defined terms utilized in this SOW but not herein defined shall have the meaning as set forth in the Agreement.

1.   **Project Title**:

2.   **Project Managers**:

   BI Project Manager Name: XXX

   BI Project Manager Title: XXX

   BI Project Manager Phone: XXX

   BI Project Manager Email: XXX

   Vendor Project Manager Name: XXX

   Vendor Project Manager Address: XXX

   Vendor Project Manager Phone: XXX

   Vendor Project Manager Email: XXX

3.   **Services/Program Description**:

   3.1  In BI's sole discretion, BI may request that a single SOW be submitted by Vendor for all work to be performed for a particular product, or BI may request that a separate SOW be submitted by Vendor for different aspects of the work to be performed for a particular product.  Vendor will also submit a staffing plan that relates to each agreed upon SOW.  BI and Vendor will agree to rates for all time of staff on each SOW as further described in this Agreement.

   3.2  In addition to the services described in the SOW, Vendor agrees to perform the following services, as may be required from time to time by BI:

   1)   Study BI products or services;

   2)   Analyze BI present and potential markets;

   3)   Create, prepare, and submit to BI for approval, ideas and programs;

   4)   Prepare and submit to BI for approval, estimates of costs of these recommended programs in advance of their preparation;

FINAL

     5)  Such other services as are customarily rendered for the project to be performed.

4. <u>Deliverables</u>:

5. <u>Program Details</u>:

6. <u>Responsibilities – BI and Vendor</u>:

7. <u>Fees and Payment Schedule</u>:

8. <u>Detailed Budget</u>:

9. <u>Reporting</u>:

On a monthly basis Vendor will send to BI Product Management, BI Global Sourcing and BI Controlling a monthly tracking report by product in the form specified in <u>Appendix I</u> to this Exhibit A. This tracking report must list for each product: (i) all projects being conducted by Vendor, including the status thereof, any change(s) thereto and any cancellation of all or a portion thereof, (ii) estimated time of staff and out of pocket expenses for each project, and (iii) actual costs incurred year to date for time of staff and out of pocket expenses for each project. In the event a project is cancelled, Vendor is required to report all costs associated therewith at time of cancellation.

10. <u>Test/Control</u>:

11. <u>Service Levels</u>:

12. <u>Governance Model</u>:

13. <u>Change Management Process</u>:

14. <u>Appendix</u>:

    <u>Appendix I: Tracking Report (Excel Spreadsheet)</u>

*Marketing Sourcing Master Services Agreement*
*Boehringer Ingelheim Pharmaceuticals, Inc./ Axtria Inc.*
*Effective Date:  May 30, 2016*

FINAL

## EXHIBIT A

### Appendix I

### Tracking Report (Excel Spreadsheet)

| Tracking Report | BIPI | Date | | | Originator | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Agency Job # | BIPI Job Number | Activity # (Will start with the brand prefix with #1 or 2) | POA or Term | Status Active, Planned or Cancelled | Project List Year | Name of Project | Original Est. Cost — Fees and OOP's | Actual Project Cost — Fees and OOP's | Variance vs Original Est. Cost — Total Fees OOP's | Monthly Invoiced Fees | Monthly Invoiced OOP's | Monthly Meeting Card Expenses (if Applicable) | Comments |
| | | | | | | Fill in individual project | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | | | | | **Total Costs** | 0 | 0 | 0 | 0 | 0 | 0 | |

Marketing Sourcing Master Services Agreement
Boehringer Ingelheim Pharmaceuticals, Inc./ Axtria Inc.
Effective Date: May 30, 2016

FINAL

## EXHIBIT B

### SUBMISSION REQUIREMENTS

Vendor must adhere to the following BI Submission Requirements and must receive written permission from BI's Marketing Operations group to deviate from these requirements:

**All materials must be approved through BI's Ensemble review or alliance review process. Final approval ("disc release") can only be issued by Marketing Operations.**

Vendors are required to submit promotional jobs and supporting materials electronically for Ensemble review. Additionally, native working files ("WIPs") for all projects must be uploaded to BI FTP at time of submission. Paper submissions are allowed only at the discretion of BI's Marketing Operations group.

**Vendor is required to have adequate network infrastructure and equipment to support efficient performance and response times on BI's Tempo system or working with BI's FTP site for art files.**

Vendor should familiarize itself with, as well as adhere, to the best of their ability, to BI's Policy #29 [EXHIBIT B1]: "Promotional Materials and Promotional Program Approval".

In developing materials hereunder that utilize trademarks, trade names or logos of BI, Vendor agrees to strictly adhere to BI's "Submission Requirements" as specified in Exhibit B. In the event any provision contained in Exhibit B conflicts with any part of this Agreement, the provisions set forth in this Agreement shall take precedence. In developing materials hereunder that utilizes any trademarks, trade name or logos of BI. Vendor shall comply with the Corporate Design Guidelines of BI, and any other BI design guidelines provided by BI to Vendor in writing or via website access accessible under http://cd.boehringer-ingelheim.com. Vendor is invited to register at the Corporate Design website and subscribe to the News section in order to be notified and up-dated of any changes to such Guidelines.

### PROOFREADING/EDITORIAL EXCELLENCE

Vendor is responsible for the proofreading of all materials that enter into and leave the BI Ensemble process. This includes, but is not limited to, supplying references that meet standards of medical excellence, ensuring the accuracy of all references, including proper placement of footnotes and accuracy of source citations. Marketing Operations Content Managers are responsible for managing the addition of reference assets to the Tempo digital asset library (DAL). Vendor must submit references to the Content Manager along with citation list five (5) business days before they intend to submit into Tempo. It is Vendor's responsibility to do the following:

- Vendor must check DAL to make sure that all references that will be used are already in the library.

- If a reference is not yet in the DAL, Vendor must purchase a clean, original PDF produced by Acrobat Distiller version 6.0, 7.0 or 8.0 and saved or optimized to Adobe version 6.0, 7.0 or 8.0. When saving a PDF in 9.0, you will need to save to a compatibility of 1.4 or earlier.

- Vendor must then send this PDF of the reference, along with the AMA citation, to the therapeutic Content Manager for upload into Tempo DAL.

Vendor agrees to ensure documents comply with the following BI standards:

FINAL

- *Internet references are only acceptable if the internet is the original source of the information. If, upon review, Content Managers decide that the reference is not a primary reference, Vendor will be contacted and the two parties will work to resolve the issue.*

- Data on file ("DOF"). DOF is used heavily, especially at product launch. Although data on file information is listed as a single reference in the finished piece, individual reference documents must be attached as DOF and named so as to distinguish one piece of DOF from another (for example, "DOF: Adverse Event Table 5). Vendor should be current about when data on file papers become published. At such time, the Content Manager is notified, and the DOF asset will be locked, and future pieces must include the current published source in its stead.

- Product Prescribing Information (PI) is usually a major source of information; however, BI does not formally reference the PI for a BI product in the finished piece. BI PIs are in the DAL for referencing, and should be tagged and linked like any other asset, but do not need to be cited in the actual printed piece. PIs for products not owned/licensed by BI are treated as any other reference: uploaded, tagged, linked, and cited in the final job.

- All pieces need to be completely referenced (using tags and links in Tempo), and the piece must contain appropriate footnotes. The footnotes are shown as 'superscripts' and the references cited are placed on the last page of the piece, numbered, and in the AMA citation format. Note: Pieces directed at a consumer will not have the footnotes or reference list in the printed piece, but must still be tagged and linked in Tempo so that the Ensemble review team can review the content.

- Vendor is also responsible for;

  o Verifying/securing permission to use copyrighted material in promotional pieces and supplying such documentation to the Content Manager for approval.

  o Reading the permissions they receive before sending them.

  o Addressing the use of direct quotations or graphics from any source – how the material will be used in the piece, and to whom it will go.

  o Letters requesting permission from the publisher for quotes and for use of graphs/charts from any source. These need to be collected and forwarded to the Content Manager in order for a piece to be released.

  o Model and photograph releases and/or receipts. These need to be collected and forwarded to the Content Manager in order for a piece to be released.

- No piece will be released until this material is received, and approved, by the Content Manager.

Proprietary and confidential information: It is Boehringer Ingelheim Pharmaceuticals, Inc. policy to respect the intellectual property rights of other companies just as BI expects that its rights will be respected. In this regard, Content Managers give special attention to copyright. Indiscriminate or wholesale copying of works (visual, written, or audio) prepared by others exposes the company to a charge of copyright infringement. This includes artwork, images, copywriting text, and photographs obtained for or on our behalf of BI. Content Managers play the key role in ensuring the company is protected.

FINAL

Promotional PIs, including PPIs, Brief Summaries, Patient Instructions, etc., are typically created by Creative Services and proofread at BI and furnished to agencies upon request. In the event that Vendor is requested to create one of these documents, Vendor verifies and confirms accuracy by signature and date of review. This signature indicates that the document is accurate and reflects the most recent version of the PI in BI Docs.

## ELECTRONIC SUBMISSIONS OF JOBS AND SUPPORTING PIECES FOR ENSEMBLE REVIEW

BI will issue secure IDs, accounts and passwords and train the agency on Tempo to allow the submission of electronic copies of jobs and supporting documents. In the event that Vendor does not have the capability to submit documents electronically, BI requires the use of AOR (Agency of Record) for electronic submission.

## SUBMISSIONS USING TEMPO

## VENDOR WORKSTATION REQUIREMENTS

### Hardware

- CPU: PC - Pentium 4, or equivalent, Macintosh – Core Duo 1.66 GHz
- RAM: 1 GB Minimum
- Hard Disk: Although no TEMPO software is installed on the client machine, at least 250 MB of Internet temporary file space is required.

### Software

- Operating System: Windows XP Service Pack 2; Windows Vista, or Mac OS X 10.4.10;
  Mac OS 10.4.11; Mac OS X 10.5.1
- Network: TCP/IP with operational Internet access of sufficient bandwidth to allow for efficient response time in TEMPO
- Web Browser:
- Windows: Microsoft Internet Explorer 6.0, Service Pack 2 (Windows XP) or Microsoft Internet Explorer 7.0 (7.0.5730.11 for Windows XP or 7.0.6000.16386 for Windows Vista)
- Macintosh: Safari Version 2.0 (2.0.4.419.3) on Mac OS X version 10.4.10 or Safari Version 3.0 (3.0.4) on Mac OS X version 10.4.11 or Mac OS X version 10.5.1.
- Marketing Operations will supply Vendor information about specific browser settings.
- Adobe Reader: Windows and Macintosh – Version 6.0, 7.0, or 8.0. Save to a compatibility of 1.4 or earlier when saving a PDF in 9.0.

## TRAINING

BI requires all Vendor members that work on BI jobs to be trained on Ensemble procedures including Tempo (BI's electronic and review tool). Vendor will not be given access to Tempo until Ensemble and Tempo training have been completed. Each member of the Vendor that will be accessing the Tempo system or working directly with MOps must complete both Ensemble and Tempo training. It is Vendor's responsibility to ensure any new team members are trained on BI procedures and systems and to maintain records of this training. Vendor must be able to provide these training records of these individuals upon request by the BI audit team.

Page 31 of 56

*Marketing Sourcing Master Services Agreement
Boehringer Ingelheim Pharmaceuticals, Inc./ Axtria Inc.
Effective Date: May 30, 2016*

FINAL

Vendor should contact BI Marketing Operations at tempo.rdg@boehringer-ingelheim.com for training on TEMPO – BI's electronic submission and review tool.

BI will issue Secure ID(s), log on(s) and password(s) to Vendor.

Periodically with updates, Vendor will be required to attend mandatory training for process changes/updates.  Vendor participation/adherence to new process changes will be reflected in the bi-annual evaluation.

## ALL SUBMISSIONS TO BI

### ART & DIGITAL FILES

All art and digital files created for BI by Vendor, including all original photography and illustrations in unflattened formats, are the sole property of BI and must be promptly supplied to BI upon request.  All WIPs must be submitted at the time the piece is put into Tempo, including but not limited to fonts, artwork, photography, and illustrations. These WIPs can be Quark or InDesign files.

Corrections mandated in the MLR review process will be implemented by BI Creative Services.  When corrections are done at BI, WIPs will be returned to the agency the same way with a layer showing corrections.

### SPEC SHEETS

A fully completed spec sheet should be submitted by Vendor, preferably upon first round MLR approval so Strategic Sourcing can provide pricing to brand in a timely manner. If that is not possible, then within a week, of the second round of MLR review, the fully completed spec sheet must be submitted to Strategic Sourcing in order for BI to provide pricing to Marketing for inclusion in TEMPO.

A working comp of each project must be submitted to Strategic Sourcing for pieces other than ads, pocket folders, sell sheets, letterhead and envelopes.

Spec sheets must be complete.  Production contact at Vendor must fill out all fields especially stock coating (aqueous dull or satin or gloss).

The spec sheet uploaded at file release must be reviewed to confirm it is accurate, updated and contains the correct TEMPO project number.

Vendor should follow TEMPO requirements when uploading files.  They must be in the correct version TEMPO requires or else printer cannot download and read.

### FOREIGN LANGUAGE TRANSLATIONS

BI has contracted Corporate Translations Inc. to handle all translations of its promotional materials for domestic use. BI Strategic Sourcing has supplied Corporate Translations with list of authorized BI contracted Ad Agencies - BI pricing is applied to any jobs done on BI's behalf.

The following process will be followed by Vendor:

- BI Marketing Operations will supply contact information for Corporate Translations Inc. to Vendor

- Vendor will forward materials for translation to Corporate Translations Inc.

FINAL

- Vendor will pay Corporate Translations directly and will bill BI on a no-markup basis as a pass-through expense.

- Corporate Translations will forward both the translation and accuracy certificate to Vendor, Vendor will submit to BI.

<u>PROOFS</u>

Online Proofing Process:  PDF blues will be routed to Vendor on a case-by-case basis, as determined by BI Content Manager. Vendor must pull a high-end matchprint or digital proof of key images conforming to GRACol-7 standards at final release ("disc release") and forward one copy to Print Vendor and one copy to BI Creative Services.  This matchprint will serve as the agency approved color proof.

If production does not include an online proofing process:

> Vendor is responsible for reading and signing off on two (2) Blues and one (1) Color Proof for all print pieces.  Vendor must return one (1) Blue and one (1) Color Proof to Marketing Operations Content Manager, not to Strategic Sourcing.  Vendor is responsible for reading and signing off on two (2) Preproduction Proofs for premium items.  Vendor must return one (1) Preproduction Proof to Content Manager, not to Strategic Sourcing. Vendor must turn the proofs around in 24 hours.

In certain cases, Strategic Sourcing will deviate from this process and will inform Vendor of specific instructions. But the protocol above needs to be followed or the delivery of the job could be jeopardized.

<u>AD RELEASES</u>

Vendor is to work off of approved media plan to create a master ad that can be sized up/down to fit all books on the plan.

The final uploaded file must be released 4CP. If Ad is a spread, files must be released as single pages.

A Brief Summary MUST accompany all ad releases.

Vendor is to upload a completed Spec Sheet for each ad that releases.  They should not release one spec sheet for multiple ads.

**Strategic Sourcing requires 5 days for ad approval routing/release. Vendor must take this into consideration, along with the 2253 Approval timing when agreeing to meet a material due date.**

**Vendor cannot release to publication directly.**

<u>RECORD RETENTION OF COMPLETED JOBS BY VENDOR</u>

BI's record retention schedule for Ensemble approved jobs is **three (3) years** from the time that the Marketing Operations releases the job for production.  At the end of this time period all jobs completed for BI by Vendor should be destroyed by Vendor.  This includes hardcopy, as well as art and digital files of jobs.  Vendor is expected to track BI jobs for destruction in accordance with BI's retention schedule.

<u>**If Vendor is producing any materials for BI, not going through BI Strategic Sourcing, Vendor must adhere to the following 2253 FDA Submission Requirements before the pieces can be used in-market:**</u>

<u>ELECTRONIC FILES/HARD COPY SAMPLES FOR 2253 FDA SUBMISSION:</u>

*Marketing Sourcing Master Services Agreement*
*Boehringer Ingelheim Pharmaceuticals, Inc./ Axtria Inc.*
*Effective Date:  May 30, 2016*

FINAL

After production is complete the following are required for FDA Submission:

- Printed Material: 15 Samples must be sent to BI MOps

- Websites: 4 Interactive CDs and 4 hard copies showing all of the requisite pages (5 for Micardis)

- Commercials: DTC – 4 DVDs, 4 sets of storyboards (5 for Micardis)

- Radio: 4 scripts, 4 CDs with audio (5 for Micardis)

- Interactive Convention Pieces: 4 hard copies (5 for Micardis)

- All CDs and DVDs must have a professional label with the BI Job Number and job name

**Vendor should allow 6 business days for completion of 2253 FDA Submission from the date BI MOps receives samples. Please make sure this is built into your timelines.**

Vendor will receive written confirmation either via a Tempo notification, or for older projects via email from the Project Manager, notifying them that 2253 has been submitted and the piece can be placed "into market". <u>**Pieces, materials, or promotional programming cannot be placed "into market" without written confirmation that 2253 has been submitted.**</u>

<u>**BI reserves the right to continuously monitor and audit the Vendor's adherence to BI's standards defined above including but not limited to quality submission.**</u>

*Page 34 of 56*

*Marketing Sourcing Master Services Agreement*
*Boehringer Ingelheim Pharmaceuticals, Inc./ Axtria Inc.*
*Effective Date:  May 30, 2016*

FINAL

## EXHIBIT B1

### BI Policy #29:  Promotional Materials and Promotional Programs Approval

**A.      INTRODUCTION AND PHILOSOPHY:**

All Promotional Materials and Promotional Programs, regardless of media, regardless of whether they are developed internally or externally, regardless of type (advertising, coupons, booths at events, etc.) and regardless of intended audience or place of presentation are considered promotional in nature, and are, therefore, subject to legal and regulatory requirements, including Federal Food and Drug Administration ("FDA") regulations and, potentially, state and federal laws relating to fraud and abuse and other laws. Violations of these laws can subject both the individual and Boehringer Ingelheim Pharmaceuticals, Inc. ("BI") to serious civil and criminal penalties.  Failure to comply with these policies may result in disciplinary action up to and including termination of employment.  The purpose of this Policy is to insure that BI Promotional Materials and Promotional Programs are in compliance with all applicable laws and regulations, and are medically appropriate.

**B.      GENERAL PRINCIPLES:**

All employees involved in the production of Promotional Materials and Promotional Programs are required to familiarize themselves with the applicable legal and regulatory standards, and adhere to this Policy and any BI procedures relating to product promotion.

All Promotional Materials and Promotional Programs shall provide an accurate balanced and complete picture of product attributes and characteristics, and shall not expose BI to competitive or product liability.  Likewise, such programs shall be developed in the best interest of patients and conveyed in a manner that assists prescribers and healthcare practitioners in using BI products in a safe and effective manner.

BI has instituted a review process (MLR Review) to insure that all promotional materials and programs are in compliance with applicable laws and regulations, and are medically appropriate.  All Promotional Materials and Programs (including content relating to the execution of that program) are required to be submitted for MLR Review. No Promotional Materials or Programs may be piloted, launched or otherwise used in a promotional context with or sent to any healthcare provider or patient without the MLR Review approval.

All employees and agents involved in the MLR Review Process must adhere to all applicable laws and regulations, including promotional laws and regulations and fraud and abuse.

General guidelines pertaining to the review of Promotional Materials is set forth in <u>Appendix I</u>.  General guidelines pertaining to the review of Promotional Programs are set forth in <u>Appendix II</u>.

**C.      APPLICABILITY:**

This Policy applies to all BI employees initiating and conducting Promotional Materials and/or Promotional Programs.

**D.      DEFINITIONS:**

1.   Promotional Material means any material, regardless of media utilized, distributed by or on behalf of BI pertaining or relating to a BI product or a competing product or any disease or condition that such products treat or any item bearing a BI trademark or the trademark of a competitor.  In addition, Promotional Material also includes communications (e.g., sales bulletins), materials used for sales training. This also includes the materials used in the training of HSS personnel.

*Marketing Sourcing Master Services Agreement*
*Boehringer Ingelheim Pharmaceuticals, Inc./ Axtria Inc.*
*Effective Date:  May 30, 2016*

FINAL

2. Promotional Program means any program, regardless of media utilized, distributed by or on behalf of BI pertaining or relating to a BI product or a competing product or any disease or condition that such products treat or any item bearing a BI trademark or the trademark of a competitor. Programs may be generated by or on behalf of Product Marketing, Sales or Managed Markets and intended to involve any Customer. The term is intended to include, but is not limited to, promotional programs involving use of physicians as speakers, programs where BI uses third party providers, "value added" services, gifts, promotional items and giveaways to customers, customer coupons, promotional activity at conventions, non-independent education programs and managed care programs funded directly or indirectly by, or initiated by or at the direction of Product Marketing, Sales or Managed Markets personnel.

3. Customer means any healthcare provider, managed care professional, potential or existing patient, or care-giver.

**E.    APPENDIX:**

Appendix I:    General Guidelines for Product Promotional Materials
Appendix II:    General Guidelines for Promotional Programs

Page 36 of 56

*Marketing Sourcing Master Services Agreement*
*Boehringer Ingelheim Pharmaceuticals, Inc./ Axtria Inc.*
*Effective Date:  May 30, 2016*

FINAL

## EXHIBIT B1

### Appendix I
### General Guidelines for Product Promotional Materials

**1.    Conformance to Full Prescribing Information**

The law requires that any promotional materials given to a healthcare provider must contain "full disclosure": that is, directions for use, including a statement of the products risks and benefits.  Promotional materials should convey complete and accurate information about BI products.  The full prescribing information is the basis for this information.  Promotion must be consistent with and not contrary to the FDA approved prescribing information.  Claims that do not conform may render a product "misbranded" under federal law and could jeopardize the company's ability to market the product.  Also, materials extending claims or minimizing risks may expose the Company to product liability claims.

**2.    Materials May Not be False or Misleading**

Both false statements and misleading statements are prohibited.  True statements may become misleading if taken out of context where part of the whole truth is omitted.  To be accurate, and not misleading, claims must be given in context.  Untrue or misleading information in an advertisement cannot be corrected by including the missing information or a brief summary in another part of the advertisement.  Promotional claims may be subject to multiple interpretations.  If any reasonable interpretation of a claim can be regarded as false, misleading or inadequately supported, such claim is objectionable.  Materials may not promote side effects as if they were a clinical benefit.

**3.    Materials Must be Balanced**

In addition to materials being in conformance with the full prescribing information, the materials must provide an objective and balanced presentation of both the risks and benefits of the product.  Claims and risk information must be given comparable prominence and readability.  Materials may not lift statements out of context, or underscore or highlight information to distract the readers' attention from risk and warning information.  The absence of balance can make a statement misleading.

If an advertisement fails to present a fair balance between information relating to side effects and contraindications, and information relating to effectiveness of the drug, it can be considered misbranded.

**4.    Adequate Clinical Support and Product Comparisons**

A drug is misbranded if its advertising represents that it is (i) better, (ii) more effective, (iii) useful in a broader range of conditions, (iv) safer, or (v) has fewer or less incidence of side effects than has been demonstrated by substantial evidence.  Substantial evidence usually means two adequate and well-controlled clinical trials.  Comparisons of safety, efficacy and or tolerability between products and related superiority claims may only be made if supported by head to head clinical trials, and not on the basis of comparing prescribing information.

*Marketing Sourcing Master Services Agreement*
*Boehringer Ingelheim Pharmaceuticals, Inc./ Axtria Inc.*
*Effective Date:  May 30, 2016*

FINAL

## EXHIBIT B1

### Appendix II
### General Guidelines for Promotional Programs

Any company activity or program which provides "value" (including goods, services, cash or an opportunity to earn money) to a healthcare provider or office staff is subject to federal and state laws prohibiting kickbacks, bribery, false claims and fraud. In general, these laws prohibit providing value, in whole or in part, to induce the purchase, use or recommendation of Company products. The laws are enforceable with both civil and criminal penalties and govern the entire range of goods and services one might provide to a healthcare professional.

Acceptability of a program is largely factually driven. In evaluating acceptability the following are some of the factors reviewed.

• Whether the value offered is sufficient to interfere with a person's legitimate prescribing judgment (where such judgment should be based on considerations of safety efficacy, quality and cost of the product).

• Whether remuneration offered for services exceeds the reasonable fair market value of the service rendered.

• Whether there is a relationship between the value provided and the volume of prescriptions or sales.

• Whether the transaction is appropriately structured and rolled out.

• Whether the programs comply with the American Medical Association guidelines on gifts to physicians from industry, the FDA guidance on industry sponsored scientific activities, PhRMA Code on interactions with Healthcare Professionals, and other internal governing policies.

Promotional programs must also comply with FDA Promotional regulations.

FINAL

## EXHIBIT C

## PURCHASE ORDERS, CONTACT INFORMATION & INVOICE INSTRUCTIONS

### PURCHASE ORDERS (PO)

The PO and any revised PO will be sent electronically via Email; POs are no longer signed by a BI purchasing representative. Any PO must be accepted by Vendor signing and returning such PO, without modification or revision, electronically to the appropriate BI representative.

### CONTACT INFORMATION

Purchase Orders & Accounts Payable

US toll free:  1-800-203-2916

Outside US:  1-203-791-6513

### INVOICE INSTRUCTIONS

The preferred method of submitting invoices is via email or fax.

If email, send to apinvoice.rdg@boehringer-ingelheim.com.

- The subject line of Vendor email must read: AP Invoice
- An invoice can only reference one PO
- Attach a separate file for each invoice.  Format as PDF only
- Vendor email can contain multiple files, but only 1 invoice per file
- There is a 12 MB size limit on the e-mails.  WinZip files will not be accepted by the system
- If  Vendor submits invoice(s) by email, DO NOT also send a hard copy by mail
- The body of the email should be blank
- For Services performed on a time and materials basis, invoices must indicate the individual working, the number of hours worked, a description of the Services performed, the dates when Services were rendered and the resulting fees.  Applicable discounts that have been mutually-agreed upon in writing must be applied.
- For expenses incurred for which reimbursement is sought, original receipts or other documentation approved in writing by BI must be submitted in accordance with the Sample Expense Report attached hereto as Exhibit C1.
- Send only invoices (with copies of receipts if applicable) and credit memos to this email address

**If Fax, use 1 (203) 837- 5856**

If email or fax is not feasible mail to our remit to address:

Boehringer Ingelheim

Attn: Accounts Payable

PO Box 1088

900 Ridgebury Road

Ridgefield, CT  06877-1088

**For all methods of Invoice submittal:**

DO NOT send Pro Forma Invoices

DO NOT send Purchase Order Confirmations

DO NOT send statements of account.

For all other communications to Accounts Payable, please use the general Accounts Payable email address serviceacctpay.rdg@boehringer-ingelheim.com.

*Marketing Sourcing Master Services Agreement*
*Boehringer Ingelheim Pharmaceuticals, Inc./ Axtria Inc.*
*Effective Date: May 30, 2016*

FINAL

## Invoices must be structured in the following format:

### Invoice Header (Top Part)

- Vendor business name & address (as identified by Vendor Tax ID), telephone, email and web address
- The words ""Invoice"" or "Credit"
- A unique invoice number (clearly labeled as "Invoice Number")
- Invoice Date in the following format:  mm/dd/yyyy
- BI Purchase Order Number
- BI Contact Name – first and last name
- Payment Terms, i.e. NET 45 (must match the BI PO/contracted agreement)

### Invoice Body (Middle Part)

- Fees and expenses must be subtotaled and separated (matching the PO line for line)
- Materials and labor must be subtotaled and separated

### Invoice Footer (Bottom Part)

- Invoice total (before tax)
- Tax Amount (if applicable)
- Freight Amount (if applicable)
- Total after tax and freight

### Payment Method (must be included)

The preferred method of payment is via ACH

- Vendor Remit to Address
- For electronic payments, vendor must provide full bank name, account number, routing number and details (ACH for domestic, Wire transfer for international)

*Marketing Sourcing Master Services Agreement*
*Boehringer Ingelheim Pharmaceuticals, Inc./ Axinle Inc.*
*Effective Date:  May 30, 2016*

FINAL

## EXHIBIT C1

### SAMPLE EXPENSE REPORT

| NAME: | |
|---|---|
| JOB NAME: | |

**FULLY DESCRIBED RECEIPT FOR EACH ITEM MUST BE SUPPLIED**
**PLEASE GROUP LIKE ITEMS**
**TAPE RECEIPTS TO SEPARATE PAGE AND NUMBER THEM**
**USE ASTERISK IF NO RECEIPT**

| Receipt # | ITEM | DATE | AMOUNT | DESCRIPTION-BE SPECIFIC | OFFICE USE: CODE |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |

**TOTAL**
**CASH ADVANCE**
**TOTAL DUE:**
**TOTAL OWED:**

| APPROVED BY: | DATE: |
|---|---|
| | |

*Marketing Sourcing Master Services Agreement*
*Boehringer Ingelheim Pharmaceuticals, Inc./ Axtria Inc.*
*Effective Date:  May 30, 2016*

FINAL

## EXHIBIT C2

### INTENTIONALLY OMITTED

FINAL

## EXHIBIT D

## STATEMENT OF RATES

### PROJECT FEES/RATES AS STATED ON EACH INDIVIDUAL PURCHASE ORDER.

The Rates are estimated on a per-project basis and must be approved by BI project lead prior to the start of work. The Statement of Work (SOW) with agreed upon project rates will be attached or included in each individual Purchase Order.

FINAL

## EXHIBIT E

### BI TRAVEL AND EXPENSE REIMBURSEMENT GUIDELINE FOR VENDORS

**PURPOSE:**  To detail how individuals who supply services directly or indirectly to or on behalf of Boehringer Ingelheim ("BI") should book their business travel and to define reimbursable business travel expenses while conducting BI business.

**APPLICABILITY/SCOPE:**  This Guideline applies to individuals who supply services directly or indirectly to or on behalf of BI, but not limited to supplemental workers, agency workers, contractors and vendors ("Vendors") and does not apply to Health Care Providers (HCPs).

For the latest Guideline, go to http://policy.boehringer-
ingelheim.com/vendor%20travel%20guideline%20web%20based%20exhibit.pdf

**VENDOR'S RESPONSIBILITY:**  This Guideline is subject to change without notice.  Vendor is responsible for reviewing the Guideline periodically and must, at a minimum, review this Guideline each January to ensure compliance with the latest Guideline.

FINAL

## EXHIBIT F

## REBATE SCHEDULE

INTENTIONALLY OMITTED

Page 45 of 56

*Marketing Sourcing Master Services Agreement*
*Boehringer Ingelheim Pharmaceuticals, Inc./ Axtria Inc.*
*Effective Date: May 30, 2016*

FINAL

## EXHIBIT G

## ATTESTATION TO BI REGARDING
## REPORTING REQUIREMENTS AND TRAINING

Axtria Inc. ("Vendor") and Boehringer Ingelheim Pharmaceuticals, Inc. ("BI") entered into that certain Marketing Sourcing Master Services Agreement dated March 23, 2016 (the "Agreement").

Vendor hereby acknowledges and agrees as follows:

(i)       Pursuant to the terms of the Agreement, Vendor and all Vendor Personnel (as defined in the Agreement) are responsible for reporting, as defined in Exhibit H, adverse events ("AE"), product complaints ("PC"), and extraneous comments ("EC") related to the use of BI products of which it becomes aware during the term of the Agreement, according to the process defined in Exhibit H, as amended by BI from time to time and provided or made available to Vendor.  Vendor Personnel involved in performing Services for BI under this Agreement are required to complete required adverse event training before any Vendor Personnel may engage in any task that provides the Vendor Personnel the opportunity to be made aware of an adverse event or product complaint.

(ii)       Pursuant to the terms of the Agreement, Vendor is responsible for reporting all Payments (as defined in the Agreement) made by Vendor or any Vendor Personnel.  Vendor must report all Payments made to all HCPs and HCOs incurred during each calendar month in accordance with the BI Transparency and Disclosure Policy provided by BI.  Vendor and Vendor Personnel providing Services for BI under the Agreement are required to complete a web-based training module on BI Payment reporting procedures ("HCP Payment Training").  HCP Payment Training must be completed by each Vendor Personnel within thirty (30) days of such Vendor Personnel commencing Services under the Agreement.

(iii)       With respect to the foregoing, Vendor hereby represents that the required AE training has been completed or will be completed before any Vendor Personnel engage in any task that provides them an opportunity to be made aware of an adverse event, product complaint, or extraneous comment; and that the required HCP Payment Training has been completed or will be completed within thirty (30) days of the Agreement execution date and prior to commencing of services by any and all Vendor Personnel who will provide services pursuant to the Agreement; and will be completed by each additional, replacement or substitute Vendor Personnel who provides services pursuant to the Agreement following the date of this Attestation prior to the date on which such individual commences provision of such services.

(iv)       Furthermore, Vendor represents that monthly awareness reminders regarding AE/PC/EC reporting and Payment reporting requirements will be sent to all relevant Vendor Personnel during the term of the Agreement.

(v)       Vendor will keep documentation of all Vendor Personnel who have completed adverse event training and will, in the context of a regulatory audit by a government agency, make the list available upon written request by BI within four (4) business hours.

(vi)       Vendor will, within ten (10) business days following written request by BI, provide proof of HCP Payment Training completion, and monthly awareness reminders of Payment and AE/PC/EC reporting requirements.

Axtria Inc.

_____
Signature

Print Name and Title: _____

Date: _____

*Marketing Sourcing Master Services Agreement*
*Boehringer Ingelheim Pharmaceuticals, Inc./ Axtria Inc.*
*Effective Date: May 30, 2016*

FINAL

## EXHIBIT H

## ADVERSE EVENT, TECHNICAL PRODUCT COMPLAINT, MEDICAL INFORMATION REQUEST AND EXTRANEOUS COMMENT NOTIFICATION

## DEFINITIONS

**Adverse Event:**  An adverse event ("AE") is defined as any untoward medical occurrence, including an exacerbation of a pre-existing condition in a patient or clinical investigation subject administered a pharmaceutical product and which does not necessarily have to have a causal relationship with this treatment.  This may include Medical Extraneous Comments.

**Technical Product Complaint:**  A technical product complaint ("PC") is the failure of a product functionality, condition, labeling, or packaging.  This could include suspected product tampering, adulteration, or counterfeiting. This includes Technical Product Complaint Extraneous Comments.

**Medical Information Request:**  A medical information request ("MI") is an inquiry, on- or off-label, from a healthcare provider or consumer which is unsolicited.

**Extraneous Comment:**  Occasionally, consumers and health care providers add unexpected commentary. Specifically, extraneous comments ("EC") include information other than what was specifically requested.  There are 6 categories of reportable extraneous comments.

> **Medical Extraneous Comment ("Medical EC"):**  A comment that is associated with the use of the product and might include a potential adverse event.  It can include reporting of side effects, misuse, drug interaction or other symptoms.

> **Non English Extraneous Comment ("Non-English EC"):**  Any comment that is received in any language other than English.  For example, this would apply to comments made on an IVR (Interactive Voice Response), entered as a response on the Web, or written as a response on a business reply card (BRC).

> **Technical Product Complaint Extraneous Comment ("Product EC"):**  A comment pertaining to the physical properties of a drug, the functionality of a delivery system, or to product packaging or shipment or comments or suggestions regarding product improvement.

> **Non-Medical Extraneous Comment ("Non-Medical EC"):**  Feedback on the Company, feedback on Company products that do not relate to potential adverse events, comments that cannot be read/understood and media inquiries.  All of which are not medically related to a BI product.

> **Legal Threat Extraneous Comment ("Legal Threat EC"):**  Threatened legal action or lawsuit.

> **Violent Threat Extraneous Comment ("Violent Threat EC"):**  Terrorist threat or threatened violence against the Company.

## FORMAL NOTIFICATION PROCESS

A formal process for notifying the Boehringer Ingelheim Medical, Technical & Customer Information (MTCI) Department immediately (the same working day) upon receiving any report of a potential **adverse event, technical product complaint, medical information request,** or **extraneous comment** will be established and provided to

*Page 47 of 56*

*Marketing Sourcing Master Services Agreement*
*Boehringer Ingelheim Pharmaceuticals, Inc./ Axtria Inc.*
*Effective Date: May 30, 2016*

FINAL

Boehringer Ingelheim.  The following is a general description of the formal process. In coordination with BI, the specific details of the applicable process can be tailored to each specific program.

1. Upon Vendor Live Agent receipt of any potential report of an adverse event (AE), medical information request (MI), a medical extraneous comment (Medical EC), or non-English extraneous comment (Non-English EC): an attempt to warm transfer the call to BI MTCI through 800-542-6257 (Option #4) will be made.

2. Upon Vendor Live Agent receipt of any report of a technical product complaint (PC), product suggestion or comment (Product EC): an attempt to warm transfer the call to BI MTCI through 800-542-6257 (Option #3) will be made.

3. Upon Vendor Live Agent receipt of any report of any legal or violent threat and Non-Medical extraneous comment (Legal Threat EC, Violent Threat EC, Non-Medical EC): the preferred notification approach is direct web entry to the EC Console or submission via XML text file transfer using secure file transfer protocol (SFTP), in accordance with a signed "Interface Agreement." An alternative approach, for example for those who do not have access to the EC Console via direct web entry or XML file transfer via SFTP, would be to attempt to warm transfer the call directly to BI Customer Response Unit (CRU), 1-800-243-0127.

4. Once the agent successfully contacts BI MTCI, there will be a name exchange, and the BI MTCI representative will provide the Vendor agent with the BI Case Identification Number.  Agent names and Case Identification Numbers will be used for warm transfer reconciliation purposes.

5. If the attempt to warm transfer to BI MTCI is unsuccessful, the Vendor agent will be obligated to call the information into BI at the same number as above (800-542-6257 -- Option #4 or #3, as the case may be), and speak with a live BI agent; or, as coordinated with BI, follow the appropriate & prior coordinated alternative method, for example direct web entry to the EC Console, and/or submission via XML text file transfer using secure file transfer protocol (SFTP) in accordance with a signed "Interface Agreement." Paragraph 6 below lists other alternative methods.

6. If warm transfer to BI MTCI is not possible (for example, outside standard operating hours) the operator or vendor will be obligated to follow the appropriate & prior coordinated method for providing the information related to a potential adverse event (AE), medical information request (MI), technical product complaint (PC), and any extraneous comment (EC).  The preferred method is submission of potential AE, MI, PC, and EC information via direct web entry to the EC Console and/or XML text file transfer using secure file transfer protocol (SFTP), in accordance with a signed "Interface Agreement." Alternative methods include (but not limited to) the following:

    a. Submission of potential adverse event (AE) via fax to BI Global Pharmacovigilance (GPV) at 1-203-837-4329 using a customized AE form provided by the BI GPV Dept. in accordance with the GPV provided "Instructions for Completing the Adverse Event Report." Transmission via fax should include any supporting document related to the report (e.g. forms, letters, emails, notes, etc.).  In some programs, vendors may be requested to provide patient or Health Care Provider contact information. Vendor shall keep the fax machine confirmation of successful transmission, all supporting documents, and the original completed AE Form in accordance with their record retention policy, to ensure these documents are available for audit, if needed.

    b. For medical information (MI) requests, medical extraneous comments (Medical EC), non-English extraneous comments (Non English EC): forwarded to druginfo.rdg@boehringer-ingelheim.com.

FINAL

Vendor shall keep the email auto-reply confirming BI's receipt and the original information in accordance with their record retention policy, to ensure these documents are available for audit, if needed.

c.  For technical product complaints (PC) and product suggestions or comments (Product EC): forwarded to techprod.rdg@boehringer-ingelheim.com.  Vendor shall keep the email auto-reply confirming BI's receipt and the original information in accordance with their record retention policy, to ensure these documents are available for audit, if needed.

d.  For legal or violent threats and Non-Medical extraneous comments (Legal Threat EC, Violent Threat EC, Non-Medical EC): forwarded to cru.rdg@boehringer-ingelheim.com.

7.  Potential adverse events (AE), medical information requests (MI), technical product complaints (PC), and extraneous comments (EC) not captured via telephone (e.g., hardcopy, email, fax, etc.) should be captured as paper, or a file (e.g. PDF, JPG, etc.), and submitted to BI via direct web entry to the EC Console, and/or using secure file transfer protocol (SFTP) in accordance with a signed "Interface Agreement".  Alternative submission methods may be coordinated with BI, for example the following:

a.  For potential adverse events (AE): the hardcopy document, including any supporting documents related to the report (e.g. forms, letters, emails, notes, etc.), will be faxed with the completed customized AE form that has been provided by BI Global Pharmacovigilance (GPV), to GPV at 1-203-837-4329, in accordance with the GPV provided "Instructions for Completing the Adverse Event Report."  In some programs, vendors may be requested to provide patient or Health Care Provider contact information.  Vendor shall keep the fax machine confirmation of successful transmission, all supporting documents, and the original completed AE Form in accordance with their record retention policy, to ensure these documents are available for audit, if needed.

b.  For medical information (MI) requests, medical extraneous comments (Medical EC), non-English extraneous comments (Non English EC): hardcopy documents captured as a file will be forwarded to druginfo.rdg@boehringer-ingelheim.com. Vendor shall keep the email auto-reply confirming BI's receipt and the original documents in accordance with their record retention policy, to ensure these documents are available for audit, if needed.

c.  For technical product complaints (PC) and product suggestions or comments (Product EC): hardcopy documents captured as a file will be forwarded to techprod.rdg@boehringer-ingelheim.com. Vendor shall keep the email auto-reply confirming BI's receipt and the original documents in accordance with their record retention policy, to ensure these documents are available for audit, if needed.

d.  For legal or violent threats and Non-Medical extraneous comments (Legal Threat EC, Violent Threat EC, Non-Medical EC): hardcopy documents captured as a file will be forwarded to cru.rdg@boehringer-ingelheim.com.

## FORMAL RECONCILIATION PROCESS

### Telephone Warm Transfer Reconciliation

When the vendor operates a service with live agents, a formal reconciliation process between BI and the Vendor agent will be created to ensure that all appropriate information related to warm transfers has been forwarded to BI.

Page 49 of 56

*Marketing Sourcing Master Services Agreement*
*Boehringer Ingelheim Pharmaceuticals, Inc./ Axtria Inc.*
*Effective Date: May 30, 2016*

FINAL

1. Vendor will provide weekly **Reconciliation Reports** that lists the count of warm transfers and all case identification numbers received for the previous completed week. Reconciliation Reports are required even when there have been zero warm transfers during the notification period.

2. Vendor will e-mail the completed reports to BI service mailbox (druginfo.rdg@boehringer-ingelheim.com) by COB every Monday (or other pre-arranged weekday). Reports sent will be for the most recently completed 7-day period starting Saturday and ending Friday immediately preceding the submission of the reconciliation.

3. The email will include the spreadsheet template that contains the case identification numbers for warm transferred calls. (In the event there were no warm transfers during the report period, the spreadsheet would be attached with no entries.)

4. BI will confirm receipt of Reconciliation Report via e-mail within 24 hours (for example, Tuesday if received by Monday). BI confirmation and reconciliation communication will be sent to a mailbox designated by the Vendor.

5. BI will review reports, comparing case identification number entries in their system and ensuring that all contacts forwarded to BI were received.

6. BI will notify Vendor immediately by e-mail if something is missing or inconsistent from the Vendor provided Reconciliation Report.

7. If a discrepancy is discovered during the reconciliation process, the discrepancy must immediately be researched by all parties and resolved in good faith as soon as possible.

## XML File Transfer Reconciliation

When the Vendor transfers potential adverse event (AE), technical product complaint (PC), and/or extraneous comment (EC) information using XML text file transfer via secure file transfer protocol (SFTP), the Vendor will follow the appropriate formal reconciliation process, detailed in the "Interface Agreement" to ensure that all appropriate information has been successfully forwarded to BI. The key elements are as follows:

1. Vendor will have automated posting of records to the SFTP site.

2. Vendor will send to BI (or 3rd party designated by BI) automated daily email notification of number of records posted to SFTP ("Daily Reconciliation").

3. Vendor to receive daily reconciliation notification from BI (or 3rd party designated by BI), acknowledging number of XML records picked up from SFTP, and number of records loaded from SFTP into the appropriate BI database ("Daily Summary").

4. If a discrepancy is discovered during the reconciliation process, the discrepancy must immediately be researched by all parties and resolved in good faith as soon as possible.

## Asset File Transfer and Reconciliation

When the Vendor reports potential adverse events (AEs) that have related asset files (for example, the original document with the suspected AE), these also need to be transferred and reconciled in accordance with the signed "Interface Agreement." For asset files transferred/uploaded via SFTP, key elements are as follows:

*Page 50 of 56*

*Marketing Sourcing Master Services Agreement*
*Boehringer Ingelheim Pharmaceuticals, Inc./ Axtria Inc.*
*Effective Date: May 30, 2016*

FINAL

1. Asset files include audio/voicemail files (e.g., wav, mp3, etc.), hardcopy files captured as a file (e.g. PDF, JPG, TIFF, etc.) from business reply mail (BRM) or business reply cards (BRC), or other "white-mail" received via post, email, fax, etc.

2. Vendor will indicate the related asset filename in the associated XML record posted to the SFTP site.

3. Vendor will transfer all Asset files to BI using secure file transfer protocol (SFTP) as defined by the Interface Agreement.

4. Vendor will send automated email of Asset files posted to the SFTP.

5. Vendor to receive email verifying receipt of Asset files.

6. BI (or 3rd party designated by BI), will confirm that Asset files are on hand for each record with related asset file/s.

7. In the event BI, or 3rd party designate, determines a record is missing its related asset file, all parties will resolve the issue in good faith as soon as possible; this may include asking the originating Vendor for the missing asset file.

**Fax Form Reconciliation**

When the Vendor regularly transfers potential adverse event (AE) using the AE Form provided by BI Global Pharmacovigilance (GPV) and customized for each vendor and/or project, a reconciliation process may be required by GPV. The reconciliation process, if required, will be described in the Statement of Work.

**OPERATIONAL ELEMENTS**

**Adverse Event Training.**  Before performing any services, Vendor Personnel who may receive any adverse event, product complaint, or extraneous comment in connection with Vendor Services, are required to complete the adverse event training provided by BI MTCI, preferably using the appropriate URL below.

For NON-Market Research vendors and/or non-market research staff:

- http://bi-medicine.com/AE_Training_Program_US/AE_Vendors_Generic
- Case Sensitive Password: AEgen2014

For Market Research vendors and/or market research staff:

- http://www.bi-medicine.com/AE_Market_Research_Vendors
- Case Sensitive Password: AEtmrv2014

All Vendor Personnel who have completed AE training must email the completed and signed Training Record Certificate to the following email address:

- For NON-Market Researchers: Group.Mailbox1e9ac7@boehringer-ingelheim.com
- For Market Researchers: marketresearch.rdg@boehringer-ingelheim.com

All additional, replacement, or substitute Vendor Personnel must complete the same BI MTCI AE training, through the same process, before they start providing services under this agreement.

Annually, all Vendor Personnel must complete adverse event training provided by the BI MTCI.

*Marketing Sourcing Master Services Agreement*
*Boehringer Ingelheim Pharmaceuticals, Inc./ Axtria Inc.*
*Effective Date:  May 30, 2016*

FINAL

Other AE training format (e.g. webinar, in-person meeting, etc.) may be coordinated with/by BI MTCI.

**Interface Agreement**.  As may be determined by the BI MTCI Department and the BI Multi-Channel Marketing (MCM) Department, vendor will work with the BI designated 3rd party vendor to complete an "Interface Agreement" that ensures proper operational coordination for direct web entry to EC Console and/or successful XML file and Asset file transfer via secure file transfer protocol (SFTP), including reconciliation.

**Database Information**.  In the event Vendor needs to enter potential adverse events (AE), medical information requests (MI), medical extraneous comments (Medical EC), non-English extraneous comments (Non-English EC), technical product complaints (PC), product suggestions or comments (Product EC) in a proprietary database (for example to complete XML file transfer in accordance with an Interface Agreement), Vendor shall: (1) Disclose the name/description of the database, (2) Disclose the relevant Field Names where the information is stored, (3) Make the records and fields available via a report in the event of an audit, (4) Ensure proper implementation of Vendor's data retention policy with regard to these records and fields.

**Flowchart**.  Vendor to provide a flowchart to BI that schematically illustrates how the vendor's AE, MI, PC & EC formal notification & reconciliation processes are implemented and integrated in the delivery of the vendor contracted service.

**Volume Forecast and Reporting**.  For projects with live operator service, vendor will provide a best estimate of vendor call volume and warm transfer volume prior to program start. Should the warm transfer volume estimate (or actual) meet/exceed a specific volume coordinated with the BI MTCI and BI MCM (for example greater than 10 warm transfers per week), vendor will also submit, separate from weekly reconciliation, weekly volume and transfer reports required by BI including following the BI provided template, or agreed report format.

**Product Returns and Replacement**.  For projects that involve vendor storage and shipment of product, vendor will coordinate with BI MTCI the process for handling product returns and replacements.

**Meetings with BI Medical Technical and Customer Information (MTCI) Department**.  Vendor will coordinate with the BI MTCI to have a plan and schedule for regular meetings exclusive with the MTCI team, for example quarterly. This will include a mix of in-person and video conferences, as mutually agreed upon.

**Audits.**  In the context of vendor notification of potential adverse events, medical information request, technical product complaints, and extraneous comments, vendor shall be prepared for audit activities, including but not limited to simulated caller tests and site visits. In the event of a BI audit by any government or regulatory agency (for example, the FDA), vendor will provide requested information to BI within an agreed turnaround time (for example, within 4 hours of receipt of a written request).

**Compliance Monitoring**.  Vendor will establish an internal compliance monitoring system to ensure that they are operating according to this agreement and the BI Company policies related to notification of potential adverse events, medical information request, technical product complaints, and extraneous comments. The vendor shall be prepared to have BI conduct periodic monitoring of the vendor established internal compliance monitoring system.

*Page 52 of 56*

*Marketing Sourcing Master Services Agreement*
*Boehringer Ingelheim Pharmaceuticals, Inc./ Axtria Inc.*
*Effective Date:  May 30, 2016*

FINAL

## EXHIBIT I

## ON-SITE POLICIES

1.   Access.

(a)   Purpose. BI may grant Vendor access to one or more of its facilities (the "Facility") for the limited purpose of offering the Services described in the foregoing Agreement. In such event, Vendor Personnel shall be allowed entrance to the Facility only during the normal business hours of BI or as may be otherwise reasonably necessary for Vendor Personnel to adequately perform their employment duties on behalf of Vendor related to the Services. Vendor Personnel shall not be allowed to roam freely on the Premises in performing Services under this Agreement and shall, whenever feasible, announce his or her presence to BI staff. Vendor Personnel shall not enter or approach any individual's office or other work space without prior notice to and acknowledgement from such individual. Vendor Personnel shall not enter the Facility for purposes unrelated to the Services.

(b)   Identification Badges. BI may issue identification badges to Vendor Personnel as necessary for access to the Facility. Any such badges must be worn by Vendor Personnel and shall be prominently displayed at all times during access to the Facility. Upon termination of Vendor's access to the Facility, Vendor Personnel shall return all such badges to BI's designee.

(c)   Vehicle Access. Vendor-owned vehicles and other vehicles operated by Vendor Personnel shall be parked only in the designated parking area at the Facility.

(d)   Personnel Access. In the interest of safety or security, BI may, in its sole and absolute discretion and without notice or cause, exclude or expel any Vendor Personnel from the Facility.

2.   Security. Throughout the term of the Agreement, BI may maintain such security measures as it deems necessary for the safety and protection of its business, its personnel, and Vendor Personnel, and Vendor shall comply and cause Vendor Personnel to comply with such measures. BI will not provide policing of Vendor's materials, equipment and other property. From time to time throughout the term of the Agreement, BI may specify certain additional safety precautions and procedures at the Facility as in BI's sole discretion are necessary for the safety and security of the business and the personnel of BI and Vendor Personnel. Vendor shall promptly comply with the additional security precautions requested by BI, and shall cause its employees to comply with such additional precautions.

3.   Illegal Substances. BI prohibits the unauthorized or illegal use, possession or sale of alcoholic beverages, drugs or other intoxicants ("Illegal Substances") at the Facility and any other property owned or operated by BI. No Vendor Personnel shall be permitted to bring Illegal Substances into the Facility or onto any other property owned or operated by BI. BI reserves the right to exclude or expel any person violating (or reasonably believed to be violating) this policy from the Facility or any other property owned or operated by BI. BI may notify law enforcement authorities of any suspected criminal violation concerning the possession, use or sale of Illegal Substances. Vendor shall require Vendor Personnel who shall have access to the Facility to comply with the foregoing policy.

4.   Searches. BI may conduct searches of any persons and personal possessions brought into the Facility. Such searches may be scheduled or unannounced and may include all areas of the Facility, including, but not limited to, lockers, desks, lunchboxes, packages and motor vehicles (regardless of ownership) located at the Facility or other property owned or operated by BI. Any items discovered during a search which, in BI's sole judgment, appear to jeopardize the safety and security of the business or any personnel of BI or Vendor, or which otherwise appear to be improperly possessed, may be seized until the safety or proper possession of such item is determined. The results of searches may be reported to public authorities or such person's employer, as appropriate. Vendor shall inform Vendor Personnel of the foregoing policy regarding searches and shall cause Vendor Personnel to comply with such policy.

FINAL

**Master Services Agreement**

**between**

**Axtria, Inc.**

**and**

**Otsuka America Pharmaceutical Inc**

# MASTER SERVICES AGREEMENT

This Master Services Agreement ("Agreement") is dated October 17, 2014 by Otsuka America Pharmaceutical Inc. ("Otsuka"), and Axtria, Inc. ("Vendor").  Otsuka and Vendor are sometimes referred to collectively herein as "the Parties" and individually as a "Party."

**WHEREAS**, Otsuka desires to engage Vendor, based on particular requirements and qualifications as described in individual Task or Purchase Orders; and

**WHEREAS**, Vendor desires to be engaged in such a capacity;

**NOW, THEREFORE**, the Parties hereto intending to be legally bound agree as follows:

1. **SERVICES**

   Vendor agrees to perform for Otsuka the services listed in one or more "Tasks" executed by the Parties or Purchase Orders issued by Otsuka ("Services"), which Tasks and Purchase Orders are incorporated into and form a part of this Agreement.   Any Statement/Scope of Work ("SOW"), being incorporated by reference in an Otsuka Purchase Order and said Purchase Order having been accepted by Vendor, shall be deemed accepted by both Parties.   Vendor warrants and agrees that all services and deliverables shall be provided in a proficient manner and with professional diligence and skill and shall be in accordance with Otsuka's SOW, written specifications and other performance requirements, as may be established by Otsuka and all applicable laws, regulations, rules, ordinances, guidelines and professional standards, including those pertaining to confidentiality, and the use and disclosure of patient health information. Only those Services identified in a Task or a Purchase order shall be performed by Vendor and only following execution of a Task or issuance of a Purchase Order. Otsuka may, in its sole discretion, involve collaboration contractors in work performed under this Agreement.

2. **TERM & TERMINATION**

   a. <u>Term</u>. This Agreement will begin on October 17, 2014 and will end on October 16, 2019 unless terminated sooner in accordance with the terms of this Agreement.  This Agreement may be renewed for additional periods with the written consent of the Parties.

   b. <u>Termination</u>. Vendor may terminate this Agreement or any Task attached hereto or Purchase Order upon ninety (90) days written notice to Otsuka.   Otsuka may terminate this Agreement or any Task attached hereto or any Purchase Order upon ten (10) days written notice to Vendor. Upon notice of termination, Vendor shall not,

without written authorization from Otsuka, incur additional expenses or make additional commitments in connection with Services after notification of termination. Otsuka shall pay all reasonably substantiated costs incurred by Vendor in connection with this Agreement prior to date of notification of termination and additional costs thereafter if authorized in writing by Otsuka.   If this Agreement or any Task or Purchase Order is terminated due to Vendor's inability to perform Services in a professional and timely manner, Otsuka's obligation to compensate Vendor for Services shall be limited to actual and reasonable costs incurred by Vendor as a result of its satisfactory performance of Services.   Termination of this Agreement or any Task or Purchase Order for any reason shall be without prejudice to either Party's right to recover damages resulting from a breach hereof. The termination of this Agreement or any Task or Purchase Order shall be executed in an orderly manner. Upon termination Vendor shall deliver to Otsuka all work, in whatever state of completion, that has begun and been paid for as of the termination date.

3.    **COMPENSATION**
The Parties agree that Vendor will be compensated according to the Statement of Work and Budget of any individual Task attached hereto or any Purchase Order.  No other costs are authorized and no payments shall be made for any cost not set forth in a written Task or Purchase Order.

a.   Travel Expenses
Vendor will be reimbursed for reasonable travel, subject to prior Otsuka written approval, incurred as part of providing Service(s) to Otsuka. No reimbursement will be made for travel expenses incurred by anyone other than the Vendor.  Otsuka reserves the right, at any time, to request copies of receipts associated with invoiced travel and/or other pass-through expenses. All travel by vendor to be submitted for reimbursement shall be in compliance with Otsuka's then current Corporate Travel Policy. All travel and pass-through expenses shall be invoiced at cost.

b.   Invoices
**Vendor shall submit invoices using one of the following:**

| Regular Mail | Fax | E-mail* |
|---|---|---|
| P.O. Box 66749 | (831) 430-1970 | Otsuka@accelim.com |
| Scotts Valley, CA 95066 | | |

***E-mailed invoices must be in PDF-file format and considered to be the "original" invoice.  No other electronic formats will be accepted.***

Note that Otsuka may change any/all of the above 'invoice' addresses by written notification to Vendor without the need to amend this Agreement.

Invoices must reference a valid contract database number (assigned to a specific Task Order) when no purchase order is used or, if a purchase order is used, an applicable purchase order number to be considered valid.

Unstapled, 8 ½" x 11", single sided invoices are preferred. Failure to provide a valid TIN # may also result in delayed payment.

c. <u>Payment</u>
Otsuka shall pay correct and valid invoices within 45 days of receipt.

Payments shall be made to:

| | |
|---|---|
| Bank Name: | HSBC Bank USA |
| Account Name: | Axtria |
| ABA Routing No. | 021001088 |
| Account No. | 415015405 |
| SWIFT Code: | MRMDUS33 |

**4.    AMENDMENTS**
No amendment hereto will be of any force or effect unless (i) reduced to writing and signed by both Parties hereto, and (ii) expressly referred to as being an amendment of this Agreement.

**5.    WORK PRODUCT**
Except for the Tools (as defined below), it is understood and agreed to by the Parties that all data collected under this Agreement or any Task or Purchase Orders and provided as deliverables, including any compilations, tabulations, or analyses of such data, and all work product related thereto shall be owned by Otsuka. All rights, title and interest in and to any ideas, discoveries, innovations, new uses, and/or inventions conceived, developed, or reduced to practice by Vendor in the course of or as a result of performing Service(s) under this Agreement or any Task or Purchase Orders  (other than the Tools) shall be the sole property of Otsuka. Vendor shall assist Otsuka, upon execution of a Task or issuance of a Purchase Order, in securing protection for any such property rights and will execute any applications, assignments and/or documents required to secure such protection. The costs incurred by Vendor in securing such protection shall be paid by Otsuka. Vendor further assigns and agrees to assign to Otsuka all rights, title and interest in and to all copyrightable material created by Vendor pursuant to this Agreement.  Unlocked, electronic copies of any work product shall be provided to Otsuka upon request.

Notwithstanding anything set forth herein, Vendor shall own all right, title, and interest, including any patent right or copyright interest in any data, information, systems, processors, equipment, computer software, derivative works, service marks or trademarks, and technology developed by or licensed to Vendor prior to this Agreement, or developed by or licensed to Vendor independent of Services under this Agreement

without the use of Otsuka Intellectual Property or Confidential Information, that is used to deliver Services under this Agreement (collectively, the "Tools"). Otsuka shall not reverse engineer, decompile, disassemble or otherwise attempt to determine the source code for computer programs or other trade secrets from the Tools. Notwithstanding the above, the Tools owned by Vendor shall not include any custom developed software or Services to the extent that the custom development was identified as such in a Task that incorporates Otsuka Intellectual Property or Confidential Information, in which case, such custom development shall be owned by Otsuka. To the extent that Services identified in a Task incorporate Tools owned by Vendor, Vendor grants to Otsuka a limited, irrevocable, perpetual, worldwide, royalty-free right to use such Tools for its internal business purposes, which said limited license of use shall be non-transferrable except as to Otsuka Affiliated Companies and defined under Section 13.

6.   **CONFIDENTIALITY**
Each Party (the "Receiving Party") agrees to maintain in strict confidence and not to disclose or disseminate, or to use for any purposes other than as authorized hereunder (with Vendor, such limits being solely for the performance of the Services), any Confidential Information disclosed by the disclosing Party (the "Disclosing Party") under this Agreement. Any work product delivered to Otsuka by Vendor (except for the Tools), shall be deemed Confidential Information of Otsuka. Such Confidential Information shall remain the confidential and proprietary property of the Disclosing Party, and shall be disclosed only to Receiving Party's officers, employees, and agents with a need know. The obligation of nondisclosure shall not apply to the Confidential Information which:

(a) at or after such time that it is or becomes publicly available through no fault of the Receiving Party;

(b) at or after such time that it is disclosed to Receiving Party by a third party entitled to disclose such information;

(c) that is already known to Receiving Party as shown by its prior written records, provided Receiving Party so advises Disclosing Party within fifteen (15) days after disclosure of Confidential Information hereunder;

(d) is required by law to be disclosed to federal, state or local authorities.

For a period of ten (10) years after termination of this Agreement, Receiving Party shall treat as confidential all Confidential Information and take every reasonable precaution and use all reasonable efforts to prevent the unauthorized disclosure of the same. Receiving Party agrees to take all steps necessary and appropriate to ensure that Receiving Party's officers, employees, and agents treat the Confidential Information as confidential and to ensure that such officers, employees, and agents are familiar with and abide by the terms of this Agreement.

7.   **INJUNCTIVE RELIEF**

Receiving Party acknowledges and agrees that any violation of the terms of this Agreement relating to the disclosure or use of Confidential Information may result in irreparable injury and damage to Disclosing Party that may not be adequately compensable in money damages, and for which Disclosing Party may have no adequate remedy at law. Receiving Party, therefore, consents and agrees that Disclosing Party may obtain injunctions, orders, or decrees as may be necessary to protect its Confidential Information.

8.   **INDEMNIFICATION**

Vendor shall be solely liable for and expressly agrees to indemnify and hold harmless Otsuka from any and all liability, claims, loss, damage, costs, including attorneys' fees, with respect to any liability arising out of Vendor's negligent or wrongful acts, omissions, or failure to comply with the requirements of this Agreement.

Otsuka shall be solely liable for and expressly agrees to indemnify and hold harmless Vendor from any and all liability, claims, loss, damage, costs, including attorneys' fees, with respect to any liability arising out of Otsuka's negligent or wrongful acts, omissions, or failure to comply with the requirements of this Agreement.

9.   **WARRANTIES**

Except as expressly set forth herein, Vendor makes no further representations or warranties of any kind whatsoever, express or implied. Vendor specifically disclaims any implied warranties of merchantability or fitness for a particular purpose.

10.   **LIMITATION OF LIABILITY**

In no event shall one Party be liable to the other for tort, consequential, exemplary, special, incidental, or punitive damages even if advised of the possibility of such damages. Except for liability arising under Section 5 (Work Product), Section 6 (Confidentiality), and Section 8 (Indemnification), Section 13 (Insurance), and Section 38 (Privacy), the liability of either Party for any loss or damages directly or indirectly suffered by other shall not exceed the three (3) times the value of fees paid to Vendor by Otsuka pursuant to the Task under which the liability arose.

11.   **ENTIRETY OF THE AGREEMENT**

This Agreement embodies the entire understanding between the Parties, and supersedes all prior understandings and Agreements between the Parties, oral or written, with reference to the subject matter hereof.

12.   **INDEPENDENT CONTRACTORS**

Each Party to this Agreement shall act as an independent contractor and shall not be construed for any purpose as the agent, employee, servant, or representative of the other

Party. Accordingly, the employee(s) of one Party shall not be considered to be employee(s) of the other Party, and neither Party shall enter into any contract or Agreement with a third party which purports to obligate or bind the other Party.

13. **INSURANCE**

Vendor shall procure and maintain, at its own expense, during the term of this Agreement, the following policies of insurance:

a) Commercial General Liability Insurance providing coverage for premises/operations, contractual, products/completed operations and personal/advertising injury liabilities with combined single limits of not less than one million dollars ($1,000,000) per occurrence for bodily injury and property damage, naming Otsuka and all other Indemnities as additional insureds, and shall stipulate that such insurance is primary to, and not contributing with, any other insurance carried by, or for the benefit of Otsuka or the other additional insureds.

b) Workers Compensation Insurance providing statutory benefits and limits of liability complying with all applicable requirements in states in which Vendor will be providing Services, with a waiver of subrogation in favor of Otsuka and its affiliates.

c) Employer's Liability Insurance with limits not less than one million dollars ($1,000,000 per accident or disease.

d) Motor vehicle liability insurance with coverage for all owned, non-owned, and hired vehicles including the loading and unloading thereof with combined single limits not less than one million dollars ($1,000,000) per occurrence for bodily injury and property damage. If no vehicles are owned or leased, the Commercial General Liability Insurance shall be extended to provide insurance for non-owned and hired automobiles.

e) Umbrella liability insurance in an amount not less than four million dollars ($4,000,000) annual aggregate with above general employer's and motor vehicle liability as scheduled underlying insurance.

f) Professional liability errors and omissions insurance with a limit of not less than two million dollars ($2,000,000) per occurrence.

Each policy will be underwritten by an insurer rated A-, VIII or better by A.M. Best Co. and (except to the extent prohibited by Applicable Law) contain a waiver of subrogation in favor of Otsuka. Each policy other than workers' compensation policies will name Otsuka as an additional insured.

Vendor will cause the underwriter of each policy to furnish Otsuka a Certificate of Insurance for each insurance policy required by this Agreement. Such certificates must be furnished to Otsuka before Vendor begins performance under this Agreement and again upon renewal or replacement of any policy required by this Agreement.

14. **ASSIGNMENT**

Neither Party may assign this Agreement without the prior written consent of the other Party, except that Otsuka may, without the consent of the other, assign the Agreement to an Otsuka Affiliated Company. An Otsuka Affiliated Company is one that is majority owned by Otsuka Pharmaceutical Co., Ltd. or one of its subsidiaries.

15. **NOTICE**

All notices, certificates and acknowledgments hereunder will be in writing in English and will be deemed properly delivered when delivered by hand, sent by telefax, duly mailed by first class mail, or delivered by courier to the other Party at its address as follows, or to such other address(s) as either Party may, by written notice, designate to the other from time to time.

If to Otsuka:          Otsuka America Pharmaceutical, Inc.

                       2440 Research Boulevard

                       Rockville, Maryland 20850

                       Attn: Legal Affairs Department


If to Vendor:          Axtria, Inc.

                       400 Connell DR., Suite 1300

                       Berkeley Heights, NJ 07922

                       Attn: Legal Department


16. **WAIVER**

Waiver of any provision of this Agreement will not be deemed a waiver of any other provision of this Agreement, nor will waiver of any breach of this Agreement be construed as a continuing waiver of other breaches of the same or other provisions of this Agreement.

17. **HEADINGS**

Headings of paragraphs and subparts of this Agreement are for the convenience of the Parties only, and will be given no substantive or interpretative effect whatsoever.

18. **FORCE MAJEURE**

Neither Party will be liable to the other for any delay in, nor failure of performance of their respective obligations under this Agreement caused by occurrences beyond the control of the Party (as the case may be).

19. **NON-DISCRIMINATION**

As applicable, the provisions of Executive Order 11246, as amended by EO 11375 and EO 11141 and as supplemented in Department of Labor regulations (41 CFR Part 60 et. seq.), are incorporated into this Agreement and must be included in any subcontracts awarded involving this Agreement. Vendor hereby certifies by signing this Agreement that all services are provided without discrimination on the basis of race, color, religion, national origin, disability, sex, or veteran's status; Vendor does not maintain nor provide for Vendor's employees any segregated facilities, nor will Vendor permit Vendor's employees to perform their services at any location where segregated facilities are maintained. In addition, Vendor agrees to comply with Section 504 of the Rehabilitation Act and the Vietnam Era Veteran's Assistance Act of 1974, 38 U.S.C. Section 4212.

"Segregated facilities", as used in this provision, means any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees, that are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin because of habit, local custom, or otherwise.

20. **DEBARMENT**

a. Vendor hereby certifies that it has not been and that it is not:

   i. debarred under section 306 of the Federal Food, Drug, and Cosmetic Act in connection with this Agreement.

   ii. excluded, debarred, suspended or is otherwise ineligible to participate in Federal health care programs or in Federal procurement or non-procurement programs.

   iii. charged with or convicted of a criminal offense that falls within the ambit of 42 U.S.C. 1320a-7(a).

b. Vendor hereby certifies that in its performance of the Services it did not and will not use in any capacity the services of any person or entity that has been:

   i. debarred under section 306 of the Federal Food, Drug, and Cosmetic Act in connection with this Agreement.

   ii. excluded, debarred, suspended or is otherwise ineligible to participate in Federal health care programs or in Federal procurement or non-procurement programs.

   iii. charged with or convicted of a criminal offense that falls within the ambit of 42 U.S.C. 1320a-7(a).

c. The certifications herein shall be ongoing during the term of this Agreement and

Vendor shall immediately notify Otsuka of any change in the status of the certifications set forth in this section.

d. Vendor agrees to notify Otsuka immediately upon becoming aware of any inquiry, commencement of any proceeding, concerning conduct by Vendor, which could result in debarment exclusion, or similar action.

21. **UTILIZATION OF SMALL BUSINESS CONCERNS (JAN 2011)**
    a. It is the policy of the United States that small business concerns, veteran-owned small business concerns, service-disabled veteran-owned small business concerns, HUBZone small business concerns, small disadvantaged business concerns, and women-owned small business concerns shall have the maximum practicable opportunity to participate in performing contracts let by any Federal agency, including contracts and subcontracts for subsystems, assemblies, components, and related services for major systems. It is further the policy of the United States that its prime contractors establish procedures to ensure the timely payment of amounts due pursuant to the terms of their subcontracts with small business concerns, veteran-owned small business concerns, service-disabled veteran-owned small business concerns, HUBZone small business concerns, small disadvantaged business concerns, and women-owned small business concerns.

    b. The Contractor hereby agrees to carry out this policy in the awarding of subcontracts to the fullest extent consistent with efficient contract performance. The Contractor further agrees to cooperate in any studies or surveys as may be conducted by the United States Small Business Administration or the awarding agency of the United States as may be necessary to determine the extent of the Contractor's compliance with this clause.

    c. *Definitions.* As used in this contract—

    "HUBZone small business concern" means a small business concern that appears on the List of Qualified HUBZone Small Business Concerns maintained by the Small Business Administration.

    "Service-disabled veteran-owned small business concern"—

    (1) Means a small business concern—

        i.   Not less than 51 percent of which is owned by one or more service-disabled veterans or, in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more service-disabled veterans; and

        ii.  The management and daily business operations of which are controlled by one or more service-disabled veterans or, in the case of a service-disabled veteran

with permanent and severe disability, the spouse or permanent caregiver of such veteran.

(2) Service-disabled veteran means a veteran, as defined in 38 U.S.C. 101(2), with a disability that is service-connected, as defined in 38 U.S.C. 101(16).

"Small business concern" means a small business as defined pursuant to Section 3 of the Small Business Act and relevant regulations promulgated pursuant thereto.

"Small disadvantaged business concern" means a small business concern that represents, as part of its offer that—

(1) (i) It has received certification as a small disadvantaged business concern consistent with 13 CFR part 124, Subpart B;

(ii) No material change in disadvantaged ownership and control has occurred since its certification;

(iii) Where the concern is owned by one or more individuals, the net worth of each individual upon whom the certification is based does not exceed $750,000 after taking into account the applicable exclusions set forth at 13 CFR 124.104(c)(2); and

(iv) It is identified, on the date of its representation, as a certified small disadvantaged business in the CCR Dynamic Small Business Search database maintained by the Small Business Administration, or

(2) It represents in writing that it qualifies as a small disadvantaged business (SDB) for any Federal subcontracting program, and believes in good faith that it is owned and controlled by one or more socially and economically disadvantaged individuals and meets the SDB eligibility criteria of 13 CFR 124.1002.

"Veteran-owned small business concern" means a small business concern—

(1) Not less than 51 percent of which is owned by one or more veterans (as defined at 38 U.S.C. 101(2)) or, in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more veterans; and

(2) The management and daily business operations of which are controlled by one or more veterans.

"Women-owned small business concern" means a small business concern—

(1) That is at least 51 percent owned by one or more women, or, in the case of any publicly owned business, at least 51 percent of the stock of which is owned by one or more women; and

(2) Whose management and daily business operations are controlled by one or more women.

(d)(1) Contractors acting in good faith may rely on written representations by their subcontractors regarding their status as a small business concern, a veteran-owned small business concern, a service-disabled veteran-owned small business concern, a small disadvantaged business concern, or a women-owned small business concern.

(2) The Contractor shall confirm that a subcontractor representing itself as a HUBZone small business concern is certified by SBA as a HUBZone small business concern by accessing the Central Contractor Registration (CCR) database or by contacting the SBA. Options for contacting the SBA include—

(i) HUBZone small business database search application web page at http://dsbs.sba.gov/dsbs/search/dsp_searchhubzone.cfm;            or http://www.sba.gov/hubzone;

(ii) In writing to the Director/HUB, U.S. Small Business Administration, 409 3rd Street, SW., Washington, DC 20416; or

(iii) The SBA HUBZone Help Desk at hubzone@sba.gov.

## 22.   COMPLIANCE TRAINING

a) Pursuant to Otsuka's Comprehensive Compliance Program, Otsuka requires Vendors engaged in certain functions related to marketed products to complete compliance training.  This training consists of:

i.  Otsuka's Code of Ethics and Professional Conduct (see paragraph b below); and

ii.  Certain topics related to Otsuka's business (see paragraph c below)

All training and certifications required under this section shall be completed via Otsuka's online learning management system.

b) Code of Ethics and Professional Conduct

i.  Vendor shall require all persons assigned to provide Services, including subcontractors, to read Otsuka's Code of Ethics and Professional Conduct ("Code"), abide by the Code, and complete the Code's online attestation within twenty-five (25) days of being assigned to provide Services.

ii.  In the event that Otsuka issues a new Code during the course of this Agreement, Vendor shall ensure that within twenty-five (25) days of notice and receipt of a new Code, all persons assigned to provide Services shall read the new Code and complete a new Code attestation online.

c) Compliance Training Instructions

i.  Vendor shall require all persons who meet Otsuka's criteria for needing compliance training, including subcontractors, to complete the required training

within the specified timeframe.   This training may consist of several electronic learning modules.   The required training shall be completed annually thereafter.

d) Any questions regarding training should be sent to: EQCcompliancetraining@otsuka-us.com.

e) Failure to complete satisfactorily any training or certification, pursuant to this section, shall be a basis for immediate termination of the Agreement.

23.   **NOTICE OF INSPECTIONS**
Unless prohibited by law or by the applicable governmental or regulatory entity, Vendor shall provide Otsuka with immediate notice of any governmental or regulatory review, audit or inspection of its facility, processes, or products that might relate to the goods, equipment, software, or services furnished Otsuka under this Agreement. Vendor shall provide Otsuka with the results of any such review, audit or inspection and copies of any subsequent written communication exchanged with the Party who performed the inspection. Otsuka shall be given the opportunity to provide assistance to Vendor in responding to any such review, audit or inspection.

24.   **OTSUKA RIGHT TO AUDIT**
At Otsuka's request on reasonable notice and during normal business hours, Vendor shall make its records, premises, and facilities available for audit by Otsuka (or its designated representative) to enable Otsuka to assess Vendor's compliance with and performance under this Agreement. Otsuka will provide Vendor with reasonable notice of any audit and such audits will be conducted during normal business hours.  If there are any audit findings Vendor shall address the findings in corrective and preventive action plan. Otsuka's audit rights extend to any subcontractors who are providing services related to this Agreement.

25.   **BOOKS AND RECORDS**
Vendor shall have archiving and retention policies and procedures for Vendor's records relating to the performance of its duties and obligations under this Agreement that shall be aligned with Otsuka's archiving and retention policies and procedures.  All records shall be maintained in accordance with United States generally accepted accounting principles consistently applied ("GAAP").  The retention period for such records shall be at least seven (7) years.

26.   **DISCLOSURE OBLIGATION**
Vendor represents that neither it nor any of its owners, directors, employees, agents, or consultants is a Government or Public Official or political party official or candidate for public or political office. In the event that during the term of this Agreement there is a change in the information required to be disclosed in this paragraph, Vendor agrees to promptly notify Otsuka.

27.   **CONFLICT OF INTEREST**
Vendor warrants and confirms that:  (i) no principal and/or their family members (either as an owner or a member of Vendor's management) owns a significant share of any other

business entity currently doing business with Otsuka America Pharmaceutical, Inc. , Otsuka Canada Pharmaceutical, Inc., Otsuka Pharmaceutical Development & Commercialization, Inc.,  Otsuka Maryland Medicinal Laboratories, Inc., or Otsuka America, Inc.(the "Otsuka Companies");  (ii) that no employee of the Otsuka Companies, or their respective family members, is an officer, director, consultant, employee or vendor of Vendor and;  (iii) that no employee of the Otsuka Companies, or their respective family members, has a financial interest in Vendor.  In the event that during the term of this Agreement there is a change in the information required to be disclosed in this paragraph, Vendor agrees to promptly notify Otsuka.

28. **HEALTHCARE FRAUD AND ABUSE, ANTI-KICKBACK, AND HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT ("HIPPA")**
Vendor warrants and represents that Vendor, it's employees and management, contractors, and sub-contractors have not been convicted of and/or are not under investigation for violations of any healthcare fraud and abuse, anti-kickback, or HIPAA statutes or regulations.

29. **PERSONALLY IDENTIFIABLE INFORMATION**
Vendor shall maintain appropriate level of controls to assure that any Personally Identifiable Information ("PII") provided by Otsuka, whose access by Vendor is provided by Otsuka, or is collected by Vendor on Otsuka's behalf shall not be accessible to any Party unauthorized to access the PII by Otsuka.

30. **DRUGS AND ALCOHOL**
Vendor shall assure that no Services shall be provided by any individual under their employ who, at the time the Services are being performed, is under the influence of alcohol or illegal drugs.  In the event that a violation is found to exist under this clause, Otsuka reserves the right, in its sole discretion, to temporarily or permanently bar that individual from performing any services under this Agreement and that Vendor shall comply with any such direction from Otsuka.

31. **NON-SOLICITATION**
During the term of this Agreement, neither Vendor nor Otsuka shall directly solicit, recruit, hire, or otherwise retain the services of the other Party's employees, except as provided herein.  For purposes of this Section 31, a general solicitation of employment by a Party not specifically directed towards employees of the other Party will not constitute solicitation by the Party).

32. **EXISTING VENDOR RELATIONSHIPS**
Vendor agrees to work in full cooperation with all applicable Otsuka vendors and/or suppliers and Otsuka staff to provide quality service with no conflicting objectives, agendas, or excessive delays.

33. **OTSUKA THIRD PARTY USAGE**
This Agreement is non-exclusive and Otsuka may in its absolute discretion enter into arrangements with other third parties to supply similar products and/or services.

34. **USE OF SUBCONTRACTORS**
    Vendor may subcontract its obligations under this Agreement provided that Vendor gives Otsuka reasonable prior written notice outlining relevant information regarding the proposed subcontract. Otsuka shall have the absolute right to approve or disapprove of proposed subcontractors, in its discretion – such approval shall not be unreasonably withheld.

35. **SEVERABILITY**
    If any part, term or provision of this Agreement will be held void, illegal, unenforceable, or in conflict with any law of any central, state, or local government having jurisdiction over this Agreement, or its subject matter, the validity of the remaining portions or provisions will not be affected thereby.

36. **GOVERNING LAW**
    This Agreement shall be governed by and construed in accordance with the laws of the State of Maryland.

37. **REPORTING SERIOUS MEDICAL EVENTS AND PRODUCT QUALITY COMPLAINTS**

    Vendor shall immediately report to Otsuka (no later than twenty-four (24) hours) all serious medical events or product quality complaints whether believed to be related to an Otsuka product or not. A serious medical event is one that is fatal or life threatening (i.e., results in an immediate risk of death), is permanently or substantially disabling/incapacitating, requires or prolongs hospitalization, or is a congenital anomaly/birth defect, cancer or medication overdose, results in the development of drug dependency or drug abuse, including any other events believed to be serious or unexpected important medical events or which would suggest a significant hazard, contraindication, side effect, or precaution. A written report should promptly follow within three (3) working days. Vendor will provide assistance to Otsuka in obtaining follow-up on the serious medical event or product quality complaint information, should it be necessary. The information should be reported via one of the following:

    o   By telephone – 1-866-232-2557 (Abilify)

    o   By telephone -  1-800-438-9927 (other Otsuka products)

    o   By email – IRAE.receipt@otsuka-us.com

    To comply with the aforementioned reporting requirements, Vendor agrees to the following for its personnel involved in executing the services to be performed in any Statement of Work associated with this Agreement:

    a. Such personnel will be provided training to ensure that the procedures set forth by Otsuka for handling adverse events, product complaints, and products quality issues are followed.

    b. Training that includes (but may not be limited to) an acknowledgement that such personnel have received reporting instructions for adverse events, product complaints, and products quality issues; or certification that such personnel have been trained on Otsuka's policies and procedures for handling adverse events, product complaints, and products quality issues.

## 38.   PRIVACY

    a. Vendor, its employees, agents, subcontractors and any authorized third parties ( the "Vendor Parties") shall comply with all state and federal laws and regulations applicable to the performance of the Services including, without limitation, those laws and regulations governing the privacy and security of Personal Information. Vendor and the Vendor Parties will establish commercially reasonable controls to ensure the confidentiality of Personal Information and to ensure that Personal Information is not disclosed contrary to the provisions of this Agreement. "Personal Information" means personally identifiable information including, without limitation, a person's name, address, telephone number, fax number, e-mail address, social security number or other government-issued identifier, credit card information, biometric identifiers, and face or other personal images, in any media or format including computerized or electronic records and paper-based files, collected or used by Vendor on Otsuka's behalf from consumers, patients, Otsuka employees, physicians, and other business-to-business customers (collectively, "Individuals").

    b. Vendor, and the Vendor parties will provide to Otsuka, and as otherwise required by law, prompt written notice of all security incidents that involve, or which Vendor reasonably believe involve, the unauthorized access, use, or disclosure of Personal Information; provided, further, such notice shall summarize in reasonable detail the impact on Otsuka of the breach or unauthorized use or disclosure of, or access to, Personal Information and the corrective action taken or to be taken by Vendor; provided, further, Vendor shall promptly take all necessary and appropriate corrective action including, without limitation, at the request of Otsuka and at Vendor's expense, to provide notices to Individuals whose Personal Information may have been affected, whether or not such notice is required by law.

    c. Vendor shall indemnify, defend, and hold Otsuka harmless from any liability, loss, claim, injury, damage, or expense (including reasonable attorneys' fees and costs) incurred by Otsuka as a result of and to the extent of any breach of this Agreement by Vendor including, without limitation, requirements to pay appropriate third parties hereunder for any use of Personal Information other than as contemplated by this Agreement. Notwithstanding any other provision of this Agreement, there shall be no exclusion or limitation of liability for any collection, use, disclosure, or retention of Personal Information in violation of this Agreement.

39.   **ANTI-CORRUPTION**

  a.   Compliance Policy:  It is the policy of Otsuka to comply fully with all applicable laws and regulations of all jurisdictions in which it does business.   Vendor warrants and represents that it will not take any action that would constitute a violation, or implicate Otsuka in a violation, of any law of any jurisdiction in which it performs business including without limitation, the United States Foreign Corrupt Practices Act of 1977, as amended ("FCPA"), the United Kingdom Bribery Act ("U.K. Bribery Act"), and where applicable, any other anti-bribery/corruption legislation enacted by countries in which the Vendor provides services to Otsuka.

  b.   Non-Compliance: Vendor understands and acknowledges that any non-compliance with the above representations will constitute grounds for termination of this Agreement and any other agreements Vendor has entered into with Otsuka or any of its affiliated companies.

*Signatures on the following page*

**IN WITNESS WHEREOF** the Parties have signed this Agreement as of the dates listed below.

Contract number: 20144533

**Otsuka America Pharmaceutical, Inc.**

*Steven J. Weisel*
Steven J. Weisel (Nov 7, 2014)

Name: Steven J. Weisel

Title: V.P. & Gen. Counsel

Date: Nov 7, 2014

**Axtria, Inc.**

*Christian Hoyvald*
Christian Hoyvald (Nov 7, 2014)

Name: Christian Hoyvald

Title: Principal

Date: Nov 7, 2014

# Otsuka-Axtria MSA

EchoSign Document History                                November 07, 2014

| | |
|---|---|
| Created: | November 07, 2014 |
| By: | Christina Pellegrino (christina.tc-pellegrino@otsuka-us.com) |
| Status: | SIGNED |
| Transaction ID: | XG6JYSFK3B66B5K |

# "Otsuka-Axtria MSA" History

- Document created by Christina Pellegrino (christina.tc-pellegrino@otsuka-us.com)
  November 07, 2014 - 8:02 AM PST - IP address: 205.211.91.2

- Document emailed to Christian Hoyvald (christian.hoyvald@axtria.com) for signature
  November 07, 2014 - 8:03 AM PST

- Document viewed by Christian Hoyvald (christian.hoyvald@axtria.com)
  November 07, 2014 - 8:06 AM PST - IP address: 98.221.222.129

- Document e-signed by Christian Hoyvald (christian.hoyvald@axtria.com)
  Signature Date: November 07, 2014 - 8:18 AM PST - Time Source: server - IP address: 98.221.222.129

- Document emailed to Steven J. Weisel (stevenw@otsuka.com) for signature
  November 07, 2014 - 8:18 AM PST

- Document viewed by Steven J. Weisel (stevenw@otsuka.com)
  November 07, 2014 - 8:23 AM PST - IP address: 68.49.22.195

- Document e-signed by Steven J. Weisel (stevenw@otsuka.com)
  Signature Date: November 07, 2014 - 8:23 AM PST - Time Source: server - IP address: 68.49.22.195

- Signed document emailed to Steven J. Weisel (stevenw@otsuka.com), Christina Pellegrino (christina.tc-pellegrino@otsuka-us.com) and Christian Hoyvald (christian.hoyvald@axtria.com)
  November 07, 2014 - 8:23 AM PST

Adobe EchoSign

**Master Services Agreement**

**between**

**Axtria, Inc.**

**and**

**Bayer HealthCare Pharmaceuticals, Inc.**

Confidential

## MASTER SERVICES AGREEMENT

THIS MASTER SERVICES AGREEMENT (this "**Agreement**") is made as of the 1st day of May, 2016 ("**Effective Date**"), by and between Bayer HealthCare Pharmaceuticals Inc., with offices at 100 Bayer Blvd., P.O. Box 915, Whippany, New Jersey 07981-0915 ("**BAYER**"), and Axtria, Inc., with offices at 400 Connell Drive, Berkeley Heights, New Jersey 07922 ("**COMPANY**").

WHEREAS, BAYER desires to retain COMPANY to provide services to BAYER and its Affiliates (as defined herein); and

WHEREAS, COMPANY desires to perform such services.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, BAYER and COMPANY mutually agree as follows:

**SECTION ONE. DEFINITIONS.** As used in this Agreement, the terms listed in this Section One shall have the following meanings:

**1.1 Affiliate.** "Affiliate" shall mean any individual, corporation, firm, joint venture, limited liability company, partnership or other entity which, directly or indirectly, through one or more intermediaries, *controls, is controlled by, or is under common control with BAYER. As used in this definition, "control"* means (a) to possess, directly or indirectly, the power to direct the management or policies of an entity, whether through ownership of voting securities or by contract or otherwise, or (b) to own, directly or *indirectly, more than fifty percent (50%) of the outstanding voting securities or other ownership interest of* an entity. Notwithstanding the foregoing, the definition of "Affiliate" shall not include Covestro LLC or any other individual, corporation or other business entity which, either directly or indirectly, is controlled by *Covestro Deutschland AG.*

**1.2 Confidential Information.** "Confidential Information" shall mean all non-public information *belonging to or in the possession of one party (the "Discloser") (which, when BAYER is the Discloser,* means BAYER and its Affiliates) consider confidential including, without limitation, information concerning Discloser's technical information, finances, business plans, marketing and sales strategies and results, *customers and accounts, computer hardware and software applications and systems and designs and* plans for such computer systems; and when BAYER is the Discloser, the study, discovery, screening, design, research, development, manufacture, formulation, extraction, compounding, mixing, processing, testing, control, preservation, storage, finishing, packing, packaging, use, administration, distribution, sale, reimbursement and/or marketing of pharmaceutical products or compounds and potential products or compounds; data from and methodology of pre-clinical and clinical studies; the contents of any *submission to the U.S. Food and Drug Administration or other regulatory authorities; any information* marked "confidential" by Discloser and all notes, summaries, analyses, and other materials, including, *when BAYER is the Discloser, the Deliverables (as defined herein), prepared by COMPANY or its* *employees, representatives and agents that contain, or are based on BAYER's and its Affiliates'* Confidential Information. Confidential Information may be conveyed or disclosed in electronic, written, graphical, physical or oral form.

**1.3 Healthcare Professional.** "Healthcare Professional" shall mean any actual or potential source (including distributors, wholesalers, suppliers, physicians or other healthcare providers, contractors or agents) of referrals and sales (including referring, recommending, arranging for, ordering, prescribing, or purchasing) of products sold by BAYER in the United States.

**1.4 Services.** "Services" shall mean COMPANY's provision of computer analytics workbench capabilities and support, including the Software Deliverables, for Commercial Analytics and Corporate and Government Customers' initiatives, as requested from time to time pursuant to a Statement of Work (as defined below).

Customer File Number: US2083161773

**1.5 "Software"** means analytical computer code and program(s) and models that will run on BAYER's computer servers, including related programming tools, scripts and routines, that COMPANY is required to or otherwise does develop or provide under this Agreement, as described more fully in each Statement of Work, including all updates, upgrades, new versions, new releases, enhancements, improvements and other modifications thereto, made or provided pursuant to any Statement of Work. As context dictates, "Software" may refer to one or more Software Deliverables.

**1.6 "Software Deliverable"** means any Software, together with its documentation (which documentation will include the applicable written business rules), required to be delivered by COMPANY as set forth in the applicable Statement of Work.

**1.7 "Work Product"** means all Software Deliverables, specifications and other documents, work product and materials related thereto, that COMPANY is required to, or otherwise does, develop and provide to BAYER hereunder, together with all ideas, concepts, processes and methodologies developed in connection therewith whether or not embodied therein.

SECTION TWO. PROVISION OF SERVICES.

**2.1 Provision of Services and Software; Statements of Work; Engagement of Healthcare Professionals.**

(a) COMPANY shall provide Services as requested by BAYER from time to time during the term of this Agreement. COMPANY agrees that nothing herein shall obligate BAYER to request COMPANY to perform any Service whatsoever. Any Services to be provided by COMPANY shall be described in individual Statements of Work (each referred to herein as a **"Statement of Work"** or **"SOW"**) which shall be subject to the mutual agreement of, and executed by, the parties to such SOW. Each Statement of Work shall set forth a description of the Services to be provided, a detailed description of the Software and other Deliverables (as defined below) to be developed or provided, the timing of such Services, the delivery and/or implementation of Software Deliverables, the fees and expenses for the provision of the Services, the resources required, the names and contact information for the parties' project managers, and such other terms and conditions as the parties may agree. A form of Statement of Work is attached hereto as <u>Exhibit A</u>.

(b) COMPANY agrees that any Services provided shall be of the highest professional standards and quality and that COMPANY shall use its best efforts to perform the Services agreed to hereunder. COMPANY further agrees to design, develop, create, test, deliver, install, configure, integrate, customize, maintain and otherwise provide and make fully operational on BAYER'S servers, any Software Deliverable as described in a Statement of Work on a timely and professional basis in accordance with (i) all terms, conditions and specifications set forth in this Agreement and the applicable Statement of Work, and (ii) BAYER's quality control systems, processes and procedures. COMPANY shall ensure all Software complies with the agreed specifications and documentation therefor. Except to the extent expressly provided otherwise in the Statement of Work for any Software, COMPANY shall provide all Software to BAYER in both object code and source code form.

(c) In the event COMPANY engages a Healthcare Professional to perform services for BAYER or otherwise pays any remuneration to a Healthcare Professional on behalf of BAYER, COMPANY shall:
(i) only engage the services of a Healthcare Professional in a manner consistent with (1) all applicable laws and regulations including, without limitation, the Anti-Kickback Statute (42 U.S.C § 1320a-7b(b)) and the "personal services safe harbor" to such statute (42 C.F.R. §1001.952(d)), (2) industry guidelines including, without limitation, the PhRMA Code on Interactions with Healthcare Professionals, as amended (the **"PhRMA Code"**), promulgated by the Pharmaceutical Research and Manufacturers of America (PhRMA), and (3) BAYER Policies (as defined below);
(ii) only engage a Healthcare Professional to provide bona fide services pursuant to a fully-executed written agreement;
(iii) provide copies of such fully-executed agreements to BAYER, upon request;

(iv)   pay such Healthcare Professional for his/her services an amount not to exceed the amount set forth by BAYER only after performance of the services on behalf of BAYER have been confirmed and documented; and

(v)   promptly upon completion of the services, complete and send to BAYER the Payment Data File and Proof of Service Form to be provided by BAYER.

(d)   BAYER reserves the right to audit COMPANY's compliance with the provisions set forth in paragraph (c) above.

(e)   In the event COMPANY performs any Services at BAYER's premises, COMPANY shall cooperate with BAYER's personnel, shall not interfere with the conduct of BAYER's business and shall observe all rules, regulations, policies and security requirements of BAYER concerning the safety of persons and property and security of systems, data and information.

### 2.2   Term; Termination.

(a)   Unless sooner terminated pursuant to the terms of this Agreement, this Agreement shall commence on the Effective Date and end on April 30, 2019.  In the event the term of any Statement of Work entered into during the term of this Agreement extends beyond the expiration of this Agreement, then, unless otherwise agreed, this Agreement shall remain in effect with respect to such Statement of Work until the expiration or termination of the SOW.

(b)   BAYER may terminate this Agreement or any Statement of Work at any time without cause by providing thirty (30) days' advance written notice thereof to COMPANY.  Termination of any Statement of Work will not impact any other Statement of Work.  Termination of this Agreement shall serve as termination of all Statements of Work.  BAYER shall pay the then current rates for Services provided during the 30-day period commencing upon the date the notice of termination is sent by BAYER to COMPANY, with such payment due within sixty (60) days of BAYER's receipt of COMPANY's invoice.

(c)   BAYER shall also have the right to terminate this Agreement or any Statement of Work for cause due to COMPANY's  non-performance or non-adherence to the terms of this Agreement or any SOW  upon 30 days' prior written notice pursuant to the following process:

(i) If COMPANY's performance does not meet BAYER's service level expectations based on the service metrics detailed within the "Service Metrics" section of any SOW, BAYER will notify COMPANY of same in writing in its 30-day advance written notice.  COMPANY will have the opportunity to take corrective action and achieve service metrics' compliance; provided, that if COMPANY is unable to meet the agreed upon service metrics within thirty (30) days from receipt of BAYER's notice of termination, BAYER may terminate this Agreement or any SOW for cause at the end of the aforementioned 30-day period.

(ii) BAYER shall pay the then current rates for Services provided during the 30-day period beginning when the notice to terminate for non-performance related reasons is sent by BAYER to COMPANY, with such payment being due within sixty (60) days of BAYER's receipt of COMPANY's invoice.

(d)   In addition, BAYER shall have the right to terminate this Agreement or any SOW immediately for COMPANY's material breach of the requirements of this Agreement or any SOW for any reason not related to non-performance as described in Section 2.2(c).

Customer File Number:  US2083161773

**2.3    Remuneration; Acceptance.**

(a)  For Services requested by BAYER and performed by COMPANY in accordance with the terms of this Agreement and the applicable Statement(s) of Work, BAYER shall pay to COMPANY an amount not to exceed the amount set forth in the applicable Statement of Work.  COMPANY's standard hourly rates for its long-term and short-term professional resources are set forth in Exhibit B attached hereto, which shall not be revised without BAYER's prior written consent.

(b)  BAYER's obligation to pay COMPANY any amounts due for Services, or reimburse COMPANY for related expenses, is subject to BAYER's acceptance as set forth herein.  If BAYER within thirty (30) days of receipt (or such other times set forth in the applicable Statement of Work, in its sole and reasonable discretion, determines that the Services performed (and any Software or other Deliverables provided in connection therewith) do not conform to the standards required hereunder or in any appendices or exhibits hereto or to a Statement of Work, or otherwise do not conform to the terms and conditions of this Agreement, BAYER shall notify COMPANY thereof, specifying in reasonable detail the respects in which the Services (or Software or other Deliverables) are unsatisfactory or unacceptable. Within such time as is agreed in writing by the parties (and, in the absence of any such agreement, ten (10) days following receipt of any such notice), COMPANY shall, at no additional cost to BAYER, take all steps necessary to render the Services (and Software and other Deliverables) satisfactory and acceptable to BAYER, or BAYER may, without prejudice to its other rights hereunder or otherwise, terminate this Agreement or the applicable Statement of Work immediately by written notice at any time after the end of such time period.

**2.4    Expenses (including travel, out-of-pockets, pass-throughs).**  Reasonable expenses incurred by COMPANY in the course of providing the Services, including round-trip economy airfare (or round trip business-class airfare for intercontinental travel), auto rental, meals, lodging and long distance telephone charges, will be reimbursed to COMPANY by BAYER at cost as set forth, and up to the amount (if any) specified in the applicable Statement of Work *provided, however,* that all travel, meal and lodging expenses shall be reimbursed only if plans for same are approved by BAYER in advance. Receipts shall be submitted with the invoices for any expense in the amount of $25.00 or greater.  Mileage will be reimbursed at the IRS standard rate.  In no event will the amount of expenses incurred by COMPANY and its personnel under any Statement of Work exceed ten percent (10%) of the professional fees set forth in the applicable Statement of Work.

**2.5    Invoices.**  When a purchase order has been issued, COMPANY shall submit an invoice for Services rendered, including expenses covered by Section 2.4, on a monthly basis.  **Invoices should be sent to the address set forth in the applicable purchase order.**  The terms of this Agreement shall prevail over any inconsistent statements or provisions contained in any bill or other writing passing between the parties unless agreed to in writing by both parties.   BAYER will pay invoiced amounts due to COMPANY within sixty (60) days from the date of BAYER's receipt of COMPANY's invoice, except for any amounts disputed by BAYER, in which case BAYER will so notify COMPANY and the parties agree to work in good faith to promptly resolve any such disputes. In the event no purchase order is issued, BAYER shall pay COMPANY amounts due hereunder consistent with the payment terms set forth above.

**2.6    Audits.**  COMPANY shall keep accurate and complete records and accounts of its activities in connection with this Agreement and any Statement of Work, including reasonable substantiation of all Services provided and expenses incurred.  During the term of this Agreement and for the two (2) year-period following the termination or expiration of this Agreement, BAYER or its duly authorized third-party auditor, upon reasonable advance notice and at BAYER'S sole expense, shall have the right during normal business hours to examine and copy such books, records, and other documents and materials (except individual salary and other personal information) with respect to the subject matter and terms of this Agreement and any Statement of Work.

**2.7    Extension to Affiliates**.  Any BAYER Affiliate may enter into a SOW pursuant to, and subject to, this Agreement.   In the event any such Affiliate enters into any SOW pursuant to this Agreement, such SOW: (i) shall incorporate by reference the terms of this Agreement; (ii) shall be

deemed a separate contract between the parties who sign it and an independent contractual obligation separate from any other SOW, (iii) shall be interpreted and construed to include only the BAYER Affiliate executing such SOW, and (iv) there shall be no joint or several liability between or among any Affiliates or BAYER and any Affiliate. The parties expressly agree that BAYER SHALL HAVE NO LIABILITY NOR SHALL BAYER INCUR ANY OBLIGATION OR BE RESPONSIBLE FOR, THE FAILURE OF ANY BAYER AFFILIATE TO PERFORM ITS OBLIGATIONS UNDER THIS AGREEMENT OR ANY SOW ENTERED INTO HEREUNDER.

## SECTION THREE. CONFIDENTIALITY; OWNERSHIP.

**3.1   Confidentiality Agreement; Return of Information.**

(a)   The receiving party ("Recipient") will hold in confidence and take such steps as it normally takes to protect its own confidential and proprietary information, but in any event no less than reasonable steps, to preserve the confidentiality of the Confidential Information disclosed by Discloser to Recipient (including Confidential Information disclosed prior to the date hereof related to this Agreement, the Services or necessary for the performance thereof). For purposes hereof, Confidential Information does not include information that: (i) at the time of disclosure, is in the public domain; (ii) after disclosure, becomes part of the public domain by publication or otherwise, except by breach of this Agreement by Recipient; (iii) Recipient can establish by competent proof was in Recipient's possession at the time of disclosure by Discloser and was not acquired, directly or indirectly, from Discloser (or an affiliate thereof); and (iv) Recipient receives from a third party (other than, when BAYER is the Discloser, an Affiliate) without any reasonable basis to believe that such third party is under any obligation which would be breached by disclosing such information to Recipient; *provided, however,* that such information was not obtained by such third party, directly or indirectly, from Discloser or, when BAYER is the Discloser, an Affiliate. Confidential Information shall not be deemed to be or have come into the public domain merely because any part of such Confidential Information is embodied in general disclosures or because individual features, components or combinations thereof are or become publicly known.

(b)   Nothing in this Section 3.1 shall prohibit Recipient from complying with applicable legal or regulatory requirements or a validly issued subpoena, order of a court of competent jurisdiction or other request for information from a governmental agency, seeking disclosure of any Confidential Information, provided that Recipient provides prompt notice thereof to Discloser (unless legally prohibited) so that Recipient may seek a protective order or other appropriate remedy. Recipient shall thereafter be entitled to comply with such legal or regulatory requirements, subpoena, court order or other request for information. Confidential Information disclosed pursuant to this Section 3.1(b) shall remain Confidential Information for all other purposes of this Agreement.

(c)   Recipient agrees that it will not use the Confidential Information, which Recipient is required hereunder to keep confidential, for any purposes other than as authorized hereunder, without first entering into a written agreement signed by Recipient and Discloser covering the use thereof.

(d)   COMPANY acknowledges that the federal securities laws prohibit any person who has received material non-public information about BAYER, any Affiliate of BAYER, or any partner or potential partner of BAYER or any Affiliate of BAYER, from purchasing or selling securities of any such entity in reliance on such information or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities in reliance on such information.

(e)   Recipient agrees that, at Discloser's request, Recipient will promptly return to Discloser any of the Confidential Information that Discloser may have delivered to Recipient in writing or in any other tangible form, and that Recipient will retain no copies thereof (except that Recipient's attorney may retain one (1) copy in a sealed file). In addition, at BAYER's request, COMPANY will transfer to BAYER all work in progress, property and all other materials in COMPANY's possession that would be deemed Confidential Information or property of BAYER.

(f)   Each party's obligation under this Section 3.1 to preserve the confidentiality of any and all of the Confidential Information disclosed to it shall continue during the term of this Agreement and for a period of five (5) years following expiration or termination of this Agreement.

(g)   The provisions of this Section 3.1 are necessary for the protection of Discloser's business and goodwill and are considered by the parties to be reasonable for such purpose. Recipient

agrees that any breach of this Section 3.1 will cause Discloser substantial and irreparable harm for which money damages may be inadequate and, therefore, in the event of any such breach, in addition to other remedies that may be available, Discloser shall have the right to seek specific performance and other injunctive and equitable relief.

**3.2   Ownership of Deliverables; Third Party Materials.**

(a)    Any Work Product (which includes the Software Deliverables) and reports, evaluations, specifications and other deliverables, in any medium, provided by COMPANY as part of the Services (collectively, the "**Deliverables**") shall be, subject to Section 3.2(d) below, BAYER's sole and exclusive property, and COMPANY hereby irrevocably assigns, transfers and otherwise conveys to BAYER, in each case without additional consideration, all rights, title and interest throughout the world in and to the Deliverables, including all intellectual property rights therein.  COMPANY agrees that any Deliverable that may qualify as a "work made for hire" as defined in the Copyright Act of 1976, as amended, is hereby deemed a "work made for hire" for BAYER.  Upon BAYER's request and at BAYER's cost and expense, COMPANY will promptly take such further actions, including execution and delivery of all appropriate instruments of conveyance, as may be necessary to assist BAYER to prosecute, register, perfect or record its rights, title and interest in or to any Deliverables.  COMPANY irrevocably waives any and all claims COMPANY may now or hereafter have in any jurisdiction to so-called "moral rights" or rights of *droit moral* with respect to the Deliverables.

(b)    It is the parties' intent that COMPANY shall not include in any Software, and the operation of all Software in accordance with its specifications and documentation shall not require, any software owned by third parties.  In the event the parties agree to include any third-party software in any Software provided under this Agreement, COMPANY shall secure, at its sole cost and expense, all necessary rights, licenses, consents, approvals and authorizations necessary for BAYER to use, perpetually and throughout the universe, all third-party software as incorporated in or otherwise used in conjunction with the Software as specified in the applicable Statement of Work or elsewhere in this Agreement.  Ownership of all open-source software components, and all intellectual property rights therein, is and will remain with the respective owners thereof, subject to BAYER's rights under the applicable open-source licenses.

(c)    COMPANY's obligations pursuant to this Section 3.2 shall survive expiration or termination of this Agreement.

(d)    All right, title and interest to Company Pre-existing Works will remain vested in COMPANY. For the purpose of this Agreement, "**Company Pre-existing Works**" shall include all materials, systems, ideas, techniques, processors, equipment, software, knowhow, service marks or trademarks (and intellectual property rights therein) used by the COMPANY to provide the Services and prepare the Deliverables (not including any BAYER'S or its Affiliates' Confidential Information), along with any intellectual property rights thereto, including any modifications or enhancements thereto, whether created before, during or after the performance of this Agreement. With respect to such Company Pre-existing Works contained in any Deliverables, COMPANY hereby grants to BAYER an irrevocable, non-exclusive, worldwide, fully paid, royalty-free, perpetual right and license to use, execute, reproduce, display and perform copies of Company Pre-existing Works for so long as such Company Preexisting Works are required for the use of the Deliverables per the terms of this Agreement.

**3.3   Use of Name.**  Neither party shall use the name, logos, trademarks, service marks or trade names of the other party (or their affiliates) in any public announcement, press release or other public document without the written consent of such other party; provided, however, that either party may use the name of the other party in any document filed with any governmental authority or regulatory agency to comply with legal or regulatory requirements.  COMPANY'S obligations pursuant to this Section 3.3 shall survive expiration or termination of this Agreement.

**3.4    Reporting.**  Pursuant to 42 C.F.R. §403.904, BAYER will be required to report payments or other transfers of value to covered recipients (i.e., physicians and teaching hospitals), and BAYER may disclose COMPANY's name, address, the nature of the services rendered, the remuneration paid

hereunder and such other information as may be required or requested to the U.S. Department of Health and Human Services' Centers for Medicare and Medicaid Services, and pursuant to any other applicable federal, state and/or local laws and regulations.

### SECTION FOUR.  REPRESENTATIONS AND WARRANTIES; OTHER AGREEMENTS.

#### 4.1  Compliance with Laws and Industry Guidelines.

(a)   COMPANY and BAYER agree that each shall comply with all applicable federal, state and local laws and regulations, including, without limitation, laws related to anti-corruption, fraud, abuse, privacy, discrimination, disabilities, fair labor standards, samples, confidentiality, false claims and prohibition of kickbacks. Without limiting the generality of the foregoing, the parties acknowledge that BAYER conducts its interactions with Healthcare Professionals in compliance with applicable laws, including, without limitation, the U.S. Anti-Kickback Statute, 42 U.S.C. §1320a-7(b), the PhRMA Code, and the Physician Payment Sunshine Act (Section 6002 of the Patient Protection and Affordable Care Act). In furtherance of this intention, please refer to Bayer's Code of Conduct and applicable policies and procedures under the Anti-Kickback Statute http://www.bayer.us/en/products/bayer-pharmaceuticals/ ("**BAYER Policies**").  COMPANY, in the performance of the Services, shall conduct its interactions with Healthcare Professionals (and, to the extent applicable, shall cause its employees and subcontractors to conduct their interactions with Healthcare Professionals) in accordance with all applicable laws and regulations, BAYER Policies and the PhRMA Code.

(b)   COMPANY agrees to comply with all applicable federal, state and local laws and regulations relating to the privacy of patient health information, including, but not limited to, the Standards for Individually Identifiable Health Information, 45 C.F.R. §§160 and 164 (the "**HIPAA Privacy Regulation**") promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996. If COMPANY deems it necessary in the performance of its duties under this Agreement to disclose to BAYER the "**Protected Health Information**" (as such term is used in the HIPAA Privacy Regulation) of a patient, then, in advance of any such disclosure, COMPANY shall obtain a written authorization executed by such patient for the use and disclosure of such Protected Health Information in accordance with the HIPAA Privacy Regulation.

**4.2  COMPANY Representations and Warranties.**  COMPANY represents, warrants and covenants that: (i) COMPANY has the full right and authority to enter into this Agreement and perform the Services, and has received all necessary approvals in connection with entering into this Agreement and performing the Services; (ii) COMPANY is in compliance with and shall comply with all applicable federal, state and local laws and regulations, and has and shall maintain in effect all licenses, permissions, authorizations, consents and permits that it needs to carry out its obligations under this Agreement; (iii) compliance with the terms of this Agreement and performance of the Services do not and will not breach or conflict with any other agreement, arrangement or order to which COMPANY is a party or is bound; (iv) compliance with the terms of this Agreement and performance of the Services does not and will not breach any agreement to keep in confidence proprietary information acquired in confidence or in trust; (v) during performance of the Services, COMPANY will not disclose to BAYER, or induce BAYER to use, any proprietary information belonging to a third party; and (vi) any Work Product and other Deliverables will not infringe the intellectual property rights of any third party.

#### 4.3  Debarment.

(a)   COMPANY represents, warrants and covenants to BAYER that after due inquiry:
(i)   neither COMPANY nor, to the extent applicable, any employee of COMPANY, subcontractor or employee of a subcontractor has been debarred by the FDA pursuant to its authority under Sections 306(a) and (b) of the U.S. Food, Drug, and Cosmetic Act (21 U.S.C. § 335(a) and (b)) or is the subject of any investigation or proceeding which may result in debarment by the FDA; and

(ii)   neither COMPANY nor, to the extent applicable, any employee of COMPANY, subcontractor or employee of a subcontractor is included in the List of Excluded Individuals/Entities

(maintained by the U.S. Department of Health and Human Services Office of Inspector General) or the List of Parties Excluded from Federal Procurement and Nonprocurement maintained by the U.S. General Services Administration, or is the subject of any investigation or proceeding which may result in inclusion in any such list.

(b)     COMPANY agrees to immediately notify BAYER in writing if COMPANY becomes aware of any such debarment, exclusion, investigation or proceeding of COMPANY or, to the extent applicable, any employee of COMPANY, subcontractor or employee of a subcontractor.

**4.4   Subcontractors.**  COMPANY shall not engage any subcontractor(s) to perform any portion of Services hereunder without obtaining BAYER's prior written consent.  Any subcontractor(s) engaged by COMPANY to perform any portion of Services hereunder must agree in a writing addressed to BAYER to be bound by the terms of this Agreement and a copy of such writing shall be sent to BAYER.  COMPANY shall be solely responsible for activities performed by any subcontractor(s), and the use of a subcontractor shall not relieve COMPANY of any of its obligations hereunder.  COMPANY, and not BAYER, shall be solely responsible for all withholdings, liabilities and contributions in respect of any such subcontractor(s).

**4.5   Insurance.**  At all times during the term of this Agreement, COMPANY shall maintain insurance with responsible carriers in such amounts and with such coverages and deductibles as is appropriate under the circumstances and within COMPANY'S industry.

**4.6   Indemnification and Limitation of Liability.**  COMPANY shall indemnify and hold harmless BAYER and its Affiliates, and their respective successors, assigns, officers, directors, stockholders, employees and customers (the "**Indemnitees**"), from and against any and all liability, losses, damages, claims, demands, fines, causes of action, suits or proceedings and expenses connected therewith (including reasonable attorneys' fees) arising from or related to performance of the Services or the breach of any representation, warranty or covenant herein except to the extent caused by the gross negligence or willful misconduct of an Indemnitee.  COMPANY's obligations pursuant to this Section 4.6 shall survive expiration or termination of this Agreement.

Except as expressly set forth herein, Company makes no further representations or warranties of any kind whatsoever, express or implied.  Company specifically disclaims any implied warranties of merchantability or fitness for a particular purpose.  Except for the indemnification obligations set forth above, in no event shall one party be liable to the other for tort, consequential, exemplary, special, incidental, or punitive damages even if advised of the possibility of such damages.  Except for the indemnification obligations set forth above, the liability of either party for any loss or damages directly or indirectly suffered by other shall not exceed the aggregate fees and expenses paid to COMPANY by BAYER pursuant to the Statement(s) of Work  under which the liability arose.

**4.7   No Inducement.**  The Services requested by and to be performed for BAYER represent bona fide services and under no circumstances is the requisition of such Services, or the remuneration therefor, meant to serve as an obligation, express or implied, to recommend, purchase, prescribe, arrange for the use of, or otherwise support, any BAYER product or service.

**SECTION FIVE.  MISCELLANEOUS.**

**5.1   Notices.**  Any notice required pursuant to this Agreement shall be in writing, shall be sent by registered or certified mail, or nationally recognized courier service, to the attention of the signatory to this Agreement at the address set forth above, and shall be effective upon receipt.  Either party may from time to time change the address to which notices to it are to be sent by notifying the other party, in writing, of the change and the new address pursuant to this Section.

**5.2   Governing Law.**  This Agreement and any SOW shall be governed by the laws of the State of New Jersey, without giving effect to its conflict of laws provisions.

**5.3   Relationship of Parties.**   COMPANY shall be deemed for all purposes to be an independent contractor and not an employee or agent of BAYER.  COMPANY shall not have the authority to enter into agreements or make representations on behalf of, or otherwise bind, BAYER.  Neither COMPANY nor, to the extent applicable, any employee of COMPANY, subcontractor or employee of a subcontractor shall be eligible to participate in any employee benefit program of BAYER by reason of this Agreement or the relationship between the parties created by this Agreement. In the event that COMPANY or, to the extent applicable, any employee of COMPANY, subcontractor or employee of a subcontractor commences any legal action claiming any rights under any employee benefit program of BAYER, COMPANY shall indemnify and hold BAYER and all other Indemnitees harmless from any and all liabilities, losses, damages and expenses (including reasonable attorneys' fees) arising from or related to such action, except to the extent caused by the negligence or willful misconduct of BAYER. Except as otherwise required by law, BAYER shall not withhold any sums from the remuneration paid hereunder for Social Security or other federal, state or local tax liabilities or contributions.  All withholdings, liabilities and contributions shall be solely the responsibility of COMPANY. COMPANY'S obligations pursuant to this Section 5.3 shall survive expiration or termination of this Agreement.

**5.4   Entire Agreement.**   This Agreement and any SOW entered into hereunder constitutes the sole and only agreement of the parties and supersedes any prior understandings or written or oral agreements between the parties with respect to the subject matter of this Agreement or any SOW.  No alterations, amendments, changes or additions to, or waiver of any provision of, this Agreement or any SOW will be binding upon either party unless reduced to writing and signed by both parties.

**5.5   Successors and Assigns.**   This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.  COMPANY shall not assign this Agreement or any SOW or any of its rights hereunder or thereunder, or delegate any performance of the Services under this Agreement or any SOW without the written consent of BAYER, and any purported assignment of rights or delegation of performance in violation of this Section is void and of no effect.

**5.6   Exhibits and Purchase Orders.**   To the extent that the provisions of any appendix or exhibit attached to this Agreement or any Statement of Work, or any purchase order issued in connection with this Agreement or any Statement of Work, are inconsistent or conflict with the terms hereof, the provisions of this Agreement shall control, even if any such appendix, exhibit or purchase order is executed by both parties.

**5.7   Severability.**   If any provision of this Agreement or SOW shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement or SOW or the validity or enforceability of this Agreement or SOW in any other jurisdiction, and the parties shall negotiate in good faith to modify such provision so that it is valid or enforceable to the parties.

**5.8   Section Headings.**   The section and paragraph headings of this Agreement are for convenience of reference only and shall not be construed as modifying or changing the obligations or terms and conditions expressed in this Agreement.

**5.9   Counterparts; Originals.**   This Agreement or any SOW may be executed in one or more counterparts, each of which is an original, and all of which together constitute one and the same instrument.  Delivery of an executed counterpart's signature page of this Agreement or any SOW by facsimile, electronic mail in portable document format (.pdf) or by other electronic means has the same effect as delivery of an executed original of this Agreement or any SOW.   A facsimile, digital, e-mail or other electronic copy of this Agreement or any SOW shall suffice as an original Agreement or SOW.

IN WITNESS WHEREOF, the authorized representatives of BAYER and COMPANY have executed this Agreement to be effective as of the Effective Date.

BAYER HEALTHCARE PHARMACEUTICALS INC.          AXTRIA, INC.

By: _____          By: _____
Name:  Peter Barschdorff                       Christian Hoyvald
Title:    Vice President, Business Insights      Name:  Christian Hoyvald
                                                 Title:    Principal

Digitally signed by Christian Hoyvald
DN: cn=Christian Hoyvald, o=Axtria, ou,
email=christian.hoyvald@axtria.com, c=US
Date: 2016.04.19 09:30:38 -04'00'

```
Reviewed
4/14/2016
Legal: PM

Finance:
```

## EXHIBIT A

### Statement of Work
### under
### Master Services Agreement 9999999999

This Statement of Work (this "**SOW**") is entered into as of [month, day, year] ("**SOW Effective Date**"), by and between Bayer _____, with offices at 100 Bayer Blvd., P.O. Box 915, Whippany, New Jersey 07981-0915 ("**BAYER**"), and [Name of Company] with offices at ____[address of Company]_____ ("**COMPANY**"), pursuant to and subject to the Master Services Agreement dated _____, as it may have been amended from time to time (the "**Agreement**").

1.   **Description and Scope of Specific Services.**  COMPANY will provide the following services: _____, as further described in **Appendix 1,** which is an integral part of this SOW.  Such services will constitute "Services" as defined in the Agreement.

2.   **Deliverables.**  As described in Appendix 1.  Any deliverables provided under this SOW will constitute "Deliverables" as defined in the Agreement.

3.   **Fees for Services.**  For Services satisfactorily performed, BAYER will pay to COMPANY the sum of $_____, exclusive of expenses.

4.   **Expenses.**   BAYER will reimburse COMPANY at cost for reasonable expenses in accordance with the Agreement.

5.   **Term.**  This SOW takes effect as of the SOW Effective Date and continues through **month day,year.**

6.   **Incorporation by Reference.**  The provisions of the Agreement are incorporated herein by reference and will govern the performance of the parties under this SOW.

7.   **Counterparts.**  This SOW may be executed in one or more counterparts, each of which is an original, and all of which together constitute one and the same instrument.  Delivery of an executed counterpart's signature page of this SOW by facsimile, electronic mail in portable document format (.pdf) or by other electronic means has the same effect as delivery of an executed original of this SOW.

IN WITNESS WHEREOF, the parties have indicated their acceptance of this SOW by the signatures of their authorized representatives below.

**BAYER** _____                     **[NAME OF COMPANY]**

By: _____                  By: _____
Name:                                                 Name:
Title:                                                Title:

```
┌─────────────────────────┐
│     Reviewed            │
│                         │
│  Legal:                 │
│                         │
│  Finance:               │
└─────────────────────────┘
```

**Exhibit B**

**<u>Axtria, Inc. Hourly Rates</u>**

- **Long-Term Resource Rates (>= 3 months duration)**

| FTE/Resource Type | Blended Rate (hourly) |
|---|---|
| Off-Shore | $41.67 |
| On-Shore | $109.25 |

- **Short-Term Resource Rates (<3 months duration):**
  - Short-term resource rates will be equivalent to the Long-Term Resource Rates plus 20%

\* \* \* \* \*

**Master Services Agreement**

**between**

**Axtria, Inc.**

**and**

**Quest Diagnostics Incorporated**



# MASTER SERVICE AGREEMENT

This **Master Service Agreement**, effective 2/16/2016 ("Effective Date"), is between Quest Diagnostics Incorporated, a Delaware corporation with offices at 3 Giralda Farms, Madison, New Jersey 07940 ("Quest Diagnostics") and Axtria, a Delaware corporation with offices at 400 Connell DR., Suite 1300, Berkeley Heights, NJ 07922 ("Axtria" or "Seller").

## BACKGROUND

Axtria provides analytics, technology and outsourcing services. Quest Diagnostics is interested in obtaining services from Axtria. This Agreement sets forth the terms and conditions pursuant to which Axtria will perform, and Quest Diagnostics will purchase, the services. The Parties agree as follows:

1.   **GENERAL PROVISIONS**

   1.1.   *Definitions*

      (a)   Capitalized terms not otherwise defined in this Agreement have the meanings set forth in this Subsection.

      (b)   "Agreement" is this **Master Service Agreement**, including all schedules, exhibits, and attachments referenced in this Agreement and any reference in this Agreement to a Section, Article, Schedule, Statement of Work, or Exhibit is to a Section, Article, Schedule, Statement of Work, or Exhibit of this Agreement.

      (c)   "Applicable Laws" are the international, federal, state, and local laws, rules, and regulations that relate to the conduct of the Parties' businesses and their performance of their respective obligations under this Agreement.

      (d)   "Authorized Representatives" are a Party's officers, directors, employees, agents, consultants, counsel, and advisors that the Party authorizes to act in its place and on its behalf under this Agreement.

      (e)   "Business Day" is any day other than a Saturday, Sunday, or day on which the Federal Reserve Bank of Philadelphia is closed.

      (f)   "Business Unit" is any (i) limited liability company, partnership, joint venture, or other similar entity of which Quest Diagnostics is a party, (ii) licensed, clinical laboratory owned by Quest Diagnostics, or (iii) subsidiary owned or controlled by Quest Diagnostics.

      (g)   "Contract Period" is defined in **Subsection 2.1** [Contract Period], and any extension.

      (h)   "Dispute" is any dispute, controversy, or claim between the Parties arising out of or under this Agreement or its performance.

      (i)   "*Force Majeure* Event" is an act or event, foreseen or unforeseen, that (i) prevents a Party from performing it obligations under this Agreement ("Non-Performing Party"); (ii) is beyond the control and not the fault of the Non-Performing Party, and (iii) the Non-Performing Party has been unable to avoid or overcome the act or event by exercising due diligence. A *Force Majeure* Event does not include economic hardship, changes in market conditions, or insufficiency of funds.

DocuSign Envelope ID: 14F34801-914C-4AAF-A97E-CF8EAB8D5A51



(j)      "Order" is any order issued by Quest Diagnostics, which may be: (i) a purchase order or other document; (ii) a request placed using electronic data interchange or Axtria's on-line website; (iii) in emergencies, a request placed by telephone; or (iv) a request placed using a Quest Diagnostics-issued procurement card.

(k)      "Performance Management Criteria" are the agreed upon performance standards and commitments that Axtria must provide under this Agreement.

(l)      "Performance Management Criteria Failure" is Axtria's failure to meet any Performance Management Criteria.

(m)      "Purchasing Operations Center" is the Quest Diagnostics facility located in Collegeville, Pennsylvania.

(n)      "Records" are the books and records relative to Axtria providing the Services, including prices, instructions, plans, receipts, invoices, vouchers, and manifests as well as any other records or reports required under Applicable Laws.

(o)      "Relationship Manager" is a Party's Authorized Representative who will have decision-making authority for the appointing Party regarding issues relating to this Agreement.

(p)      "Service Location" is any location where Quest Diagnostics may require Axtria to perform the Services.

(q)      "Services" are the services that Axtria will provide or be required to provide pursuant to this Agreement.

1.2.   *Eligible Purchasers*

(a)      Beneficiaries. Quest Diagnostics entered into this Agreement for its benefit and for the benefit of its Business Units. Quest Diagnostics has the right to (i) purchase Services on behalf of any Business Unit and (ii) authorize any Business Unit to purchase Services.

(b)      Pre-Existing Agreement. If Quest Diagnostics acquires an entity with a pre-existing agreement with Axtria ("Pre-Existing Agreement"), Quest Diagnostics will notify Axtria that the entity has become a Business Unit. Quest Diagnostics may elect to terminate that Pre-Existing Agreement or have it remain in effect through its stated expiration date. Any Pre-Existing Agreement that Quest Diagnostics elects to terminate will terminate as of the date the entity became a Business Unit. There will be no adverse financial or other consequences to Quest Diagnostics or the new Business Unit if Quest Diagnostics terminates that Pre-Existing Agreement.

1.3.   *No Minimum Purchases*

This Agreement is not a requirements contract nor does it guarantee any minimum purchase by Quest Diagnostics. Quest Diagnostics' failure to meet a specific purchase amount will not result in any penalty or other obligation, financial or otherwise, to Quest Diagnostics.

## 2.      CONTRACT PERIOD AND EXPIRATION OR TERMINATION
2.1.   *Contract Period*

The Contract Period starts on the Effective Date and continues until the earlier of (i) thirty-six (36) months from the Effective Date or (ii) a Party terminates it as provided in this Agreement.

DocuSign Envelope ID: 14F3488149FC-4AAF-A97E-CF8EA88D9F45



2.2. *Termination*

(a) <u>For Cause</u>. Either Party may terminate this Agreement for cause. Cause exists to terminate this Agreement if either Party defaults. A Party defaults if it fails to meet or perform any material term, provision, agreement, or obligation contained in this Agreement. If a Party defaults, the non-defaulting Party may give the defaulting Party written notice of the default ("<u>Default Notice</u>"). The defaulting Party has ten days from the date of the Default Notice to cure the default ("<u>Cure Period</u>"). If, within the Cure Period, the defaulting Party does not cure the default, the non-defaulting Party may seek any available legal or equitable remedy available to it under Applicable Law. If, during the Cure Period, the defaulting Party cures the default, this Agreement will remain in effect and the Default Notice will be void. If the defaulting Party does not cure the default but makes substantial progress towards curing the default, the non-defaulting party may opt to void the Default Notice or exercise any of the rights listed above.

(b) <u>Other</u>. A Party may terminate this Agreement as provided elsewhere in this Agreement.

2.3. *Transition Assistance Services upon Termination*

"<u>Transition Assistance Services</u>" are the services that Quest Diagnostics may reasonably request from Axtria to enable Quest Diagnostics to transition to another supplier or suppliers. If a Party terminates this Agreement and Quest Diagnostics requests Transition Assistance Services, Axtria will provide those Services for up to ninety days, or for a period agreed to by the Parties ("Transition Period"). During the Transition Period, Axtria will maintain contracted pricing in force and Quest Diagnostics agrees to compensate Axtria at such pricing for the Transition Assistance Services Rendered. All terms and conditions of this Agreement remain in effect until the 90 day or agreed upon Transition Period expires.

3. **SERVICES**

3.1. *Request for Services*

During the Contract Period, Quest Diagnostics may ask Axtria to render Services in accordance with this Agreement and pursuant to a Statement of Work agreed upon and executed by the parties (the "Statement of Work"). Absent the execution of a Statement of Work, this Agreement does not, in and of itself, represent a commitment by either Party to provide any minimum amount of fees or services. **Schedule 3.1** is the first Statement of Work.

3.2. *Statement of Work*

Each Statement of Work, when executed by the Parties' Authorized Representative, becomes part of, and subject to, all terms and conditions of this Agreement. If a conflict exists between the terms and conditions of a Statement of Work and the terms and conditions of this Agreement, the terms and conditions of this Agreement governs unless the Statement of Work expressly states that it is amending this Agreement.

3.3. *Contents*

The Parties will number each Statement of Work consecutively to facilitate identification. Each Statement of Work shall identify Axtria's project manager and may include (i) a description of the Services, (ii) the place and duration of the Services; (iii) acceptance criteria; (iv) milestones for completing the Services, (v) specifications and documentation for any Deliverable; (vi) fees and payment schedule, and (vii) any other terms that the Parties agree to include.

3.4. *Performance*

(a) <u>Performance</u>. Axtria will perform all Services in a competent, workmanlike, expeditious, and professional best efforts manner, and meet the applicable standard of care of similar professionals. If Axtria has access to or controls the operation of any Quest Diagnostics information system,

---

DocuSign Envelope ID: 14F34801-914C-4AAF-A97E-CF8EAB8D5A51



network, or website, Axtria will abide by all Quest Diagnostics security, operating, and safety procedures in effect during the Contract Period. Quest Diagnostics may immediately terminate this Agreement effective upon notice to Axtria if Axtria materially breaches any Quest Diagnostics security, operating or safety procedures, reserving cumulatively all other rights and remedies available at law and in equity.

    (b)   <u>Contractors; Key Persons.</u> Axtria will not, without Quest Diagnostics' prior written consent, use any contractor, subcontractor, or other person not employed by Axtria to perform Services for Quest Diagnostics, provided, however, such contractor, subcontractor or other person not employed by Seller: (a) will solely provide indirect services in support of this Agreement, including, but not limited to email, phone system or servers and (b) does not have access to the Confidential Information of Quest Diagnostics. If 's Statement of Work designates an employee or agent of Axtria as a "Key Person," Axtria shall not remove the Key Person from performing Services or substantially reduce his or her involvement in performing the Services without Quest Diagnostics' advance written consent.

3.5.    *Expenses*

    Axtria is responsible for all ordinary and reasonable expenses that it may incur in connection with this Agreement. Quest Diagnostics will, however, reimburse Seller for expenses, including transportation and lodging expenses, for out-of-town travel on Quest Diagnostics business previously approved in writing by Quest Diagnostics. Quest Diagnostics will not reimburse Axtria for expenses for its local employees, Authorized Representative, or agents incur in traveling to and from work. All travel must comply with Quest Diagnostics' travel policy.

Axtria shall provide Quest Diagnostics with itemized statements of reimbursable expenses with receipts attached for any single expenditure in excess of twenty-five US Dollars (USD $25) upon request. Each statement shall contain the Agreement and the applicable Statement of Work numbers under which the expenses were incurred. The following expenses are allowed:

1.   Airfares: at the lowest rate available not to exceed coach

2.   Automobile, Mileage: at the per mile rate in effect by the Internal Revenue Service for actual miles traveled in the performance of Services

3.   Automobile, Rental:
   - where necessary in the performance of Services
   - subcompact or compact shall be used unless more than four people share the same car;
   - where two or more Seller Employees are at the same site in connection with one Purchase Order, one car shall be shared by up to four individuals

4.   Meals & Lodging: shall not exceed the Per Diem rates listed with the site: http://www.gsa.gov/portal/category/100120 per day per person

3.6    *Quest Diagnostics Policies*

    Without limiting any of Axtria's other obligations, Axtria shall, and shall ensure that its employees and contractors shall, at all times in performing their obligations hereunder: (i) act consistently with the principles of Quest Diagnostics' Code of Business Ethics set out at www.questdiagnostics.com, as it may be amended from time to time; and (ii) if Axtria has knowledge or a good faith belief that Quest Diagnostics or any of its employees or representatives is violating or has violated any law, regulation, company policy or ethical guideline, promptly report the information to the Vice President, Compliance or the Senior Vice President and General Counsel of Quest Diagnostics, who may be reached through Quest Diagnostics' website.



**4.** **FEES**

    4.1. *Service Fees*. The applicable Fee Schedule, Schedule 3.1, will set forth the hourly rates for the Services.

**5.** **INVOICES, PAYMENT TERMS, AND INVOICE DISPUTES**

    5.1. *Invoices*

        (a)    <u>Format</u>. Axtria will invoice Quest Diagnostics by electronic data interchange, within thirty days after the end of each calendar month or according to the schedule specified in a Statement of Work. Quest Diagnostics will not accept third party invoices. Axtria's invoice must reference the Quest Diagnostics Statement of Work number and the prices charged must conform to the prices listed in the applicable Statement of Work. Axtria's failure to follow these requirements may result in delayed payments by Quest Diagnostics and, upon written notice and a failure to cure such defect, Axtria will have no right to declare a breach or to treat as a late payment.

        (b)    <u>Final Invoice</u>. At termination, Axtria will submit its invoice to Quest Diagnostics within one month for any amounts accrued as of the expiration or termination date except to the extent otherwise authorized in the Statement of Work or by Quest Diagnostics in writing.

        (c)    If either Party terminates this Agreement before the end of any term, Axtria shall reimburse Quest Diagnostics the pro rata portion of any pre-paid fees it paid or per the Statement of Work when such termination reimbursement language is included for the Services through the termination (or any Transition Period, as the case may be).

    5.2. *Payment Terms/Invoice Disputes*

        (a)    <u>Payment Terms</u>. Except as provided below, Quest Diagnostics will pay Axtria net 60 days end of month. "Net 60 days end of month" as used herein means that the applicable monthly invoice must be paid by the end of the calendar month that is 60 days from the date of the applicable monthly invoice. For example, a monthly invoice dated January 1 would be payable by March 31; a monthly invoice dated January 25 would also be payable by March 31.

        (b)    If Quest Diagnostics makes a payment in error, Quest Diagnostics reserves the right to adjust later payments to Axtria to compensate for the error, notwithstanding the fact that later payments might be unrelated to those Services for which Quest Diagnostics made the erroneous payment.

        (c)    If Quest Diagnostics disputes Axtria's invoice, Quest Diagnostics will notify Axtria and specify the reasons for the Dispute prior to the payment date of the invoice. The Parties' Authorized Representatives will meet by telephone or in person to discuss the Dispute and work to resolve it. If the Parties are unable to resolve a Dispute within 45 days after Quest Diagnostics sends Axtria the Dispute notice, either Party may seek to resolve the Dispute in accordance with the Dispute Resolution provisions in **Subsection 15.2.** Once the Parties resolve the Dispute, Quest Diagnostics will remit any amounts it owes to Axtria within ten Business Days. An invoice Dispute does not relieve Axtria of its performance obligations under this Agreement during the dispute period.

    5.3. *Taxes*

        (a)    <u>Parties' Responsibilities</u>. Each Party is responsible for any personal property taxes or real property taxes on property it owns, for franchise and privilege taxes on its business, for doing business taxes, for taxes based on its income, gross receipts, or capital, and for any employment, payroll, unemployment, workers compensation, withholding taxes, or any other taxes on its own employees.

DocuSign Envelope ID: 14F34801-914C-4AAF-A97E-CF8EAB8D5A51



      (b)    <u>Axtria's Responsibilities</u>. Axtria is responsible for any sales, use, transfer, value-added, goods and services, services, consumption, and other taxes and duties ("Taxes"), including any excise taxes imposed on it in the conduct of its own business, on the goods or services used or consumed by Axtria in providing the Equipment and Services.

      (c)    <u>Quest Diagnostics' Responsibilities</u>. Quest Diagnostics is responsible for any Taxes imposed by Applicable Law on the Equipment it purchases and Services it receives from Axtria.

      (d)    <u>Cooperation</u>. If a taxing authority assesses Taxes on the Equipment, the Parties will segregate the payments into two payment streams: one for taxable Equipment and the other for nontaxable Equipment. The Parties will cooperate to enable each to determine its own tax liability and to minimize its liability to the extent legally permissible. Each Party will provide and make available to the other any exemption certificates, any applicable tax forms such as IRS Forms W-9/W-8BEN, information regarding the Equipment, or other information reasonably requested by the other Party. Quest Diagnostics shall be entitled to deduct from any payments hereunder any withholding taxes that Quest Diagnostics is required under Applicable Law to remit on behalf of Axtria.

**6.**    **WARRANTIES**

    6.1.    Seller's representations, warranties, and covenants pertaining to the Services will survive any inspection by Quest Diagnostics.

    6.2.    Seller represents, warrants, and covenants to Quest Diagnostics, its successors, assigns and customers that Seller shall render the Services in a timely, professional, and workmanlike manner that conforms to generally accepted industry standards and procedures for similar services.

    6.3.    Seller represents, warrants, and covenants to Quest Diagnostics, its successors, assigns and customers that the Services conform to the representations Seller made to Quest Diagnostics in Seller's response, if any, to Quest Diagnostics' Request for Proposal or in connection with soliciting or negotiating this Agreement, including facts concerning Seller, its capabilities and personnel; and any statements in any proposal or similar document provided by Seller.

    6.4.    Seller represents, warrants, and covenants to Quest Diagnostics, its successors, assigns and customers that it will render its performance under this Agreement in a timely, professional, and proficient manner and that Seller's personnel assigned to perform Services has the proper skill, training, and background to perform the Services in a competent and professional manner

    6.5.    The Warranty Period for the Services is thirty (30) days unless a longer period is agreed upon in writing as per the applicable Statement of Work.

**7.**    **CUSTOMER SERVICE**

    7.1.    Seller will maintain a sufficiently trained and qualified customer service department to respond to general inquiries and provide readily available support related to the Services at no additional cost to Quest Diagnostics.

    7.2.    On Business Days, Seller's customer service representatives will answer incoming calls from «time» AM until «time» PM («TimeZone» time) within one minute from the time the telephone begins to ring. If the customer service representative cannot answer the inquiry at the time of the call, Seller will provide a response to the inquiry no later than one hour from the time of the initial call.



**8.      PERFORMANCE STANDARDS**

    8.1.    *Performance Management Criteria*

        (a)      Performance Management Criteria are the agreed upon performance standards and commitments that Seller must provide under this Agreement.

        (b)      Performance Management Criteria include any specific minimum performance objective for Seller, as set forth in **each Statement of Work** and any performance objectives or standards that Seller advertises it maintains or provides generally to its customers and potential customers or that Seller specifically represented in its response, if any, to Quest Diagnostics' Request for Proposal. Seller will monitor all Performance Management Criteria in a manner sufficient to detect any potential Performance Management Criteria Failures and will put procedures in place to prevent Performance Management Criteria Failures.

    8.2.    *Performance Management Criteria Failures*

        (a)      If Seller detects a potential Performance Management Criteria Failure or fails to meet any Performance Management Criteria, Seller will promptly investigate and report to Quest Diagnostics' Relationship Manager the reasons for the Performance Management Criteria Failure. After investigating the Performance Management Criteria Failure, Seller shall advise Quest Diagnostics' Relationship Manager of the status of remedial efforts Seller is taking with respect to the Performance Management Criteria Failure.

        (b)      Seller shall promptly correct the root cause for the Performance Management Criteria Failure to the extent Seller is responsible and begin meeting the Performance Management Criteria as soon as practicable thereafter. Seller shall take appropriate preventive measures to reduce the potential for the Performance Management Criteria Failure to recur. Seller shall document all proposed corrective actions and submit them to the Quest Diagnostics Relationship Manager for approval.

**9.      RELATIONSHIP MANAGERS, MEETINGS, AND REPORTS**

    9.1.    *Relationship Managers/Meetings*

        (a)      Each Party will designate a Relationship Manager. The Relationship Managers are responsible for communications between the Parties about the relationship.

        (b)      Each Party will consult with the other before appointing a new Relationship Manager. The Quest Diagnostics Relationship Manager may be the Sourcing Manager for the Services.

        (c)      During the Contract Period, the Parties will meet quarterly at a mutually agreeable time and place or by telephone to review and discuss, in good faith, the Parties' performance as well as issues or concerns arising under this Agreement. The Relationship Managers may invite other members of their organizations to participate in these meetings from time to time.

    9.2.    *Reporting*

        (a)      At a minimum, Seller must provide a Performance Management Criteria performance and diversity report. Seller will deliver the reports required in this Subsection to the Relationship Manage unless otherwise indicated. Seller will deliver the reports in an electronic format agreed to by the Parties, on a monthly basis, as requested in writing from Quest Diagnostics' Relationship Manager, or as otherwise specified in this Agreement.

        (b)      The Performance Management Criteria performance report will provide data on Seller's performance in the month just ended as well as comparisons to previous months' performance. The report will include agreed upon trending and statistical analysis.

DocuSign Envelope ID: 14F34801-914C-4AAF-A97E-CF8EAB8D5A51



   (c)  The Diversity report will provide information regarding monies spent with suppliers who are qualified Minority-Owned Businesses, Service Disabled Veteran Businesses, Veteran Owned Businesses, businesses with an 8(A) Designation, or Woman-Owned Businesses. Seller must provide this report quarterly.

   (d)  Any Business Unit may submit written requests for additional or different reports from time to time. Upon receiving a request from a Business Unit, Seller will evaluate the request to determine whether it can provide the report and provide an estimate regarding the time and effort required to produce the report. If Seller can provide the report, Seller will promptly advise the Business Unit and will make the report available as soon as reasonably practicable, but in no event later than thirty days after notifying the Business Unit that Seller can provide the report.

## 10. COMPLIANCE WITH LAWS

  10.1. *Applicable Laws*

   (a)  Each Party must comply with all Applicable Laws. Either Party may consider the other Party's failure to comply with any Applicable Law to be a material breach of this Agreement.

   (b)  Each Party represents that it is not an Excluded Provider. For purposes of this subsection, an "Excluded Provider" is a person or entity (a) convicted of a criminal offense related to health care or (b) currently listed by a federal agency as debarred, excluded, or ineligible to participate in federally funded health care programs. A Party will notify the other Party in writing within five days after any change in this representation or if circumstances change to render this representation false during the Contract Period. Any change in circumstances will constitute cause by the other Party to terminate this Agreement immediately. For purposes of this Subsection, the terms "Quest Diagnostics" and "Axtria" include the entity entering into this Agreement and the entity's parent, principals, shareholders, directors, and officers and any employees or agents of that entity.

  10.2. *Compliance with Massachusetts Standards for the Protection of Personal Information (201 CMR 17.00).* In performing the Services, Axtria may have access to Personal Information of Massachusetts residents. "Personal Information" under 201 CMR 17.00 is defined as an individual's name associated with their social security number or drivers license or other state-issued ID card, or with a financial account or credit card number. To the extent this law applies to information accessed by Axtria, in accordance with the requirements of 201 CMR 17.00, Axtria must implement and maintain appropriate safeguards to protect the Personal Information that Axtria accesses. This obligation survives termination of this Agreement, to the extent that Axtria may have any Personal Information after the termination of this Agreement.

  10.3. *Privacy and Security Requirements.* The provisions applicable to privacy and security of patient health information are set forth in **Schedule 10.3**, which provisions are incorporated as if fully set forth herein.

  10.4. *EEO, Affirmative Action, and Small Business*

   Axtria hereby certifies that all Equipment produced or manufactured, or Services provided in the United States are produced, manufactured, or provided in compliance with applicable United States government requirements, orders, and regulations pertaining to nondiscrimination, equal employment opportunity, and affirmative action, as amended from time to time, including: the Federal Fair Labor Standards Act of 1938, as amended, Title VII of the Civil Rights Act, as amended, the Age Discrimination in Employment Act of 1967, as amended, Section 503 of the Rehabilitation Act of 1973, as amended, Executive Order 11246, the Vietnam Veterans' Readjustment Assistance Act of 1974, as amended, the Occupational Safety and Health Act of 1970, as amended ("OSHA"), (in the event of a conflict between the requirements of OSHA and any industry codes or standards applicable to this Agreement, the more stringent requirement shall apply), the Noise Control Act of 1972, all applicable environmental laws and regulations, including without limitation, the Solid



Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, and the standards of accessibility set forth in Section 402 of the Americans with Disabilities Act, and the rules, regulations and orders pertaining to the above. To the extent Axtria will provide services to Quest Diagnostics in direct support of a federal government contract, the following Federal Acquisition Regulations may apply: (i) <u>52.203-13</u>, Contractor Code of Business Ethics and Conduct (Apr 2010) (Pub. L. 110-252, Title VI, Chapter 1 (<u>41 U.S.C. 251 note</u>)); (ii) <u>52.219-8</u>, Utilization of Small Business Concerns (Jul 2013) (<u>15 U.S.C. 637(d)(2)</u>); (iii) <u>52.222-17</u>, Nondisplacement of Qualified Workers (JAN 2013) (E.O. 13495); (iv) <u>52.222-26</u>, Equal Opportunity (Mar 2007) (E.O. 11246); (v) <u>52.222-40</u>, Notification of Employee Rights Under the National Labor Relations Act (Dec 2010) (E.O. 13496); (vi) <u>52.222-41</u>, Service Contract Act of 1965 (Nov 2007) (<u>41 U.S.C. 351</u>, *et seq*.); and, (vii) <u>52.222-50</u>, Combating Trafficking in Persons (Feb 2009) (<u>22 U.S.C. 7104(g)</u>). **In addition, the following government regulations may apply: FAR <u>52.222-35</u>, Equal Opportunity for Veterans (Sep 2010) (<u>38 U.S.C. 4212</u>), also found at 41 CFR 60-300.5(a), and FAR <u>52.222-36</u>, Affirmative Action for Workers with Disabilities (Oct 2010) (<u>29 U.S.C. 793</u>), also found at 41 CFR 60-741.5(a), which regulations prohibit discrimination against qualified protected veterans and qualified individuals on the basis of disability, and requires affirmative action by covered prime contractors and subcontractors to employ, and advance in employment, qualified protected veterans and individuals with disabilities.** In the event that there are changes or additions to the preceding regulations based on the performance of federal government contracts, Quest Diagnostics may unilaterally amend this Agreement for purposes of complying with the changes or additions by sending a notice of amendment to Axtria .

## 11. CONFIDENTIALITY

### 11.1. *Definitions*

(a) "Confidential Information" is information or materials disclosed by or on behalf of, Disclosing Party relating to Disclosing Party's business or operations that is (i) not generally known other than by Disclosing Party, and (ii) Receiving Party learns about due to entering into this Agreement or due to the relationship between the Parties. Confidential Information includes the existence and terms of any negotiations between the Parties, and the terms and conditions of this Agreement. Confidential Information also includes information relating to pricing; inventory levels; Product specifications; prototypes; marketing techniques and materials; marketing plans; timetables; strategic and development plan; organizational, technical, and financial data; personnel statistics; customer and patient information; trade secrets; organizational structure; business plans; and financial information whether discussed orally or in writing.

(b) "Disclosing Party" is the Party disclosing Confidential Information to Receiving Party.

(c) "Receiving Party" is the Party (or its Authorized Representatives) receiving Confidential Information from Disclosing Party.

### 11.2. *Confidentiality Obligations*

(a) Receiving Party shall hold in confidence and not to disclose Confidential Information received to any person or entity except for Receiving Party's Authorized Representatives and only to the extent necessary to perform the Receiving Party's duties and obligations, or to enforce its rights under this Agreement. Each Party shall advise its Authorized Representatives of the confidentiality requirements in this Agreement and shall require them to comply. Each Party is responsible for any breach of this Agreement by its Authorized Representatives. Receiving Party shall use Disclosing Party's Confidential Information solely for the purposes set forth in this Agreement.

(b) Receiving Party shall limit dissemination of Disclosing Party's Confidential Information to its Authorized Representatives who have a need to know the information for the purposes set forth in this Agreement. During the Contract Period and for two years thereafter each Party shall maintain

DocuSign Envelope ID: 44F3486F-94AC-4AAF-A97E-CF8EAB8D5A9F



appropriate and adequate safeguards, policies, and procedures to protect Confidential Information against unauthorized use, disclosure, alteration, or destruction.

11.3.   *Exclusions*

(a)      Confidential Information does not include information independently developed by Receiving Party and that development can be documented;

(b)      Confidential Information does not include information known to Receiving Party before receiving it pursuant to this Agreement and that knowledge can be documented;

(c)      Confidential Information does not include information released from the obligation of confidentiality by agreement of the Parties;

(d)      Confidential Information does not include information later obtained from a third party without an obligation of confidentiality or secrecy; or

(e)      Confidential Information does not include information that is or subsequently becomes public knowledge through no fault of Receiving Party.

11.4.   *Permitted Disclosures*

(a)      Receiving Party may disclose Confidential Information when required to do so by court order. If required by a court order to disclose Confidential Information, Receiving Party shall promptly notify Disclosing Party of the need for the disclosure and give Disclosing Party a reasonable time, if possible, to oppose the process. In addition, Disclosing Party may disclose only the minimum amount of Confidential Information required to comply with the court order.

(b)      The confidential nature of Confidential Patient Information does not expire.

11.5.   *Intellectual Property.*

(a)      Subject to Section (b) below, the Deliverables shall be considered works made for hire under the United States copyright laws and shall become the exclusive property of Quest Diagnostics upon payment of any amount due.  To the extent that any such materials, under applicable law, may not be considered works made for hire or all right, title, and interest therein and thereto may not be otherwise considered to have fully, irrevocably, and unconditionally vested in Quest Diagnostics, Seller hereby irrevocably and unconditionally assigns to Quest Diagnostics all right, title, and interest, including all copyrights, patent rights, trade secrets, trademarks, moral rights, and all other intellectual property and proprietary rights, in and to all such materials, without the necessity of any further action or consideration.  Seller agree, at the request of Quest Diagnostics, to execute and deliver such documents as in the opinion of Quest Diagnostics are necessary or desirable to evidence further Quest Diagnostics ownership interest. If Seller has any rights to the Deliverables that cannot be assigned to Quest Diagnostics, Seller unconditionally and irrevocably: (i) waives the enforcement of such rights; and (ii) grants to Quest Diagnostics an exclusive, irrevocable, perpetual, worldwide, royalty-free license to reproduce, create derivative works of, distribute, publicly perform and publicly display such Deliverable, by all means now known or later developed, with the right to sublicense such rights.

(b)      Notwithstanding anything in Section (a) to the contrary, Seller will at all times retain and have sole and exclusive title to and ownership of any software, methodologies, tools, configurations, specifications, techniques or documentation which are utilized by Seller in the performance of Services hereunder whether created before, during or after the performance of this Agreement, but not including any confidential information of Quest Diagnostics, together with any and all additions, enhancements, improvements or other modifications thereto which do not include the confidential information of Quest Diagnostics (collectively "Pre-Existing IP"), and all copyright, trademark, patent and other intellectual property

DocuSign Envelope ID: 7A5C66E1-98AC-4AA4-A87E-CF5EAB88DE48



rights related to any of the foregoing. If and to the extent that any Pre-Existing IP is embodied in the Deliverables or required for use in connection with the Deliverables, Seller hereby grants to Quest Diagnostics and its Affiliates, an irrevocable, perpetual, non-exclusive, worldwide, royalty-free, right and license to use, reproduce, create derivative works of, distribute, publicly perform and publicly display such Pre-Existing-IP with the right to sublicense such rights, solely as part of or in connection with the use of the Deliverables per the terms hereunder.

## 12.   INDEMNIFICATION

### 12.1.   *Definitions*

(a)   "Claim" – any claim, demand, action, suit, or proceeding whether civil, criminal, administrative, or investigative, in which either Party may be involved, or threatened to be involved as a Party, that may give rise to the other Party's indemnification obligation.

(b)   "Indemnifiable Losses" means the aggregate of Losses and Litigation Expenses.

(c)   "Litigation Expenses" are any court filing fees, court costs, mediation fees or costs, witness fees, and the cost of investigating and defending or asserting any Claim, including reasonable attorneys' fees, other professionals' fees, and disbursements.

(d)   "Losses" are any liabilities, losses, claims, settlement payments, costs and expenses, interests, awards, judgments, damages, fines, fees and penalties, or other charge, other than a Litigation Expense.

(e)   "Quest Diagnostics Indemnified Parties" are (i) Quest Diagnostics, (ii) Quest Diagnostics' subsidiaries, affiliates, assignees, employees, officers, and directors, and (iii) all subsidiaries, affiliates, employees, officers, and directors of Quest Diagnostics' subsidiaries, affiliates, and assignees.

(f)   "Sellers Indemnified Parties" are (i) Seller, (ii) Seller's subsidiaries, affiliates, assignees, employees, officers, and directors, and (iii) all subsidiaries, affiliates, employees, officers, and directors of Seller's subsidiaries, affiliates, and assignees.

### 12.2.   *Indemnification Obligations*

(a)   A Party will indemnify and hold the other Party harmless from and against any Indemnifiable Losses incurred in connection with a Claim arising out of or relating to (i) a Party's acts or omissions in connection with this Agreement; (ii) personal injury or property damage related to or caused by: (A) the Party's negligence or willful misconduct; (B) the negligence or willful misconduct of the Party's employees, agents, contractors, or subcontractors; and (iii) the infringement (or any claim of infringement) of any intellectual property or other proprietary rights (including patents, copyrights, trademarks, and trade secrets). Notwithstanding the foregoing, the indemnity obligations under this Section 12 shall not apply to the Seller to the extent that any infringement or claim thereof is based upon: (i) the combination, operation or use of the Services or any deliverables in combination with equipment or software not supplied or recommended by Seller hereunder where the Services or any deliverables would not themselves be infringing, (ii) compliance with designs, specifications or instructions provided by the Quest Diagnostics' Indemnified Parties or any third parties working at the direction of the Quest Diagnostics' Indemnified Parties, (iii) use of the Services or any deliverables in an application or environment for which it was not designed or not contemplated under this Agreement, or (iv) modifications of a Services or any deliverables by anyone other than Seller where the unmodified version of the Services or any deliverables would not be infringing.

DocuSign Envelope ID: 74F34801-914C-4AAF-A97E-CF8EAB8D5A51



     (b)    Seller will indemnify and defend Quest Diagnostics' Indemnified Parties against all Indemnifiable Losses and defend Quest Diagnostics against Claims arising out of the negligence or willful misconduct of the Seller.

    12.3.   *Procedural Issues*

     (a)    A Party is not obligated to defend or indemnify the other Party's Indemnified Parties for any Indemnifiable Losses if those losses arise from the Indemnified Parties' negligence or willful misconduct.

     (b)    The Party seeking indemnification ("Indemnified Party") will give Indemnifying Party prompt notice of any Claim. Indemnified Party will cooperate with Indemnifying Party, at Indemnifying Party's expense, by complying with its reasonable instructions and requests in connection with the preparation for and defense of the Claim. Indemnified Party, at its option and expense, may hire counsel to assist in defending the Claim.

     (c)    Indemnifying Party will not compromise or settle any Claim that affects Indemnified Party adversely or admits any matter concerning the Indemnified Party without the Indemnified Party's prior written consent. Indemnified Party's failure to provide Indemnifying Party with prompt written notice of a Claim will not discharge Indemnifying Party's indemnification obligations under this Section unless the failure or delay in providing the notice materially prejudices its ability to defend the Claim.

    12.4.   *Infringement Remedy*

     (a)    If commercially reasonable, Seller will, at its sole cost and expense: (i) obtain any rights necessary to enable Quest Diagnostics to continue to use the Services or (ii) modify the Services so that they do not infringe while continuing to meet the required specifications.

     (b)    If these options are not available, Seller shall refund to Quest Diagnostics all monies it paid for the infringing Service.

**13.   INSURANCE, LIMITS**

    During the Contract Period and for twelve months thereafter, Seller must maintain the types and levels of insurance sufficient to cover Seller's obligations under this Agreement, in amounts not less than $1,000,000 per occurrence and $3,000,000 in the aggregate. If Seller carries insurance on a claims-made basis, Seller must maintain the insurance for so long as a Party may make claims legally with respect to occurrences during the Contract Period. Except as expressly set forth herein, Seller makes no further representations or warranties of any kind whatsoever, express or implied. Seller specifically disclaims any implied warranties of merchantability or fitness for a particular purpose. In no event shall one party be liable to the other for exemplary, consequential, incidental, special, or punitive damages even if advised of the possibility of such damages. Except for the indemnification obligations set forth above, the liability of either party for any loss or damages directly or indirectly suffered by other shall not exceed the aggregate fees paid to Seller by Quest Diagnostics pursuant to the Statement of Work under which the liability arose.

**14.   RECORDS**

    Seller must maintain complete and accurate Records, in accordance with generally accepted accounting principles, to substantiate Seller's charges and expenses under this Agreement. Seller will maintain the Records in accordance with accepted industry information storage practices and record retention periods applicable to Seller's business and the health care industry, in compliance with Applicable Laws and in accordance with sound accounting practices, consistently applied.



**15.** **MISCELLANEOUS**

   15.1.   *Notices*

      (a)   Any notices or communications required or contemplated by this Agreement must be in writing and sent, properly addressed to the other Party at its address listed below or to any other Name or address as a Party may specify to the other Party in writing delivered in accordance with this Section. Notice is effective upon delivery.

      (b)   Unless otherwise specified in this Agreement, the Parties must send any notices or communications by a nationally recognized delivery service; or certified or registered mail, postage prepaid, return-receipt requested.

| | |
|---|---|
| **To Quest Diagnostics:** | 1201 South Collegeville Road<br>Collegeville, PA 19426<br>Attention: Sourcing Manager, Commodity |
| **With a copy to:** | 3 Giralda Farms<br>Madison, New Jersey 07940<br>Attention: General Counsel |
| **To Seller:** | Axtria, Inc<br>400 Connell DR., Suite 1300<br>Berkeley Heights, NJ 07922<br>Attn: President |
| **With a copy to:** | Axtria, Inc<br>.400 Connell DR., Suite 1300<br>Berkeley Heights, NJ 07922<br>Attn: Legal |

   15.2.   *Dispute Resolution/Governing Law*

      (a)   This Subsection sets forth the exclusive dispute resolution procedures for any Dispute.

      (b)   Any dispute must first go to the Relationship Managers who will work to resolve the Dispute. If the Relationship Managers cannot resolve the Dispute, the Parties will escalate the Dispute to persons who have authority to settle the controversy. These persons must meet within ten Business Days after one Party notifies the other in writing about the Dispute ("**Notice of Dispute**"). All negotiations pursuant to this clause are confidential and the Parties shall treat the negotiations as settlement negotiations.

      (c)   If the Parties cannot or do not resolve the Dispute by negotiation within thirty days after delivery of the Notice of Dispute, the Parties must endeavor to settle the dispute by mediation. In mediating the Dispute, the Parties will work under the CPR Mediation Procedure. If one Party fails to participate in the negotiation, the other Party may initiate mediation prior to the expiration of the thirty days. All negotiations pursuant to this clause are confidential and the Parties shall treat them as settlement negotiations. Each Party will bear its own costs and expenses. The Parties will bear the costs and expenses related to the mediation equally.

      (d)   If the mediation does not resolve the Dispute negotiation or mediation, the Parties will submit the Dispute to arbitration. The Rules of the International Institute for Conflict Prevention and Resolution for Non-Administered Arbitration ("CPR") then currently in effect will apply. Three independent and impartial arbitrators will conduct the arbitration. Each Party will select one arbitrator who will in turn select the third arbitrator. The information obtained via the arbitration process, including discovery documents, evidence, testimony and the award, and may not be disclosed by the Parties, CPR, or any other participants to the arbitration to any third Party any except as required by law. The Federal Arbitration Act will govern the arbitration. Any court having jurisdiction may enter judgment upon the award rendered by the arbitrators. The place of the arbitration shall be New York City, New York. The arbitrators will have no authority to award

DocuSign Envelope ID: 14F34801-91AC-4AAF-A97E-CF8EAB8D9A9F



punitive damages or any damages other than actual damages. The arbitrators' rulings, findings, or awards must conform to the provisions of this Agreement and Applicable Law.

(e)     Before the Parties appoint the arbitrators, any person may request that a court of competent jurisdiction grant interim measures of protection to: (i) preserve the status quo pending resolution of the Dispute; (2) prevent the destruction of documents and other information or things related to the Dispute; and (3) prevent the transfer, dissipation, or hiding of assets. No request for interim relief from a judicial authority is incompatible with or a waiver of the right to arbitrate a Dispute. Once appointed, the arbitrators will have the authority to modify any interim relief granted by a Court.

(f)     Each Party shall bear its own costs and expenses and shall share equally the costs and expenses related to the administration.

15.3.     *Use of Marks and Press Releases*

(a)     No Party may use another Party's Name, insignia, symbol, trademark, trade Name, or logotype (or any abbreviation or adaptation thereof) in any publications, press releases, promotional materials, or other form of publicity without the other Party's prior written consent. These restrictions do not prohibit a Party from identifying another Party when required by Applicable Law or the Parties contemplated it when drafting this Agreement.

(b)     The Parties will not and will not permit their affiliates to issue or publish any press release or make public announcements with respect to this Agreement or another Party, without the prior written consent of that other Party.

15.4.     *General Provisions*

(a)     During the Contract Period and for one year thereafter, neither party shall solicit the employment of any employee of the other party with which such party has had contact in connection with the relationship arising under this Agreement.   For purposes of this Section 15.4, a general solicitation of employment by  a party not specifically directed towards employees of the other party will not constitute solicitation by the party

(b)     A *Force Majeure* Event excuses, the Non-Performing Party from whatever performance the *Force Majeure* Event prevents, but only to the extent prevented by the *Force Majeure* Event. When the Non-Performing Party is able to resume performing its obligations, it will immediately give the other Party written notice to that effect and resume performing its obligations no later than two working days after sending the notice. If the Force Majeure Event extends beyond thirty days, the other party will have the right to terminate this Agreement, without penalty, upon written notice to the Non-Performing Party. Further, during any Seller's excused period of non-performance, Quest Diagnostics may procure the Services, as needed, from other vendors, without penalty.

(c)     Expiration or termination of this Agreement for any reason does not relieve the Parties of rights accrued or obligations incurred prior to the effective date of expiration or termination. In addition to any provisions that by their nature are intended to survive termination or that contemplates performance or observance subsequent to termination or expiration of this Agreement, the provisions of Sections 1, 2, 4, 5, and 10-15 will survive expiration or termination of this Agreement.

(d)     The Parties are independent contractors engaged in the operation of their own respective businesses. No Party is a fiduciary, agent, Authorized Representative, or employee of another. No Party has authority to enter into contracts or assume any obligation for or on behalf of another Party or to make any warranties or representations for or on behalf of another Party.



(e)     If a court of law or arbitral panel holds any provision unenforceable, the remaining provisions will continue in effect. If possible, the Parties will amend this Agreement to modify any unenforceable provision to render it valid and enforceable and to preserve, as much as is reasonably practicable, the original intent of the unenforceable provision.

(f)     No Party may assign its rights or delegate its duties or obligation under this Agreement to a third party without the prior written consent of the other Party. However, either Party may assign this Agreement (or any of its rights or interest) to a successor entity to which the assigning Party transfers or assigns all or substantially all of its assets. The assigning Party will provide written notice to the other Party of the assignment and will remain liable for the assignee's performance of its duties or obligations under this Agreement.

(g)     This Agreement constitutes the entire agreement between the Parties concerning its subject matter and supersedes all prior written or oral agreements or understandings between the Parties concerning its subject matter. Modifications to this Agreement must be in writing and signed by the Parties' Authorized Representatives.

(h)     No waiver of any breach or failure by either Party to enforce any of the terms or conditions of this Agreement will limit or waive the Party's right to enforce and to compel strict compliance with every term and condition nor will it constitute a waiver by the Party of its rights in equity or under Applicable Law. The rights and remedies provided in this Agreement are cumulative and are in addition to any other rights and remedies available to the Parties at law and in equity.

(i)     The Parties may execute this Agreement in one or more counterparts each of which constitutes an original, and all of which, collectively, constitute one agreement. This Agreement is binding when each Party has signed one or more counterparts. The signature of all Parties need not appear on the same counterpart.

(j)     Each Party had its own counsel or access to counsel during the negotiation and drafting of this Agreement. The Parties negotiated the words used in this Agreement. Neither Party is a fiduciary of the other. The fact that a particular Party drafted the language at issue shall not be a consideration when resolving any ambiguity in this Agreement. If provisions in this Agreement conflict with provisions in a Schedule or Exhibit, the provisions of this Agreement control, unless the Schedule or Exhibit expressly states that it will control.

(k)     <u>Prohibition against Gifts</u>

(i)     Seller may not offer gifts or other items of value including cash, free goods, merchandise, tickets to sporting or entertainment events, special discounts, honoraria, liquor, food products, personal services, preferential treatment, reimbursement, or payment for travel expenses, lodging, or meals to Quest Diagnostics employees, representatives, officers, or directors or to their family members ("Gifts"). Promotional items or items of minimal value such as pens, caps, mugs, and t-shirts are not Gifts.

(ii)     Compliance with this provision is a condition of doing business with Quest Diagnostics. If Seller does not comply with the requirements of this provision, Quest Diagnostics may consider it a material breach of this Agreement regardless of whether the Quest Diagnostics employee accepted the gift or benefit. If Seller breaches the requirements of this Subsection, Seller has thirty days to cure the breach after receiving notice from Quest Diagnostics describing the incident. If, after thirty days, Seller has not or cannot cure the breach, Quest Diagnostics has the right to terminate this Agreement and any other agreements it has with Seller.

(iii)     Seller shall cooperate with Quest Diagnostics in investigating any incident in which a Quest Diagnostics employee accepted a Gift offered by Seller's employee. Seller's cooperation

DocuSign Envelope ID: 14F34801-914C-4AAF-A97E-CF8EAB8D5A91



would include making the employee who made the offer available to Quest Diagnostics, under agreed upon terms and conditions, to answer questions about the incident.

The Parties intend to abide by this Agreement's terms and condition, understand that it binds them legally, and represent that the individuals executing this Agreement have the authority to bind their respective entities.

| **AXTRIA** | **QUEST DIAGNOSTICS INCORPORATED** |
|---|---|
| By: *David Wood* <br> D0E5DD8B475A417... | By: *Thomas A. Plungis* <br> 90E304E5AA8E4A5... |
| Print Name: David Wood | Print Name: Thomas A. Plungis |
| Title: Sr. Principal | Title: Executive Director  –  Supply Mgmt |
| Date Signed: 2/16/2016 | Date Signed: 2/16/2016 |

## Schedules

**Schedules 3.1**    **Fee Schedule**
**Schedule 10.3**    **Privacy and Security of Patient Confidential Information (Inadvertent Access)**

**Exhibit 1 IT Security**

DocuSign Envelope ID: 4B0AB81-88AC-4A04-A87E-CF8CAB8D5436



SCHEDULE 3.1    Fee Schedule

**Fee Schedule**. Listed below are the hourly rates for Seller personnel.

| Rates | Commercial Analytics | | Commercial Operations | |
|---|---|---|---|---|
| | *Onshore* | *Offshore* | *Onshore* | *Offshore* |
| Associate | $130 | $50 | $110 | $32 |
| Manager | $215 | $95 | $175 | $55 |
| Director | $310 | $135 | $245 | $110 |
| Principal | $395 | $215 | $315 | $175 |

The table below references the expected skills and experience within each level across Commercial Analytics and Commercial Operations resources.

| Level | Commercial Analytics | Commercial Operations |
|---|---|---|
| Associate | • 0-3 years of experiences in analytics<br>• Knows tools and technologies in the analytics and data visualization (e.g., SAS, R, SQL, VBA/Macros, and Tableau/Qlikview etc.) | • 0-3 years of experience in business operations, and data management<br>• Understand client business issues, operating business rules, data and standard operating procedures<br>• Experience in providing detailed statistical analysis and support to operations management<br>• Knowledge of SQL, Oracle, Unica, RedShift, etc.<br>• Incorporate process changes in response to evolving business needs |
| Manager | • 5+ years of professional work experience<br>• Hands-on data analysis experience with tools<br>• Familiarity with statistical concepts and database concepts<br>• Hands-on programming experience<br>• Proficiency in applying advanced statistical concepts to business problems preferred<br>• Project management skills, | • 5+ years of professional work experience<br>• Deep analytic skills and ability to evaluate alternatives and make compelling recommendations based on solid business case analysis<br>• The key tools for operation are SQL, Oracle, Unica, RedShift, etc. Examples include sales force deployment, marketing operations, performance |

DocuSign Envelope ID: 14F34801-974C-4AAF-A97E-CF8EAB8D5A51



| Level | Commercial Analytics | Commercial Operations |
|---|---|---|
| | including ability to monitor, correct and report-out on cost, quality and schedule <br> • Expertise on tools and technologies in the analytics and data visualization (e.g., SAS, R, SPSS, SQL, VBA/Macros, Tableau, etc.) | management, offline reporting & adhoc analysis, etc. <br> • Lead analyses on requests from clients relating to deliverables <br> • Perform what-if analyses to evaluate business scenarios <br> • Mentor, coach and guide associates in the team, often across multiple offices <br> • Expertise in key sales and marketing processes and advise client and internal teams on |
| Director | • 7+ years of experiences in analytics <br> • Partner with various stakeholders to define the project scope, assessment and timelines; manages small-to-large engagement <br> • Strong analytical and business acumen: ability to structure problems, diagnose issues and triangulate with multiple approaches while keeping sight of the big picture | • 7+ years of experiences in operations analytics <br> • Structure and execute operational and strategic initiatives by developing work plans, gathering and synthesizing relevant data, leading analyses and developing recommendations <br> • Build capabilities in operational teams to ensure seamless transition of project execution and results <br> • Build operational dashboards with metrics to track the impact of the projects |
| Principal | • Leadership position with 15+ years of analytics experience <br> • Demonstrates thought leadership in analytics <br> • Conceptualize proofs-of-concept, design analytical models and drive insights <br> • Managing multiple teams with diverse skill-sets | • Leadership position with 15+ years of experience <br> • Responsible for all work streams related to running core business operations in sales, marketing and risk <br> • Managing multiple teams with diverse skill-sets |



SCHEDULE 10.3 [INADVERTENT ACCESS]

PRIVACY AND SECURITY OF PATIENT CONFIDENTIAL INFORMATION

**Privacy and Security of Patient Information**

Definitions. "HIPAA" is the Health Insurance Portability and Accountability Act of 1996, as amended from time to time, and the regulations issued pursuant to it. "Individually Identifiable Health Information" has the definition set forth in HIPAA. "Privacy Regulations" are all regulations in effect from time to time issued pursuant to HIPAA and applicable to the privacy of Individually Identifiable Health Information. "Protected Health Information" is Individually Identifiable Health Information transmitted by electronic media, maintained in any medium described in the definition of electronic media, or transmitted or maintained in any other form or medium "Security Regulations" are the regulations in effect from time to time pursuant to HIPAA and applicable to the security of Individually Identifiable Health Information.

Obligations. In performing its obligations under this Agreement, Axtria, or its employees, representatives, or agents, may inadvertently obtain access to Individually Identifiable Health Information ("Patient Information"). Patient Information is not required for Axtria to perform its obligations under this Agreement. Axtria must advise its Authorized Representatives of the requirement to keep Patient Information confidential and require them to comply with the obligations set forth in this Schedule 10.3 relating to Patient Information. Axtria will not use, disclose, or reproduce, in any manner, any Patient Information that it obtains or to which it gains access because of this Agreement. Axtria will immediately report to Quest Diagnostics any incident in which it or its Authorized Representatives gain access to, use, or disclose Patient Information. Axtria will maintain appropriate security policies, procedures, and practices to protect the Patient Information against unauthorized use or disclosure.

Indemnification. Axtria shall indemnify, defend, and hold Quest Diagnostics harmless from and against any loss or damage that Quest Diagnostics may sustain due to Axtria's failure to comply with this provision.

DocuSign Envelope ID: 14F34801-91AC-4AAF-A87E-CF8EAB8D5A57


Quest Diagnostics®

## Exhibit 1 IT Security

**Service Provider** shall be responsible for establishing and maintaining an information security program related to securing and protecting Quest Diagnostics, its employees, any deliverables, its data (including but not limited to confidential information and proprietary materials) and its customers' data (collectively "Data") that is designed to: (i) ensure the security and confidentiality of the Data; (ii) protect against any anticipated threats or hazards to the security or integrity of Data; (iii) protect against unauthorized access to or use of Data; (iv) ensure the proper disposal of Data; and, (v) ensure that all contractors/subcontractors of **Service Provider**, if any, comply with all of the foregoing.

In addition to the above, and more specifically, **Service Provider** shall meet or exceed industry accepted standards, including where applicable, the Payment Card Industry Data Security Standards (PCI-DSS), to comply with the following:

**A. Personnel Security**
  1. **Service Provider** shall perform background checks on all employees and contractors/subcontractors (collectively "Users") that will have access to Data prior to employment or engagement and annually thereafter.
  2. **Service Provider** employees shall sign a Quest Diagnostics access agreement before end user access is granted to any Quest Diagnostics networks, systems, or applications.
  3. **Service Provider** shall maintain a list of users with access to Quest Diagnostics networks, systems, and applications, and will provide a copy of this list to Quest Diagnostics upon its request. **Service Provider** shall notify Quest Diagnostics within a reasonable timeframe when a user no longer requires access, so that Quest Diagnostics may disable their access.
  4. **Service Provider** shall provide security awareness training to its employees who are providing Services to Quest Diagnostics at least annually, including, as applicable, training regarding Protected Health Information, as defined by HIPAA, Personally Identifiable Information, as defined by federal and state laws and Payment Card Industry Credit Card Information.
  5. **Service Provider** shall ensure all employees and subcontractors of **Service Provider** who are providing Services to Quest Diagnostics comply with this exhibit.

**B. Physical and Environmental Security**
  1. **Service Provider** shall have and implement access control policies and procedures for its facilities and data centers containing Quest Diagnostics Data.

**C. Technical Controls**
  1. <u>Access Controls</u> - **Service Provider** shall implement access controls that include the following:
     a. Access that is authorized, unique for each User, authenticated, and assigned with least and minimum necessary privileges, and includes session timeout not to exceed 30 minutes.
     b. Password controls with appropriate password strength and complexity, expiration and history, removal of vendor supplied passwords, and account lockout.

  2. <u>Remote Access</u>
     a. **Service Provider** shall follow Quest Diagnostics remote access procedures when accessing Quest Diagnostics network. Procedures include, but are not limited to, the execution of access agreements for each User requiring access.
     b. **Service Provider** shall follow Quest Diagnostics remote access procedures when accessing Quest Diagnostics network. Procedures include, but are not limited to, the execution of access agreements for each User requiring access.

  3. <u>Network / Security Management</u>



    a.  Protection against Malicious Code – **Service Provider** shall implement automated tools to detect, prevent, remove, and remedy malicious code on desktops, servers, email and internet access. Servers shall be updated with security patches that meet or exceed industry-accepted standards and criticality. **Service Provider** shall use supported versions of operating systems for which patches are actively deployed.

## D. Data Security
1. <u>**Personal Devices**</u> - **Service Provider** shall only store or process Data on/in assets owned or leased by **Service Provider**. **Service Provider** shall not store Data on storage devices such as flash drives, memory sticks, CDs, or DVDs.
2. <u>**Mobile and Removable Media**</u> - **Service Provider** shall comply with all state and federal laws and regulations that require encryption of laptops, data storage devices and other mobile computing devices that may contain Data.
3. <u>**Data in Transit**</u> - All sensitive Data transmitted by **Service Provider** over public networks, including email, shall be encrypted.
4. **Service Provider** must have policies and procedures in place that require **Service Provider** employees, contractors and subcontractors to destroy, at the conclusion of that work session or shift, all electronic or hardcopy data containing PHI saved locally or printed during that session or shift.._ Notwithstanding the forgoing, if **Service Provider** is provided Quest hardware for the services being contracted, they will not move Data off the hardware without prior written permission.

## E. Data Destruction and Retention
1. **Service Provider** shall implement policies and procedures around the physical destruction or secure deletion of hardcopy and electronic media that meet or exceed industry-accepted standards.

## F. Incident Response
1. **Service Provider** shall have a Computer Security Incident Response Plan (CSIRP) that is supported by a cross-functional response and recovery team that are on call 24x7, 365 days a year.
2. **Service Provider** will promptly notify Quest Diagnostics when Data has been compromised or suspected to have been compromised.

## G. Compliance with Laws and Regulations
1. <u>**Security Breaches**</u>
    a.  **Service Provider** shall maintain the security of the Data received from, or on behalf of, Quest Diagnostics under this Agreement. **Service Provider** agrees to comply with all laws that apply to "Security Breaches" of "Personal Information", as those or similar terms are defined in the states with security breach laws (e.g., CA Civil Code Section 1798.82), or by any Federal law that may be enacted that supersedes the state security breach laws.
    b.  In the event that the **Service Provider** has a security breach, **Service Provider** shall promptly notify Quest Diagnostics, but in no event later than then (10) business days after **Service Provider** knows of or should have known of the security breach, of the circumstances and scope of the breach. **Service Provider** must provide Quest Diagnostics with the detail needed to meet any reporting obligations relating to the security breach, e.g., date of breaches, elements breached, identification of persons impacted (to the extent that such information is known to Service Provider). **Service Provider** shall investigate the causes of the breach, ensure that remedial measures are promptly instituted to prevent further breaches, fully and reasonably cooperate with Quest Diagnostics in addressing the security breach, mitigating any associated harm caused by the security breach and/or reimburse Quest Diagnostics for the cost of mitigation based upon, arising out of, or attributable to, the acts or omissions of **Service Provider** for uses or disclosures in violation of the Agreement, and meeting all legal

DocuSign Envelope ID: 14F34B01-914C-4AAF-A87E-CF8EAB8D5A91



requirements associated with such breaches. In the event of such a violation, **Service Provider** shall be responsible for its and Quest Diagnostics reasonable costs associated with meeting the requirements of the security breach laws, including costs associated with issuing notifications to individuals and government agencies where applicable. Additionally, all of the direct costs reasonably associated with sending out notifications to patients, individuals, clients and regulatory authorities shall be the responsibility of **Service Provider**. In addition, to the extent such incident warrants the provision of credit monitoring, **Services Provider** shall be responsible for the costs of providing at least one year's worth of credit monitoring to the extent required by law or as part of a settlement. In the event that an identity theft arising from **Services Provider's** acts or omissions in violation of this Agreement, **Services Provider** shall be responsible for the costs incurred by Quest Diagnostics in providing services reasonably required to remediate the consequences of such identity theft.

2.  Compliance with Massachusetts Standards for the Protection of Personal Information (201 CMR 17.00). In performing the Services, **Service Provider** may have access to Personal Information of Massachusetts residents. "Personal Information" under 201 CMR 17.00 is defined as an individual's name associated with their social security number or driver's license or other state-issued ID card, or with a financial account or credit card number. To the extent this law applies to information accessed by **Service Provider**, in accordance with the requirements of 201 CMR 17.00, **Service Provider** must implement and maintain appropriate safeguards to protect the Personal Information that **Service Provider** accesses.

**H. Audit and Monitoring**

1.  No less than annually and in compliance with all applicable laws, **Service Provider** shall conduct an independent third-party audit of its information security program. **Service Provider** shall perform regular and periodic vulnerability assessments on internal and external systems with respect to its information security controls and policies. **Service Provider** shall make available such audit and assessment findings to Quest Diagnostics upon request and within a reasonable timeframe. Quest Diagnostics shall treat these audit findings as confidential information of **Service Provider**.

2.  **Service Provider** shall make available and/or provide all audit reports within 30 days of request by Quest Diagnostics, i.e. SSAE16 attestation, vulnerability scan and/or penetration test results and proof of regulatory compliance such as, but not limited to those associated with the U.S. Sarbanes-Oxley Act of 2002 and Payment Card Industry (PCI) where applicable.

3.  **Service Provider** shall be responsible for all costs associated with any mutually agreed upon additional penetration testing required using a mutually agreed upon 3rd party tool or vendor. All critical and high risk vulnerabilities must be remediated by **Service Provider** within 30 days of the testing report, at no additional cost to Quest Diagnostics. All medium and low risk vulnerabilities shall be remediated upon delivery of future releases.

4.  In addition, Quest Diagnostics, at its own expense, reserves the right to perform vulnerability testing on applications developed and hosted for Quest Diagnostics by **Service Provider**, using industry recognized 3rd party scanning tools or vendor(s) at least annually or more frequently within one year of an event of a confirmed security incident. All such reports may only be used in evaluating the security readiness of the **Service Provider** shall be deemed Confidential Information of the **Service Provider**. A copy of such report shall be promptly provided to **Service Provider** upon completion.

5.  Upon reasonable notice to **Service Provider**, Quest Diagnostics shall have the right to review **Service Provider's** policies, processes, controls, and results of internal and/or external reviews of processes and controls regarding its information security program associated with the contracted service prior to the commencement of Services and during the term of this Agreement, including immediately at any time after any security incident incurred by **Service Provider** that may impact Data. Additionally, Quest Diagnostics, at its own expense, shall be entitled to perform, or to have performed by an independent third party, an on-site audit of **Service Provider's** process, controls



and results regarding its information security program associated with the contracted service.  In lieu of an on-site audit, upon request by Quest Diagnostics, **Service Provider** agrees to complete, within twenty (20) days of receipt, an audit questionnaire provided by Quest Diagnostics regarding **Service Provider's** information security program. **Service Provider** shall implement any required safeguards as identified by Quest Diagnostics or information security program audits in order to conform to the terms hereunder.

6. **Service Provider** will perform the Quest Diagnostics Supplier Security Assessment within 30 days of contract renewal.  Supplier, at no cost to Quest Diagnostics, will remediate all critical and high findings within 6 months of the review and notification of Quest Diagnostics findings.  All medium and low risk findings will be reviewed collectively and remediation on mutually agreed upon issues will be corrected based on an agreed upon timeframe.

# Axtria, Inc.

## Agreement of Lease

## For location

300 Connell Dr., Ste. 5000, Berkley Hts., NJ 07922

# LEASE

between

## THE CONNELL COMPANY

Landlord

and

## AXTRIA, INC.

Tenant

300 Connell Drive

## TABLE OF CONTENTS

| | PAGE |
|---|---|
| ARTICLE I. BASIC LEASE INFORMATION | 1 |
| Section 1.01. Building and Land; Real Estate | 1 |
| Section 1.02. Demised Premises | 1 |
| Section 1.03. Base Rent | 2 |
| Section 1.04. Security Deposit | 2 |
| Section 1.05. Term | 2 |
| Section 1.06. Tenant's Pro Rata Share | 2 |
| Section 1.07. Authenticate Termination | 2 |
| ARTICLE II. DEFINITIONS | 3 |
| ARTICLE III. PREPARATION OF THE DEMISED PREMISES | 6 |
| Section 3.01. Tenant Work | 6 |
| Section 3.02. Tenant's Early Access | 7 |
| Section 3.03. No Representation | 7 |
| ARTICLE IV. OPTIONS TO RENEW; RIGHT OF FIRST OFFER | 7 |
| Section 4.01. Options to Renew | 7 |
| Section 4.02. Right of First Offer | 8 |
| ARTICLE V. RENT | 9 |
| Section 5.01. Base Rent | 9 |
| Section 5.02. Tax Increase Amount | 9 |
| Section 5.03. Building Operating Costs; Adjustments | 9 |
| Section 5.04. Payment of Rent | 13 |
| Section 5.05 Security Deposit | 13 |
| ARTICLE VI. SIGNS | 14 |
| Section 6.01. Directory | 14 |
| Section 6.02. Signs | 14 |
| ARTICLE VII. REPAIRS, ALTERATIONS, COMPLIANCE, SURRENDER | 14 |
| Section 7.01. Repairs by Landlord | 14 |
| Section 7.02. Repairs, Maintenance and Improvements by Tenant | 14 |
| Section 7.03. Approval by Landlord of Improvements | 15 |
| Section 7.04. Emergency Repairs | 16 |
| Section 7.05. Electrical Lines | 16 |
| Section 7.06. Surrender of Premises | 17 |
| ARTICLE VIII. SERVICES AND UTILITIES | 17 |
| Section 8.01. Landlord's Services | 17 |
| Section 8.02. Electricity | 18 |
| ARTICLE IX. USE AND OPERATION | 18 |

i

15.02721

Section 9.01.    Use ...................................................................................... 18
Section 9.02.    Rules and Regulations Established by Landlord .......... 18
Section 9.03.    Restrictions on Tenant's Activities ................................ 19
Section 9.04.    Illegal Purposes ............................................................... 19

ARTICLE X.   TRANSFER OF INTEREST; PRIORITY OF LIEN ....... 19

Section 10.01.   Assignment, Subletting, etc. ......................................... 19
Section 10.02.   Subordination ................................................................... 21
Section 10.03.   Attornment ....................................................................... 21
Section 10.04.   Transfer of Landlord's Interest ..................................... 21
Section 10.05.   Mortgagee's Rights ......................................................... 22

ARTICLE XI.   COMMON AREA ....................................................... 22

Section 11.01.   Use of Common Area ..................................................... 22
Section 11.02.   Landlord's Rights ............................................................ 22
Section 11.03.   License Numbers ............................................................. 23
Section 11.04.   Landlord's Obligation with Respect to Parking Area .... 23

ARTICLE XII.   DESTRUCTION OR DAMAGE ............................... 23

Section 12.01.   Rent Abatement ............................................................... 23
Section 12.02.   Option to Terminate ....................................................... 23
Section 12.03.   Landlord's Obligation to Rebuild .................................. 24
Section 12.04.   Landlord's Liability ........................................................ 24

ARTICLE XIII.   CONDEMNATION .................................................. 24

Section 13.01.   Definitions ........................................................................ 24
Section 13.02.   Taking of Demised Premises ......................................... 24
Section 13.03.   Taking for Temporary Use ............................................ 25
Section 13.04.   Disposition of Awards .................................................... 25

ARTICLE XIV.   TENANT'S INSURANCE ....................................... 25

Section 14.01.   General Insurance ........................................................... 25
Section 14.02.   Liability Insurance .......................................................... 25
Section 14.03.   Property Insurance .......................................................... 26
Section 14.04.   Worker's Compensation Insurance ................................ 26
Section 14.05.   Other Insurance ............................................................... 26
Section 14.06.   Waiver of Subrogation .................................................... 26
Section 14.07.   Insurance Rate ................................................................. 26

ARTICLE XV.   INDEMNIFICATION AND LIABILITY ................. 26

Section 15.01.   Indemnification ................................................................ 27
Section 15.02.   Waiver and Release ......................................................... 27
Section 15.03.   Liability of Landlord ...................................................... 27

ARTICLE XVI.   DEFAULT; REMEDIES ......................................... 28

Section 16.01.   Default ................................................................................ 28

Section 16.02.   Landlord's Remedy .......................................................... 29
Section 16.03.   Landlord's Re-Entry ......................................................... 29
Section 16.04.   Landlord's Additional Remedies ..................................... 29
Section 16.05.   Agreed Final Damages ..................................................... 30
Section 16.06.   Waiver of Right of Redemption ...................................... 30
Section 16.07.   Landlord's Right to Perform for Account of Tenant ...... 30
Section 16.08.   Additional Remedies, Waivers, etc. ............................... 30

ARTICLE XVII.   TENANT'S ESTOPPEL CERTIFICATE .............. 31

ARTICLE XVIII.   RIGHT OF ACCESS ............................................ 31

ARTICLE XIX.   COVENANT OF QUIET ENJOYMENT ............... 31

ARTICLE XX.   MISCELLANEOUS .................................................. 32

Section 20.01.   Interpretation ..................................................................... 32
Section 20.02.   Construction of Words and Phrases ............................... 32
Section 20.03.   Written Agreement Required .......................................... 33
Section 20.04.   Notice .................................................................................. 33
Section 20.05.   Survival of Provisions upon Termination of Lease ...... 33
Section 20.06.   Successors and Assigns .................................................... 34
Section 20.07.   Guarantor of Tenant ......................................................... 34
Section 20.08.   Tenant at Sufferance ........................................................ 34
Section 20.09.   Interest ................................................................................ 34
Section 20.10.   Late Charge ....................................................................... 34
Section 20.11.   Non-Waiver ....................................................................... 35
Section 20.12.   Broker ................................................................................. 35
Section 20.13.   Short Form Lease .............................................................. 35
Section 20.14.   Mechanic's Liens ............................................................. 35
Section 20.15.   Corporate Authority ......................................................... 35
Section 20.16.   Force Majeure .................................................................... 35
Section 20.17.   Governing Law .................................................................. 35
Section 20.18.   Financial Statements ......................................................... 36

ARTICLE XXI.   ENVIRONMENTAL MATTERS ........................... 36

Section 21.01.   Industrial Site Recovery Act .......................................... 36
Section 21.02.   Spill Act ............................................................................. 38
Section 21.03.   Toxic and Hazardous Materials ...................................... 38
Section 21.04.   Other Environmental Laws ............................................. 39
Section 21.05.   Survival of Environmental Terms and Conditions ....... 39

EXHIBITS

Exhibit A       Legal Description of the Land and Site Layout
Exhibit B       Rental Plan showing the Demised Premises
Exhibit C-1     Space Plans
Exhibit C-2     Tenant Worksheet
Exhibit D       Rules and Regulations
Exhibit E       Building Janitorial Specifications
Exhibit F       Commencement Date Addendum

THIS IS A CONFIDENTIAL DOCUMENT

LEASE

THIS AGREEMENT OF LEASE (together with all Exhibits and Schedules attached or to be attached hereto, this "Lease") is dated as of September 11, 2015, between THE CONNELL COMPANY, a New Jersey corporation, whose address is 200 Connell Drive, Berkeley Heights, New Jersey 07922 (subject to Section 10.04 hereof, "Landlord") and AXTRIA, INC., a Delaware corporation whose address is 400 Connell Drive, Berkeley Heights, New Jersey 07922 ("Tenant").

Landlord hereby leases to Tenant and Tenant hereby rents from Landlord the Demised Premises (hereinafter defined) for the Term (hereinafter defined) at the rent and subject to all of the terms and conditions set forth herein. Intending to be legally bound hereunder and in consideration of $1.00 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree with each other as follows:

ARTICLE I. BASIC LEASE INFORMATION

Section 1.01.  Building and Land; Real Estate:

The "Building" is 300 Connell Drive, Berkeley Heights, New Jersey 07922. The "Land" shall mean all that real property which is more particularly described in Exhibit A attached hereto and made a part hereof (such Exhibit A containing both a legal description of the Land and a site layout thereof). The Building and the Land are sometimes referred to collectively herein as the "Real Estate."

Section 1.02.  Demised Premises:

The Demised Premises is the portion of the Building leased to Tenant, consisting of 16,037 usable square feet (the "usable square feet of floor area by multiplying the usable square feet by 122.5%, and located on the fifth floor and designated as "Demised Premises" on the "Rental Plan" (which is attached hereto as Exhibit B). The Demised Premises includes any alterations, additions, improvements or repairs of any nature made thereto. This computation of rentable square footage shall be binding and conclusive on the parties and their successors and assigns.

Section 1.03.  Base Rent:

"Base Rent" in the applicable period during the Term shall be an amount as set forth below:

(i)   Months 1 through 3:  $0.00 per rentable square foot of the Demised Premises per annum, or $0.00 per month;

(ii)  Months 4 through 15:  $27.00 per rentable square foot of the Demised Premises per annum, or $44,313.75 per month;

(iii) Month 16:  $0.00 per rentable square foot of the Demised Premises per annum, or $0.00 per month;

(iv)  Months 17 through 28:  $27.50 per rentable square foot of the Demised Premises per annum, or $45,134.38 per month;

(v)   Months 29 through 40:  $28.00 per rentable square foot of the Demised Premises per annum, or $45,955.00 per month;

(vi)  Months 41 through 52:  $28.50 per rentable square foot of the Demised Premises per annum, or $46,775.63 per month;

(vii) Months 53 through 64:  $29.00 per rentable square foot of the Demised Premises per annum, or $47,596.25 per month.

Base Rent during any renewal term shall be governed by Section 4.01 hereof. Base Rent shall be payable per Section 5.01 hereof (it being understood that payment for electricity per Section 8.02 hereof is an amount in addition to Base Rent).

Section 1.04.  Security Deposit:

"Tenant shall, on the date this Lease is executed, deposit with Landlord an amount equal to $132,941.25 as a security deposit (the "Security Deposit"). The Security Deposit shall be governed by Section 5.03 hereof.

Section 1.05.  Term:

The "Term" of this Lease shall commence on the Commencement Date and shall continue for five (5) years and four (4) months thereafter, unless sooner terminated or renewed in accordance with the provisions of this Lease.

Section 1.06.  Tenant's Pro Rata Share:

For purposes of this Lease, Tenant's Pro Rata Share shall be the ratio of the total rentable square footage of the Demised Premises to the total rentable square footage of the Building. Landlord and Tenant have determined that Tenant's Pro Rata Share is 8.0666%, calculated as follows: Demised Premises of 19,695 rentable sq. ft. divided by the rental Area of Building of 244,179 sq. ft. = 0.08066 x 100 = 8.066%. This determination of Tenant's Pro Rata Share shall be binding and conclusive on the parties, and their successors and assigns.

Section 1.07.  Authentidate Termination:

Landlord and Tenant acknowledge that as of the date hereof (i) Landlord is leasing the space described in this Lease as the "Demised Premises" to Authentidate Holding Corp. ("Authentidate") pursuant to a lease agreement (as amended, the "Authentidate Lease") between Landlord and Authentidate and (ii) Landlord and Authentidate are currently in discussions to amend the Authentidate Lease to terminate the Authentidate Lease (with respect to the Demised Premises only) prior to its scheduled expiration date and have Authentidate lease other space in the Building from Landlord. In the event that by September 30, 2015 (the "Cut-Off Date") Landlord shall not have entered into (and received a fully executed copy of) an agreement with Authentidate terminating the Authentidate Lease with respect to the Demised Premises only prior to its scheduled expiration date and having Authentidate lease other space from Landlord in the Building, in form and substance (including, without limitation, the termination date, the effective date of the lease of the new space and rental rate) satisfactory to Landlord in Landlord's sole discretion, then Landlord shall notify Tenant of the same and (unless otherwise agreed to in writing by Landlord and Tenant) (x) effective as of the Cut-Off Date this Lease shall terminate and be null and void and of no force or effect whatsoever and (y) Landlord and Tenant shall amend the 400 Lease to provide that (I) the term of the 400 Lease shall be for six (6) months commencing on January 1,

15-0231

2

2016, provided that Tenant shall have the right to terminate the 400 Lease prior to such scheduled expiration date within thirty (30) days prior written notice thereof to Landlord, (II) the Base Rent under the 400 Lease shall be $23.60 per rentable square foot of the 400 Leased Space per annum and (III) Sections 4.01 and 4.02 of the 400 Lease shall be deleted (Tenant shall not have any renewal options or rights of first offer). Landlord makes no representation or warranty of any kind that it will enter into the agreement with Authentidate described above in this Section 1.07, and Landlord shall not have any liability to Tenant in the event that Landlord does not enter into any such agreement with Authentidate.

## ARTICLE II. DEFINITIONS

Section 2.01. As used herein, the terms below shall have the following meanings:

(a)  "Authentidate" shall have the meaning set forth in Section 1.07 of this Lease.

(b)  "Appraisal Procedure" shall mean the following: within ten (10) days after the expiration of the fifteen (15) day period specified in Section 4.01(b) hereof, each party shall appoint a disinterested, independent appraiser who is a member of the American Institute of Real Estate Appraisers (or a successor organization if it then exists), has at least five years (or a successor organization if it then exists), the most similar organization) and has at least five years experience appraising rental properties in the Berkeley Heights area (which shall include the Route 78 corridor) (an "Appraiser"). Within twenty (20) days after that appointment, the two Appraisers so appointed shall appoint a third Appraiser. If no third Appraiser is appointed within thirty (30) days after the appointment of the two Appraisers, then either party may apply to the American Arbitration Association ("AAA") to make such appointment, and both parties shall be bound by such appointment. Each Appraiser appointed pursuant to the foregoing procedure shall be instructed to determine the amount of Market Rent within twenty (20) days after his or her appointment. Each of the three Appraisers shall determine the value of Market Rent applying the parameters set forth in Section 4.01(b). The values of the Market Rent determined by each of the three Appraisers shall then be averaged, the determination which differs most from such average shall be excluded, the remaining two values shall then be averaged, and such average shall be the Market Rent, which shall be final and binding on the parties. The expenses and fees of all such Appraisers shall be shared equally between Landlord and Tenant.

(c)  "Assessed Valuation" shall mean (i) the assessed valuation of the Building plus (ii) one-third (1/3) of the assessed valuation of the Land, in each case including any added and/or omitted assessments, and in each case as reflected in the real estate tax records of the Township of Berkeley Heights and the real estate tax records of the Borough of Watchung, as applicable.

(d)  "Base Rent" shall have the meaning set forth in Section 1.03 of this Lease.

(e)  "Base Tax Rate" shall mean the real estate tax rate in effect for the calendar year 2016.

(f)  "Building 400" shall have the meaning set forth in Section 1.01 of this Lease.

(g)  "Building 400" shall mean the building located at 400 Connell Drive, Berkeley Heights, New Jersey 07922, as designated on Exhibit A attached hereto. For purposes of clarification, any parking lots, roadways or courtyards located anywhere on the Land are not included within the definition of Building 400.

"Building 500" shall mean the building to be located at 500 Connell Drive, Berkeley Heights, New Jersey 07922, as designated on Exhibit A attached hereto (it being understood that as of the date hereof, only the foundations of Building 500 have been constructed). For purposes of clarification, any parking lots, roadways or courtyards located anywhere on the Land are not included within the definition of Building 500.

3

15.02731

---

(h)  "Building Operating Costs" shall have the meaning set forth in Section 5.01(c)(i,d) and (e) of this Lease.

(i)  The "Commencement Date" of this Lease shall be the earlier of (i) the day on which Landlord, having substantially completed the Tenant Work, obtains a Certificate of Occupancy or Temporary Certificate of Occupancy for the Demised Premises or (ii) the day on which Tenant commences to do business in the Demised Premises. Notwithstanding the foregoing, and to the extent that there is any delay in the completion of the Tenant Work, which is attributable to the act(s) or omission(s) of Tenant or Tenant's Agents (each, a "Tenant Delay"), then the "Commencement Date" for all purposes under this Lease shall be the day on which the Commencement Date would have occurred but for such Tenant Delay. The parties agree that, without limiting the generality of what constitutes a Tenant Delay, any of the following events that delay the Commencement Date shall be treated as a Tenant Delay: (I) special equipment, fixtures or materials requested by Tenant not included on the Space Plans, (II) changes, alterations or additions to the Tenant Work after the parties have agreed on the Plans and Specifications, or (III) the delay or failure of Tenant in supplying information or approving or authorizing any applicable plans, specifications, or other matters as required under this Lease or any other act or omission of Tenant not in compliance with this Lease. Promptly following the Commencement Date, Landlord and Tenant shall execute a Commencement Date Addendum in the form attached hereto as Exhibit F which shall confirm the Commencement Date (it being agreed that the failure of either party to execute the Commencement Date Addendum shall not in any way affect the Commencement Date or any other terms of this Lease).

(j)  The "Common Area" shall mean, collectively, without limitation, the hallways, entryways, stairs, cafeteria, elevators, driveway, sidewalks, parking areas, loading facilities, and all other areas and facilities of the Building and the Land provided from time to time by Landlord for the general use and convenience of Tenant with other tenants and their respective employees, servants, invitees, licensees or other visitors; provided, however, that for purposes of clarification, Common Area (i) shall not include Building 400 or Building 500 but (ii) shall include any parking lots, roadways or courtyards located anywhere on the Land.

(k)  "Connell Corporate Park" shall mean the corporate park located in Berkeley Heights, New Jersey which is commonly known as the "Connell Corporate Park."

(l)  "Demised Premises" shall have the meaning set forth in Section 1.02 of this Lease.

(m)  "Expiration Date" shall be the last day of the Term. If this Lease shall have been renewed, the Expiration Date shall be the last day of the Term as so renewed. Notwithstanding anything otherwise to the contrary herein, if this Lease is cancelled or terminated prior to the Expiration Date by reason of an Event of Default (as hereinafter defined), Tenant's liability under the provisions of this Lease shall continue until the date the Term would have expired had such cancellation or termination not occurred or as otherwise provided herein.

(n)  "Extra Taxes" shall have the meaning set forth in Section 5.02(b) of this Lease.

(o)  "Land" shall have the meaning set forth in Section 1.01 of this Lease.

(p)  "Mortgage" shall mean any mortgage, deed to secure debt, trust indenture, deed of trust or other security document or instrument which may now or hereafter affect, encumber or be a lien upon the Demised Premises, the Building, the Land, and any spreading agreements, including, without limitation, any renewals, modifications, consolidations, replacements and extensions thereof.

(q)  "Mortgagee" shall mean the holder of any Mortgage at any time.

4

15.02731

of this Lease.

(s) "Operating Increase Amount" shall have the meaning set forth in Section 5.03(a) of this Lease.

(t) "Operating Year" shall mean any calendar year. The "First Operating Year" is the calendar year 2016.

(u) "Parking Area" shall mean those portions of the Land which are designated for parking by Landlord, from time to time. Up to 10% of the parking spaces may be designated as reserved by the Landlord; *it being understood* that Section 8.01(c) hereof sets forth the number of parking spaces designated as reserved for Tenant and the parking ratio for Tenant's access to parking spaces.

(v) "Plans and Specifications" shall have the meaning set forth in Section 3.01 hereof.

(w) "Real Estate" shall have the meaning set forth in Section 1.01 hereof.

(x) "Real Estate Tax Base" shall mean the dollar amount of real estate taxes payable with respect to the Real Estate on an annual basis, determined by multiplying the Assessed Valuation by the Base Tax Rate plus any charges or assessments imposed upon the Real Estate which are reasonably anticipated to continue thereafter (*it being understood* that the Real Estate Tax Base shall not include any real estate tax which may be imposed on the Building value (as opposed to the land value) if Building 400 or Building 500 (if and when such building is constructed).

(y) "Rent" shall mean the aggregate of Base Rent, Tax Increase Amount, Extra Taxes, Operating Increase Amount (each as defined herein) and any other charges payable to Landlord hereunder, including utility charges.

(z) "Security Deposit" shall have the meaning set forth in Section 1.04 hereof.

(aa) "Space Plans" shall have the meaning set forth in Section 3.01(a) of this Lease.

(bb) "Tax Increase Amount" shall have the meaning set forth in Section 5.02(a) of this Agreement.

(cc) "Tax Year" shall mean any calendar year.

(dd) "Taxes" shall mean all real estate taxes, charges and assessments imposed upon the Real Estate (*it being understood* that (i) Taxes shall not include any real estate taxes, charges and assessments imposed upon the building portion, as opposed to the land portion, of Building 400 and Building 500 and when such building is comprised and (ii) subject to any Extra Taxes, in determining Taxes attributable to the Land (as opposed to the Building) which shall be allocated to this Lease, one-third (1/3) of the assessed valuation of the Land (times the applicable real estate tax rate), as determined by the real estate tax records of the Township of Berkeley Heights and the real estate tax records of the Borough of Watchung, as applicable, shall be allocated to this Lease). If any franchise, capital stock, capital gains, rent, income, profit or any other tax or charge of any nature whatsoever shall be substituted in whole or in part for the current ad valorem taxes now or hereafter imposed upon the Real Estate due to a change in the method of taxation or assessment, such franchise, capital stock, capital gains, rent, income, profit or other tax or charge shall be deemed included as Taxes.

(ee) "Tenant's Agents" shall mean, without limitation Tenant's employees, servants, representatives, agents, licensees, permitted subtenants and assignees, contractors, heirs, successors, legatees, and devisees.

(ff) "Tenant's Pro Rata Share" shall have the meaning set forth in Section 1.06 of this Lease.

(gg) "Tenant Work" shall have the meaning set forth in Section 3.01 of this Lease.

(hh) "Term" shall have the meaning set forth in Section 1.05 of this Lease.

(ii) "400 Lease" shall mean the lease agreement dated as of the date of this Lease entered into between Landlord and Tenant pursuant to which Tenant is leasing certain space specified therein in Building 400 from Landlord.

(jj) "400 Leased Space" shall mean the space which Tenant is leasing from Landlord under the 400 Lease.

## ARTICLE III. PREPARATION OF THE DEMISED PREMISES

### Section 3.01. Tenant Work.

(a) The parties agree that the space plans attached hereto as Exhibit C-1 (the "Space Plans") shall be the space plans for the design and construction of the Tenant Work.

(b) The parties agree that Landlord shall retain an architect to design the interior of the Demised Premises and prepare complete construction drawings, including without limitation layouts and interior specifications and mechanical, electrical, plumbing and fire protection drawings for the preparation of the Demised Premises, in each case substantially in accordance with the Space Plans (the "Plans and Specifications"). Tenant shall cooperate as necessary in connection with the preparation of the Plans and Specifications, in a complete and timely manner and as reasonably requested by Landlord, and without limiting the foregoing, Tenant shall provide to Landlord all reasonable information as shall be reasonably required for the preparation of mechanical drawings.

(c) Landlord shall cause the Plans and Specifications to be delivered to Tenant for Tenant's review and consideration as soon as reasonably possible. Tenant shall inform Landlord of any requested changes as soon as possible, but in no event later than ten (10) business days following Tenant's receipt of the Plans and Specifications. Any requested changes must be acceptable to Landlord, and the final Plans and Specifications must be mutually agreed upon by Landlord and Tenant. Tenant shall act in a reasonable manner in approving or objecting to the Plans and Specifications. The parties agree that once Tenant shall have approved the Plans and Specifications, Landlord shall not have any responsibility for such Plans and Specifications (including the functionality thereof), other than to have the construction performed in accordance with such Plans and Specifications pursuant to the terms of this Lease. For purposes of clarification, it is agreed that Tenant shall be responsible, at its own cost, for the installation of any data cabling and telecommunications wiring within the Demised Premises (and any such installations must be done by Tenant in compliance with the terms of this Lease). With respect to all aspects of the Tenant Work, Tenant agrees to reasonably cooperate with Landlord in an effort to have the Tenant Work completed as soon as possible. Any material change or modification of the Plans and Specifications shall not be valid or binding unless consented to by Landlord in writing.

(d) The Tenant Workletter, annexed hereto as Exhibit C.2, sets forth in detail the parties' understanding regarding building standards, Tenant Work and certain other aspects of Tenant Work in the Building.

(e) Construction, according to the Plans and Specifications ("Tenant Work") shall be carried out and pursued to completion by Landlord, with the cooperation of Tenant. In that connection:

(i) Landlord shall have the sole right to designate general contractors and subcontractors for the initial Tenant Work.

15.02731

15.02731

(ii) Landlord shall apply for all approvals and permits legally required in connection with the performance of Tenant Work. If necessary, Tenant shall join in the execution of the application, and at Landlord's request, shall cooperate with the prosecution of the application. Landlord shall be responsible for the actual fees and costs of any such applications.

(f) Unless otherwise specifically stated in the Plans and Specifications, all materials for the Tenant Work shall be in accordance with Building standards. Landlord shall cause the Tenant Work to be completed in a good and workman-like manner and in conformance with all applicable building codes and laws. Landlord shall use commercially reasonable efforts to substantially complete the Tenant Work by December 31, 2015.

(g) Tenant acknowledges that the Building is a multi-tenant building, and that Landlord and other tenants in the Building and their respective contractors will be performing build-up work and other construction in the Building from time to time, during both Business Hours and non Business Hours.

Section 3.02. Tenant's Early Access:

(a) Landlord shall permit Tenant to enter the Demised Premises before the Commencement Date during normal Business Hours for the purposes of inspection only. Landlord shall also permit Tenant to enter the Demised Premises thirty (30) days prior to the Commencement Date in order to allow Tenant to install, at Tenant's expense and in accordance with the terms of this Lease, telecommunications equipment, fixtures, wiring and furniture.

(b) If Tenant is permitted access to the Demised Premises prior to the Commencement Date (including, without limitation, pursuant to Section 3.02(a) hereof), it shall be at Tenant's sole risk. The foregoing license is conditioned upon Tenant and Tenant's Agents not interfering with Landlord or Landlord's Agents completion of the Tenant Work, or the workmen of any other tenant. This license may be withdrawn by Landlord at any time, upon written notice to Tenant. Landlord shall not be liable in any way for any injury, loss or damage of any nature whatsoever occurring as a result of early access to the Demised Premises by Tenant or any employee, agent, servant, contractor or representative thereof. Landlord shall have the right to impose such additional conditions on tenant's early entry as Landlord, in its reasonable discretion, deems appropriate.

(c) Notwithstanding anything contained in this Section 3.02, the parties understand that as of the date of this Lease Landlord is leasing the Demised Premises to Authentidate and Tenant shall not be permitted to enter the Demised Premises prior to the date the lease of the Demised Premises to Authentidate terminates and Authentidate vacates the Demised Premises.

Section 3.03. No Representation:

Landlord represents that, to the best of its knowledge, all base building systems, including HVAC, electrical, plumbing, elevators, and life safety systems, will be in good working order in the Demised Premises on the Commencement Date and the Demised Premises and Building are compliant with the Americans with Disabilities Act. Landlord has made and makes no representations, covenants or warranties with respect to the Demised Premises, the Building or the Land, except as expressly set forth in this Lease.

ARTICLE IV. OPTIONS TO RENEW, RIGHT OF FIRST OFFER

Section 4.01. Options to Renew

(a) Tenant shall have two (2) options to renew this Lease (each a "Renewal Option") for all (but not less than all) of the Demised Premises on the same terms and conditions of this Lease and in

7

the manner provided below, each for a term of five (5) years (the first five (5) year renewal being referred to herein sometimes as the "First Renewal Term" and the second five (5) year renewal being referred to herein sometimes as the "Second Renewal Term"); provided that there has been no Event of Default (or event or condition which, with the passage of time or giving of notice, or both, would constitute an Event of Default) that has occurred and is continuing at the time of exercise of the option. In the event Tenant desires to elect the first Renewal Option, Tenant shall give Landlord written notice of its exercise of the first Renewal Option twelve (12) months prior to the Expiration Date of the Term. Assuming the First Renewal Option is exercised and in the event Tenant desires to elect the second Renewal Option, Tenant shall give Landlord written notice of its exercise of the second Renewal Option twelve (12) months prior to the expiration date of the First Renewal Term. In the event Tenant fails to timely notify Landlord of its exercise of a Renewal Option, then all Renewal Options shall expire.

(b) Base Rent during the renewal term shall equal the prevailing market rental rate for office space of comparable quality, design and location in the Berkeley Heights area (which shall include the Route 78 corridor) for tenants occupying an amount of space comparable to the amount then leased by Tenant, taking into consideration any concessions (e.g., rent abatement, tenant improvement and other allowances) then being offered by landlords to prospective tenants for comparable space ("Market Rent"), but in no case less than the then existing Base Rent. The parties shall negotiate in good faith to establish the Market Rent. If the parties are unable to agree on Market Rent within fifteen (15) days after Tenant gives Landlord its notice exercising the Renewal Option (the "Notice Date"), then the Appraisal Procedure (as defined in Section 2.01) shall be utilized.

Section 4.02. Right of First Offer.

If during the period commencing on the Commencement Date through to the end of the base Term of this Lease, an entire floor of space (i.e., not a partial floor) at the Building or the balance of the fifth floor of the Building becomes available for lease (any such entire floor of space, or the balance of the fifth floor of the Building being referred to as the "Subject Full Floor Space"), then provided that there has been no Event of Default (or event or condition which, with the passage of time or giving of notice, or both, would constitute an Event of Default) that has occurred and is continuing at the time of exercise of the option (and provided that neither Landlord nor any of its affiliates desire to lease or otherwise occupy such space, and no existing tenant or subtenant of such space is interested in such space), Landlord shall notify Tenant that the Subject Full Floor Space is available for lease and that Tenant may elect to lease all (but not less than all) of the Subject Full Floor Space. Tenant shall have fifteen (15) days from receipt of Landlord's notice to exercise its option to lease the Subject Full Floor Space, by written notice to Landlord. The parties agree that the Base Rent for the Subject Full Floor Space shall be an amount equal to the Market Rent (as defined in Section 4.01(b) hereof). The lease of the Subject Full Floor Space shall include, in addition to such Base Rent, such other terms and conditions (including, without limitation, the lease term) as shall be mutually reasonably acceptable to Landlord and Tenant, and at the time the lease of the Subject Full Floor Space is entered into, Tenant shall have the option (which must be exercised by written notice thereof by Tenant to Landlord at the time the lease of the Subject Full Floor Space is entered into) to terminate the 600 Lease with respect to the 7,898 rentable square feet of space on the first floor of Building 600 subject to the 600 Lease, with such termination being effective upon the commencement date of the lease of the Subject Full Floor Space; provided, however, that if Tenant elects to exercise such termination option described in this sentence, if the Subject Full Floor Space is the balance of the fifth floor of the Building anything contained in this Section 4.02, (I) in the event Tenant declines to exercise its option described in this Section 4.02 with respect to the Subject Full Floor Space (or if Tenant exercises such option but the parties are otherwise unable, after exercising reasonably and in good faith, to negotiate an agreement on the lease of such space within ten (10) business days after Tenant's exercise of such option), then Tenant's rights described in this Section 4.02 with respect to the Subject Full Floor Space shall expire, and Landlord shall have no further obligations to Tenant with respect to the Subject Full Floor Space; Tenant shall not have any rights under this Section 4.02 so long as Tenant is subleasing (and/or having available for sublease) any portion of the Demised Premises or the 600 Leased Space (other than to an affiliate of Tenant) and (III) Tenant's rights under this Section 4.02 shall be subject and subordinate to any

8

expansion rights, existing as of the date this Lease is fully executed, that any other tenants in Cornell Corporate Park, may have with respect to such space.

## ARTICLE V. RENT

**Section 5.01.  Base Rent:**

Tenant shall pay Base Rent to Landlord, in the amount set forth in Section 1.03, without notice or demand, in monthly installments in advance beginning on the Commencement Date. Each subsequent installment shall be due to and received by the Landlord on or before the first day of each month during the Term. Base Rent for partial months shall be pro-rated.

**Section 5.02.  Tax Increase Amount:**

(a)  In addition to Base Rent and all other charges Tenant is required to pay hereunder, Tenant shall pay the Tax Increase Amount (as hereinafter defined) to Landlord as follows:

(i)  If the Taxes for any Tax Year during the Term of this Lease shall be greater than the Real Estate Tax Base, then Tenant shall pay to Landlord, as a component of Rent and as provided in Section 5.02(a)(ii) below, the amount (the "Tax Increase Amount") determined by multiplying the difference between the Taxes for the applicable Tax Year and the Real Estate Tax Base by Tenant's Pro Rata Share.

(ii)  Within one hundred and eighty (180) days after the commencement of each Tax Year after and including the year in which the Assessed Valuation has been established, or as soon as practicable thereafter, Landlord shall submit to Tenant a copy of the bill(s) for the Taxes for each Tax Year and a statement (the "Tax Statement") which shall indicate: (i) any annual increase in the Taxes, (ii) the effective date of such increase, (iii) the Tax Increase Amount due, if any, and (iv) any Extra Taxes due as set forth below. Tenant shall pay the Tax Increase Amount to Landlord within thirty (30) days after the issuance of the Tax Statement. Any Tax Increase Amount for a period of less than a full Tax Year shall be ratably apportioned.

(b)  Tenant shall be liable for any portion of the Taxes, charges and assessments imposed upon the Real Estate during the Term of this Lease which are attributable to extraordinary improvements in the Demised Premises or the Building constructed at Tenant's expense or for Tenant's specific benefit and for which the taxing authority has assigned a distinguishable increase in valuation in computing the Assessed Valuation ("Extra Taxes"). Landlord shall pay such Extra Taxes within thirty (30) days after issuance of the Tax Statement as set forth above. Any Extra Taxes due for a period of less than a full year shall be ratably apportioned. Tenant shall not be liable for any Extra Taxes attributable to the improvements of any other tenant in the Building.

(c)  Tenant's obligations for payment of Tax Increase Amount or Extra Taxes during the Term shall survive the expiration or early termination of this Lease.

**Section 5.03.  Building Operating Costs; Adjustments:**

(a)  Tenant hereby agrees that for each Operating Year during the Term of this Lease for which the Building Operating Costs (as hereinafter defined) budgeted for such Operating Year exceeds the Building Operating Costs for the First Operating Year, Tenant shall pay to Landlord as a component of Rent and in the manner further provided in this Section 5.03, an amount (the "Operating Increase Amount") determined by multiplying the difference between the budgeted Building Operating Costs for the applicable Operating Year and the Building Operating Costs for the First Operating Year by Tenant's Pro Rata Share. Within one hundred and eighty (180) days after the commencement of each Operating Year, or as soon as practicable thereafter, except for the First Operating Year, Landlord shall

present to Tenant a statement (the "Operating Statement") showing, inter alia, the Operating Increase Amount, if any, due hereunder (the date upon which the Operating Statement is presented to Tenant being hereinafter referred to as the "Billing Date"). Tenant shall pay the Operating Increase Amount no less frequently than monthly in advance in an amount determined by multiplying the Operating Increase Amount for the applicable Operating Year by one-twelfth (1/12). These monthly payments of the Operating Increase Amount shall be added to and paid simultaneously with the Base Rent. If the total of such monthly payments made by Tenant during any Operating Year is less than the Operating Increase Amount, as shown on the next Operating Statement, Tenant shall pay the difference to Landlord within thirty (30) days after the Billing Date. If the total of such monthly payments made by Tenant during any Operating Year is greater than the Operating Increase Amount, as shown on the next Operating Statement, Landlord shall refund the excess amount to Tenant within thirty (30) days after the Billing Date. Each Operating Statement shall indicate (i) the Operating Increase Amount for the current year, (ii) the difference between the actual dollar amount of Building Operating Costs and the budgeted Building Operating Costs for the preceding Operating Year, if applicable, and payments made by Tenant hereunder for the preceding Operating Year, (iii) the total of the monthly payments made by Tenant hereunder for the preceding Operating Year, if applicable, and (iv) the amount of any overpayment or underpayment by Tenant on account of the Operating Increase Amount for the preceding year.

(b)  If Tenant disputes the amount or characterization of any item contained in the Operating Statement by giving written notice thereof to Landlord within sixty (60) days of the Billing Date, Tenant shall have the right, provided that there has been no Event of Default (or event or condition which, with the passage of time or giving of notice, or both, would constitute an Event of Default) that has occurred and is continuing at such time, to designate a firm of independent certified public accountants reasonably acceptable to Landlord (and whose compensation is not directly or indirectly, contingent in whole or in part on the results of the audit) to audit Landlord's records upon which the Operating Statement is based, provided Tenant first pays all sums due as shown on the Operating Statement first and such notice identifies with specificity the particular item(s) in the Operating Statement that Tenant believes are incorrect. Such audit shall be conducted promptly after Tenant's notice of dispute is given to Landlord and, unless otherwise specified by Landlord, shall be conducted during regular business hours at the office where Landlord maintains its books and records. The fee for any audit conducted on Tenant's behalf shall be borne solely by Tenant (subject to the penultimate sentence of this Section 5.03(b)). Landlord shall use its commercially reasonable efforts to mutually agreed upon third party nationally recognized certified public accountant, whose determination shall be conclusive and binding on both Landlord and Tenant. If, as a result of Tenant's inspection of Landlord's books or the audit of Landlord's records and review by independent certified public accountants, an error is discovered in the Operating Statement, Landlord shall revise the Operating Statement accordingly and any overpayment by Tenant shall be refunded to Tenant forthwith and any underpayment shall be paid by Tenant on demand. If the final audit discloses that the actual cost of Building Operating Costs is less than the amount which Tenant paid for such period, then Landlord shall be deemed to be conclusive of the settlement of the dispute. If Tenant does not notify Landlord of a dispute within sixty (60) days of receipt of any Operating Statement, Tenant shall be deemed to have accepted such Operating Statement. Landlord's books and any information provided to Tenant by Landlord or its accountants pursuant to this Section 5.03(b), and the results of any such audit, shall be kept strictly confidential and shall not be made available by the accountants or Tenant to any other person or entity. If requested by Landlord, Tenant and its auditor shall, prior to any such audit, execute and deliver to Landlord a confidentiality agreement prepared by Landlord, in form and substance reasonably acceptable to Landlord. If the final audit discloses an overstatement in Landlord's determination of Building Operating Costs by five percent (5%) or more, then all costs of the audits shall be borne by Landlord. If the final audit discloses that Landlord's determination of Building Operating Costs was not overstated by five percent (5%) or more, then all costs of the audits shall be borne by Tenant.

(c)  The "Building Operating Costs" shall include each and every expense incurred in connection with the ownership, operation, insurance, maintenance and repair of the Real Estate, or reasonably charged by Landlord if Landlord performs services in connection with the Real Estate, including management, consulting, reasonable legal and accounting fees, and, further, including but not limited to, wages, salaries and fees paid to persons either employed

15.0221

15.0221

by Landlord or engaged as independent contractors in performing or managing the services related to the Real Estate, and such other typical items of expense as indicated in Subsection (d) below. If any person or independent contractor is employed with respect to more properties than the Real Estate, the wages, salaries or fees paid therefor shall be allocated based on time spent by such person or Contractor on matters relating to the Real Estate or the degree of responsibility for the Real Estate compared to the other properties involved.

(d)   Some of the typical items of expense which comprise or may comprise the Building Operating Costs are or may be the following, but only to the extent that they relate solely to or are properly allocated to the Real Estate:

(i)   Repairs and maintenance;

(ii)   Utility costs (including meter reading and certification service fees), including but not limited to the cost of electricity to power HVAC units and to heat the Building (both Tenant premises and Common Area) and to light the Common Area;

(iii)   Cleaning costs, including but not limited to windows, tenant premises and Common Areas;

(iv)   Service contracts including but not limited to elevator, HVAC, janitorial and window cleaning, rubbish removal, exterminating and towel service;

(v)   Costs of landscaping and snow removal;

(vi)   Cost of redecorating Common Area, but excluding the cost of installing sculpture, paintings or other objects of art;

(vii)   Wages, salaries and other compensation, including taxes, insurance, retirement, fringe benefits, uniforms payable to employees performing services related to the Real Estate;

(viii)   Reasonable fees and other compensation payable to independent contractors or other agents of Landlord performing services related to the Real Estate;

(ix)   Cost of Landlord's insurance, including but not limited to, fire and extended coverage, public liability and property, rental value insurance (including Base Rent, estimated Tax Increase Amount and estimated Operating Increase Amount), elevator, worker's compensation, boiler and machinery insurance;

(x)   Reasonable auditing, accounting, attorneys' and consultants' fees and disbursements incurred in connection with the maintenance and operation of the Real Estate;

(xi)   A reasonable management fee to compensate Landlord for management services, if Landlord, its employees, agents or servants, perform same, or reasonable and customary fees for management services provided by an independent management company;

(xii)   Any other expenses of any kind whatsoever reasonably incurred in managing, operating, maintaining and repairing the Real Estate;

(xiii)   The cost, if any, of non-Tenant area capital improvements installed by Landlord after the completion of the Building as amortized over the useful life of such

15-02731

---

improvements, with only the annual amortized amount attributable to any Operating Year to be included in the Building Operating Costs for that Operating Year; and

(xiv)   The costs, charges and expenses, if any, incurred by Landlord in connection with any charge of any company providing electric service to the Real Estate, including, without limitation, maintenance, repair, installation, and service costs associated therewith.

(e)   The term "Building Operating Costs" shall not include or be deemed or construed to include:

(i)   Costs incurred in connection with the construction of the Building or the initial development of the Real Estate;

(ii)   Costs for which Landlord is reimbursed by its insurer, any tenant's insurer or any tenant or third party;

(iii)   Costs attributable to leasing of and improvements to the premises of other tenants in the Building;

(iv)   Costs, expenses or expenditures relating to the duties, liabilities or obligations of other tenants in the Building;

(v)   Interest, principal or other payments on mortgages or other debt costs, if any;

(vi)   Depreciation on the Building;

(vii)   Taxes;

(viii)   Leasing commissions and other expenses incurred in connection with negotiating and enforcing leases;

(ix)   Costs which are paid directly by any tenant;

(x)   Costs incurred in connection with the construction, if applicable, of Building 500 or any other new building on the Land;

(xi)   Ground rents; and

(xii)   Wages, salaries, or other compensation paid to any executive employees above the grade of property manager.

(f)   Landlord and Tenant agree that with respect to all Building Operating Costs, the actual costs thereof for the First Operating Year and for each Operating Year thereafter shall be adjusted to reflect all Building Operating Costs for a full year. Landlord and Tenant further agree that in the event occupancy in the Building during the First Operating Year or any Operating Year thereafter is less than ninety five percent (95%), then Building Operating Costs for the First Operating Year or any other Operating Year, as applicable, shall be "grossed up" to the amount of Building Operating Costs that, using Landlord's reasonable projections, would normally be expected to be incurred during the First Operating Year or other Operating Year, as applicable. If the Building were ninety five percent (95%) occupied during such First Operating Year or other Operating Year; however, in no event shall Landlord charge all tenants (in the aggregate) more than actual Building Operating Costs incurred in a given year.

15-02731

shall survive the expiration or early termination of this Lease for costs incurred during the Term.

(g)   Tenant's obligations for payment of Building Operating Costs during the Term and 5.03 of this Lease shall be aggregated or netted, as applicable, so that only one payment is made, if any, with respect to such amounts.

### Section 5.04. Payment of Rent:

(a)   Rent shall be paid without notice, demand, counterclaim, offset, deduction, defense, or, except as expressly provided herein, abatement.

(b)   Unless otherwise directed by Landlord to Tenant in writing, all Rent payable under this Lease shall be payable to Landlord by wire transfer in immediately available funds in U.S. Dollars, to the following account: Wells Fargo Bank, N.A., 190 River Road, Summit, NJ 07901; Attn: Ms. Kathy Murphy, Senior Vice President; ABA: 121000248, For Credit to the A/C of: The Connell Company; Account Number: 2000010817252.

(c)   If Tenant shall fail to pay any Tax Increase Amount, Operating Increase Amount, Extra Taxes, or any other charges payable hereunder, whether or not the same are called Rent, Landlord shall have all remedies provided for in the Lease or at law as in the case of nonpayment of Base Rent. Tenant's obligations (accruing during the Term) under Article V and Article XXI hereof shall survive the expiration or earlier termination of this Lease.

### Section 5.05. Security Deposit:

(a)   The sum set forth in Section 1.04, which Tenant is required to deposit with Landlord, is security for the full and faithful performance by Tenant of all of its obligations under this Lease or in connection with this Lease. If an Event of Default (as herein defined) has occurred, Landlord may use, apply or retain the whole or any part of the Security Deposit for the payment of (i) Rent or any other sums of money which Tenant may not have paid or which may become due after the occurrence of the Event of Default; (ii) any sum expended by Landlord on Tenant's behalf in accordance with the provisions of this Lease; or (iii) any sum which Landlord may expend or be required to expend by reason of such Event of Default, including any damages or deficiency in the reletting of the Demised Premises in connection with Article XVI hereof. In the case of every such application, or retention during the Lease Term, Tenant shall, on demand, pay to Landlord a sum equal to that so applied or retained, which shall be added to the Security Deposit so that the same shall be restored to its original amount. Landlord may use, apply or retain the whole or any part of the Security Deposit for the repair of damage to the Demised Premises upon Tenant's surrender of the Demised Premises on Expiration Date. The use, application or retention of the Security Deposit or portion thereof by Landlord shall not prevent Landlord from exercising any other right or remedy provided for hereunder or at law shall not operate as a limitation on any recovery to which Landlord may otherwise be entitled.

(b)   The Security Deposit shall bear no interest, and if legally permissible, Landlord shall be entitled to commingle the Security Deposit with Landlord's other funds.

(c)   If Tenant shall fully and faithfully comply with all of the provisions of this Lease, the Security deposit or any balance thereof shall be returned to Tenant within thirty (30) days after the Expiration Date or upon any later date after which Tenant has vacated the Demised Premises. In the absence of evidence satisfactory to Landlord of any assignment of the right to receive the Security Deposit or the remaining balance thereof, Landlord may return the Security Deposit to the original Tenant regardless of one or more assignments of Tenant's interest in such Security Deposit. In such event, upon the return of such Security Deposit or balance thereof to the original Tenant, Landlord shall be completely relieved of liability hereunder.

13

15.02731

(d)   Tenant covenants and agrees that it shall not assign, pledge, hypothecate, mortgage or otherwise encumber the Security Deposit during the Term of the Lease.

(e)   The Security Deposit may be transferred to any purchaser of Landlord's interest in the Building or the Real Estate, provided as a condition of such transfer, the transferee assumes, in writing, the obligation to hold the same pursuant to this Section 5.05 and upon such transfer, Landlord shall be relieved of any obligation with respect thereto.

## ARTICLE VI. SIGNS

### Section 6.01. Directory:

Landlord shall provide a directory of tenants in the first floor lobby area of the Building.

### Section 6.02. Signs:

(a)   Tenant shall have no right to install and maintain a sign on the entrance doorway of the Demised Premises without Landlord's prior written consent which shall not be unreasonably withheld or delayed. Landlord may permit Tenant to identify its business name by lettering on the exterior of the Demised Premises with Landlord's prior written consent as to dimensions, material, content, location and design.

(b)   Tenant shall obtain and pay for all required permits and licenses relating to such sign, if same are required. Copies of all such permits and licenses shall be delivered to Landlord within a reasonable time after they are issued.

(c)   Tenant shall not have the right to install or maintain any signs in or at the Real Estate or visible from the outside of the Demised Premises.

(d)   Landlord shall have the right to remove any sign in order to paint, or to make repairs, alterations or improvements in or upon the Building or Demised Premises; at its expense, and Landlord shall reinstall, at its expense, any such sign after the completion of such work. At the expiration of the Term, Tenant shall, at Tenant's sole cost and expense, remove all signs and restore the area in which they were affixed to its prior condition.

## ARTICLE VII. REPAIRS, ALTERATIONS, COMPLIANCE; SURRENDER

### Section 7.01. Repairs by Landlord:

Landlord shall make or cause to be made necessary repairs to the Common Areas. Landlord shall make or cause to be made necessary repairs to the roof of the Building and structural repairs to the foundation, exterior walls, windows, electrical, HVAC, plumbing and mechanical systems of the Building (other than the electrical, HVAC, plumbing, and mechanical systems serving solely the Demised Premises), elevators, and any load-bearing interior walls of the Demised Premises, provided, however that Landlord's obligations shall exclude anything caused by (a) any act, omission or negligence of Tenant, Tenant's Agents or invitees; (b) the failure of Tenant to perform or comply with any terms, conditions or covenants in this Lease; or (c) any alterations, installations, additions or improvements made or to be made by Tenant. Damage set forth in clauses (a), (b) and (c) in this Section 7.01 will be repaired by Landlord at Tenant's expense.

### Section 7.02. Repairs, Maintenance and Improvements by Tenant:

14

15.02731

repairs Landlord is specifically obligated to make, Tenant, at its expense, shall be responsible for all repairs, maintenance and replacements within the Demised Premises. Notwithstanding the foregoing, Landlord shall make all repairs required by the occurrence of fire and other casualty as more particularly set forth in Section 12.03 hereof; provided, however, that Tenant shall be responsible for the repair and restoration of Tenant's improvements to the Demised Premises. Tenant shall notify Landlord in advance of all repairs to be made by Tenant exceeding an amount equal to $0.50 per rentable square foot of the Demised Premises in cost. Tenant shall not remove blinds from windows. In making repairs, Tenant shall observe and comply with the insurance requirements of Section 3.03 hereof and all requirements, laws, or regulations of any applicable authority and the terms and conditions of all insurance policies required by Article XIV relating to or affecting the Real Estate.

(b)  Tenant shall be responsible and liable for all damages to the Demised Premises the Building or the Land or any part thereof attributable to the fault, negligence, or misuse of Tenant, Tenant's Agents, or Tenant's guests or invitees.

Section 7.03. Approval by Landlord of Improvements:

(a)  Tenant may not make, repairs, alterations, additions or improvements to the Demised Premises, or any part thereof, without the prior written consent of Landlord, if the reasonable cost of such improvements is estimated to exceed an amount equal to $0.50 per rentable square feet of the Demised Premises. Any permitted alterations shall be performed in a good and workmanlike manner in accordance with all requirements of any applicable governmental authority, the terms and conditions of all required insurance policies and any other provisions relating to Tenant Work herein contained. In no event shall Tenant make any alterations of the outside dimensions of the Building or the existing load-bearing walls and columns, exterior walls, roof, structural ceiling or foundations. Landlord shall require the right to require Tenant to restore the Demised Premises to the conditions prior to any alterations or as of the Commencement Date; at completion of Tenant Work provided Landlord provides notice to Tenant of such restoration requirement at the time Tenant seeks Landlord's consent for such alteration. In no event shall Tenant be required to remove the initial Tenant Work.

(b)  Without limiting anything contained in Section 7.03(a) hereof, any permitted repairs, alterations, additions or improvements described in Section 7.03(a) shall be on the terms and conditions set forth below (and as Tenant's cost and expense) and otherwise in compliance with the terms set forth in Exhibit C-2 attached hereto for Tenant Work (including, without limitation, compliance with item 3 of Exhibit C-2 attached hereto):

(i)  Prior to commencing any such work, Tenant shall furnish to Landlord a written list of general contractors (and all contractors) who are proposed to perform such work. Such general contractors (and all contractors) shall be first-class union contractors and shall maintain current licenses with applicable governmental and/or other enforcement authorities. Tenant shall furnish to Landlord copies of such general contractors' and other contractors' insurance policies, including workers compensation, public liability and property damage, all in amounts and with companies acceptable to Landlord, which consent shall not be unreasonably withheld or delayed. Landlord shall have the right to reject such proposed general contractors by written notice to Tenant within ten days of Landlord's receipt of the above information.

(ii)  Tenant shall promptly apply for all approvals and permits legally required in connection with the performance of such work. If necessary, Landlord shall join in the execution of the applications, and at Tenant's request, shall cooperate with the prosecution of the application. Tenant shall bear all fees, costs and expenses in connection with the applications including any legal or other costs incurred by Landlord. Tenant shall prosecute the applications diligently and use its best efforts to

15

seek the approvals and permits applied for and shall provide Landlord with copies of all permits and approvals upon receipt thereof. Tenant shall advise Landlord of its progress from time to time and upon request by Landlord.

(iii)  Promptly after all requisite approvals and permits have been granted, Tenant shall commence the performance of such work and shall diligently prosecute such work to completion.

(iv)  Tenant shall perform or cause to be performed all of such work in accordance with the plans and specifications, all requirements of regulations of any applicable public authority, and the terms and conditions of all insurance policies and shall do so in a good and workmanlike manner, and such work shall in no event interfere with building systems or with any other tenant's use and quiet enjoyment of such tenant's leased space in the Building. Notwithstanding any failure by Landlord to object to any such work, Landlord shall have no responsibility therefor. Tenant agrees to save and hold Landlord harmless as provided in the Lease for said work.

(v)  Tenant shall provide Landlord with "as built drawings" upon completion of such work.

(vi)  If any governmental authority requires that a certificate of occupancy be issued with respect to the Demised Premises as a result of such work, Tenant shall apply for, obtain such certificate of occupancy and provide a copy thereof to Landlord prior to Tenant's occupancy of the Demised Premises.

(vii)  Tenant shall not make or cause to be made any alterations, repairs or installations, or perform any other work to or on the Demised Premises or otherwise in connection with this Lease unless Tenant shall obtain, and shall require all its contractors to obtain, and have in force during the performance of such work, public liability and worker's compensation insurance to cover every contractor to be employed as set forth in this Section 7.03. Such policies shall be in such amounts and on such terms as Landlord deems appropriate; they shall be non-cancellable without thirty (30) days' prior notice to Landlord by the insurance company. In accordance with Section 7.03 hereof, Tenant shall supply Landlord with copies of the insurance policies prior to commencing any such work. Landlord and Tenant shall be named as an additional insured on any such policy.

(c)  The parties agree that all permitted alterations and improvements made to the Demised Premises (including, without limitation, any alterations or improvements made in connection with the Tenant Work) shall become the property of Landlord upon their installation without compensation to Tenant.

Section 7.04. Emergency Repairs:

If, in an emergency, it shall become necessary to make any repairs or replacements otherwise required to be made by Tenant, Landlord may enter the Demised Premises, and proceed to make or cause such repairs or replacements to be made at Tenant's expense. Landlord shall give Tenant telephonic or written notice of such emergency; provided, thirty (30) days' notice renders a bill for such repairs or replacements. Tenant shall reimburse Landlord for the cost of making such repairs.

Section 7.05. Electrical Lines:

(a)  Tenant may not install any electrical equipment that overloads the lines in the Demised Premises, the Building or the Real Estate or which will interfere with the use thereof by other tenants of the Building unless Landlord approves same in the Plans and Specifications or as provided for

16

in Section 7.01 above. If Tenant makes such installation, Landlord may require Tenant, at Tenant's sole cost and expense, to make whatever alterations and/or repairs are necessary and which are in compliance with the terms and conditions of all required insurance policies and all requirements of applicable governmental authorities. Tenant shall be responsible or liable for all damages anywhere in the Building or with respect to the Real Estate caused by any electrical overload attributable to Tenant.

(b)   At all times, Tenant shall provide access for Landlord to trench headers provided that Landlord's work shall not prevent the conduct of Tenant's business.

**Section 7.06. Surrender of Premises.**

On the Expiration Date, Tenant shall quit and surrender the Demised Premises together with all alterations, fixtures (except trade fixtures, it being understood that, if Tenant removes trade fixtures, Tenant shall exercise reasonable care in doing so, and the Demised Premises shall be restored to the condition it was in prior to the installation of the trade fixtures, reasonable wear and tear excepted), installations, additions and improvements which may have been made in, annexed or otherwise attached thereto, broom clean, and in good condition and repair, ordinary wear and tear excepted, and except for damage by fire or other casualty, which Landlord is required to repair hereunder, unless Landlord provides otherwise in writing. Any personal property of Tenant, or any subtenant or occupant, which shall remain in or on the Demised Premises after the termination of this Lease and the removal of such Tenant, subtenant or occupant from the Demised Premises, may, at the option of Landlord and without notice, be deemed to have been abandoned by such Tenant, subtenant or occupant, and may either be retained by Landlord as its property or be disposed of, without accountability, in such manner as Landlord may see fit. Tenant shall reimburse Landlord for any cost or expense incurred by Landlord in carrying out the foregoing which obligation shall survive the Expiration Date. Landlord shall not be responsible for any loss or damage occurring to any such property owned by Tenant or any subtenant or occupant.

**ARTICLE VIII. SERVICES AND UTILITIES**

**Section 8.01. Landlord's Services:**

(a)   Landlord shall furnish: (i) during Business Hours, base building heat and air conditioning required for the Demised Premises and the electricity to operate services as set forth in the "Building Janitorial Specifications" (hereinafter so called), annexed hereto as Exhibit E, on weekdays, excluding Holidays; (ii) elevator service; (iii) restroom supplies; (iv) cleaning services as set forth in the "Building Janitorial Specifications" (hereinafter so called), annexed hereto as Exhibit E, on weekdays, excluding Holidays, and (v) such other services as Landlord may set forth from time to time. Landlord shall have the right to reasonably modify the terms and/or frequency of the services so long as Landlord gives at least five (5) days' notice of any changes.

(b)   Tenant shall have the right to use the Demised Premises beyond Business Hours, and on weekends and Holidays upon the express condition that Tenant shall be responsible, at its sole cost and expense, for any and all building services required and attributable to such excess use charged at the Current Rate for such services; provided, however, that notwithstanding anything contained in the Rules and Regulations, Tenant shall not be charged for any such excess use of building services during the period between 9:00 a.m. and 1:00 p.m. on Saturdays. Payment for excess use of services shall be deemed Rent and shall be paid to Landlord monthly, together with Base Rent.

(c)   Landlord shall maintain and provide services for the Land and Common Area, including lobbies, stairs, elevators, corridors, restrooms, and Parking Area. Access to the parking in the Parking Area shall be granted 4 cars for each 1,000 rentable square feet (i.e., 79 cars for 19,895 rentable square feet). Landlord will designate ten percent (10%) of the number of parking spaces to which Tenant is granted access pursuant to the preceding sentence (i.e., 8 spaces) as "reserved" for Tenant.

(d)   Landlord shall not be liable for any losses or damages caused by interruption of services due to repair, inspection or causes beyond its reasonable control. Tenant shall continue to be responsible for payment of Rent during any period of such interruption. Landlord shall use its best efforts to restore services after interruption. Notwithstanding the foregoing, if the Demised Premises is rendered untenantable for five (5) consecutive business days after written notice thereof from Tenant to Landlord due to an interruption of services, the Rent shall be abated to the extent that the Demised Premises have been rendered untenantable during the period of such interruption of services unless such interruption was caused by (i) Tenant, or (ii) by circumstances beyond Landlord's reasonable control.

**Section 8.02. Electricity:**

(a)   The Demised Premises shall be submetered to measure the electricity actually consumed in the Demised Premises (including in connection with any supplemental HVAC system for the Demised Premises under this Lease), and Tenant shall pay to Landlord, as a component of Rent, for its electric usage based upon such submetering on a monthly basis, at the rate applicable to Landlord (including any meter certification and meter reading service fees charged by any third party engaged by Landlord to measure and invoice Tenant for such electric usage; it being understood that it is contemplated that Landlord shall have a third party measure and invoice Tenant for such electric usage). This sum shall represent the cost of all electricity furnished to Tenant at the Demised Premises.

(b)   Landlord currently uses a certain company to provide electricity for the Real Estate (the "Current Energy Provider"). Notwithstanding the foregoing, if permitted by applicable law, Landlord shall have the right at any time and from time to time during the Term of this Lease to either contract for services from a different company or companies providing electricity (each such company being referred to as an "Alternate Energy Provider") or continue to contract for service from the Current Energy Provider. Landlord currently uses a local distribution company (the "Utility") to deliver electricity and other services for the Real Estate. Tenant shall cooperate with Landlord, the Utility, the Current Electric Service Provider, and any Alternate Service Provider at all times and, as reasonably necessary, shall allow Landlord and such other entities reasonable access to the Building's electric lines, feeders, risers, wiring, and any other machinery within the Demised Premises.

**ARTICLE IX. USE AND OPERATION**

**Section 9.01. Use:**

Tenant shall use the Demised Premises for general offices and for no other purpose (it being agreed that Tenant may install microwave ovens (for food), coffee pots and similar appliances in employee break areas within the Demised Premises). Tenant shall comply with all applicable zoning regulations or requirements and all other laws, rules, regulations and ordinances of any governmental entity having jurisdiction over the Real Estate (including, without limitation, environmental laws and regulations), as well as all the requirements set forth in Article XXI. Notwithstanding the foregoing, Tenant shall not be responsible for remedying any incident of non-compliance with applicable laws to the extent existing as of the Commencement Date.

**Section 9.02. Rules and Regulations Established by Landlord:**

The rules and regulations of the Landlord in effect as of this date are set forth in Exhibit I.D annexed hereto. Tenant shall observe all such rules and regulations and all rules and regulations established by Landlord from time to time for the Building and the Real Estate (collectively, the "Rules and Regulations"). Tenant shall be given at least five (5) days' notice of any changes therein. In the event of any conflict between the terms of this Lease and the Rules and Regulations (or any other Exhibit attached hereto), this Lease shall control. The parties agree that notwithstanding anything contained in the Rules and Regulations, with respect to any extermination services provided by Landlord, Tenant shall

18

only be required to provide Landlord with access to the Demised Premises after (and not during) Business Hours.

Section 9.03. Restriction on Tenant's Activities

(a) Garbage:

(i) Tenant shall handle and dispose of all rubbish and garbage in accordance with the Rules and Regulations established by Landlord.

(ii) Landlord shall provide rubbish and garbage removal in accordance with the cleaning specifications incorporated as part of Exhibit E.

(iii) Tenant shall arrange for the prompt removal of any rubbish and garbage in excess of the quantity to be disposed of by Landlord pursuant to the cleaning specifications set forth in Exhibit E at Tenant's sole expense.

(b) Plumbing Facility Use: Tenant shall not use the plumbing, facilities of the Demised Premises or the Building for any purpose other than those for which they are intended. Tenant may not dispose of any substances therein which may clog, erode or damage the pipelines and conduits of the Demised Premises, the Building or the Land.

(c) Floor Load: Tenant shall not install, operate or maintain in the Demised Premises any heavy item of equipment which exceeds the floor load of one hundred (100) pounds per square foot without Landlord's written consent.

(d) Exterior Walls or Roof: Tenant shall not use all or any portion of the roof or exterior walls of the Demised Premises or the Building for any purpose.

Section 9.04. Illegal Purposes:

Tenant shall not use or permit the use of the Demised Premises for any illegal trade, manufacture, or other business, or for any other illegal purpose.

ARTICLE X. TRANSFER OF INTEREST; PRIORITY OF LIEN.

Section 10.01. Assignment, Subletting, etc.:

(a) Tenant may sublet the Demised Premises in whole or in part or assign this Lease to its parent corporation or any affiliate or subsidiary or successor-in-interest of Tenant ("Tenant Affiliate") without Landlord's consent so long as Tenant continues to be primarily liable and responsible for the performance of all obligations under this Lease.

(b) Tenant shall not sublet the Demised Premises or any part thereof, nor assigns, transfer, mortgage or hypothecate, or otherwise encumber this Lease or any interest therein, nor grant concessions or licenses for the occupancy of the Demised Premises or any part thereof to any unaffiliated company without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, and any unauthorized subletting, assignment, transfer or other similar such action shall be deemed null and void and of no effect. Upon the return of the Demised Premises, all terms and conditions of this Lease shall be null and void, except for those provisions of the Lease which shall survive the Expiration Date, as herein provided.

19

approval to a transfer, assignment or subletting under Paragraph (b) above, under the following conditions:

(i) The financial condition of the subtenant or other user is unsatisfactory.

(ii) The proposed use of the Demised Premises by the subtenant or other user would be prejudicial to the safety, character, reputation and interests of the Building and its tenants or contrary to any zoning ordinance or law, rule, regulatory or ordinance promulgated by any governmental authority.

(iii) The subtenant's or other user's occupancy of the Demised Premises will cause excessive demands on the Real Estate.

(iv) The subtenant or other user is already a Tenant in the Building.

(d) Tenant shall remain primarily liable for all obligations arising in the event it sublets or assigns all or any portion of the Demised Premises.

(e) A subtenant or assignee (other than, in the case of an assignee, a Tenant Affiliate) shall not have the rights to renewal of the Lease of the Demised Premises provided herein or the right of first offer provided herein.

(f) Any Excess Assignment Consideration (as defined below) or Excess Sublease Rentals (as defined below) in connection with an assignment or sublease permitted under this Lease shall be shared equally between Tenant and Landlord. For purposes of this Section 10.01(f), (i) "Excess Assignment Consideration" shall mean all consideration received by Tenant in connection with such assignment (including but not limited to third party leasing commissions, concessions, outside attorneys' fees and tenant improvements) and (ii) "Excess Sublease Rentals" shall mean all consideration paid or to be paid by the subleasee of Tenant in excess of all Rent paid or to be paid by the Tenant for the Demised Premises subleased for the same period, after deducting expenses incurred by Tenant in connection with such sublease (including but not limited to third party leasing commissions, concessions, outside attorneys' fees and tenant improvements), it being understood that if only a portion of the Demised Premised are sublet, then only the portion of the space so sublet shall be taken into account for purposes of such calculation.

(g) In the event Tenant requests Landlord's consent to assign this Lease or sublease the entire Demised Premises, then Landlord shall have the right, to be exercised by Landlord in its sole discretion by giving written notice to Tenant within fifteen (15) days after receipt of Tenant's notice, to recapture the entire Demised Premises and terminate this Lease.

(h) Notwithstanding anything contained in Section 10.01 hereof, any subtenancy arrangement permitted under this Section 10.01 shall be pursuant to a written agreement in form and substance satisfactory to the Landlord and subject to Landlord's written approval (the "Sublease") containing terms not inconsistent with the terms of this Lease and complying with the following requirements:

(i) The Sublease shall be subject and subordinate to the terms of this Lease. Subtenant shall acknowledge that it has reviewed and agreed to all of the terms of this Lease, and shall agree in the Sublease not to do, or fail to do, anything that would cause Tenant to violate any of its obligations under this Lease.

(ii) The Sublease shall contain a waiver of subrogation against Landlord and shall require the subtenant's insurance policies to acknowledge such waiver of subrogation.

20

the assignment of the Sublease by subtenant, without first obtaining Landlord's written consent, which consent may be granted or withheld in Landlord's sole discretion.

(iv)     The Sublease shall provide that, at Landlord's option, the Sublease shall not terminate in the event that this Lease terminates prior to its scheduled expiration date. The Sublease shall require subtenant to execute an attornment agreement, if Landlord, in its sole discretion, shall elect to have the Sublease continue beyond the date of termination this Lease. Such attornment agreement shall be in form and content acceptable to Landlord.

(v)     The Sublease shall provide that unless and until such time as an attornment agreement is executed by subtenant pursuant to clause (iv) above, nothing contained in the Sublease shall create or shall be construed or deemed to create privity of contract or estate between Landlord and subtenant.

(vi)     The Sublease shall provide that (x) nothing in the Sublease shall amend or shall be construed or deemed to amend this Lease and (y) Tenant and subtenant shall not amend the Sublease without Landlord's written consent.

(vii)     The Sublease shall contain such other terms as Landlord may require.

Section 10.02.  Subordination:

(a)     At Landlord's election, this Lease shall be subordinate or superior to the lien of any present or future mortgage irrespective of the time of recording of such mortgage. Landlord may exercise such election by giving notice thereof to Tenant. At the election of Landlord, this clause shall be self-operative and no further instrument shall be required. Upon Landlord's request, at any time and from time to time, Tenant shall (a) confirm in writing and in recordable form that this Lease is so subordinate or so paramount to the lien of any mortgage and/or (b) execute an instrument making this Lease so subordinate or so paramount (as Landlord may elect) to the lien of any mortgage, in such form as may be required by an applicable mortgagee provided such mortgagee delivers a non-disturbance agreement recognizing Tenant's rights under this Lease. The exercise of any of the options provided in this Section shall not exhaust Landlord's right to elect differently thereafter, from time to time.

(b)     Landlord shall endeavor to obtain from any Mortgagee a non-disturbance agreement in favor of the Tenant for so long as the Tenant is not in default under this Lease, and provided the Tenant agrees to attorn to the said Mortgagee in the event it comes into possession of the premises.

(c)     Landlord shall have the right to assign Tenant's Rent payments to any Mortgagee. Upon prior written notice from Landlord, Tenant shall make payments directly to such assignee.

Section 10.03.  Attornment:

If the Demised Premises, the Building or the Land are encumbered by a Mortgage and such Mortgage is foreclosed, or if same are sold pursuant to such foreclosure or by reason of a default under said Mortgage, (a) Tenant shall not disaffirm this Lease or any of its obligations hereunder, and (b) at the request of the applicable Mortgagee or purchaser at such foreclosure or sale, Tenant shall attorn to such Mortgagee or purchaser provided such holder delivers a non-disturbance agreement recognizing Tenant's rights under this Lease and execute a new lease for the Demised Premises setting forth all of the provisions of this Lease except that the term of such new lease shall be for the balance of the Term.

Section 10.04.  Transfer of Landlord's Interest:

The term "Landlord" as used in this Lease means only the owner or the mortgagee in possession of the Demised Premises, the Building or the Real Estate for the time being. In the event of any sale (including any sub-leasehold) of the Demised Premises, the Building or the Real Estate, Landlord shall be and hereby is entirely freed and relieved of all of its covenants, obligations and liability hereunder, provided the transferee assumes all of Landlord's obligations hereunder. This subsection shall be applicable to each owner from time to time, and shall not be limited to the first owner of the Demised Premises, the Building or the Real Estate.

Section 10.05.  Mortgagee's Rights:

If Landlord shall notify Tenant that the Demised Premises, the Building or the Land are encumbered by a Mortgage and in such notice set forth the name and address of the Mortgagee thereof, then, notwithstanding anything to the contrary contained herein, no notice intended for Landlord shall be deemed properly given unless a copy thereof is simultaneously sent to such Mortgagee by certified or registered mail, return receipt requested. If any Mortgagee shall perform any obligation that Landlord is required to perform hereunder, such performance by Mortgagee, insofar as Tenant is concerned, shall be deemed performance on behalf of Landlord and shall be accepted by Tenant as if performed by Landlord.

ARTICLE XI.  COMMON AREA

Section 11.01.  Use of Common Area:

During the Term, the following privileges to use certain portions of the Real Estate in common with Landlord and any designee of Landlord, subject to the terms of this Lease and Landlord's Rules and Regulations, are hereby granted to Tenant:

(a)     the non-exclusive license to permit its employees, agents and invitees to use the Common Area as defined under 2.01; and

(b)     the non-exclusive privilege to permit its employees, agents and invitees to use the entrance and exit ways designated by Landlord from time to time for access to the Demised Premises from a public street or highway adjacent to the Real Estate through the appropriate entrances and exits so designated.

Section 11.02.  Landlord's Rights:

Notwithstanding anything to the contrary contained herein, Landlord shall have the right:

(a)     to close all or any portion of the Common Area including the Parking Area to such extent as may, in the opinion of Landlord's counsel, be necessary to prevent a dedication thereof or the accrual of any rights of any person or the public therein;

(b)     to close all or any portion of the Common Area;

(c)     to prohibit parking or passage of motor vehicles in areas previously designated for such and to change the location of exclusively marked parking spaces provided Landlord provides substitute parking, if required;

(d)     to temporarily close any of the Common Area for repair, maintenance, alteration or improvements;

Area or the Land;

(e)    to build additions to the Building or erect additional buildings on the Common

(f)    to build new improvements or modify or demolish existing improvements within the Building or the Land;

(g)    to create paths, walks or other means of cross access through the Land, in each case, provided Tenant's access to the Demised Premises is not unreasonably obstructed.

## Section 11.03. License Numbers:

In order to restrict the use by Tenant's employees of areas designated or which may be designated by Landlord as handicapped, reserved or restricted Parking Areas, Tenant agrees that it will, at any time requested by Landlord, furnish Landlord with the License numbers of any vehicle of Tenant and Tenant's employees or agents.

## Section 11.04. Landlord's Obligation with Respect to Parking Area:

Throughout the Term, Landlord shall keep the Parking Area properly paved and in good order and repair, properly drained and shall provide painted stripes to designate parking spaces. After the end of a snowfall, Landlord will commence to remove accumulated snow and ice from the Parking Area and diligently prosecute the same to completion so that, to the extent practicable, the Parking Area shall be reasonably free of snow and ice. Landlord may deposit accumulated snow on such portions of the Common Area as may be necessary under the circumstances. If any ice cannot be removed with reasonable effort on the part of Landlord, it will be sufficient for Landlord to spread sand and other abrasive substances over the ice.

## ARTICLE XII. DESTRUCTION OR DAMAGE:

### Section 12.01. Rent Abatement:

If the Demised Premises shall be partially damaged or destroyed by fire or other casualty not attributable to the fault, negligence or mission of Tenant, its agents or employees, the Rent payable hereunder shall be abated to the extent that the Demised Premises shall have been rendered ununtenantable and for the period from the date that Tenant shall have provided Landlord with written notice of such damage or destruction to the date the Demised Premises is rendered tenantable. Should Tenant reoccupy a portion of the Demised Premises during the period any restoration work is taking place and prior to the date same is made completely tenantable, Rent allocable to such portion shall be payable by Tenant from the date of such partial occupancy.

### Section 12.02. Option to Terminate:

If the Building or the Demised Premises shall be damaged or destroyed by fire or other casualty (in the former case, whether or not the Demised Premises are damaged or destroyed) so as to require an expenditure in Landlord's reasonable opinion of more than 40% of the full insurable value (determined prior to the casualty) of the Building or Demised Premises (as the case may be), in either such case, Landlord may terminate this Lease by giving Tenant written notice within ninety (90) days after the date of the casualty, specifying the date of termination of this Lease. In such event, Tenant shall forthwith quit, surrender and vacate the premises without prejudice, however, to Landlord's rights and remedies against Tenant under the lease provisions in effect prior to termination; and any rights which survive such termination. In the event of termination, the Rent payable hereunder shall be abated from the date of damage or destruction.

23

## Section 12.03. Landlord's Obligation to Rebuild:

If all or any portion of the Demised Premises or access thereto is damaged by fire or other casualty and if Landlord has not elected to terminate this Lease, Landlord shall, within a reasonable time after such occurrence, use reasonable efforts to repair or rebuild the Demised Premises, such portion or access thereto to substantially its condition immediately prior to the Commencement Date to the extent permitted by applicable laws. Tenant may terminate this Lease by giving written notice to Landlord, if Landlord has not commenced the required repairs or has not restored and rebuilt the Demised Premises as herein provided within nine (9) months from the date of such damage or destruction (or, if the damage occurs during the last year of the Term of this Lease, Landlord's reasonable estimate of the time to complete the restoration and rebuild of the Demised Premises as provided herein extends to a date which is later than two (2) months prior to the last day of Term of this Lease) and such damage is not due to the fault of Tenant or any Tenant's Agent, invitee or visitor, Landlord shall not be obligated to expend in such repair or rebuilding any sums greater than the proceeds of any insurance policy carried by Landlord for Landlord's benefit.

### Section 12.04. Landlord's Liability:

Landlord shall not be obligated to pay any damages, compensation or claim for inconvenience, loss of business or annoyance arising from any casualty, or repair or restoration of any portion of the Demised Premises or of the Building pursuant to this Article.

## ARTICLE XIII. CONDEMNATION.

### Section 13.01. Definitions:

As used herein, the following words have the following meanings:

(a)    Taking: The deprivation of or damage to the Demised Premises, the Building or the Land or any portion thereof, as the result of the exercise of any power of eminent domain, condemnation, or the purchase by purchaser under threat thereof.

(b)    Taking Date: With respect to any Taking, the date on which the condemning authority or purchaser under threat shall have the right to possession of the Demised Premises, the Building or the Land or any portion thereof.

(c)    Award: The proceeds of any Taking, less all expense in connection therewith, including reasonable attorneys' fees.

### Section 13.02. Taking of Demised Premises:

(a)    In the event of a Taking of the whole of the Building, Land or Demised Premises, other than a Taking for temporary use, this Lease shall automatically terminate as of the Taking Date.

(b)    In the event of a Taking of 40% of the Building, 40% of the Land or 50% of the Demised Premises, Landlord, at its sole option, may terminate this Lease by giving written notice to the other party anytime between the period three (3) months prior to the Taking Date and three months after such date. The termination of the Lease shall be effective three months after such notice is received. In the event of a Taking of a portion of the Demised Premises which materially interferes with Tenant's ability to conduct its business in the Demised Premises or which materially interferes with Tenant's access to the Demised Premises, Tenant, at Tenant's sole option, may terminate this Lease by giving Landlord written notice of its election within thirty (30) days

24

of the Taking. This Lease shall terminate three (3) months following Tenant's written notice (but such termination shall in no event be effective prior to the effective date of the Taking.

Section 13.03. Taking for Temporary Use:

If there is a Taking of the Demised Premises for temporary use, this Lease shall continue in full force and effect, and Tenant shall continue to comply with all the provisions thereof, except as such compliance would be rendered impossible by reason of such Taking. Rent shall be abated during the course of such Taking to the extent and for the period of time that the Demised Premises shall have been rendered unattainable.

Section 13.04. Disposition of Awards:

All Awards shall belong to Landlord according to Landlord. Tenant shall have the right to make an independent claim allowed by law against the applicable governmental authority for moving expenses and loss of personal property; provided that such independent claim does not affect the Award to Landlord.

ARTICLE XIV. TENANT'S INSURANCE:

Section 14.01. General Insurance:

(a) At all times during the Term of this Lease, Tenant shall carry and maintain, at Tenant's expense, the insurance required hereunder, in the amounts specified in this Article (and without any deductible) or such other amounts and in form and substance as Landlord may from time to time reasonably request, issued by an insurance company reasonably satisfactory to Landlord. Upon the execution of this Lease, and from time to time as requested by Landlord, Tenant shall deliver to Landlord certificates of all insurance policies required to be carried hereunder with evidence of payment of applicable premium. All policies shall include an additional insured endorsement naming Landlord, Landlord's direct and indirect subsidiaries, divisions and affiliates, Landlord's members, if applicable, and all mortgagees, as additional insureds.

(b) Each policy so issued shall include a notice of cancellation endorsement stating that the insurance carrier shall send a cancellation notice to Landlord at least thirty (30) days prior to the policy being cancelled or otherwise terminated. Each policy so issued shall expressly provide: (i) that the insurance company shall not fail to renew the policy without thirty (30) days' advance written notice to Landlord; (ii) that no material change may be made in the policy; (iii) that it is not subject to invalidation as to Landlord's interest by reason of any act or omission of Tenant; and (iv) that it is primary without right of contribution.

(c) The term "insurance policy" shall include any extensions or renewals of such insurance policy.

Section 14.02. Liability Insurance:

(d) Landlord shall maintain insurance coverage for the Building and Land as it deems necessary, and Tenant shall not do or permit to be done any act or thing upon the Real Estate which would (i) jeopardize or be in conflict with property insurance policies covering the Building and fixtures and property on the Land, (ii) increase the rate of property or other casualty insurance applicable to the Real Estate to a rate higher than it otherwise would be for general office use of the Building, or (iii) subject Landlord to any liability or responsibility for injury to any person or persons or to property by reason of any business or operation Tenant carries on upon the Real Estate.

Tenant shall provide on or before it enters the Demised Premises for any reason and shall keep in force during the Term for the benefit of Landlord and Tenant, liability insurance naming Landlord and any designee of Landlord as additional insureds. The policy shall protect Landlord, Tenant and any designee of Landlord against any liability occasioned by any occurrence on or about the Demised Premises or any appurtenance thereto or arising from any of the items indicated in Section 15.01 against which Tenant is required to indemnify Landlord. Such policy is to be at least $1,000,000 per occurrence; $1,000,000 in general aggregate and bodily injury and property damage and $2,000,000 in the general aggregate. In addition, Tenant shall maintain and provide a $8,000,000 umbrella policy on terms Landlord specifies.

Section 14.03. Property Insurance:

Tenant shall insure and keep its equipment, personal property and all leasehold improvements benefiting the Demised Premises or elsewhere on the Real Estate insured at replacement cost against damage by fire, water, terrorism and other casualties and risks covered by "All Risk" property insurance. Landlord will not carry insurance of any kind on Tenant's equipment or personal property, and, except as provided by law or by reason of its sole negligence or its breach of any of its obligations hereunder, shall not be obligated to repair any damage thereto or replace the same.

Section 14.04. Worker's Compensation Insurance:

Tenant shall maintain worker's compensation insurance insuring against and satisfying Tenant's obligations and liabilities under the applicable worker's compensation laws, including without limitation, employer's liability insurance in the amounts of $1,000,000 each accident/$1,000,000 disease per person/$1,000,000 disease policy limit.

Section 14.05. Other Insurance:

Tenant shall carry insurance against such other hazards and in such amounts as may be customarily carried by tenants of similar properties, as Landlord may reasonably require for its protection from time to time.

Section 14.06. Waiver of Subrogation:

Landlord and Tenant each hereby releases the other, its officers, directors, employees and agents from liability or responsibility (to the other or anyone claiming through or under them by way of subrogation or otherwise) for any loss or damage to property covered by valid and collectible special form property insurance policy with standard extended coverage endorsement, even if such loss or damage shall have been caused by the fault or negligence of the other party, or anyone for whom such party may be responsible to the extent of insurance proceeds. Landlord and Tenant each agree that any special form property insurance policies carried by each of them respectively and covering the Demised Premises or their contents will include such a clause or endorsement.

Section 14.07. Insurance Rate:

If, as a result of (a) any act or omission by Tenant or violation of any terms of this Lease; (b) the use to which Tenant has put Demised Premises; or (c) Tenant's failure to comply with Landlord's insurance requirements, Landlord's insurance rates applicable to the Real Estate are raised, Tenant shall reimburse Landlord, on demand, for the increased cost of Landlord's insurance premiums, which comprise part of Rent. For the purpose of this Section, any finding or schedule of the fire insurance rating organization having jurisdiction over the Real Estate shall be deemed to be conclusive.

ARTICLE XV. INDEMNIFICATION AND LIABILITY

## Section 15.01. Indemnification

(a) Tenant hereby indemnifies and agrees to defend and hold Landlord, its affiliates and each of their respective shareholders, members, officials, directors, employees, representatives, servants and agents, and any Mortgagee (each, an "Indemnified Party" and, collectively, the "Indemnified Parties") harmless from and against any and all claims, suits, proceedings, fees, penalties, actions, causes of action, responsibilities, liabilities, judgments, losses, damages and expenses (including attorneys' fees and disbursement) of any nature whatsoever, except to the extent due to Landlord's gross negligence or willful or intentional misconduct, relating to or arising from:

(i) Tenant's possession, use, occupation, management, repair, maintenance or control of the Demised Premises, the Building, or the Land (including, without limitation, use of any buildings at Cornell Corporate Park), or any portion thereof (including, without limitation, any injury or damages to person(s) or property or loss of life sustained in or about the Demised Premises, the Building, or the Land);

(ii) any act, omission or negligence of Tenant, Tenant's Agents, invitees or visitors;

(iii) any default, breach, violation or nonperformance of this Lease or any provision therein by Tenant.

Tenant shall defend any actions, suits and proceedings which may be brought against any Indemnified Party with respect to the foregoing or in which they may be implicated. Tenant shall pay, satisfy and discharge any judgments, orders and decrees which may be recovered against any Indemnified Party in connection with the foregoing.

(b) The rights to indemnification set forth in this Section 15.01 shall be in addition to and not in lieu of any other rights to indemnification set forth in this Lease, and shall survive the Expiration Date or other termination hereof. Landlord (on behalf of itself and any applicable Indemnified Party) shall notify Tenant of any claims for which Landlord seeks indemnification pursuant to this Section 15.01.

## Section 15.02. Waiver and Release.

(a) Tenant hereby waives and releases all claims against Landlord with respect to all matters for which Landlord has disclaimed liability pursuant to the provisions of this Lease.

(b) Tenant will not be entitled to, and will not make, any claim, and Tenant waives any claim, for money damages (nor will Tenant claim any money damages by way of set-off, counterclaim or defense) based upon any claim or assertion that Landlord has unreasonably withheld or unreasonably delayed its consent or providing for such consent or approval. Tenant's sole remedy will be an action or proceeding to enforce any such provision, or for specific performance, injunction or declaratory judgment.

## Section 15.03. Liability of Landlord.

(a) Neither Landlord nor any agent or employee of Landlord shall be liable to Tenant for (i) any injury or damages to Tenant or any other person or (ii) any damage to, or loss by theft or otherwise) of, any property of Tenant or any other person, irrespective of the cause of such injury, damage, or loss, except to the extent caused by or due to the willful misconduct or gross negligence of Landlord, its agents or employees.

(b) Landlord, and (in case Landlord shall be a joint venture, limited liability company, partnership, tenancy-in-common, association or other form of joint ownership) the members of any joint venture, limited liability company, partnership, tenancy-in-common, association or other form of joint ownership shall have absolutely no personal liability with respect to any provision of this Lease, or any obligation or liability arising therefrom or in connection therewith. Tenant shall look solely to the equity of the owner in the Real Estate or to any insurance which Landlord is obligated to provide under the terms of this Lease for the satisfaction of any remedies of Tenant in the event of a breach by Landlord of any of its obligations. Such exculpation of liability shall be absolute and without any exception whatsoever.

(c) Subject to clause (a) above, all property (whether real, personal or mixed) at any time located in or upon the Demised Premises shall be at the risk of Tenant only, and Landlord shall not become liable for any damage to said property or to Tenant, or to any other property, caused by water, leakage, steam, sewerage, gas or odors or for any damage whatsoever done or occasioned by or from any boiler, plumbing, gas, water, steam or other pipes, or any fixtures, or equipment or appurtenances whatsoever, or for any damage arising from any act or neglect or arising by reason of the use of, or any defect in, the Demised Premises or any of the fixtures, equipment or appurtenances therein contained, or by the Act or neglect of any other person or caused in any other manner whatsoever or occasioned by theft, Act of God, riot, strike or other labor difficulty.

(d) Except as otherwise expressly provided herein, this Lease and the obligations of Tenant hereunder shall not be in any way affected, impaired or excused because Landlord is unable to fulfill, or is delayed in fulfilling, any of its obligations under this Lease.

## ARTICLE XVI. DEFAULT; REMEDIES.

### Section 16.01. Default.

Each of the following shall constitute an Event of Default:

(a) the filing by Tenant of a bankruptcy petition, or the commencement of a proceeding under the insolvency laws of any State naming Tenant as the debtor;

(b) the filing by anyone other than Tenant of a bankruptcy petition or a proceeding under the insolvency laws of any State naming Tenant as the debtor, which case shall not have been discharged within 60 days of the commencement thereof;

(c) the making by Tenant of any assignment for the benefit of creditors or any other arrangement involving all or substantially all of its assets under any state statute;

(d) the appointment of a receiver or trustee for the Tenant or for all or any portion of the property of Tenant in any proceeding, which receivership shall not have been set aside within 60 days of such appointment;

(e) the refusal by Tenant to take possession of the Demised Premises upon completion of Tenant Work or the vacation and abandonment of the Demised Premises by Tenant, permitting the same to remain unoccupied and unattended;

(f)     the failure of Tenant to pay any Rent, or any other charge required to be paid by Tenant hereunder; any such failure continuing for five (5) days after written notice from Landlord to Tenant that the same is past due and payable;

(g)     the failure of Tenant to maintain insurance in force in full compliance with and to the extent required by Article XIV hereof; and

(h)     the failure by Tenant to perform or observe any requirement of this Lease not specifically referred to in this Section, and such failure continuing for thirty (30) days after written notice from Landlord to Tenant specifying the items in default, or, in the case of a default which cannot with due diligence be cured within thirty (30) days and is capable of being cured, such additional time (but not to exceed an additional thirty (30) days) as may be reasonably necessary to permit the same to be cured with all due diligence.

Section 16.02. Landlord's Remedy:

At any time after the occurrence of an Event of Default, Landlord may give written notice to Tenant specifying such Event(s) of Default and stating that the Lease and Term shall terminate upon the giving of such written notice, at which time this Lease and the Term and all of the right, title and interest of Tenant hereunder shall wholly cease and expire, and Tenant shall quit and surrender the Demised Premises to Landlord. Notwithstanding such termination, surrender, and the expiration of this Tenant's right, title, and interest, Tenant's liability and responsibility under all of the provisions of this Lease shall continue.

Section 16.03. Landlord's Re-Entry

If this Lease shall be terminated as provided in Section 16.02, above, Landlord, or its agents or employees, may re-enter the Demised Premises at any time and remove therefrom Tenant, Tenant's Agents, and any subtenants, licensees, concessionaires or invitees, together with any of its or their property, either by summary dispossession proceedings or by any suitable action or proceeding at law or otherwise. In the event of such termination, Landlord may repossess and enjoy the Demised Premises. Landlord shall be entitled to the benefits of all provisions of law respecting the speedy recovery of lands and tenements, or proceedings in forcible entry and detainer. Tenant waives any rights to the service of any notice of Landlord's intention to re-enter provided for by any present or future law. Landlord shall not be liable in any way in connection with any action it takes pursuant to the foregoing. Notwithstanding any such re-entry, repossession, dispossession or removal, Tenant's liability and responsibility under all of the provisions of this Lease shall continue.

Section 16.04. Landlord's Additional Remedies:

(a)     In case of re-entry, repossession or termination of this Lease, whether the same is the result of the institution of summary or other proceedings, Tenant shall remain liable (in addition to accrued liability(s) to the extent legally permissible for: (i) the Rent, and all other charges provided for herein until the date this Lease would have expired had such termination, re-entry or repossession not occurred; and all expenses of Landlord in re-entering the Demised Premises, or in repossessing the same; making good any Event of Default; painting, altering or dividing the Demised Premises; combining or placing the same in proper repair; protecting and preserving the same by placing therein watchmen and caretakers; re-letting the same (including attorneys' fees and disbursements, marshall's fees, brokerage fees, in so doing); and any expenses which Landlord may incur during the occupancy of any new tenant; less (ii) the net proceeds of any re-letting. Tenant agrees to pay to Landlord the difference between items (i) and (ii) hereinabove with respect to each month, at the end of such month. Any suit brought by Landlord to enforce collection of such difference for any one month shall not prejudice Landlord's right to enforce the collection of any difference for any subsequent month.

In addition to the foregoing, Tenant shall pay to Landlord such sums as the court may adjudge reasonable as attorneys' fees with respect to any successful lawsuit or action instituted by Landlord to enforce the provisions hereof.

(b)     Landlord may re-lease the whole or any part of the Demised Premises for the whole of the unexpired period of this Lease, or longer, or from time to time for shorter periods, for any rental then obtainable, giving such concessions of rent and making such special repairs, alterations, decorations and painting for any new tenant as it may in its sole and absolute discretion deem advisable and may collect and receive the rents therefor . Landlord shall use reasonable efforts to re-lease or to attempt to re-let the Demised Premises to mitigate its damages.

Section 16.05. Agreed Final Damages:

If Landlord so elects, Tenant shall pay Landlord, on demand, as liquidated and agreed final damages, the following amount: (A) (i) the net present value of all Rent which would have been payable by Tenant from the date of such demand to the date when this Lease would have expired if it had not been terminated as aforesaid (such period of time being referred to as the "Remaining Default Term"), plus (ii) any amounts due and owing from Tenant to Landlord as of the date of Landlord's demand, which have not been paid, plus (iii) all expenses which Landlord may have incurred in re-entering the Demised Premises, repossessing the same; making good any Event of Default; painting, altering or dividing the Demised Premises; combining or placing the same in proper repair; protecting and preserving the same; and re-letting the same, minus (B) the net present value of the fair market rent (as defined below), determined as of the date of Landlord's demand, for the Demised Premises during the period commencing three (3) months after the date of Landlord's demand until the last day of the Remaining Default Term (such calculation being for a period which is three months less than the Remaining Default Term to reflect the possibility of the Demised Premises remaining unleased for a significant period of time). The net present values described in clauses (A)(i) and clause (B) above shall be computed using a discount rate equal to six percent (6%) per annum. Upon payment of such liquidated and agreed final damages and all other amounts described in this Section 16.05, Tenant shall be under no further liability with respect to the period after the date of such demand.

For purposes of this Section 16.05, "fair market rent" shall have the same meaning as determined by obtaining an appraisal, that (1) fair market rent shall be determined by obtaining the appraisal (as defined in Section 2.0) hereof) selected by Landlord (and not the Appraisal Procedure described in this Lease) and (2) the Appraiser shall be instructed to determine fair market rent based on the then current condition of the Demised Premises.

Section 16.06. Waiver of Right of Redemption:

Tenant hereby expressly waives (to the extent legally permissible, for itself and all persons claiming through, by or under it) any right of redemption or for the restoration of the operation of this Lease under any present or future law in case Tenant shall be dispossessed for any cause, or in case Landlord shall obtain possession of the Demised Premises as herein provided.

Section 16.07. Landlord's Right to Perform for Account of Tenant:

If an Event of Default shall occur hereunder, Landlord may, at any time, cure said Event of Default for the account and at the expense of Tenant. Tenant shall pay, on demand, to Landlord, with interest as required by Section 20.09 hereof, the amount so paid, expended, or incurred by Landlord, and any expense of Landlord, including reasonable attorneys' fees, incurred in connection with such Event of Default; and all of the same shall be deemed to be additional Rent.

Section 16.08. Additional Remedies, Waivers, etc:

With respect to the rights and remedies of and waivers by Landlord:

29

30

## ARTICLE XX.  MISCELLANEOUS.

### Section 20.01  Interpretation.

(a)   Every term, condition, agreement or provision contained in this Lease which imposes an obligation on Tenant shall be deemed to be also a covenant by Tenant.

(b)   Any reference herein to subtenants or licensees shall not be deemed to imply that any subtenants or licensees are permitted hereunder. Any reference herein to any extension or renewal of the Term or any period during which Tenant may be in possession after the Expiration Date shall not be deemed to imply that any extension or renewal of the Term is contemplated hereby or that Tenant shall be permitted to remain in possession after the expiration of the Term.

(c)   If any provision of this Lease or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those to which it is invalid or unenforceable, shall not be affected thereby, and each provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

(d)   The captions and headings used throughout this Lease are for convenience of reference only and shall not affect the interpretation of this Lease.

(e)   Anything in this Lease to the contrary notwithstanding:

(i)   Any provision which permits or requires a party to take any particular action shall also be deemed to permit or require a party to cause such action to be taken; and

(ii)   Any provision which requires any party not to take any particular action shall be deemed to require the party not to permit such action to be taken by any person or by operation by law.

(f)   This Lease may be executed in several counterparts, and in such case the counterparts shall constitute but one and the same instrument.

(g)   Wherever a requirement is imposed on any party hereto, it shall be deemed that such party shall be required to perform such requirement at its own expense unless it is specifically otherwise provided herein.

(h)   The singular includes the plural and the plural includes the singular.

(i)   All Exhibits and Schedules hereto are hereby incorporated by reference in and form an integral part of this Lease, and all references to the Lease shall be deemed to include such Exhibits and Schedules.

### Section 20.02  Construction of Words and Phrases:

(a)   Wherever it is provided herein that a party may perform an act or do anything, it shall be construed that such party may, but shall not be obligated to, so perform or so do.

(b)   The words "re-enter" and "re-entry" as used herein are not restricted to their technical legal meaning.

32

15.02731

---

other right and remedy now and hereafter provided by law. All such rights and remedies shall be cumulative and not exclusive of each other. Landlord may exercise such rights and remedies at such times, in such order, to such extent, and as often as Landlord deems advisable without regard to whether the exercise of one right or remedy proceeds, concurs with or succeeds the exercise of another.

(b)   A single or partial exercise of a right or remedy shall not preclude (i) a further exercise thereof, or (ii) the exercise of another right or remedy, from time to time.

(c)   No delay or omission by Landlord in exercising a right or remedy shall exhaust or impair the same or constitute a waiver of, or acquiescence to an Event of Default.

(d)   No waiver of an Event of Default shall extend to or affect any other Event of Default or impair any right or remedy with respect thereto.

(e)   No action or inaction by Landlord shall constitute a waiver of an Event of Default.

(f)   No waiver of an Event of Default shall be effective unless it is in writing and signed by Landlord.

## ARTICLE XVII.  TENANT'S ESTOPPEL CERTIFICATE

At any time within thirty (30) days after written request by Landlord, Tenant shall certify to Landlord, any mortgagee, assignee of a mortgagee, any purchaser, or any other person, specified by Landlord, by written instrument, duly executed and acknowledged, (a) whether or not Tenant is in possession of the Demised Premises; (b) whether or not this Lease is unmodified and in full force and effect (or if there has been modification, that the same is in full force and effect as modified and setting forth such modification); (c) whether or not there are then existing set-offs or defenses against the enforcement of any right or remedy of Landlord, or any duty or obligation of Tenant (and if so, specifying the same); (d) the dates, if any, to which any Rent or other charges have been paid in advance; and (e) such other factual matters relating to this Lease as may be reasonably requested by Landlord, any mortgagee or any of their designees.

## ARTICLE XVIII.  RIGHT OF ACCESS

Landlord, its employees, agents, representatives, may enter upon the Demised Premises, or any portion thereof (with people and materials, if required), with prior notice to Tenant and at reasonable times, for the purpose of:  (a) inspecting same; (b) making such repairs, replacements or alterations which it may be required to perform as herein provided or which it may deem desirable for the Demised Premises; and (c) showing the Demised Premises to prospective purchasers or lessees. Landlord shall use reasonable efforts to minimize disruption or inconvenience to Tenant's business operations during such access.

## ARTICLE XIX.  COVENANT OF QUIET ENJOYMENT

Landlord covenants that if Tenant pays the Rent and all other fees, charges and expenses provided for herein in a timely manner as and when due, duly performs all of its other obligations provided for hereunder, and observes all of the other provisions hereof, Tenant shall, at all times during the Term, peaceably and quietly have, hold and enjoy the Demised Premises, without any interruption or disturbance from Landlord, subject to the terms hereof.

31

15.02731

(c) The word "person" shall be construed as an individual, fiduciary, estate, trust, partnership, firm, association, corporation, other organization, or a government or governmental authority.

(d) The following words and phrases shall be construed as follows:

(i) "At any time" shall be construed as, "at any time or from time to time."

(ii) "Any" shall be construed as "any and all."

(iii) "Including" shall be construed as "including but not limited to."

Section 20.03. Written Agreement Required:

This Lease contains the entire agreement between the parties hereto concerning the subject matter hereof, and supersedes all other agreements, written or oral, with respect thereto. No amendment, alteration, modification of or addition to the Lease will be valid or binding unless expressed in writing and signed by Landlord and Tenant.

Section 20.04. Notice:

Every notice, request, consent, approval, waiver or other communication under this Lease shall be deemed to have been given if in writing and upon mailing by registered, overnight express/courier service, or certified mail, return receipt requested, postage prepaid, addressed:

(a) If to Landlord, to the address designated as Landlord's Notice Address, or such other address as Landlord designates, with a copy thereof to such other person or party as Landlord shall designate;

(b) If to Tenant, to the address designated as Tenant's Notice Address, or such other address as Tenant designates, with a copy thereof to the address designated as Tenant's Notice Copy Address or to such other person or party as Tenant shall designate.

(i) Landlord's Notice Address:

The Connell Company
200 Connell Drive
Berkeley Heights, New Jersey 07922
Attention: President

(ii) Tenant's Notice Address:

Axtria, Inc.
400 Connell Drive
Berkeley Heights, New Jersey 07922
Attention: Jaswinder S. Chadha, President

Section 20.05. Survival of Provisions upon Termination of Lease.

This Lease shall survive the expiration or termination of the Term to the extent necessary that any term, covenant or condition of this Lease requires the performance of obligations or the forbearance of an act by either party hereto after the expiration or termination of the Lease. Such survival shall be to the extent reasonably necessary to fulfill the intent thereof, or if specified, to the extent of such specification, as same is reasonably necessary to perform the obligations and/or forbearance of an act set forth in such term, covenant or condition.

Section 20.06. Successors and Assigns:

Subject to the provisions hereof, this Lease shall bind and inure to the benefit of the parties and their respective successors, representatives, heirs and permitted assigns.

Section 20.07. Guarantor of Tenant:

Any restrictions on or requirements imposed upon Tenant hereunder shall be deemed to extend to any guarantor of Tenant, Tenant's subtenants, concessionaires and licensees and it shall be Tenant's obligation to cause the foregoing persons to comply with such restrictions or requirements.

Section 20.08. Tenant at Sufferance:

If Tenant shall remain in possession of the Demised Premises after the end of the Term (including if the Demised Premises have not been surrendered in accordance with the terms of this Lease), such holding over shall cause the Tenant to be deemed a tenant-at-sufferance, subject to all of the provisions, conditions and obligations of this Lease, except that the Rent to be charged Tenant during such hold over period shall be (i) in the case of the first thirty (30) days of such hold over period, 1.5 times the monthly Rent in effect for the last month of the Term or any renewal periods and (ii) thereafter, two times the monthly Rent in effect for the last month of the Term or any renewal periods. Any acceptance of hold over Rent by Landlord shall not be deemed a waiver of any rights or remedies available to Landlord arising out of Tenant's failure to have vacated the Demised Premises upon the end of the Term, or an acquiescence to Tenant's tenant-at-sufferance period.

Section 20.09. Interest:

Any payment required to be made by Tenant under the provisions of this Lease not made by Tenant when due shall be payable by Tenant to Landlord on demand with interest thereon at three (3%) percent over the rate designated by the Bank of New York, New York (or its successor) from time to time as the prime rate, but not to exceed the highest legal rate, computed from the date said sum became due to and including the date of payment thereof to Landlord.

Section 20.10. Late Charges:

In order to cover the extra expense involved in handling delinquent payments, Tenant, at Landlord's option, shall pay a "late charge" of five (5%) percent of the amount due when any payment of Rent hereunder is received by Landlord more than five (5) days after the date thereof. It is understood and agreed that this charge is for additional expense incurred by Landlord, shall not be considered interest, and shall be due in addition to the interest required under Section 20.09 hereof.

Section 20.11. Non-Waiver:

The failure of Landlord to insist upon strict performance of any covenants or conditions of this Lease or Landlord's failure to exercise any option herein conferred in any one or more instances shall not be construed as a waiver or relinquishment of any such covenants, conditions or options, but the same shall be and remain in full force and effect. If Landlord pursues any remedy granted by the Lease or pursuant to applicable law, it shall not be construed as a waiver or relinquishment of any other remedy afforded thereby.

15.0231

Section 20.12. Broker:

Tenant represents that there was no broker acting on behalf of Tenant other than Jones Lang LaSalle (the "Broker") responsible for bringing about or negotiating this Lease. Tenant agrees to defend, indemnify, and hold Landlord harmless against any claims for brokerage commission or compensation with regard to the Demised Premises by any other broker claiming or alleging to have acted on behalf of or to have dealt with Tenant. Landlord will pay any fees or commissions due the Broker pursuant to a separate written agreement between Landlord and Broker.

Section 20.13. Short Form Lease:

Landlord and Tenant agree that neither party shall record the Lease. Upon request of either party the other shall execute a document in recordable form, or a short form lease or memorandum of lease in proper form for recording, setting forth the Commencement Date and any provision hereof other than Sections 1.03, 1.04, 5.01, 5.02, 5.03 and 5.05. The requesting party shall pay all recording fees and costs in connection with any such short form or memorandum of lease.

Section 20.14. Mechanics' Liens:

Tenant shall not do or cause anything to be done whereby the Demised Premises may be encumbered by a mechanic's lien. If any mechanic's or materialmen's lien is filed against the Demised Premises, the Building or the Land as a result of any Tenant Work (other than the initial Tenant Work undertaken by Landlord) or any additions, alterations, repairs, installations, improvements or any other work on or of Tenant, Tenant shall discharge or bond same within twenty days from the date of filing of the lien. If Tenant shall fail to discharge or bond the lien, Landlord may bond or pay the lien or claim for the account of Tenant without inquiring into the validity of the lien or claim and Tenant shall reimburse Landlord upon demand.

Section 20.15. Corporate Authority:

(a) Tenant represents that the undersigned officer(s) has (have) been duly authorized to enter into this Lease and that the execution and consummation of this Lease by Tenant does not and shall not violate any provision of any bylaws, certificate of incorporation, agreement, order, judgment, governmental regulation or any other obligations to which Tenant is a party or is subject.

(b) Landlord represents that the undersigned officer of Landlord has been duly authorized to enter into this lease and that the execution and consummation of this Lease by Landlord does not and shall not violate any provision of any by-law, certificate of incorporation, agreement, order judgment, governmental regulation or any other obligation to which Landlord is a party or is subject.

Section 20.16. Force Majeure:

Except as otherwise provided herein, Landlord shall not be liable for any delays and other events beyond the reasonable control of a party (each, a "Force(s) Majeure") including, without limitation: acts of God; strikes, lock-outs or other labor difficulties; explosions, accident, riot or civil commotion; act of war; fire or other casualty; requirements of governing authorities or inability to obtain necessary governmental permits and approvals.

Section 20.17. Governing Law:

This Lease shall be governed by and construed pursuant to the laws of the State of New Jersey.

35

Section 20.18. Financial Statements:

If requested by Landlord, Tenant shall, within 120 days after the close of each of its fiscal years, deliver to Landlord Tenant's balance sheet and profit and loss statement certified to by a recognized form of certified public accountants; provided, however, that this Section 20.18 shall not be applicable so long as Tenant is a publicly traded company.

ARTICLE XXI. ENVIRONMENTAL MATTERS.

Section 21.01. Industrial Site Recovery Act:

(a) Tenant represents and warrants that it is not an "Industrial Establishment" as that term is defined in the Industrial Site Recovery Act, formerly known as the Environmental Cleanup Responsibility Act, N.J.S.A. 13:1K-6 et seq., as same may be amended from time to time (together with all rules, regulations, ordinances, opinions, orders and directives issued or promulgated pursuant to or in connection with said Act by the New Jersey Department of Environmental Protection ("DEP"), or any subdivision or bureau thereof or any other governmental or quasi-governmental agency, authority or body having jurisdiction thereof, referred to herein as the "Act" or "ISRA"). Tenant shall not do or suffer anything that will cause it to become an Industrial Establishment under the Act during the Term of this Lease. Landlord may from time to time require Tenant at Tenant's sole expense to provide proof satisfactory to Landlord that Tenant is not an Industrial Establishment. In the event that Tenant now is or hereafter becomes an Industrial Establishment under the DEP, Tenant shall comply with all conditions as set forth in subparagraphs (b) and (d) of this Section 21.01.

(b) Tenant agrees that it shall, at its sole cost and expense, fulfill, observe and comply with all of the terms and provisions of the Act. Without limiting the foregoing, upon Landlord's request therefor, and in all events no later than sixty (60) days prior to "closing, terminating or transferring operations" (as said terms are defined and used in the Act) out of the Demised Premises, Tenant at its sole cost and expense, shall provide Landlord with a true copy of:

(i) a letter of non-applicability from DEP (or such other agency or body) which shall then have jurisdiction over ISRA matters) in form satisfactory to Landlord's counsel, stating that ISRA does not apply to Tenant, Tenant's use and occupancy of the Demised Premises and to the closing, terminating or transferring of operations at the Demised Premises; or

(ii) a Negative Declaration (as said term is defined in ISRA) duly approved by DEP (or such other agency or body then having jurisdiction over ISRA matters; or

(iii) a Cleanup Plan (as said term is defined in ISRA) duly approved by DEP (or such other agency or body which shall then have jurisdiction over ISRA matters), the intent of which will be to obtain from the DEP a "No Further Action" ("NFA") determination with respect to the Demised Premises.

(c) Nothing in this Section shall be construed as limiting Tenant's obligation to comply with ISRA.

(d) In the event Tenant complies with paragraph (b) (iii) of this Section by obtaining an approved Cleanup Plan, Tenant agrees that it shall, at its sole cost and expense:

36

(i)   post any financial guarantee or other bond required to secure implementation and completion of such Cleanup Plan; and

(ii)   promptly and diligently implement and prosecute to completion said Cleanup Plan by obtaining an NFA determination, in accordance with the schedules contained therein or as may otherwise be ordered or directed by DEP or such other agency or body which shall then have jurisdiction over such Cleanup Plan. Tenant expressly understands, acknowledges and agrees that Tenant's compliance with the provisions of subparagraphs (b) and (d) may require Tenant to expend funds or do acts after the expiration or termination of the Lease Term and Tenant shall not be excused therefrom.

(e)   Within ten (10) days after a written request by Landlord or any mortgagee of Landlord (or sooner, if required by the DEP) and, in any event, on each anniversary of the Commencement Date, Tenant shall deliver to Landlord and Landlord's Mortgagee, if any, a duly executed and acknowledged affidavit of Tenant's chief executive officer, certifying:

(i)   the proper classification under the North American Industry Classification System relating to Tenant's then current use of the Demised Premises; and

(ii)   (A) that Tenant's then current use of the Demised Premises does not involve the generation, manufacture, refining, transportation treatment, storage, handling or disposal of hazardous substances or waste (as hazardous substances and hazardous waste are defined in ISRA) on site, above ground or below ground (all of the foregoing are hereinafter collectively referred to as the "Presence of Hazardous Substances"), or (B) that Tenant's then current use does involve the Presence of Hazardous Substances, in which event, said affidavit shall describe in complete detail that portion of Tenant's operations which involves the Presence of Hazardous Substances. Such description shall inter alia, identify each hazardous substance and describe the manner in which Tenant generated, handled, manufactured, refined, transported, treated, stored and/or disposed of same. Tenant shall supply Landlord and Landlord's mortgagee, if any, with such additional information relating to the Presence of Hazardous Substances as Landlord or Landlord's mortgagee requests.

(f)   Without limiting the foregoing, Tenant agrees:

(i)   at its sole cost and expense, to promptly discharge and remove any lien or encumbrance against the Demised Premises, the Building, the Real Estate or any other property owned or controlled, in whole or in part, by Tenant imposed due to Tenant's failure to comply with ISRA; and

(ii)   to defend, indemnify and hold Landlord harmless from and against any and all liability, penalty, loss, expenses, damages, costs, claims, causes of action, judgments and/or the like, of whatever nature, including but not limited to attorneys' fees and disbursements and other costs of litigation or preparation therefor, to the extent such costs arise from or in connection with Tenant's failure or inability, for any reason whatsoever, to observe or comply with ISRA and/or the provisions of this Section 21.01.

57

Section 21.02.   Spill Act:

(a)   Tenant agrees that it shall, at its sole cost and expense, observe, comply and fulfill all of the terms and provisions of the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 et seq., as the same may be amended from time to time and all rules, regulations, ordinances, opinions, orders and directives issued or promulgated pursuant to or in connection with said Act by DEP, any subdivision or bureau thereof or any other governmental or quasi-governmental agency or body having jurisdiction thereof (Said act and all said rules, regulations, ordinances, opinions, orders and directives are hereinafter in this Section 21.02 collectively referred to as "Spill Act").

(b)   Without limiting the foregoing, Tenant agrees:

(i)   that it shall not do, omit to do or suffer the commission or omission of any act which is prohibited by or may result in any liability under the Spill Act, including without limitation the discharge of petroleum products or other hazardous substances (as said terms are defined in the Spill Act); and

(ii)   whenever the Spill Act requires the "owner or operator" to do any act, Tenant shall do such act and fulfill, all such obligations at its sole cost and expense, to the extent arising from an act of Tenant or Tenant's Agents, invitees or visitors, it being the intention of the parties hereto that Landlord shall be free of all expense and obligations arising from or in connection with compliance with the Spill Act resulting from acts of Tenant or Tenant's Agents, invitees or visitors.

(c)   Without limiting the foregoing, Tenant agrees:

(i)   at its sole cost and expense, to promptly discharge and remove any lien or encumbrance against the Demised Premises, the Building, the Real Estate or any other property owned or controlled, in whole or in part, by Tenant, imposed by Tenant's failure to comply with the Spill Act; and

(ii)   to defend, indemnify and hold Landlord harmless from and against any and all liabilities, penalties, losses, expenses, damages, costs, claims, causes of action, judgments, suits and/or the like, of whatever nature, (including but not limited to attorneys' fees and other expenses of litigation or preparation therefor) which may at any time be imposed on, incurred by or asserted against any Indemnified Party and which in any way relate to or arise from or in connection with Tenant's failure or inability, for any reason whatsoever, to observe or comply with the Spill Act and/or the provisions of this Section 21.02.

Section 21.03.   Toxic and Hazardous Materials:

Without limiting any of its other obligations hereunder, Tenant agrees that it shall not store, use, generate, manufacture, produce, release, discharge or dispose of any toxic or Hazardous Materials in, on, or about the Demised Premises or the Real Estate (and Tenant shall notify Landlord in writing immediately upon any violation of this sentence). Tenant will be solely responsible for and will defend, indemnify and hold Indemnified Parties (as defined in Section 15.01(a) of this Lease) from and against all claims, judgments, actions, costs, penalties, damages and liabilities, including attorneys' fees and costs, arising, out of or in connection with Tenant's Agents, invitees or visitors) storage, use and disposal of toxic material or Hazardous Materials. Tenant will be solely responsible for and will defend, indemnify and hold Indemnified Parties harmless from and against any and all claims,

38

15.0273

15.0273

costs and liabilities, including attorneys' fees and costs, arising out of or in connection with the removal, clean-up and restoration work and materials necessary to return the Demised Premises and any other property of whatever nature located on the Real Estate to the condition existing prior to such storage, use, generation, manufacture, production, release, discharge or disposal of toxic materials or Hazardous Materials by Tenant (or Tenant's Agents, invitees or visitors).

For purposes of this Lease, the term "Hazardous Materials" includes but is not limited to: (a) those substances included within the definitions of "hazardous substances," "hazardous materials," "toxic substances," "hazardous wastes," "solid waste" or similar terms in any Environmental Law, (b) petroleum products and petroleum byproducts, (c) polychlorinated biphenyls, and (d) chlorinated solvents. The term "Environmental Law" includes any federal, state, municipal or local law, statute, ordinance, regulation, order, rule or requirement in each case as may be amended from time to time) pertaining to health, industrial hygiene, environmental conditions (including, without limitation, air, ground, water pollution and protection and/or preservation of the environment), or hazardous materials or substances.

### Section 21.04. Other Environmental Laws.

Without limiting any of its other obligations hereunder, Tenant agrees that it shall, at its sole cost and expense, promptly comply and keep continually in full compliance with all federal, state and local laws, ordinances, rules, regulations and requirements relating to air, ground and water pollution and protection and/or preservation of the environment. Tenant shall not be responsible for the cost or expense incurred in connection with the removal or remediation of any Hazardous Materials that were not in compliance with Environmental Law on the Commencement Date and which were located in, on or under the Building or the Land prior to the Commencement Date and was not brought on to the Land by Tenant or Tenant's Agents, invitees or visitors.

### Section 21.05. Survival of Environmental Terms and Conditions.

Tenant agrees that each and every provision of this Article XXI shall survive the termination of this Lease. The parties hereto expressly acknowledge and agree that Landlord would not enter into this Lease but for the provisions of this Article XXI and the aforesaid survival thereof.

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be executed as of the day and year first above written.

WITNESS OR ATTEST:                    **THE CONNELL COMPANY**

By: _____          By: _____
Name: _Richard Parke_                 Name: _Shane Connell_
Title: _Assistant Secretary_          Title: _Exec. Vice President_


WITNESS OR ATTEST:                    **AXTRIA, INC.**

By: _____          By: _____
Name: _Mona Gregory_                  Name: _Jaswinder S. Chadha_
Title:                                Title: President

15.02731

15.02731

EXHIBIT A

LEGAL DESCRIPTION OF LAND

LEGAL DESCRIPTION
LOT 1, BLOCK 4102
TOWNSHIP OF BERKELEY HEIGHTS
UNION COUNTY, NEW JERSEY

A parcel of land described herein, being known and designated as Lot 1, Block 4102, Township of Berkeley Heights, Union County, New Jersey (and formerly being known and designated as Lots 1 & 2.01, Block 4102, Lots 1 & 2, Block 4103, and Old Colonial Road, Township of Berkeley Heights, Union County, New Jersey, as shown on a certain map entitled, "Minor Subdivision Plan, Minor Subdivision for Block 4101 Lot 2, Block 4102 - Lots 1 & 2, Block 4103 - Lots 1 & 2 and Block 4301 - Lot 1.01, Township of Berkeley Heights, Union County, New Jersey," prepared by Schoor DePalma, dated March 29, 2007 and revised to June 25, 2007) and being more particularly described as follows:

Beginning at a point in the easterly sideline of Plainfield Avenue (50 ft. wide right-of-way) distant 885.28 feet the various courses along said sideline from the northerly sideline of Valley Road, said point being the beginning point of a description of land described as Tract II, in a deed recorded in the Union County Clerk's Office in Deed Book 4260, Page 6 and running; thence;

Along said easterly sideline of Plainfield Avenue, the following eleven (11) courses;

1.  North 70 degrees 34 minutes 47 seconds West, 76.51 feet to a point of non-tangent curvature; thence,

2.  Along a curve to the right having a radius of 611.79 feet, a central angle of 10 degrees 32 minutes 59 seconds and an arc length of 112.65 feet to a point of tangency; thence,

3.  North 60 degrees 01 minutes 47 seconds West, 94.58 feet; thence,

4.  North 58 degrees 58 minutes 16 seconds West, 168.11 feet to a point of curvature; thence,

5.  Along a curve to the right having a radius of 622.00 feet, a central angle of 20 degrees 32 minutes 28 seconds and an arc length of 222.99 feet to a point of tangency; thence,

6.  North 38 degrees 25 minutes 48 seconds West, 592.47 feet to a point of curvature; thence,

7.  Along a curve to the right having a radius of 1005.09 feet, a central angle of 06 degrees 28 minutes 16 seconds and an arc length of 113.61 feet to a point of tangency; thence,

8.  North 31 degrees 57 minutes 12 seconds West, 137.31 feet to a point of curvature; thence,

9.  Along a curve to the left having a radius of 373.00 feet, a central angle of 47 degrees 00 minutes 06 seconds and an arc length of 305.98 feet to a point of tangency; thence,

10. North 78 degrees 57 minutes 18 seconds West, 18.43 feet; thence,

A-1

---

STATE OF New Jersey } SS.:
COUNTY OF Hunterdon }

On this 14 day of Sept 2015, before me personally appeared Jacqueline Chase— to me known, who, being by me duly sworn, did depose and say that (s)he is the _____ of Axtria, Inc., the corporation described in and which executed the foregoing Lease; that (s)he knows the seal of said corporation, that the seal affixed to said instrument is such corporate seal, that it was so affixed by authorization of the board of directors of said corporation, and that (s)he signed his name thereto by like authorization.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public

(Notarial Seal)

Notary Public State Of NJ
Anthony Franchini
Comm. No. Expires January 15 2016

STATE OF NEW JERSEY } SS.:
COUNTY OF UNION }

On this 24 day of Sept , 2015, before me personally appeared Dorsey Guardino to me known, who, being by me duly sworn, did depose and say that (s)he is the Sr. VP of The Council Company, the corporation described in and which executed the foregoing Lease; that (s)he knows the seal of said corporation, that the seal affixed to said instrument is such corporate seal, that it was so affixed by authorization of the board of directors of said corporation, and that (s)he signed his name thereto by like authorization.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public

(Notarial Seal)

CHRISTOPHER O. JEGEDE
NOTARY PUBLIC OF NEW JERSEY
REGISTERED IN UNION COUNTY
My Commission Expires June 19, 2018

11. North 79 degrees 08 minutes 40 seconds West, 7.56 feet to a point of intersection with the southerly sideline of Interstate Highway Route 78; thence,

Along said southerly sideline, the following five (5) courses;

12. North 88 degrees 10 minutes 39 seconds East, 15.23 feet; thence,

13. North 62 degrees 14 minutes 02 seconds East, 274.69 feet; thence,

14. North 66 degrees 41 minutes 45 seconds East, 606.26 feet; thence,

15. North 64 degrees 53 minutes 46 seconds East, 665.08 feet; thence,

16. North 56 degrees 06 minutes 40 seconds East, 63.13 feet to the northwest corner of Lot 1,012, Block 4301 as shown on the aforementioned map; thence,

Along the southwesterly line of said Lot 1,012, the following four (4) courses;

17. South 30 degrees 37 minutes 11 seconds East, 813.47 feet to a point of curvature; thence,

18. Along a curve to the left having a radius of 40.00 feet, a central angle of 82 degrees 38 minutes 32 seconds, an arc length of 57.70 feet and a chord bearing and distance of South 71 degrees 56 minutes 27 seconds East, 52.82 feet to a point of tangency; thence,

19. North 66 degrees 44 minutes 17 seconds East, 79.10 feet to a point of curvature; thence,

20. Along a curve to the left having a radius of 388.00 feet, a central angle of 19 degrees 37 minutes 13 seconds, an arc length of 132.87 feet and a chord bearing and distance of North 56 degrees 55 minutes 40 seconds East, 132.22 feet to a point of non-tangency at an intersection with the southwesterly line of Lot 1,011, Block 4501; thence,

21. Along said line, South 42 degrees 47 minutes 56 seconds East, 252.35 feet to a point in the municipal boundary line dividing the Township of Berkeley Heights, Union County and the Borough of Watchung, Somerset County; thence,

Along said municipal boundary line, being the approximate centerline of Green Brook, the following twenty-three (23) courses;

22. North 79 degrees 30 minutes 47 seconds West, 9.38 feet; thence,

23. North 40 degrees 03 minutes 25 seconds West, 12.12 feet; thence,

24. North 84 degrees 27 minutes 53 seconds West, 96.00 feet; thence,

25. South 80 degrees 42 minutes 06 seconds West, 25.14 feet; thence,

26. South 55 degrees 25 minutes 02 seconds West, 40.43 feet; thence,

27. South 56 degrees 58 minutes 39 seconds West, 119.85 feet; thence,

28. South 56 degrees 34 minutes 30 seconds West, 41.59 feet; thence,

29. South 42 degrees 12 minutes 02 seconds West, 61.20 feet; thence,

30. South 39 degrees 24 minutes 33 seconds West, 161.37 feet; thence,

31. South 17 degrees 49 minutes 34 seconds East, 20.59 feet; thence,

32. South 18 degrees 05 minutes 48 seconds East, 16.55 feet; thence,

33. South 33 degrees 44 minutes 50 seconds East, 98.31 feet; thence,

34. South 64 degrees 08 minutes 49 seconds West, 107.56 feet; thence,

35. South 03 degrees 17 minutes 01 seconds West, 58.00 feet; thence,

36. South 27 degrees 40 minutes 25 seconds West, 69.89 feet; thence,

37. South 52 degrees 30 minutes 14 seconds West, 61.29 feet; thence,

38. South 45 degrees 14 minutes 25 seconds West, 174.07 feet; thence,

39. South 39 degrees 07 minutes 16 seconds West, 22.20 feet; thence,

40. South 37 degrees 43 minutes 26 seconds West, 31.40 feet; thence,

41. South 59 degrees 58 minutes 42 seconds West, 44.15 feet; thence,

42. South 49 degrees 38 minutes 04 seconds West, 250.29 feet; thence,

43. South 49 degrees 12 minutes 28 seconds West, 74.06 feet; thence,

44. South 19 degrees 25 minutes 13 seconds West, 46.21 feet to the point or place of beginning.

Containing 2,077,363 square feet more or less / 47.6897 acres of land more or less as described herein.

Subject to all existing easements, rights-of-way and reservations of record.

A-3

A-2

LEGAL DESCRIPTION
LOT 1, BLOCK 75.01
BOROUGH OF WATCHING
SOMERSET COUNTY, NEW JERSEY

A parcel of land described herein, known and designated as Lot 1, Block 75.01, Borough of Watching, Somerset County, New Jersey, and being more particularly described as follows;

Beginning at the at the intersection of the northeasterly sideline of Plainfield Avenue (50 ft. wide right-of way) with the dividing line between the County of Union and the County of Somerset, said line being the centerline of Green Brook, distant 885.28 feet the various courses along said sideline from the northwesterly sideline of Valley Road (variable width right-of-way) and running; thence,

Along said municipal boundary line the following thirty (30) courses;

1.  North 19 degrees 25 minutes 13 seconds East, 46.21 feet; thence,

2.  North 49 degrees 12 minutes 28 seconds East, 74.06 feet; thence,

3.  North 49 degrees 38 minutes 04 seconds East, 250.29 feet; thence,

4.  North 59 degrees 58 minutes 42 seconds East, 44.15 feet; thence,

5.  North 37 degrees 43 minutes 26 seconds East, 31.40 feet; thence,

6.  North 39 degrees 07 minutes 16 seconds East, 22.20 feet; thence,

7.  North 45 degrees 14 minutes 26 seconds East, 174.07 feet; thence,

8.  North 52 degrees 30 minutes 14 seconds East, 61.29 feet; thence,

9.  North 27 degrees 40 minutes 25 seconds East, 69.89 feet; thence,

10.  North 03 degrees 17 minutes 01 seconds East, 58.00 feet; thence,

11.  North 04 degrees 08 minutes 49 seconds East, 107.56 feet; thence,

12.  North 33 degrees 44 minutes 50 seconds West, 98.31 feet; thence,

13.  North 18 degrees 05 minutes 44 seconds West, 16.55 feet; thence,

14.  North 17 degrees 49 minutes 14 seconds East, 20.59 feet; thence,

15.  North 39 degrees 24 minutes 33 seconds East, 161.37 feet; thence,

16.  North 42 degrees 12 minutes 02 seconds East, 61.20 feet; thence,

17.  North 56 degrees 34 minutes 30 seconds East, 41.59 feet; thence,

A-4

18.  North 56 degrees 58 minutes 39 seconds East, 119.85 feet; thence,

19.  North 55 degrees 25 minutes 02 seconds East, 40.43 feet; thence,

20.  North 80 degrees 42 minutes 06 seconds East, 25.14 feet; thence,

21.  South 84 degrees 27 minutes 53 seconds East, 96.00 feet; thence,

22.  South 40 degrees 03 minutes 25 seconds East, 12.12 feet; thence,

23.  South 79 degrees 30 minutes 47 seconds East, 26.06 feet; thence,

24.  North 72 degrees 22 minutes 46 seconds East, 50.52 feet; thence,

25.  North 19 degrees 01 minutes 04 seconds East, 105.58 feet; thence,

26.  North 34 degrees 06 minutes 36 seconds East, 31.59 feet; thence,

27.  South 57 degrees 22 minutes 56 seconds East, 26.21 feet; thence,

28.  South 75 degrees 21 minutes 33 seconds East, 37.21 feet; thence,

29.  North 86 degrees 44 minutes 04 seconds East, 81.21 feet; thence,

30.  North 68 degrees 14 minutes 31 seconds East, 40.37 feet to the intersection of the same with the southwesterly sideline of Lot 3, Block 75.01 as shown; thence,

31.  Along said southwesterly line, South 42 degrees 47 minutes 56 seconds East, 119.63 feet to the northeasterly corner of Lot 2, Block 75.01; thence,

Along the northwesterly and southwesterly lines of said Lot 2, the following two (2) courses;

32.  South 42 degrees 40 minutes 41 seconds West, 208.72 feet; thence,

33.  South 42 degrees 47 minutes 56 seconds East, 206.38 feet to a point of non-tangant curvature in the northwesterly sideline of Valley Road; thence,

Along said sideline, the following six (6) courses;

34.  Along a non-tangent curve to the left having a radius of 2894.93 feet, a central angle of 00 degrees 46 minutes 11 seconds, an arc length of 38.89 feet and a chord bearing and distance of South 42 degrees 24 minutes 09 seconds West, 38.89 feet to a point of tangency; thence,

35.  South 42 degrees 01 minutes 04 seconds West, 173.77 feet; thence,

36.  South 54 degrees 26 minutes 37 seconds West, 60.42 feet; thence,

37.  South 42 degrees 01 minutes 04 seconds West, 50.00 feet to a point of curvature; thence,

A-5

38. Along a curve to the left having a radius of 4043.00 feet, a central angle of 03 degrees 08 minutes 00 seconds and an arc length of 221.10 feet to a point of tangency; thence,

39. South 38 degrees 33 minutes 04 seconds West, 253.53 feet to a point of non-tangent curvature intersecting the northeasterly sideline of Plainfield Avenue; thence,

Along said sideline, the following seven (7) courses:

40. Along a non-tangent curve to the right having a radius of 40.00 feet, a central angle of 71 degrees 14 minutes 50 seconds, an arc length of 49.74 feet and a chord bearing and distance of South 74 degrees 30 minutes 41 seconds West, 46.60 feet to a point of reverse curvature; thence,

41. Along a curve to the left having a radius of 330.00 feet, a central angle of 67 degrees 02 minutes 54 seconds and an arc length of 386.17 feet to a point of tangency; thence,

42. South 43 degrees 05 minutes 13 seconds West, 100.61 feet to a point of curvature; thence,

43. Along a non-tangent curve to the right having a radius of 270.00 feet, a central angle of 66 degrees 20 minutes 01 seconds, an arc length of 312.59 feet and a chord bearing and distance of South 76 degrees 15 minutes 12 seconds West, 295.42 feet to a point of non-tangency; thence,

44. North 70 degrees 34 minutes 47 seconds West, 25.00 feet; thence,

45. South 19 degrees 25 minutes 13 seconds West, 5.00 feet; thence,

46. North 70 degrees 34 minutes 47 seconds West, 11.15 feet to the point or place of beginning.

Containing 607,086 square feet more or less / 13.94 acres of land more or less as described herein.

Being the same land described as Tract IV in Deed Book 4260, Page 06, recorded in the Somerset County Clerk's Office.

Subject to all existing easements, rights-of-way and reservations of record.

# LEGAL DESCRIPTION OF LOT 1 BLOCK 75.02,
## BOROUGH OF WATCHUNG
## SOMERSET COUNTY, NEW JERSEY

Beginning at the intersection of the southeasterly sideline of Plainfield Avenue (variable width right-of-way), and the northerly sideline of an existing 50-foot wide right-of-way originally known as Plainfield Avenue as shown on a certain map entitled "Map of Property, Block 4101 - Lots 2 & 5, Block 4102 - Lots 1 & 2, Block 4103 - Lots 1 & 2, Township of Berkeley Heights, Union County, New Jersey, and Block 75.01 - Lot 1, Block 75.02 - Lot 1 and Block 70.08 - Lots 1.01 & 4, Borough of Watchung, Somerset County, N.J.," dated September 15, 1989, revised to October 3, 1996, prepared by Cauger & Cassera, Consulting and Municipal Engineers, and running; thence,

1. Along said southeasterly sideline in a northeasterly direction and along a curve to the left having a radius of 531.00 feet, a central angle of 12 degrees 56 minutes 04 seconds, an arc length of 74.50 feet and a chord bearing north 49 degrees 33 minutes 15 seconds east, a chord distance of 74.34 feet to a monument at a point of curvature, thence,

2. Along the same, north 43 degrees 05 minutes 13 seconds east, 100.61 feet to a monument at a point of curvature; thence,

3. Along the same and along a curve to the right having a radius of 270.00 feet, a central angle of 34 degrees 12 minutes 51 seconds and an arc length of 161.23 feet to a point of compound curvature; thence,

4. Along the same and along a compound curve to the right having a radius of 68.00 feet, a central angle of 155 degrees 59 minutes 58 seconds and an arc length of 185.14 feet to a point of compound curvature in a northwesterly sideline of Valley Road (variable width right-of-way); thence,

5. Along said northwesterly sideline and said compound curve to the right having a radius of 730.00 feet, a central angle of 06 degrees 39 minutes 46 seconds and an arc length of 84.89 feet to a point of tangency; thence,

6. Along the same, south 59 degrees 57 minutes 27 seconds west, 71.95 feet to a point; thence,

7. Leaving said northwesterly sideline and along said northeasterly sideline of the existing 50-foot wide right-of-way originally known as Plainfield Avenue, north 89 degrees 06 minutes 33 seconds west, 183.62 feet to the point and place of beginning.

Containing 0.90 acres of land as described herein.
Subject to all easements of record.

LEGAL DESCRIPTION
OF LOT 2 BLOCK 4101,
TOWNSHIP OF BERKELEY HEIGHTS
UNION COUNTY, NEW JERSEY
AND
LOT 4 BLOCK 70.08
BOROUGH OF WATCHUNG
SOMERSET COUNTY, NEW JERSEY

Beginning at a point in the southerly sideline of Plainfield Avenue (variable width right-of-way),
where the same is intersected by a lot line common to said Lot 2 and Lot 3, Block 4101 as shown
on a certain map entitled "Map of Property, Block 4101 – Lots 2 & 5, Block 4102 – Lots 1 & 2,
Block 4103 – Lots 1 & 2, Township of Berkeley Heights, Union County, New Jersey, and Block
75.01 – Lot 1, Block 75.02 – Lot 1 and Block 70.08 – Lots 1,01 & 4, Borough of Watchung,
Somerset County, N.J.", dated September 15, 1989, revised to October 3, 1996, prepared by
Canger & Cassera, Consulting and Municipal Engineers, and running, thence;

1.  Along said common lot line, south 28 degrees 22 minutes 25 seconds west, 153.63 feet to a
    point; thence,

2.  Along the same, south 59 degrees 39 minutes 47 seconds west, 162.10 feet to a point in the
    centerline of the Green Brook, said centerline being the dividing line between the Borough
    of Watchung and the Township of Berkeley Heights; thence,

3.  Continuing along said common lot line, south 59 degrees 39 minutes 47 seconds west,
    168.56 feet to a point, thence,

4.  Along an easterly line of a Public Service Electric and Gas right-of-way, north 00 degrees
    57 minutes 07 seconds east, 275.72 feet to a point in said centerline of the Green Brook;
    thence,

5.  Continuing along said easterly right-of-way line, north 00 degrees 57 minutes 07 seconds
    east, 101.77 feet to a point; thence,

6.  Leaving said easterly right-of-way line, north 88 degrees 10 minutes 39 seconds east, 94.44
    feet to a point on a curve in said southerly sideline of Plainfield Avenue; thence,

7.  Along said southerly sideline in an easterly direction, and along a curve to the left having a
    radius of 575.00 feet, a central angle of 15 degrees 06 minutes 48 seconds, an arc length of
    151.67 feet and a chord bearing south 72 degrees 15 minutes 32 seconds east, a chord
    distance of 151.23 feet to a point of tangency; thence,

8.  Along the same, south 79 degrees 48 minutes 56 seconds east, 26.41 feet to a point of
    curvature; thence,

9.  Along the same and along a curve to the right having a radius of 365.00 feet, a central
    angle of 14 degrees 27 minutes 55 seconds, an arc length of 92.15 feet and a chord bearing
    south 72 degrees 34 minutes 57 seconds east, a chord distance of 91.91 feet to the point
    and place of beginning.

A-8

Containing a total area of 1.979 acres of which 1.534 acres are contained within said Lot 2 and
0.445 acres are contained within said Lot 4.

Subject to all easements of record.

A-9





Exhibit B
Rental Plan Showing Demised Premises



**EXHIBIT C-2**

300 Connell Drive
Berkeley Heights, New Jersey

TENANT WORKLETTER

The Connell Company (subject to Section 10.04 of the Lease, "Landlord") and Tenant are simultaneously executing a lease of the space mentioned therein (the "Demised Premises"). To induce Tenant to enter into the Lease (which is hereby incorporated by reference to the extent that the provisions of this agreement apply thereto) and in consideration of the covenants hereinafter contained, Landlord and Tenant mutually agrees as follows:

1.  [Intentionally omitted.]

2.  [Intentionally omitted.]

3.  Tenant shall cause to be prepared: (i) all interior architectural design and engineering drawings, layouts and material specifications and schedules for the Demised Premises; (ii) an estimate of the total cost of Tenant Work; (iii) all working, finished, detailed architectural and engineering construction drawings (including "as-built" drawings) and specifications for the Tenant Work and any revisions thereto (and for purposes of clarification, to the extent not encompassed by any of the foregoing, the Plans and Specifications), all to be in compliance with all applicable building codes and all other applicable laws and regulations. Except for "as-built" drawings, a copy of the foregoing shall be submitted to Landlord (prior to submission for application for construction permits) for general review and consent (which consent will not be unreasonably withheld), and Tenant shall not commence the Tenant Work until it shall have received Landlord's consent and all required construction permits. All Tenant Work will be completed in accordance with these approved drawings and specifications, but in all cases such work will be completed in accordance with all applicable building codes and all other applicable laws and regulations, all other terms set forth in this Lease (including, without limitation, those set forth in this Exhibit C-2), and all building design rules and construction rules reasonably required by Landlord. The Tenant Work shall in no event interfere with building systems or with any other tenant's use and quiet enjoyment of such tenant's leased space in the Building. Notwithstanding any failure by Landlord to object to any such Tenant Work (or drawings or specifications relating thereto, including without limitation the Plans and Specifications), Landlord shall have no responsibility therefor (and any approval of or consent to the same by Landlord shall not relieve Tenant from its obligation to construct the Tenant Work in compliance with the terms of this Lease). Tenant agrees to save and hold Landlord harmless as provided in the Lease for said Tenant Work. At the request of Landlord, Tenant shall (i) furnish, in writing, Landlord with both the estimated actual cost of the Tenant Work and the various components thereof, and (ii) instruct the various contractors to furnish, in writing, such information to Landlord. Tenant shall, at its own expense (but which cost can be included within the Tenant Work Allowance), provide Landlord with (a) one electronic set of drawings on a CD (preferably in AutoCAD) of 50% and/or 75% progress drawings, if issued, (b) three signed and sealed sets of drawings, one unsealed set of drawings and one electronic set of drawings on a CD (preferably in AutoCAD) when such drawings are issued for construction permits, (c) one unsealed set of drawings and one electronic set of drawings on a CD (preferably in AutoCAD) when such

C-2-1



Exhibit C-1
Space Plans

drawings are issued for each of (i) bid, (ii) construction and (iii) any revision or addition, and (d) one signed set and one electronic set of drawings on a CD (preferably in AutoCAD) when such drawings are as-built drawings.

Notwithstanding anything contained in this Section 3, the parties understand that with respect to the initial Tenant Work contemplated in Section 3.01 of the Lease, the design and construction thereof shall be carried out by Landlord as described in Section 3.01 of the Lease and the provisions of Section 3.01 of the Lease shall govern the preparation of such Tenant Work (and Tenant shall not be required to provide Landlord with the drawings referenced in the immediately preceding paragraph with respect to the initial Tenant Work).

4.

(a) Subject to subparagraph (b) below and the other provisions hereof, Tenant shall have the right to perform its Tenant Work, provided that the Tenant uses a first-class union general contractor. Said contractor must coordinate all final connections to any Building systems with Landlord and must use the Building maintenance subcontractors for the final connections to the Building management system, fire alarm system and security system.

(b) Tenant will obtain all permits and arrange for all inspections required for occupancy, in connection with all Tenant Work. The cost of all such permits and inspections shall be included in determining the cost of Tenant Work.

(c) Notwithstanding anything contained in this Section 4, the parties understand that with respect to the initial Tenant Work contemplated in Section 3.01 of Lease, the design and construction thereof shall be carried out by Landlord at Landlord's expense as described in Section 3.01 of the Lease.

5. The Building shall be delivered by Landlord with the following improvements as part of the base Building construction contract. The cost of any changes required by Tenant in said improvements shall be a portion of the cost of Tenant Work.

a. Electric Load/Wattage:
(i) The Building is designed for a capacity of 2.5 watts per square foot for lights and 4 watts per square foot for business machines.

(ii) Tenant will be responsible for construction and obtaining all necessary approval for all special wiring and power distribution for Tenant's equipment including but not limited to computer equipment and separate air conditioning related thereto.

b. Floor Decking:
Robertson Under-Floor Duct Systems for electrical and telephone/computers with presets at one per 6.25 square feet is provided in all Tenant areas.

c. Window Coverings:
The Building is supplied with installed thin line blinds on all exterior windows. Tenant shall not remove these blinds.

d. Sprinklers:

Sprinkler heads are provided in all Tenant areas in accordance with Code.

c. Heating, Ventilating and Air Conditioning:
The Building design provides sufficient capacity to maintain the following conditions in all occupied areas occupied for typical office occupancy: Indoor summer temperature of 75 degrees F.D.B., at an outside temperature of 94 degrees F.D.B.; Indoor winter temperatures of 72 degrees F.D.B. at outside temperature of 10 degrees F.D.B. Any special or supplemental exhaust or air conditioning required due to Tenant's equipment or abnormally high occupant density will be installed only at Tenant's expense and subject to the prior written approval of the Landlord.

6. The Tenant's interior design shall provide for at least the following Landlord minimum standards for Tenant Work and (with respect to the initial Tenant's Work) shall be provided by Landlord pursuant to Section 3.01 of the Lease:

a. Partitions:
(i) Interior partitions - Such partitions shall be 3 5/8 inch metal studs @ 24 inches o.c. with 1/2 inch gypsum wall board on each side, ceiling height.

(ii) Demising partitions - Such partitions shall be 3 5/8 inch metal studs @ 16 inches o.c. with sound-deadening insulation and 1/2 inch gypsum wallboard.

b. Doors:
All doors are to be set in 16 ga hollow metal frames.
(i) Tenant interior doors to be solid core, flush, birch stain grade.
(ii) Suite entry door(s) to be solid core, wood flush, stain grade veneer and/or glass entrance doors. The number of doors will be in accordance with Code.

c. Door Hardware:
All hardware shall be Schlage or equal. Locksets shall be keyed with the Building master system.

d. Flooring:
Carpeting shall be an 18" x 18" module over the trench headers in areas not requiring tile, due to the Building's Robertson Under-Floor Duct System. Carpet in balance of space may be at Tenant's option.

e. Painting:
(i) Walls - two coats of paint.
(ii) Doors and Frames - two coats of paint.

**EXHIBIT D**

300 Cornell Drive

Rules and Regulations

1. Landlord reserves the right to control and operate the Common Area.

2. Tenant shall not obstruct the entrances, exits, corridors, elevators and stairways of the Building and Tenant shall not use or permit their use for any purpose other than ingress to or egress from the Demised Premises. Fire exits are for emergency use only.

3. Landlord may, from time to time, adopt appropriate procedures for the security or safety of the Building and Tenant shall comply with such procedures. Landlord may refuse admission to the Building to any person not properly identified, or to any person whose presence, in Landlord's judgment, would be prejudicial to the safety, character, reputation and interests of the Building or its tenants. Landlord may limit or restrict access to the Building outside Business Hours (as herein defined) and Tenant shall comply with such off-hours procedures as Landlord may establish. Landlord shall in no way be liable to any Tenant for damages or loss arising from the admission, exclusion or ejection of any person to or from the Building or the Demised Premises.

4. Tenant shall not install awnings, shades or other coverings on or in any window of the Building or on any terrace. Tenant shall use only such window blinds as Landlord has supplied and Tenant shall not remove them. Tenant shall cooperate with Landlord in the efficient operation of the Building's air conditioning system by lowering the window blinds in the Demised Premises, as required. Tenant shall keep window sills in the Demised Premises in a neat and orderly appearance and shall not hang items from the ceilings so as to be visible from the exterior of the Building.

5. The Building "Business Hours" (hereinafter so called), excluding the cafeteria, shall be 8 AM to 6 PM on all days except weekends and Holidays. The following days shall be considered Building Holidays:

New Year's Day
Presidents' Day
Memorial Day
Fourth of July
Labor Day
Thanksgiving Day
Day after Thanksgiving
Christmas Day

Landlord reserves the right to modify the list of Building Holidays.

6. During Business Hours, Landlord shall provide, at Landlord's expense and as part of the Rent, electricity for Tenant's HVAC and Common Area usage. On weekends and Holidays, the Building will be heated or cooled for Tenant only upon special request of Tenant. If Tenant requires electricity for HVAC or Common Area usage outside Business Hours or on

D-1

7. Tenant (and Landlord as to the initial Tenant Work) shall also comply with each of the following:

(a) As of the date of this Lease, the Building is controlled by a Honeywell XL-5000 Direct Digital Control (DDC) Building Management System that allows facility personnel to monitor and control the environmental HVAC systems. Unless otherwise directed by Landlord to Tenant in writing, all mechanical systems, including, without limitation, central and supplemental heating and cooling plants, air handlers and cooling exhaust fans and VAV boxes must be networked together to optimize system operation and environmental comfort.

(b) Each of the following must be properly wired back to the Building's fire alarm panel: alarms, strobe speakers, security card readers, electronic locks to any door, HVAC systems, and any other items which building code requires to be wired to such panel or is required by the Berkeley Heights Township inspector or fire marshall. Additional/auxiliary fire suppression devices may (subject to the terms of this Lease) be installed by Tenant but must be compatible and match existing Building fire alarm panel/system manufacturer and be wired to the Building's main fire alarm panel. Final test/device function verification shall be performed and certified by the current building alarm system vendor and billed to Tenant (other than for the initial Tenant Work).

(c) The Building has a Robertson Under-Floor electrical system. No fastenings or hard connections shall be made to the trench header or to the system that exists on each floor. The bolts and steel beams must be used for the connections referenced above. Carpet tiles must be used and trench cover plates covered to allow access.

(d) No core boring through floors shall be permitted unless authorized by Landlord.

(e) All other tenant design specifications and construction rules that Landlord may from time to time furnish to Tenant.

C-24

weekends or Holidays, Landlord shall furnish same at Tenant's request and at Tenant's expense as follows. Each hour or fraction thereof shall be charged to Tenant at the rate of seventy-five dollars ($75.00) per hour for Tenant premises of 40,000 square feet or less and an additional seventy-five dollars ($75.00) per hour for each additional 40,000 rentable square feet or fraction thereof, with a minimum charge of four (4) hours. The hourly rate may be adjusted if the utility's charge to Landlord is increased. If Tenant does not notify Landlord prior to its usage of electricity as set forth in this paragraph, Landlord shall estimate Tenant's usage and shall charge Tenant accordingly.

7. Tenant shall not use or permit the use of hand trucks in the Common Area unless they are equipped with rubber tires and side guards.

8. The entrance doors to the Demised Premises shall not be left open at any time and shall be locked when Tenant is not in the Demised Premises.

9. Tenant shall not make or permit to be made any noise, including the playing of musical instruments, radio or television, which in the Landlord's judgment may disturb other tenants. Tenant shall not bring into or keep in the Demised Premises anything which may impair or interfere with any of the Building services, heating or cleaning of the Building, including, without limitation, ventilating, air conditioning, electrical or other equipment. Tenant shall not bring any dangerous, inflammable, combustible or explosive objects or materials into the Building or any Common Areas.

10. Tenant shall not permit any cooking on the Demised Premises.

11. Tenant shall not discharge or permit any acids, vapors or other materials to be discharged into the waste lines, vents or flues of the Building. Tenant shall not use the water, wash closets and other plumbing fixtures in or servicing the Demised Premises for any purpose other than that for which they were designed and constructed nor shall Tenant deposit any sweepings, rubbish, rags, acids or other foreign substances therein. Tenant shall be liable for any damage resulting from negligence or misuse by Tenant, its agents, employees, servants, permitted subtenants and assignees, contractors or subcontractors, visitors or licensees.

12. Tenant may not install or maintain any sign, advertisement or notice in or at the Real Estate or visible from the outside of the Real Estate without the prior written consent of the Landlord. If Tenant installs such sign, advertisement or notice, Landlord may remove same at Tenant's expense. Tenant may identify its business name by lettering on the entrance door to the Demised Premises pursuant to the terms of the Lease. Tenant may display its name, location and such reasonable number of the principal officers and employees of Tenant as Landlord in its sole discretion may approve in the Building directory provided by Landlord in the first-floor Lobby of the Building.

13. The Real Estate is zoned for office and research use only, pursuant to the zoning ordinances of the Township of Berkeley Heights, although Tenant is only authorized to use the premises for office use. Neither the Demised Premises, nor the Common Areas referred to in Paragraph 2.04 hereof shall be used by Tenant, any affiliates thereof or any of their respective employees, representatives, agents or servants, at any time, as a store, restaurant, shoe-shine or other stand, or for manufacturing or other similar purposes or otherwise in any manner prohibited by such zoning ordinances.

14. Tenant's requirements will be attended to upon application at Landlord's offices. Landlord's employees shall not perform any work or do anything outside their regular duties for Tenant unless under special instructions from Landlord's office and at the expense of Tenant.

15. Tenant shall be responsible for providing electricity and other utility services (excluding HVAC) for Landlord's agents, employees, representatives, servants or contractors who are performing janitorial and cleaning services or repairs or alterations to the Demised Premises.

16. Tenant's employees, representatives, agents or servants shall not loiter in and around the Parking Area, halls, stairways, elevators, entrances, roof or any other part of the Building or Common Areas.

17. Landlord shall provide periodic extermination services throughout the Building, and Tenant shall provide Landlord with access to the Demised Premises during Business Hours upon reasonable prior notice for the purpose of performing such services. If, in the sole option of the Landlord additional extermination is required in the Demised Premises, Landlord shall arrange for exterminators, at Tenant's expense.

18. Landlord shall provide, at its expense, those cleaning services set forth in the Building Janitorial Specifications during weekdays (excluding Holidays) between the hours of 6 PM and 11 PM. Upon Tenant's request, Landlord shall provide cleaning services on weekends, Holidays or at other hours, at Tenant's sole expense.

19. Tenant shall not in any way deface any part of the Building or the Demised Premises. Tenant shall not install linoleum or other similar floor covering without affixing an interlining of builder's deadening felt to the floor by paste or other water soluble material; the use of cement or similar adhesive is expressly prohibited. Tenant shall not place equipment, desks, files or other heavy objects on any trench header in the floor in the Demised Premises.

20. Tenant shall not place any additional locks or bolts on the doors of the Demised Premises nor shall Tenant change or replace any existing locks. Upon Tenant's request, new locks will be installed or changed by Landlord at Tenant's expense; any new locks will remain operable by Landlord's Master Key. Upon termination of the tenancy, Tenant shall deliver to Landlord all keys to the Demised Premises and Building which Landlord has furnished to Tenant. In the event of loss, Tenant shall pay to Landlord the cost of replacing the keys.

21. Canvassing, peddling, soliciting and distributing handbills or other written materials are prohibited in the Building.

22. Landlord may designate certain places in the Parking Area for visitor, reserved, handicapped or emergency parking.

23. Landlord may create paths, walks or other means of cross access through the Real Estate to other properties of the Landlord.

24. Tenant, its employees, agents or servants, shall not conduct itself in any manner inconsistent with the character of the Building or which will impair the comfort and convenience of other tenants in the Building.

**EXHIBIT E**

**BUILDING JANITORIAL SPECIFICATIONS**

**TENANT OFFICE AREAS**

**Daily:**   **(Monday through Friday, HOLIDAYS excepted)**

1. Remove all trash to designated area.

2. Spot clean glass areas to remove soil and smudges.

3. Clean drinking fountains.

4. Dust mop or vacuum uncarpeted areas using a large treated dust mop.

5. Remove fingermarks and smudges from doors and wall surfaces.

6. Vacuum all carpeted areas using beater bar or brush vacuum cleaner. All carpeted areas policed and all surface debris removed.

7. Dust exposed areas within hand reach with treated cloths.

8. Damp mop floor and wash counters in kitchenettes.

9. Replace trash bags in garbage cans.

**Weekly:**

1. Spot clean walls, carpeting, partitions, fixtures, and doors.

**Monthly:**

1. Wipe wastepaper baskets to remove evident soil.

**Quarterly:**

1. Dust all areas above hand-high reach with treated cloths, excluding ceilings and light fixtures.

2. Vacuum all air supply and exhaust diffusers.

**Every Six Months:**

1. Dust all blinds.

2. Wash all exterior windows, inside and outside.

E-1

**Overall:**

Tenants requiring services in excess of or more frequently than those described above or services on Holidays, weekends, or before or after the building's Business Hours shall request same through Landlord. All such services shall be provided at Tenant's expense.

**Lavatories**

Sweep and wash all lavatory floors with disinfectant nightly.

Clean mirrors, shelves, brightwork, and plumbing work nightly.

Wash and disinfect basins, bowls and urinals daily.

Empty and clean waste receptacles and fill wash dispensers with appropriate tissues, towels and soap nightly. Sanitary napkin receptacles emptied, cleaned and disinfected.

Wash and disinfect tile walls and dividing partitions weekly.

**Janitorial Closets and Storage Areas**

Clean and store Mops.

Clean sinks and drains free of mop strings an other debris.

Turn off lights and close and lock doors.

Clean equipment.

**Main Lobby, Atrium Areas, Elevators, and Corridors**

Wipe and wash all floors in main lobby nightly.

Wipe walls and vacuum elevator floor nightly.

Sweep and/or vacuum all hallway corridors stairwells, landings and handrails daily.

Remove fingermarks and smudges from doors, glass, and wall surfaces nightly.

Shampoo carpeting in public lobbies and corridors monthly and spot clean nightly to remove stains.

Clean compactor room nightly.

Wash walls in corridors and lobbies not reached in general cleaning annually.

E-2

**EXHIBIT F**

## COMMENCEMENT DATE ADDENDUM

Reference is made to the Lease dated as of September 11, 2015 (the "Lease") between The Connell Company ("Landlord") and Axtria, Inc. ("Tenant"). Pursuant to Section 2.01(j) of the Lease, Landlord and Tenant are entering into this addendum to the Lease to confirm the date of the Commencement Date under the Lease.

Landlord and Tenant hereby confirm that the Commencement Date of the Lease is _____.

The parties agree that this addendum is intended solely to confirm the date of the Commencement Date under the Lease, and this addendum shall not in any way affect or modify any of the terms of the Lease.

**THE CONNELL COMPANY**

By: _____
Name: _____
Title: _____
Date: _____

**AXTRIA, INC.**

By: _____
Name: _____
Title: _____
Date: _____





UNLEASH THE POWER
OF DECISION SCIENCE

AXTRIA
INGENIOUS INSIGHTS

# ABOUT AXTRIA

**Axtria is a big data analytics, business consulting and technology company that helps clients make better decisions, with measurable results.**

Our cloud-based software platforms support sales, marketing and risk management operations. Built on a legacy of serving clients around the globe for more than 5 years, the company's 700+ professionals deliver consulting and analytics services every day to more than 60 clients, from a network of 7 delivery centers.

Axtria works with clients across industries including Life Sciences, Healthcare, Banking & Financial Services, Retail, CPG and High Tech, with a high-touch on-site and offshore presence, leveraged by a global delivery platform.

Axtria has been ranked on the Inc.500|5000 list for the past two years. It is ranked #15 among New Jersey's 50 fastest growing companies, and is also a winner of Red Herring Top 100 North America award in the Cloud category.

## DATA AS A SERVICE



## AXTRIA INT SERVICES P

- Cloud enabled end-to-end data management
- Rapid development
- Eliminates non-core CapEx

## ANALYTICS AS

- Insights - more tl
- World class expe
- Always on

"We operate at the intersection of analytics, technology and domain expertise"
- Jassi Chadha, Co-founder and CEO, Axtria



7+      7,351%      60+

**LOCATIONS    3 YEAR GROWTH    CLIENTS**

# EVERYTHING 'AS A SERVICE'

Axtria has the domain expertise and consulting experience to support our clients with strategic thinking while embedding decision support capabilities in their organizations.

*Our integrated services platform enables "everything as a service" by managing data, process, and analytics with cloud-based, enterprise grade platforms.*

Our services span the spectrum of business planning, operations and process management, data technology enablement, and advanced analytics. Our analytical tools provide embedded analytics enabling clients to harness the true power of their data, thus providing business with relevant recommendations at the point of decision.

## BUSINESS PROCESS AS A SERVICE

### EGRATED
### LATFORM

- Tailored to your business
- Scalable & flexible
- Reduces cost

Data management is our core solution which enables Axtria to provide many of our cloud-based solutions like sales operations management, marketing management, customer operations and risk management.

Our nimble, flexible and ISO-certified processes and tools allow data and analytics teams to run at the "speed of business". Axtria's center of analytical excellence drives data scientists, analysts and consultants to create big data solutions and foster a data-driven decision culture.

### A SERVICE

n just the math
ise "on tap"



  

# AWARDS

AXTRIA
INGENIOUS INSIGHTS

# HOW ARE WE DIFFERENT?

**Vertical industry focus:** Each vertical is well represented by leaders who have several years of experience in their specific industry. Our industry experts have deep knowledge of data, processes and systems that are unique to each industry.

**Domain expertise and thought leadership:** Functional domain experts have deep functional knowledge of business operations like sales, marketing, customer and risk management.

**Global delivery model:** The global delivery teams have an optimal mix of onshore/offshore experts that work in unison to provide great customer experience and considerable value at scale.

**Pedigree of our people:** We are very proud of the quality and training of our associates. Our core management team consists of over 75 industry and domain experts. We have been able to attract excellent managers and executives from the industry. We recruit heavily from top-tier colleges in US and India. Axtria Institute is our in-house training program that provides the best training and career development in the analytics industry.

**Proprietary analytical applications:** We invest heavily on R&D and have been driving innovation in the data analytics industry. Today, our cloud-based analytical applications are being used by over 10,000 users delivering ingenious insights to business decision makers.

This combination of software-driven data analytics services and deep domain expertise is truly unique in the industry. In comparison with other providers that simply deliver people, our services are fueled by next generation analytical applications including Axtria SalesIQ™, Axtria MarketingIQ™, and Risk and Data Management software, all of which get embedded into customer's existing platforms.

***We deliver insights at the point of decision.***



📞 +1-877-9AXTRIA     info@axtria.com     www.axtria.com